# EXHIBIT A

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

E-FILED
10/15/2021 4:37 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
21CV389918
Reviewed By: L. Quach-Marcellana
Envelope: 7477487

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

VOLVO CAR GROUP;  VOLVO CAR TECHNOLOGY FUND AB; VOLVO CAR CORPORATION, a
corporation                                              (See Additional Parties Attachment)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

AIDEN AUTOMOTIVE TECHNOLOGIES, INC., a Delaware corporation

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*    SANTA CLARA SUPERIOR COURT
191 North First Street, San Jose, CA 95113

CASE NUMBER: *(Número del Caso):*
**21CV389918**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Marc Lazo, Esq. - K&L Law Group, P.C. - 2646 Dupont Drive, Suite 60340, Irvine, CA 92612 (949) 216-4000;  Masood R. Khan, Esq. - Khan Law Group, P.C., 9431 Haven Ave., Suite 100, Rancho Cucamonga, CA 91730 (626) 262-4012

DATE:                                                                                                              Clerk, by                                                                      , Deputy
*(Fecha)*   10/15/2021 4:37 PM   Clerk of Court   *(Secretario)*   L. Quach-Marcellana   *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010).)*


[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)                    ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)                    ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)              ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date)*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100  [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Aiden Automotive Technologies, Inc., v. Volvo Car Group, et al., | |

**INSTRUCTIONS FOR USE**

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff   ☑ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

VOLVO CAR TECHNOLOGY USA LLC; a California limited liability company; ZENSEACT; POLESTAR AUTOMOTIVE USA, INC., a Delaware corporation; HÅKAN SAMUELSSON, an individual; ÖDGÄRD ANDERSSON, an individual;   HENRIK GREEN, an individual;  MARIA HEMBERG, an individual;  MATS MOBERG, an individual; SANELA IBROVIC, an individual; PÄR ARVIDSSON, an individual; BOBBYKIN MAKWANA, an individual; JOAKIM ALPSTEN, and individual;  MÅRTEN LEVENSTAM, an individual;  PATRIK BENGTSSON, an individual;  DENNIS NOBELIUS, an individual , an individual DOES 1-100, inclusive,

Page _____ of _____

Page 1 of 1

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Marc Lazo, Esq - SBN 215998<br>K&L Law Group, P.C.<br>2646 Dupont Drive, Suite 60340<br>Irvine, CA 92612<br>TELEPHONE NO.: (949) 216-4000   FAX NO. *(Optional):*<br>E-MAIL ADDRESS:<br>ATTORNEY FOR *(Name):* Plaintiff | **Electronically Filed<br>by Superior Court of CA,<br>County of Santa Clara,<br>on 10/15/2021 4:37 PM<br>Reviewed By: L. Quach-Marcellana<br>Case #21CV389918<br>Envelope: 7477487** |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA**
STREET ADDRESS: 191 North First Street
MAILING ADDRESS: 191 North First Street
CITY AND ZIP CODE: San Jose, CA 95113
BRANCH NAME:

CASE NAME:  AIDEN AUTOMOTIVE TECHNOLOGIES, INC. v. VOLVO CAR GROUP, et al.,

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | CASE NUMBER: |
|---|---|---|
| [X] **Unlimited**  [ ] **Limited**<br>(Amount (Amount<br>demanded demanded is<br>exceeds $25,000) $25,000 or less) | [ ] Counter [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | 21CV389918 |
| | | JUDGE:<br><br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[X] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is [X] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [X] monetary b. [X] nonmonetary; declaratory or injunctive relief c. [X] punitive
4. Number of causes of action *(specify):* 11
5. This case [ ] is [X] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: October 15, 2021

MARC LAZO
(TYPE OR PRINT NAME)                          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev.September 1, 2021] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courts.ca.gov |

**CM-010**

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
  Damage/Wrongful Death
Uninsured Motorist (46) *(if the
  case involves an uninsured
  motorist claim subject to
  arbitration, check this item
  instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
    Wrongful Death
Product Liability *(not asbestos or
  toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice–
    Physicians & Surgeons
  Other Professional Health Care
    Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip
    and fall)
  Intentional Bodily Injury/PD/WD
    (e.g., assault, vandalism)
  Intentional Infliction of
    Emotional Distress
  Negligent Infliction of
    Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
  Practice (07)
Civil Rights (e.g., discrimination,
  false arrest) *(not civil
  harassment)* (08)
Defamation (e.g., slander, libel)
  (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
    *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease
    Contract *(not unlawful detainer
    or wrongful eviction)*
  Contract/Warranty Breach–Seller
    Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/
    Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open
  book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections
    Case
Insurance Coverage *(not provisionally
  complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
  Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent
    domain, landlord/tenant, or
    foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
  drugs, check this item; otherwise,
  report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court
    Case Matter
  Writ–Other Limited Court Case
    Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor
    Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
  *(arising from provisionally complex
  case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of
    County)
  Confession of Judgment *(non-
    domestic relations)*
  Sister State Judgment
  Administrative Agency Award
    *(not unpaid taxes)*
  Petition/Certification of Entry of
    Judgment on Unpaid Taxes
  Other Enforcement of Judgment
    Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
  above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-
    harassment)*
  Mechanics Lien
  Other Commercial Complaint
    Case *(non-tort/non-complex)*
  Other Civil Complaint
    *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
  Governance (21)
Other Petition *(not specified
  above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult
    Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late
    Claim
  Other Civil Petition

| SHORT TITLE: GEMAYEL v. SHALVOY | CASE NUMBER |
|---|---|

# CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court.**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

### Applicable Reasons for Choosing Court Filing Location (Column C)

1. Class actions must be filed in the Stanley Mosk Courthouse, Central District.
2. Permissive filing in central district.
3. Location where cause of action arose.
4. Mandatory personal injury filing in North District.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.
11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection, or personal injury).

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C**<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1, 4, 11 |
| **Other Personal Injury/ Property Damage/Wrongful Death Tort** | Asbestos (04) | ☐ A6070  Asbestos Property Damage<br>☐ A7221  Asbestos - Personal Injury/Wrongful Death | 1, 11<br>1, 11 |
| | Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1, 4, 11 |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons<br>☐ A7240  Other Professional Health Care Malpractice | 1, 4, 11<br>1, 4, 11 |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250  Premises Liability (e.g., slip and fall)<br>☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.)<br>☐ A7270  Intentional Infliction of Emotional Distress<br>☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1, 4, 11<br>1, 4, 11<br>1, 4, 11<br>1, 4, 11 |

LASC CIV 109 Rev. 12/18

For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3

Page 1 of 4

| SHORT TITLE: GEMAYEL v. SHALVOY | CASE NUMBER |
|---|---|

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C** Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Non-Personal Injury/ Property Damage/ Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☑ A6017  Legal Malpractice | 1, 2, 3 |
| | | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 1, 2, 3 |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ A6109  Labor Commissioner Appeals | 10 |
| **Contract** | Breach of Contract/ Warranty (06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1, 2, 5 |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 5, 6, 11 |
| | | ☐ A6012  Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ A6034  Collections Case-Purchased Debt (Charged Off Consumer Debt Purchased on or after January 1, 2014) | 5, 6, 11 |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1, 2, 5, 8 |
| | Other Contract (37) | ☐ A6009  Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ A6031  Tortious Interference | 1, 2, 3, 5 |
| | | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation          Number of parcels_____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2, 6 |
| | | ☐ A6032  Quiet Title | 2, 6 |
| | | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2, 6, 11 |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2, 6, 11 |

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

| SHORT TITLE: GEMAYEL v. SHALVOY | CASE NUMBER |
|---|---|

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C** Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus | 2, 8 |
| | | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2 |
| | | ☐ A6153  Writ - Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1, 2, 8 |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort<br>Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement<br>of Judgment (20) | ☐ A6141  Sister State Judgment | 2, 5, 11 |
| | | ☐ A6160  Abstract of Judgment | 2, 6 |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2, 9 |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2, 8 |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints<br>(Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only | 1, 2, 8 |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1, 2, 8 |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2, 8 |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121  Civil Harassment With Damages | 2, 3, 9 |
| | | ☐ A6123  Workplace Harassment With Damages | 2, 3, 9 |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case With Damages | 2, 3, 9 |
| | | ☐ A6190  Election Contest | 2 |
| | | ☐ A6110  Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ A6100  Other Civil Petition | 2, 9 |

**CIVIL CASE COVER SHEET ADDENDUM<br>AND STATEMENT OF LOCATION**

| SHORT TITLE: GEMAYEL v. SHALVOY | CASE NUMBER |
|---|---|

**Step 4:  Statement of Reason and Address:**  Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected.  Enter the address which is the basis for the filing location, including zip code. (No address required for class action cases).

| REASON:<br><br>☑ 1. ☑ 2. ☑ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11. | ADDRESS:<br><br>1219 Morningside Drive |
|---|---|

| CITY:<br><br>Manhattan Beach | STATE:<br><br>CA | ZIP CODE:<br><br>90266 | |

**Step 5:  Certification of Assignment:** I certify that this case is properly filed in the __Central__ District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., §392 et seq., and Local Rule 2.3(a)(1)(E)].

Dated: __October 7, 2021__

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1.  Original Complaint or Petition.

2.  If filing a Complaint, a completed Summons form for issuance by the Clerk.

3.  Civil Case Cover Sheet, Judicial Council form CM-010.

4.  Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 02/16).

5.  Payment in full of the filing fee, unless there is court order for waiver, partial or scheduled payments.

6.  A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7.  Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

LASC CIV 109 Rev. 12/18
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 4 of 4

E-FILED
10/15/2021 4:37 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
21CV389618
Reviewed By: L. Quach-Marcellana

1 MARC Y. LAZO, SBN: 215998
K&L LAW GROUP, P.C.
2 2646 Dupont Drive, Suite 60340
Irvine, California 92612
3 Phone No.:     (949) 216-4000
Fax No.:        (800) 596-0370
4
MASOOD R. KHAN, SBN: 231020
5 KHAN LAW GROUP, LC
9431 Haven Avenue, Suite 100
6 Rancho Cucamonga, CA 91730
Phone No:     (626) 262-4012
7 Fax No:       (626) 628-3275
Email:      mkhan@khanlegal.com
8 Attorneys for Plaintiff
AIDEN AUTOMOTIVE TECHNOLOGIES, INC.
9

10          **IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11              **FOR THE COUNTY OF SANTA CLARA**

| | |
|---|---|
| 12  AIDEN AUTOMOTIVE<br>TECHNOLOGIES, INC., a Delaware<br>13  corporation, | CASE NO:   21CV389618 |
| | **VERIFIED COMPLAINT FOR:** |
| 14           Plaintiff, | |
| 15  v. | **1. BREACH OF CONTRACT** |
| | **2. INDUCING BREACH OF CONTRACT** |
| 16  VOLVO CAR GROUP; VOLVO CAR<br>TECHNOLOGY FUND AB; VOLVO | **3. TORTIOUS BREACH OF THE**<br>**IMPLIED COVENANT OF GOOD** |
| 17  CAR CORPORATION, a corporation;<br>VOLVO CAR TECHNOLOGY USA | **FAITH AND FAIR DEALING** |
| 18  LLC; a California limited liability<br>company; ZENSEACT; POLESTAR | **4. UNFAIR BUSINESS PRACTICES**<br>**5. FRAUDULENT** |
| 19  AUTOMOTIVE USA, INC., a Delaware<br>corporation; HÅKAN SAMUELSSON, an | **MISREPRESENTATION**<br>**6. INTENTIONAL INTERFERENCE** |
| 20  individual; ÖDGÄRD ANDERSSON, an<br>individual;  HENRIK GREEN, an | **WITH CONTRACTUAL RELATIONS**<br>**7. NEGLIGENT INTERFERENCE WITH** |
| 21  individual; MARIA HEMBERG, an<br>individual; MATS MOBERG, an | **PROSPECTIVE ECONOMIC**<br>**RELATIONS** |
| 22  individual; SANELA IBROVIC, an<br>individual; PÄR ARVIDSSON, an | **8. VIOLATION OF THE CARTWRIGHT**<br>**ACT – BUSINESS & PROFESSIONS** |
| 23  individual; BOBBYKIN MAKWANA, an<br>individual; JOAKIM ALPSTEN, and | **CODE § 16700 _et seq._** |
| 24  individual;  MÅRTEN LEVENSTAM, an<br>individual;  PATRIK BENGTSSON, an | **9. CONVERSION**<br>**10. MISAPPROPRIATION OF** |
| 25  individual;  DENNIS NOBELIUS, an<br>individual , an individual DOES 1-100, | **INTELLECTUAL PROPERTY**<br>**11. PRELIMINARY AND PERMANENT** |
| 26  inclusive, | **INJUNCTION** |
| 27 | |
| 28           Defendants. | **DEMAND FOR JURY TRIAL** |

1

Plaintiff, AIDEN AUTOMOTIVE TECHNOLOGIES, INC., a Delaware corporation ("Plaintiff"), hereby sets forth its claims based upon knowledge, relevant documents and information and belief, and alleges as follows:

### PARTIES

1.    At all relevant times mentioned herein, Plaintiff is a Delaware corporation with its principal place of business in San Ramon, California in the County of Santa Clara.

2.    Defendant, VOLVO CAR GROUP, is, upon information and belief, a Swedish company doing business in the State of California.

3.    Defendant, VOLVO CAR TECHNOLOGY FUND AB is upon information and belief, a subsidiary of VOLVO CAR GROUP, doing business in the State of California.

4.    Defendant, VOLVO CAR CORPORATION, is, upon information and belief, a Swedish corporation doing business in the State of California.

5.    Defendant, VOLVO CAR TECHNOLOGY USA LLC, a California limited liability company is, upon information and belief, a Delaware limited liability company with its physical address located at 380 N. Pastoria Avenue, Sunnyvale, California and is conducting business in the State of California.

6.    Defendant, ZENSEACT, is, upon information and belief, a subsidiary of VOLVO CAR GROUP, doing business in the State of California.

7.    Defendant, POLESTAR AUTOMOTIVE USA, INC. ("POLESTAR"), a Delaware corporation is, upon information and belief, an affiliate of VOLVO CAR GROUP, doing business in the State of California.

8.    Plaintiff is informed and believes that at all relevant times mentioned herein, the following Defendants are individuals, who are both employees of VOLVO CAR GROUP and members of the Board of Directors of Defendant, VOLVO CAR TECHNOLOGY FUND AB.  They include as follows:  MARIA HEMBERG, Head of Group Legal & Corporate Governance; MATS MOBERG, SVP of Research & Development

//

//

2

9.     Plaintiff is informed and believes that at all relevant times mentioned herein Defendant, HÅKAN SAMUELSSON is Member of the Board of Directors and Chief Executive Officer of Defendant, VOLVO CAR GROUP.

10.     Plaintiff is informed and believes that at all relevant times mentioned herein, Defendant HENRIK GREEN is the Chief Technology Officer (CTO) of Defendant VOLVO CAR GROUP.

11.     Plaintiff is informed and believes that at all relevant times mentioned herein, Defendant SANELA IBROVIC is the VP & Head of Connected Experience of Defendant VOLVO CAR GROUP.

12.     Plaintiff is informed and believes that at all relevant times mentioned herein, Defendant, PÄR ARVIDSSON is and was Head Corporate Development & Governance of VOLVO CAR GROUP and Chairman of the Board of VOLVO CAR TECHNOLOGY FUND AB.

13.     Additionally, Plaintiff is informed and believes that at all relevant times mentioned herein Defendants, JOAKIM ALPSTEN and MÅRTEN LEVENSTAM, are or were members of the Board of Directors of Defendant, VOLVO CAR TECHNOLOGY FUND AB.

14.     Plaintiff is informed and believes that at all relevant times mentioned herein Defendant, ÖDGÄRD ANDERSSON is CEO of Defendant, ZENSEACT, the autonomous driving software development subsidiary of VOLVO CAR GROUP as well as a current member of the Board of Directors of Defendant, VOLVO CAR TECHNOLOGY FUND AB, and former Chief Digital Officer of VOLVO CAR GROUP.

15.     Plaintiff is informed and believes that at all relevant times mentioned herein Defendant BOBBYKIN MAKWANA is VP & General Manager of Defendant, VOLVO CAR TECHNOLOGY USA LLC.

16.     Plaintiff is informed and believes that at all relevant times mentioned herein Defendant PATRIK BENGTSSON is and was a Vice President of Software Development for Defendant VOLVO CAR GROUP.

17.     Plaintiff is informed and believes that at all relevant times mentioned herein Defendant DENNIS NOBELIUS is and was the Chief Operating Officer (COO) of Defendant POLESTAR AUTOMOTIVE.

VERIFIED COMPLAINT

18.     Each Defendant is collectively referred to as "Defendants" or "Volvo" or "Volvo Cars" and Plaintiff and Defendants are collectively referred to as "Parties".

19.     Plaintiff is informed and believes and thereon allege that at all times herein mentioned, each of the named or fictitiously designated defendants sued herein as Does 1 through 100, inclusive, was the agent, representative, employee, partner, associate, and joint venturer of every other defendant herein, as well as a co-conspirator, and in doing the things alleged herein, was acting within the scope of such agency, employment and/or conspiracy and took the actions taken with the permission, agreement, authority, ratification and/or consent of the defendants.  Therefore, each of such fictitiously named defendants is responsible in some manner to pay the obligations described herein and that Plaintiff's losses as herein alleged were proximately caused by defendants' acts. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained.

## JURISDICTION AND VENUE

20.     This matter is within the unlimited jurisdiction of this Court as the amount in controversy, exclusive of interest and costs, exceeds $25,000.00.

21.     Venue is proper in this Court in that the acts that form the basis of this Complaint occurred in Santa Clara County, and many of the parties hereto reside, transact business, and/or have their principal places of business in this county.

## INTRODUCTION

22.     Volvo Cars is a household name known widely for its family-friendly automobiles, safety record and pristine reputation.  It champions an ethical and principled workplace focused on five values:  Customer Success, Trust, Passion, Change and Performance.  According to Volvo's website, all of the values are geared towards how Volvo interacts "with our customers, and with society as a whole" and drives "decisions at all levels of the organization."

23.     This polished veneer, however, belies the reality of how Volvo actually treats certain employees, and how it engages in its business practices.

24.     This case is about Volvo's surreptitious and underhanded treatment of a small startup company founded by three Volvo employees who relied on Volvo's promises to deliver certain equipment, support and other deliverables in exchange for the startup developing its unique automobile

VERIFIED COMPLAINT

1    data enablement platform.  Indeed, Volvo's actions are typical of the greedy corporate conglomerate

2    that will stop at nothing to acquire technology it sees as valuable.

3           25.     The Plaintiff, AIDEN AUTOMOTIVE TECHNOLOGIES, INC. ("AIDEN"), seeks

4    damages for a litany of Defendants' actions, including fraud, unfair business practices and interference

5    with prospective economic advantage, among other wrongful acts.

6                                    **FACTUAL ALLEGATIONS**

7           26.     The Plaintiff, AIDEN AUTOMOTIVE TECHNOLOGIES INC., is a Delaware

8    corporation that was formed by its three founders, Niclas Gyllenram, Jonas Fenn and Syed Mubeen

9    Saifullah ("AIDEN FOUNDERS"), at the behest and encouragement of Volvo Cars' management.

10          27.     All three AIDEN FOUNDERS were originally full-time employees of the VOLVO

11    CAR TECHNOLOGY USA LLC a subsidiary of Volvo Cars, which is also known as Defendant,

12    VOLVO CAR GROUP, located in Silicon Valley, California; only one of the founders is still employed

13    full-time by Volvo.  Their roles within Volvo were related to developing and finding solutions to allow

14    for Volvo automobiles to expand their digital data utilization and footprint through partnerships with

15    other technology companies in Silicon Valley and elsewhere.

16          28.     In the course of their work, the AIDEN FOUNDERS, came to realize that a gap existed

17    in the automobile industry in regard to the capturing of automobile data being generated by cars and

18    data being fed back to cars in real time.  Realizing that this gap could be filled, and the solution could

19    potentially spawn a multi-billion dollar industry, the AIDEN FOUNDERS proposed to the Volvo

20    Defendants' corporate management a revolutionary and novel data enablement platform utilizing the

21    Android operating system.

22          29.     Pertinent VOLVO CAR GROUP management and certain members of the Board of

23    Defendant VOLVO CAR TECHNOLOGY FUND AB, namely Defendants BOBBYKIN

24    MAKWANA, SANELA IBROVIC, ÖDGÄRD ANDERSSON, PATRIK BENGTSSON, JOAKIM

25    ALPSTEN, PÄR ARVIDSSON, MARIA HEMBERG, MÅRTEN LEVENSTAM, and MATS

26    MOBERG, were impressed with this data enablement platform proposed by the AIDEN FOUNDERS.

27    The Volvo management and board, in October of 2020, voted unanimously that this data enablement

28    platform would be better suited as a separate spin-out entity of Volvo and would be better positioned

as a startup entity owned in part by Volvo.  Some of the internal steps toward approval of this spin-out entity, which received unanimous board of director approval in November 2020, were memorialized in an email dated March 11, 2021 with the subject line of "The Facts Surrounding Project AIDEN."  **See Exhibit 1.**

30.    Volvo and the three eventual founders of AIDEN negotiated the terms of this new entity in the form of a "Spin-Out Term Sheet" that was signed on or around November 11, 2020, set forth in **Exhibit 2**.  The new spinout was to be called "AIDEN AUTOMOTIVE TECHNOLOGIES, INC.".  Among the key terms of the term sheet was that Volvo was to own 18 percent of AIDEN. In addition, Volvo was to assign the intellectual property rights to AIDEN, and AIDEN was to develop the data enablement platform ("Data Enablement Platform") using AIDEN's own resources and raise a minimum of $500,000 in outside investment.

31.    The Spin-Out Term Sheet also specified that the AIDEN FOUNDERS were to maintain their current employment positions with Volvo, and that if AIDEN was able to raise the minimum $500,000 in outside capital, Volvo would enter into a formal acquisition agreement and provide AIDEN with equipment, office space, R&D project management support - *and most critically* - the testing environment to be able to deploy and test the data enablement platform in Volvo vehicles.

32.    AIDEN's obligations under the term sheet were to develop a minimally viable product, and a sales pipeline within 18 months after formal acquisition agreements were signed between Volvo and AIDEN. The sales pipeline would only be possible if Volvo provided the testing environment by providing vehicles to AIDEN through which AIDEN could demonstrate the functionality of the Data Enablement Platform to potential clients.

33.    Upon raising of the $500,000 of outside capital by AIDEN by December 2020, Defendants and AIDEN entered into a formal set of acquisition documents ("Acquisition Agreements") whereby Volvo would formally own the 18 percent of AIDEN's shares and would assign the Data Enablement Platform intellectual property to AIDEN as well as deliver equipment, office space, technology, all research and development needed, project management support and a testing environment for AIDEN in order to ultimately deploy a sales pipeline for AIDEN's technology

6

products. The Acquisition Agreements were signed on or around March 8, 2021 and effective by their terms on this same date.

34.     The relevant Acquisition Agreements signed by Volvo and AIDEN consist of 1) a Seed Preferred Stock Purchase Agreement; 2) a Voting Agreement; and 3) IP Assignment Agreements.

35.     From the outset of Volvo executing the Acquisition Agreements, Volvo did not intend to honor its obligations.  Instead, it became clear that Volvo induced the AIDEN FOUNDERS to enter into the Acquisition Agreements to have them raise their own capital to develop a successful minimally viable product.  Once AIDEN developed the Data Enablement Platform, Volvo intentionally began withholding its obligations to provide the necessary equipment, technology, office space, and testing environment with which AIDEN could develop its sales pipeline. Rather, Volvo's intent all along was to misappropriate AIDEN's developed product and intellectual property for its own commercialization and pecuniary benefit.

36.     The first signs of Volvo's bad faith and fraudulent intent occurred when AIDEN was informed by an employee of Defendant VOLVO CAR GROUP one day after the Acquisition Agreements were signed on or about March 8, 2021 that VOLVO would not be executing the Services Agreement, despite the Services Agreement being a condition of the Acquisition because Defendant HENRIK GREEN of the Defendant VOLVO CAR GROUP had decided so. Mr. Niclas Gyllenram of AIDEN, then repeatedly tried to contact Defendant HENRIK GREEN through emails and phone calls, and even left a message with Defendant ÖDGÄRD ANDERSSON (GREEN's Domestic Partner/Romantic Interest), in an effort to find out what concerns GREEN harbored and to find a resolution, but Gyllenram received no response.

37.     Then, to make matters worse, on April 19, 2021, the AIDEN FOUNDERS were told by Defendants, SANELA IBROVIC of VOLVO CAR GROUP, BOBBYKIN MAKWANA of VOLVO CAR TECHNOLOGY USA LLC and two other Volvo executives on a recorded video conference call that Defendant, VOLVO CAR GROUP's Chief Technology Officer, Defendant HENRIK GREEN, had decided the AIDEN FOUNDERS could not continue employment with Volvo, despite Volvo's previous agreement to allow otherwise, and that Volvo's incubation of AIDEN was no longer possible.

VERIFIED COMPLAINT

38.     To date, since the Acquisition Agreements were signed by the Parties, and despite repeated assurances, Volvo has yet to fulfill the Service Agreement and has not delivered the necessary equipment technology, project management and the testing environment necessary for Plaintiff AIDEN to fully develop its products and the sales pipeline due to Volvo's actions.

39.     Volvo's fraudulent behavior does not stop there. In an effort to hamstring Plaintiff AIDEN's ability to create a sales pipeline of potential clients, VOLVO CAR GROUP'S CTO Henrik Green, instructed Volvo's affiliates and subsidiaries to halt all collaboration with AIDEN in providing the testing environment necessary for AIDEN to test its product and develop a sales pipeline as contemplated in the Acquisition Agreements and Services Agreement for which AIDEN was expressly made a third-party beneficiary by paragraph 15 in the Services Agreements.

40.     Specifically, Defendant POLESTAR, a Volvo subsidiary and affiliate, which was on track to utilize and deploy AIDEN's technology on a test basis, suddenly informed AIDEN that they would not be interested in working further with AIDEN.  Inexplicably, demo sessions and discussions of integration of AIDEN's technology were cancelled without explanation and subsequent inquiries were met with radio silence.

41.     AIDEN later learned that VOLVO CAR GROUP'S CTO Henrik Green had given explicit instructions to POLESTAR – and other affiliates within Volvo - to not work with AIDEN in any capacity.

42.     The underlying intent of Volvo's bad faith and fraud was revealed when AIDEN learned that Volvo had started developing its own versions of a similar data enablement and data sharing platforms in direct competition with AIDEN's.  This was done by Volvo despite there being a contractual clause prohibiting Volvo from such development as a condition of the Acquisition Agreements.  Specifically, section 7.2 of the Share Purchase Agreement states:

> 7.2  *Non-Competition Agreement. For a period of two years from the date of the Closing, Purchaser and its Affiliates (as defined below) shall not operate a Competitive Business; provided, that nothing in this Section 7.2 shall prohibit Purchaser, or any of its Affiliates or successors and assigns, from (a) acquiring or owning, directly or indirectly, voting securities of any publicly traded Person, (b) conducting any business that Purchaser conducts as of the date hereof so long as it does not utilize the Transferred IP, or (c) utilizing*

*technology from any Competitive Business for purposes of its vehicle production operations. For purposes of this Section 7.2, (i) "**Competitive Business**" means any other Person engaged, directly or indirectly, in whole or in part, in the commercialization of a data enablement and/or data sharing system that communicates data to and from vehicles using the Android operating system, and (ii) "**Affiliates**" means Volvo Car AB and any Person controlled by Volvo Car AB.*

**See Exhibit 3.**

43.    Thus, it became clear that Volvo engaged in acts to intentionally and fraudulently induce AIDEN to enter into an agreement with Volvo in bad faith in an effort to shutter AIDEN's project while Volvo misappropriated the Data Enablement Platform for its own benefit. This misappropriation was intentional and coordinated to present the Data Enablement Platform as Volvo's own.  This became evident in Volvo's two press releases of June 30, 2021 (**Exhibit 7**) declaring that that their new "cloud-based features" allow developers access to "in-car features such as vehicle sensor data" and "user data" - an almost perfect description of AIDEN's Data Enablement Platform. Mr. HENRIK GREEN, the CTO for Volvo is currently a domestic partner and/or romantically involved with ÖDGÄRD ANDERSSON, who sits on the Board of Directors of VCTF and also the acting CEO of ZENSEACT, thus enabling them to keep close tabs on AIDEN's development and progress. In the words of ÖDGÄRD ANDERSSON herself in one of the June 30 press releases, *"With help from real-life data we can speed up our development processes and go from years to days."*  The Data Enablement Platform has a potential to revolutionize the auto industry and is projected to have a future worth in the billions of dollars – a fact clearly not lost on VOLVO.

44.    Volvo's intentional acts to prevent Volvo affiliates and subsidiaries from working with AIDEN were clearly designed to sabotage and prevent AIDEN from developing its product in the intended and agreed-to testing environment. Volvo's acts were intended to hamstring AIDEN's efforts to develop a sales pipeline for its products within the 18-month window as required by AIDEN under the Acquisition Agreements. Without having a testing environment and access to the appropriate team members at Volvo, AIDEN cannot develop its sales pipeline, a fact of which Volvo is well aware and has used to limit Plaintiff's progress.

45.    Volvo's actions have harmed AIDEN and are particularly egregious because AIDEN was formed at the behest and encouragement of Volvo.  Not only did the founders of AIDEN set up the

Delaware corporation at their own expense, but also, pursuant to the Spin-Out Term Sheet executed by Volvo, AIDEN has raised close to $2 million in capital through outside investors, has hired developers, and expended significant resources to develop the intended product, all in reliance on Volvo's false promises.

46.      Like the rest of the public, the AIDEN FOUNDERS believed that Volvo was a principled company with values they could trust and believe in.  Unfortunately, trusting Volvo's false image proved to be detrimental to AIDEN.  As further set below, Defendants' conduct has given rise to a myriad of claims and damages to Plaintiff.

**FIRST CAUSE OF ACTION**

**BREACH OF CONTRACT**

**(Against Defendants VOLVO CAR TECHNOLOGY FUND AB, VOLVO CAR**

**CORPORATION  and Does 1 through 10, inclusive)**

47.      Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby incorporates them by reference as though fully set forth herein.

48.      On November 11, 2020, Plaintiff and Defendants executed a "Spin-Out Term Sheet," (**Exhibit 2**) which was signed by VOLVO CAR TECHNOLOGY FUND AB, and by AIDEN.

49.      In the ensuing months, the Parties engaged in contractual negotiations, and on or about March 8, 2021, AIDEN entered into the following additional Agreements with Defendants, which were each signed by Defendant VOLVO CAR TECHNOLOGY FUND AB, and by AIDEN. Each agreement was also signed and witnessed by the AIDEN FOUNDERS.  These agreements include:

a.      the Seed Preferred Stock Purchase Agreement (**Exhibit 3**);

b.      the Voting Agreement **(Exhibit 4); and**

c.      the Intellectual Property Assignment Agreement **(Exhibit 5)**.

50.      The agreements set forth as **Exhibits 3 through 5** are collectively referred to as the "Acquisition Agreements."

51.      Additionally, the Services Agreement was entered into between Defendants VOLVO CAR TECHNOLOGY FUND AB and VOLVO CAR TECHNOLOGY USA LLC specifically and expressly for the benefit of AIDEN, as referenced in paragraph 15.  (**Exhibit 6**.)

10

52.     The terms of these Acquisition Agreements,  the Spin-Out Term Sheet, and the Services Agreement are fully incorporated herein by reference.

53.     AIDEN fully performed its obligations under the Acquisition Agreements having raised more than sufficient investor funding and having developed the Data Enablement Platform.

54.     Defendants breached their duties and obligations under the Acquisition Agreements and the Services Agreement (which was expressly contemplated to inure to the benefit of AIDEN), by, *inter alia*:

a.      withholding its obligations to provide the necessary equipment, office space, technology services, research and development support, and a testing environment, which were necessary for Plaintiff to develop its sales pipeline, which were breaches of all of the Acquisition Agreements and the Services Agreement;

b.      intentionally depriving Plaintiff of the ability to deploy and test the data enablement platform in Volvo vehicles, which was a breach of all of the Acquisition Agreements and the Services Agreement;

c.      attempting to terminate the AIDEN FOUNDERS on or about April 19, 2021, which was a breach of all of the Acquisition Agreements and the Services Agreement;

d.      instructing Defendants to halt all contractually agreed upon collaboration efforts with Plaintiff to provide the necessary resources for AIDEN to be able to test its product and develop a sales pipeline as contemplated in the Acquisition Agreements, which were also breaches of all of the Acquisition Agreements and the Services Agreement;

e.      usurping AIDEN's intellectual property and developing its own versions of a similar data enablement and data sharing platform in direct competition with Plaintiff's, which was a breach of the Acquisition Agreements and the Services Agreement; and

f.      maliciously causing Plaintiff to expend time, resources and money to make capital raises, hire labor, and expend significant resources to develop the intended product without compensating Plaintiff, under the false pretenses that Defendants would keep their end of the bargain, which was a breach of all of the Acquisition Agreements and the Services Agreement.

55.     Plaintiff was harmed in an amount to be proven at trial, including but not limited to being unlawfully deprived of the fruits of their money, labor, resources, and the infinitely valuable Intellectual Property they had worked so hard to create and develop, in addition to all the benefits and bargained-for consideration to which they were contractually entitled.

56.     Defendants' conduct was a substantial factor in causing Plaintiff's harm because the contractual breaches and ultimate unilateral termination of the business relationship would not have occurred but for the unlawful inducement described herein.

57.     As a direct, legal and proximate result of the Defendants' breach of the Acquisition Agreements, Plaintiff has suffered, and will continue to suffer substantial general and special damages, including but not limited to, loss of reputation and business relationships and loss of profits in an amount according to proof at the time of trial.

## SECOND CAUSE OF ACTION
### INDUCING BREACH OF CONTRACT
**(Against Defendants VOLVO CAR GROUP, HENRIK GREEN, POLESTAR AUTOMOTIVE USA, INC., BOBBYKIN MAKWANA, SANELA IBROVIC, and Does 1-10, inclusive)**

58.     Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby incorporates them by reference as though fully set forth herein.

59.     Pursuant to the Acquisition Agreements and Services Agreement, Plaintiff AIDEN was to collaborate with Defendant POLESTAR, a Volvo subsidiary and affiliate, and other Volvo subsidiaries and affiliates, to deploy and test AIDEN'S technology and develop its product to aid in ultimately creating a sales pipeline for the Parties' mutual benefit.

60.     However, on or about April 19, 2021 in a recorded conversation among AIDEN FOUNDERS and Defendants, BOBBYKIN MAKWANA and SANELA IBROVIC claimed that after a conversation with Defendant HENRIK GREEN, it was decided that "the incubation [of AIDEN] is no longer possible" and that Volvo would no longer honor the Acquisition Agreements or the Services Agreement.  They also told the AIDEN FOUNDERS that they could no longer work on AIDEN while being employed by Volvo.

61.     Thereafter, on or about June 4, 2021, defendant POLESTAR and other Volvo subsidiaries and affiliates - apropos of nothing - suddenly informed Mr. Gyllenram that they would not be interested in working further with AIDEN.   Inexplicably, demo sessions and discussions of integration of AIDEN'S technology were cancelled without explanation, a subsequent demo session scheduled for September 2, 2021 was also cancelled.  Mr. Hjelm of POLESTAR informed Gyllenram by phone that Dennis Nobelius, the COO of POLESTAR, was instructed by HENRIK GREEN to cease dealing with AIDEN.  Essentially, the contracting Defendants decided to unilaterally terminate the Acquisition Agreements and the Services Agreement, and cease their business relationship with Plaintiff.

62.     Plaintiff AIDEN later learned that Defendant VOLVO CAR GROUP's, Henrik Green, had given explicit instructions to POLESTAR – and ultimately the other Defendants and affiliates of Volvo - to stop working with Plaintiff in any capacity. POLESTAR was entirely complicit with this instruction, and furthered inducement of the contractual breaches by ceasing to do business with Plaintiff.

63.     Defendants were obviously aware of the Acquisition Agreements and AIDEN'S designated role to collaborate with POLESTAR and the other Defendant subsidiaries and affiliates within Volvo, and that such was integral to the development of Plaintiff's product and the ultimate success of the joint venture with Volvo.

64.     In making these explicit instructions, Defendants intended to cause POLESTAR and other Defendant subsidiaries and affiliates within Volvo to cause VOLVO CAR TECHNOLOGY FUND AB and VOLVO CAR CORPORATION to breach the Acquisition Agreements between AIDEN and Defendants, VOLVO CAR TECHNOLOGY FUND AB and VOLVO CAR CORPORATION, by essentially walking away from the entire business relationship.

65.     Plaintiff was harmed in an amount to be proven at trial, including but not limited to being unlawfully deprived of the fruits of their money, labor, resources, and the infinitely valuable Intellectual Property they had worked so hard to create and develop, in addition to all the benefits and bargained-for consideration to which they were contractually entitled.

13

VERIFIED COMPLAINT

66.     Defendants' conduct was a substantial factor in causing Plaintiff's harm because the contractual breaches and ultimate unilateral termination of the business relationship would not have occurred but for the unlawful inducement described herein.

67.     As a direct, legal and proximate result of the Defendants' breach of its contractual duties and obligations due and owing to Plaintiff, Plaintiff has suffered, and will continue to suffer substantial general and special damages, including but not limited to, loss of reputation and business relationships and loss of profits in an amount according to proof at the time of trial.

**THIRD CAUSE OF ACTION**

**TORTIOUS BREACH OF THE IMPLIED COVENANT OF**

**GOOD FAITH AND FAIR DEALING**

**(Against Defendants VOLVO CAR TECHNOLOGY FUND AB, VOLVO CAR**

**CORPORATION, and Does 1 through 10, inclusive)**

68.     Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby incorporates them by reference as though fully set forth herein.

69.     Implied in every contract, including the Agreement(s) is the covenant of good faith and fair dealing by which the contracting parties are bound. California law recognizes in every contract an implied covenant of good faith and fair dealing. The implied covenant imposes on a contracting party not only a duty to refrain from acting in a manner that frustrates performance of the contract, "but also the duty to do everything that the contract presupposes that he will do to accomplish its purpose." See *Pasadena Live v. City of Pasadena* 114 Cal.App.4th 1089, 1093 (2004).

70.     Defendant VOLVO CAR TECHNOLOGY FUND AB entered into each of the Acquisition Agreements with AIDEN, and Defendant VOLVO CAR CORPORATION entered into the Non-Disclosure Agreement with AIDEN.

71.     Plaintiff has performed all of its obligations required to be performed in accordance with the terms of the Acquisition Agreements.

72.     By failing and refusing to comply with the terms of the Acquisition Agreements, including the Non-Disclosure Agreement, as agreed, Defendants VOLVO CAR TECHNOLOGY FUND AB and VOLVO CAR CORPORATION unfairly interfered with Plaintiff's right to receive the

benefits of these agreements.  In particular, VOLVO CAR TECHNOLOGY FUND AB and VOLVO CAR CORPORATION for their own monetary gains, induced AIDEN to develop and create intellectual property at AIDEN's own cost for Defendants' ultimate benefit, including AIDEN's development of the Data Enablement Platform, which Defendants secretly intended to usurp for their own benefit and pecuniary gain.  Furthermore, Defendants promised that they would foster the development of AIDEN's technology by providing office space, Volvo vehicles with which to test and deploy AIDEN's intellectual property and the Data Enablement Platform. Ultimately, however, these inducements by Defendants for AIDEN to enter the Acquisition Agreements never occurred, which Plaintiff later learned was part of a malicious and fraudulent scheme to convert Plaintiff's Intellectual Property and products to these Defendants' own use.  Shortly after AIDEN entered into the Acquisition Agreements, it became clear that Defendants never had any intention of upholding their obligations under the Acquisition Agreements  as  they developed their own business relationships  using the intellectual property misappropriated from AIDEN for Defendants' own monetary gain, at AIDEN's expense.

73.    As a direct, legal and proximate result of Defendants' conduct, Plaintiff has suffered, and will continue to suffer substantial general and special damages, including but not limited to, loss of reputation and business relationships and loss of profits in an amount according to proof at the time of trial.

74.    Plaintiff was harmed in an amount to be proven at trial, including but not limited to being unlawfully deprived of the fruits of their money, labor, resources, and the infinitely valuable Intellectual Property they had worked so hard to create and develop, in addition to all the benefits and bargained-for consideration to which they were contractually entitled.

75.    Defendants' conduct was a substantial factor in causing Plaintiff's harm because the contractual breaches and ultimate unilateral termination of the business relationship would not have occurred but for the unlawful inducement described herein.

76.    AIDEN is informed and believes that the aforementioned conduct of Defendants VOLVO CAR TECHNOLOGY FUND AB and VOLVO CAR CORPORATION, and each of them, was carried out as part of a deliberate and systematic scheme of wrongful misappropriation, conversion

15

and misuse of AIDEN's intellectual property, products, and Data Enablement Platform. Such conduct was oppressive, fraudulent, and malicious, and subjected AIDEN to cruel and unjust hardship in a willful and conscious disregard of their rights, warranting exemplary and punitive damages pursuant to Civil Code Section 3294, for the reasons set forth herein and for at least the following reasons:

a.      It was done with the purpose and intent of subjecting AIDEN to the foreseeable risks of losing investment funds, its own monetary investment and resources expended in developing AIDEN and hiring people and being prevented from consummating the business so that AIDEN and its investors could each enjoy the fruits of their personal gains through the establishment of business relationships and sales, which Defendants usurped for their own gains, as set forth above;

b.      It was done with the purposeful and intentional design of putting Defendants' own personal interests ahead of the Plaintiff's rights and interests, at the expense of AIDEN's rights to pursue its own business and realize the fruits of its endeavors through the Acquisition Agreements and investor funding, sales and business relationships; and

c.      It was done with the purpose and intent of converting, misappropriating and/or misdirecting AIDEN's intellectual property and products, including the Data Enablement Platform, in furtherance of a willful and conscious disregard of AIDEN and the Acquisition Agreements.

## FOURTH CAUSE OF ACTION

### UNFAIR BUSINESS PRACTICES

### (BUSINESS & PROFESSIONS CODE §17200)

### (Against All Defendants and Does 1 – 50, inclusive)

77.     Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby incorporates them by reference as though fully set forth herein.

78.     California's Unfair Competition Law (the "UCL") defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code § 17200.

79.     The UCL imposes strict liability. Plaintiff need not prove that the Defendants intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices – but only that such practices occurred.

80.     A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

81.     The Defendants' actions constitute "unfair" business practices because, as alleged herein, Defendants engaged in misleading and deceptive conduct as follows:

a.     withholding its obligations to provide the necessary equipment, technology services, research and development support, office space and testing environment which were necessary for Plaintiff to develop its sales pipeline;

b.     intentionally depriving Plaintiff of the ability to deploy and test the data enablement platform in Volvo vehicles;

c.     attempting to terminate the AIDEN FOUNDERS on or about April 19, 2021;

d.     instructing Defendants to halt all contractually agreed upon collaboration efforts with Plaintiff to provide the necessary resources for AIDEN to be able to test its product and develop a sales pipeline as contemplated in the Acquisition Agreements;

e.     usurping AIDEN's intellectual property and Data Enablement Platform in developing Defendants' own versions of a similar data enablement and data sharing platform in direct competition with AIDEN in violation of the Non-Disclosure Agreement; and

f.     causing Plaintiff to expend time, resources and money to make capital raises, hire labor, and expend significant resources to develop the intended product without Plaintiff being compensated or Defendants keeping their end of the bargain.

82.     AIDEN was harmed in an amount to be proven at trial, including but not limited to being unlawfully deprived of the fruits of their money, labor, resources, and the infinitely valuable Intellectual Property they had worked so hard to create and develop, in addition to all the benefits and bargained-for consideration to which they were contractually entitled.

83.     Defendants' conduct was a substantial factor in causing AIDEN's harm because the contractual breaches and ultimate unilateral termination of the business relationship would not have occurred but for the unlawful inducement described herein.

17

84.     Based upon Defendants' fraudulent business practices, AIDEN is entitled to statutory damages, plus actual damages, court costs and attorneys' fees.

85.     The harm to AIDEN outweighs the utility of the Defendants' practices. There were reasonably available alternatives to further the Defendants' legitimate business interests other than the misleading, deceptive and fraudulent conduct against Plaintiff described herein.

86.     Pursuant to the UCL, AIDEN is entitled to preliminary and permanent injunctive relief and an order that Defendants to cease this unfair competition, as well as disgorgement and restitution to Plaintiff of all Defendants' gains associated with their unfair competition.

87.     As a direct, legal and proximate result of Defendants' conduct, Plaintiff has suffered, and will continue to suffer substantial general and special damages, including but not limited to, loss of reputation and business relationships and loss of profits in an amount according to proof at the time of trial.

**FIFTH CAUSE OF ACTION**

**FRAUDULENT MISREPRESENTATION**

**(Against All Defendants [Except ZENSEACT and POLESTAR AUTOMOTIVE USA, INC.] and Does 11 – 21, inclusive)**

88.     Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby incorporates them by reference as though fully set forth herein.

89.     Defendants made the following material false representations to Plaintiff, which are broadly acknowledged in an email from a concerned employee of the Defendants VOLVO CAR GROUP & VOLVO CAR TECHNOLOGY FUND dated March 11, 2021 to the Defendant MARIA HEMBERG.  These false misrepresentations are as follow:

a.      In October 2020, BOBBYKIN MAKWANA of Defendant VOLVO CAR TECHNOLOGY USA LLC informed Mr. Niclas Gyllenram that AIDEN FOUNDERS would continue to have their "day jobs" with Volvo, while they developed AIDEN, which decision Plaintiff is informed and believes MATS MOBERG of VOLVO CAR GROUP and VOLVO CAR TECHNOLOGY FUND AB had approved. These representations were knowingly false when made, as these Defendants at all times intended to terminate AIDEN's founders once they had taken what they needed from AIDEN.  In

18

1    fact, MAKWANA and IBROVIC informed the AIDEN FOUNDERS on or about April 19, 2021 that

2    they could no longer work for Volvo Cars, while they worked for AIDEN.

3        b.    In November 2020, Pratik Budhdev of Defendant VOLVO CAR

4    TECHNOLOGY FUND AB informed AIDEN FOUNDERS in various meetings that the AIDEN spin-

5    out was formally unanimously approved and that Volvo would unequivocally assign the Data

6    Enablement Platform intellectual property to AIDEN in order to foster development of their product

7    for the Android operating system, which could only be used in Volvo vehicles because Volvo controlled

8    this market supply.

9        c.    In or about December 2020, Budhdev also informed the AIDEN FOUNDERS

10   that Defendants VOLVO CAR GROUP, VOLVO CAR TECHNOLOGY FUND AB, VOLVO CAR

11   CORPORATION, VOLVO CARS TECHNOLOGY USA, would deliver to AIDEN, the equipment,

12   office space, technology and research and development project assistance for AIDEN to develop and

13   deploy Plaintiff's Data Enablement Platform using Volvo vehicles to develop sales, once AIDEN had

14   raised $500,000 in external investor funds.

15       d.    These representations were false because these Defendants surreptitiously

16   intended at all times to convert AIDEN's Intellectual Property for their own pecuniary benefit, which

17   was demonstrated by the following: (1) on or about April 20, 2021 when VOLVO CAR

18   TECHNOLOGY FUND's legal counsel informed AIDEN that the Services Agreement would not be

19   honored; (2) on or about June 30, 2021 Volvo Cars issued a press release that it had developed software

20   for the Android operating system platform for Volvo vehicles uncannily like that of AIDEN's; (3)  in

21   August 2021, AIDEN was informed of multiple commercializing projects using data sharing on the

22   Android platform that AIDEN had essentially developed;  (4) In August 2021, AIDEN was informed

23   by multiple Volvo employees that they were ordered not to work with AIDEN;  (5) In August 2021,

24   IBROVIC and MAKWANA send an email to about 100 employees at Volvo cautioning them not to

25   share information with AIDEN;  (6)  In August 2021, IBROVIC falsely informs her employees that

26   there were no contracts between AIDEN and Volvo and no Non-Disclosure Agreement entered;  and

27   (7)  in or about August 2021, IBROVIC falsely informs AIDEN FOUNDER Gyllenram that she

28

19

"doesn't have one second to spend on AIDEN", despite the Services Agreement expressly stating that R&D support would be provided to AIDEN by Volvo.

These representations were false, as Defendants' intent the whole time was to secretly sabotage AIDEN's efforts in order to usurp AIDEN's intellectual property to secretly develop its own data enablement platform and its own business relationships for Defendants own pecuniary benefits.

90.     And, at the time Defendants made these misrepresentations, they knew they were false, and Defendants concealed this information with the intent that Plaintiff rely on the misrepresentations.

91.     At the time of the Defendants' concealments and misrepresentations, Plaintiff was ignorant of the true facts, including Defendants' secret intention to develop its own data enabling platform using Plaintiff's intellectual property.  Plaintiff could not, in the exercise of reasonable diligence, have discovered these acts of fraud due to the Defendants' concealments and in fact did not realize the fraud until six months after the Acquisition Agreements were signed, when Defendants began to obstruct Plaintiff's attempts to deploy and test its Data Enabling Platform in Volvo vehicles, as had been agreed.  Based on Defendants' representations and Plaintiff's principals' employment with Volvo, which caused them to repose trust in the truth and accuracy of Plaintiff's representations, and that Defendants would deal with Plaintiff in good faith, Plaintiff reasonably relied on these representations.  If Plaintiff had known of the actual intent of the Defendants, Plaintiff would not have executed any of the Acquisition Agreements or expended money and resources to perform its obligations under these agreements, all of which were entered into at Defendants' bequest.

92.     Plaintiff was harmed in an amount to be proven at trial, including but not limited to being unlawfully deprived of the fruits of their money, labor, resources, and the infinitely valuable Intellectual Property they had worked so hard to create and develop, in addition to all the benefits and bargained-for consideration to which they were contractually entitled.

93.     Defendants' conduct was a substantial factor in causing Plaintiff's harm because the contractual breaches and ultimate unilateral termination of the business relationship would not have occurred but for the unlawful inducement described herein.

94.     AIDEN is also informed and believes that the aforementioned conduct of Defendants, and each of them, was carried out as part of a deliberate and systematic scheme of wrongful

misappropriation, conversion and misuse of AIDEN's intellectual property, products, and Data Enablement Platform.  Such conduct was oppressive, fraudulent, and malicious, and subjected AIDEN to cruel and unjust hardship in a willful and conscious disregard of their rights, warranting exemplary and punitive damages pursuant to Civil Code Section 3294, for the reasons set forth herein and for at least the following reasons:

a.      It was done with the purpose and intent of subjecting AIDEN to the foreseeable risks of losing investment funds, its own monetary investment and resources expended in developing AIDEN and hiring people and being prevented from consummating the business so that AIDEN and its investors could each enjoy the fruits of their personal gains through the establishment of business relationships and sales, which Defendants usurped for their own gains, as set forth above;

b.      It was done with the purposeful and intentional design of putting Defendants' own personal interests ahead of the Plaintiff's rights and interests, at the expense of AIDEN's rights to pursue its own business and realize the fruits of its endeavors through the Acquisition Agreements and investor funding, sales and business relationships; and

c.      It was done with the purpose and intent of converting, misappropriating and/or misdirecting AIDEN's intellectual property and products, including the Data Enablement Platform, in furtherance of a willful and conscious disregard of AIDEN and the Acquisition Agreements.

## SIXTH CAUSE OF ACTION

### INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

**(Against VOLVO CAR GROUP; VOLVO CAR TECHNOLOGY USA LLC; ZENSEACT; POLESTAR AUTOMOTIVE USA, INC.; HÅKAN SAMUELSSON;  ÖDGÄRD ANDERSSON;  HENRIK GREEN;  MARIA HEMBERG;  MATS MOBERG; SANELA IBROVIC; PÄR ARVIDSSON; BOBBYKIN MAKWANA, and Does 22 – 32, inclusive)**

95.      Plaintiff repeats and realleges each and every allegation above as if set forth in full herein. Wherever the incorporated allegations conflict with the allegations of this cause of action, they are alleged in the alternative.

96.      Defendants intentionally interfered with the Acquisition Agreements entered into between AIDEN and Defendants VOLVO CAR TECHNOLOGY FUND AB and VOLVO CAR

21

1    CORPORATION.

2        97.    Defendants VOLVO CAR GROUP; VOLVO CAR TECHNOLOGY USA LLC;

3    ZENSEACT; POLESTAR; HÅKAN SAMUELSSON; ÖDGÄRD ANDERSSON; HENRIK GREEN;

4    MARIA HEMBERG;  MATS MOBERG; SANELA IBROVIC; PÄR ARVIDSSON; BOBBYKIN

5    MAKWANA, knew of the Acquisition Agreements and the Services Agreement.

6        98.    Defendants intentionally obstructed AIDEN from receiving the benefits of the

7    Acquisition Agreements and the Services Agreement for which AIDEN was expressly named as a third

8    party beneficiary, when Defendant, HENRIK GREEN, fraudulently informed other Defendants,

9    including but not limited to POLESTAR, to cease working with AIDEN and cease providing Volvo

10   vehicles for AIDEN to test and deploy its Data Enablement Platform.   These aforementioned

11   Defendants, for their own monetary gains, induced AIDEN to develop and create intellectual property

12   at AIDEN's own cost for Defendants' ultimate benefit, including AIDEN's development of the Data

13   Enablement Platform, which these Defendants collectively and secretly intended to usurp for their own

14   benefit and pecuniary gain.   Furthermore, these Defendants promised that they would foster the

15   development of AIDEN's technology by providing office space, Volvo vehicles with which to test and

16   deploy AIDEN's intellectual property and the Data Enablement Platform these Defendants prevented

17   and obstructed from occurring as follows:

18            a.    On or about April 20, 2021 when VOLVO CARS's legal counsel informed

19   AIDEN that the Services Agreement would not be honored because HENRIK GREEN had decided so;

20            b.    On or about June 30, 2021 Volvo Cars issued a press release that it had

21   developed software for the Android operating system platform for Volvo vehicles uncannily like that

22   of AIDEN's;

23            c.    On or about June 4, 2021, defendant POLESTAR and other Volvo subsidiaries

24   and affiliates - apropos of nothing - suddenly informed AIDEN that they would not be interested in

25   working further with AIDEN.  Inexplicably, demo sessions and discussions of integration of AIDEN'S

26   technology were cancelled without explanation, a subsequent demo session scheduled for September

27   2, 2021 was also cancelled.  Mr. Hjelm of POLESTAR informed Gyllenram by phone that DENNIS

28

NOBELIUS, the COO of POLESTAR, was instructed by HENRIK GREEN to cease dealing with AIDEN;

       d.     In August 2021, AIDEN was informed of multiple commercializing projects using data sharing on the Android platform that AIDEN had essentially developed;

       e.     In August 2021, AIDEN was informed by multiple Volvo employees that they were ordered not to work with AIDEN;

       f.     In August 2021, IBROVIC and MAKWANA send an email to about 100 employees at Volvo cautioning them not to share information with AIDEN;

       g.     In August 2021, IBROVIC falsely informs her employees that there were no contracts between AIDEN and Volvo and no Non-Disclosure Agreement entered;  and (7)  in or about August 2021, IBROVIC falsely informs AIDEN FOUNDER Gyllenram that she "doesn't have one second to spend on AIDEN", despite the Services Agreement expressly stating that R&D support would be provided to AIDEN by Volvo.

99.    Based on the aforementioned conduct, these Defendants intended to disrupt the performance of the Acquisition Agreements.

100.    Plaintiff was harmed in an amount to be proven at trial, including but not limited to being unlawfully deprived of the fruits of their money, labor, resources, and the infinitely valuable Intellectual Property they had worked so hard to create and develop, in addition to all the benefits and bargained-for consideration to which they were contractually entitled.

101.    Defendants' conduct was a substantial factor in causing Plaintiff's harm because the contractual breaches and ultimate unilateral termination of the business relationship would not have occurred but for the unlawful inducement described herein.

102.    AIDEN is informed and believes that the aforementioned conduct of Defendants and each of them, was carried out as part of a deliberate and systematic scheme of wrongful misappropriation, conversion and misuse of AIDEN's intellectual property, products, and Data Enablement Platform.   Such conduct was oppressive, fraudulent, and malicious, and subjected AIDEN to cruel and unjust hardship in a willful and conscious disregard of their rights, warranting exemplary

1  and punitive damages pursuant to Civil Code Section 3294, for the reasons set forth herein and for at

2  least the following reasons:

3      a.  It was done with the purpose and intent of subjecting AIDEN to the foreseeable

4  risks of losing investment funds, its own monetary investment and resources expended in developing

5  AIDEN and hiring people and being prevented from consummating the business so that AIDEN and

6  its investors could each enjoy the fruits of their personal gains through the establishment of business

7  relationships and sales, which Defendants usurped for their own gains, as set forth above;

8      b.  It was done with the purposeful and intentional design of putting Defendants'

9  own personal interests ahead of the Plaintiff's rights and interests, at the expense of AIDEN's rights to

10  pursue its own business and realize the fruits of its endeavors through the Acquisition Agreements and

11  investor funding, sales and business relationships; and

12      c.  It was done with the purpose and intent of converting, misappropriating and/or

13  misdirecting AIDEN's intellectual property and products, including the Data Enablement Platform, in

14  furtherance of a willful and conscious disregard of AIDEN and the Acquisition Agreements.

15  <u>**SEVENTH CAUSE OF ACTION**</u>

16  **NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**

17  **(Against Defendants VOLVO CAR GROUP; VOLVO CAR TECHNOLOGY USA LLC;**

18  **ZENSEACT; POLESTAR AUTOMOTIVE USA, INC.; HÅKAN SAMUELSSON;  ÖDGÄRD**

19  **ANDERSSON;  HENRIK GREEN;  MARIA HEMBERG;  MATS MOBERG; SANELA**

20  **IBROVIC; PÄR ARVIDSSON; BOBBYKIN MAKWANA, and Does 22 – 32, inclusive)**

21  103.  Plaintiff repeats and realleges each and every allegation above as if set forth in full

22  herein. Wherever the incorporated allegations conflict with the allegations of this cause of action, they

23  are alleged in the alternative.

24  104.  Defendants VOLVO CAR GROUP; VOLVO CAR TECHNOLOGY USA LLC;

25  ZENSEACT; POLESTAR; HÅKAN SAMUELSSON;  ÖDGÄRD ANDERSSON;     HENRIK

26  GREEN;  MARIA HEMBERG;  MATS MOBERG; SANELA IBROVIC; PÄR ARVIDSSON;

27  BOBBYKIN MAKWANA, negligently interfered with AIDEN's economic relationship with

28  Defendants VOLVO CAR TECHNOLOGY FUND AB and VOLVO CAR CORPORATION, as set

1  forth in the Acquisition Agreements above.

2       105.    Defendants knew or should have known that the economic relationship between

3  Plaintiff, on the one hand, and Defendant VOLVO CAR TECHNOLOGY FUND AB, on the other

4  hand, would be disrupted if Defendants failed to act with reasonable care with respect to the obligations

5  set forth in the Acquisition Agreements by negligently interfering with the Acquisition when Defendant

6  HENRIK GREEN, fraudulently informed other Defendants, including but not limited to POLESTAR,

7  to cease working with AIDEN and cease providing Volvo vehicles for AIDEN to test and deploy its

8  Data Enablement Platform.  These aforementioned Defendants, for their own monetary gains, failed to

9  exercise reasonable care in inducing AIDEN to develop and create intellectual property at AIDEN's

10  own cost for Defendants' ultimate benefit, including AIDEN's development of the Data Enablement

11  Platform, which these Defendants obtained a monetary benefit.  Furthermore, these Defendants owed

12  AIDEN a duty to foster the development of AIDEN's technology by providing office space, Volvo

13  vehicles with which to test and deploy AIDEN's intellectual property and the Data Enablement

14  Platform these Defendants prevented and obstructed from occurring.

15       106.    The economic relationship between Plaintiff, on the one hand, and Defendants VOLVO

16  CAR TECHNOLOGY FUND AB and VOLVO CAR CORPORATION was disrupted such that

17  AIDEN did not receive any of the contracted benefits of the Acquisition Agreements, and AIDEN was

18  substantially harmed by Defendants' actions in an amount to be proven at trial.

19  **EIGHTH CAUSE OF ACTION**

20  **VIOLATION OF THE CARTWRIGHT ACT**

21  **(Against All Defendants and Does 1 – 50, inclusive)**

22       107.    Plaintiff re-alleges and incorporates by reference each and every paragraph above, as

23  though fully set forth in full.

24       108.    The Cartwright Act (Business & Professions Code §16700, *et seq*.) is the primary

25  California state antitrust law prohibiting anti-competitive activity.  It provides, in part, that every

26  contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce

27  among the several States, or with foreign nations, is declared to be illegal.

28       109.    Plaintiff is informed and believes that Defendants VOLVO CAR GROUP AND

25

POLESTAR have the only vehicles in the automotive industry running a full Android operating system. Thus, Defendants control the production and supply of such vehicles in the global automotive market. The agreed-upon purpose behind the creation of AIDEN was for AIDEN to quickly develop, produce and ready for immediate introduction in the marketplace AIDEN's Data Enablement Platform  because AIDEN had an 18-month lead ahead of anyone else in the automotive industry for its Android-based product. Defendants led AIDEN to reasonably believe that Defendants would provide the agreed-upon equipment, technology services, research and development support, office space and testing environment in good faith and in fulfillment of its contractual and ethical duties, particularly given the unanimous Board of Director approval for AIDEN's creation and spin-out in November 2020, and the subsequently negotiated Acquisition Agreements and Services Agreement.

110.   However, because Defendants control the production and supply of all vehicles running on a full Android operating system, Defendants were able to manipulate AIDEN into creating its unique and innovative Data Enablement Platform specifically for Defendants' benefit, thereby creating their own monopoly of this technology and Intellectual Property when they misappropriated it for their own use and usurped Plaintiff's bargained-for opportunities, in restraint of AIDEN's ability to conduct any trade, business or interstate commerce.

111.   Plaintiff is informed and believes and thereon alleges that Defendants, by and through their officers, directors, employees, agents, or other representatives and their co-conspirators have stolen their Intellectual Property and technology, particularly Plaintiff's Data Enabling Platform, and unlawfully obstructed Plaintiff's use of Defendants' equipment, office space and ability to test its products in order to solicit third parties and enter into business relationships with these third parties using Plaintiff's technology and products.  In doing so, Defendants unlawfully obstructed and restrained Plaintiff's ability to engage in fair trade and perform under the Acquisition Agreements and otherwise realize the fruits of their blood, sweat and tears.  Defendants' conduct violates Business & Professions Code §16700, *et seq*.

112.   Because Defendants unfairly and illegally prevented AIDEN from receiving the benefits of the Acquisition Agreements, there has been and will be a substantial effect on AIDEN's ability to conduct interstate commerce in that Defendants will continue to  collectively obstruct AIDEN from

being able to develop its Intellectual Property and product technology, through Defendants' continued efforts to prevent AIDEN from testing equipment and developing its products, and otherwise ceasing their business relationship in furtherance of their restraint of AIDEN's pursuit of livelihood.

113.   Plaintiff was harmed, and Defendants threaten to further harm the public interest, including Plaintiff's interest, and Defendants continue to be an unreasonable restraint of trade that is unlawful under the Cartwright Act.

114.   Plaintiff is entitled to recover its costs and reasonable attorneys' fees incurred herein, as the Cartwright Act contains a unilateral fee-shifting provision that allows an award of attorney fees to a prevailing plaintiff but not to a prevailing defendant. (§ 16750(a).) Plaintiff is further entitled to an injunction barring Defendants from further interruption of Plaintiff's business interests and preventing and restraining Defendants from engaging in the violations alleged herein as well as similar conduct in the future.

115.   Plaintiff was harmed in an amount to be proven at trial, including but not limited to being unlawfully deprived of the fruits of their money, labor, resources, and the infinitely valuable Intellectual Property they had worked so hard to create and develop, in addition to all the benefits and bargained-for consideration to which they were contractually entitled.

116.   Defendants' conduct was a substantial factor in causing Plaintiff's harm because the contractual breaches and ultimate unilateral termination of the business relationship would not have occurred but for the unlawful inducement described herein.

117.   AIDEN is informed and believes that the aforementioned conduct of Defendants, and each of them, was carried out as part of a deliberate and systematic scheme of wrongful misappropriation, conversion and misuse of AIDEN's intellectual property, products, and Data Enablement Platform in an unfair and illegal restraint of their ability to conduct business and commerce. Such conduct was oppressive, fraudulent, and malicious, and subjected the AIDEN to cruel and unjust hardship in a willful and conscious disregard of their rights, warranting exemplary and punitive damages pursuant to Civil Code Section 3294, for the reasons set forth herein and for at least the following reasons:

VERIFIED COMPLAINT

1        a.     It was done with the purpose and intent of subjecting AIDEN to the foreseeable

2  risks of losing investment funds, its own monetary investment and resources expended in developing

3  AIDEN and hiring people and being prevented from consummating the business so that AIDEN and

4  its investors could each enjoy the fruits of their personal gains through the establishment of business

5  relationships and sales, which Defendants usurped for their own gains, as set forth above;

6        b.     It was done with the purposeful and intentional design of putting Defendants'

7  own personal interests ahead of the Plaintiff's rights and interests, at the expense of the AIDEN's rights

8  to pursue its own business, conduct interstate commerce and realize the fruits of its endeavors through

9  the Acquisition Agreements and investor funding, sales and the development of business relationships;

10  and

11        c.     It was done with the purpose and intent of restraining and obstructing AIDEN'S

12  pursuit of its business and interstate commerce by Defendants' converting, misappropriating and/or

13  misdirecting AIDEN's intellectual property and products, including the Data Enablement Platform, in

14  furtherance of a willful and conscious disregard of AIDEN and the Acquisition Agreements in

15  Defendants' pursuit of their own business relationships.

### NINTH CAUSE OF ACTION

### CONVERSION

### (Against All Defendants and Does 1-50, inclusive)

118.    Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs of the Complaint as though fully set forth herein.

119.    Plaintiff is and at all times herein mentioned was, the rightful owner of all misappropriated intellectual property rights and assets as described herein, including the Data Enabling Platform, which Defendants unlawfully misappropriated and secretly converted to create their own data enabling platform after inducing AIDEN to develop its own products and then stealing the intellectual property developed by AIDEN for their unlawful use through their own  platform, which these Defendants used to develop their own business relationships for their own pecuniary benefit.

120.    Defendants intentionally, knowingly and substantially interfered with Plaintiff's rights to their own intellectual property and products by engaging in the misappropriation and tortious conduct

1  described herein and in creating Defendants' own business relationships from Plaintiff's intellectual

2  property and Data Enabling Platform.

3        121.    Plaintiff was harmed in an amount to be proven at trial, including but not limited to

4  being unlawfully deprived of the fruits of their money, labor, resources, and the infinitely valuable

5  Intellectual Property they had worked so hard to create and develop, in addition to all the benefits and

6  bargained-for consideration to which they were contractually entitled.

7        122.    Defendants' conduct was a substantial factor in causing Plaintiff's harm because the

8  contractual breaches and ultimate unilateral termination of the business relationship would not have

9  occurred but for the unlawful inducement described herein.

10        123.    AIDEN is informed and believes that the aforementioned conduct of Defendants and

11  each of them, was carried out as part of a deliberate and systematic scheme of wrongful

12  misappropriation, conversion and misuse of AIDEN's intellectual property, products, and Data

13  Enablement Platform.   Such conduct was oppressive, fraudulent, and malicious, and subjected AIDEN

14  to cruel and unjust hardship in a willful and conscious disregard of their rights, warranting exemplary

15  and punitive damages pursuant to Civil Code Section 3294, for the reasons set forth herein and for at

16  least the following reasons:

17            a.    It was done with the purpose and intent of subjecting AIDEN to the foreseeable

18  risks of losing investment funds, its own monetary investment and resources expended in developing

19  AIDEN and hiring people and being prevented from consummating the business so that AIDEN and

20  its investors could each enjoy the fruits of their personal gains through the establishment of business

21  relationships and sales, which Defendants usurped for their own gains, as set forth above;

22            b.    It was done with the purposeful and intentional design of putting Defendants'

23  own personal interests ahead of the Plaintiff's rights and interests, at the expense of AIDEN's rights to

24  pursue its own business and realize the fruits of its endeavors through the Acquisition Agreements and

25  investor funding, sales and business relationships; and

26            c.    It was done with the purpose and intent of converting, misappropriating and/or

27  misdirecting AIDEN's intellectual property and products, including the Data Enablement Platform, in

28  furtherance of a willful and conscious disregard of AIDEN and the Acquisition Agreements.

**TENTH CAUSE OF ACTION**

**MISAPPROPRIATION OF INTELLECTUAL PROPERTY**

**(Against All Defendants and Does 1-50, inclusive)**

124.    Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs of the Complaint as though fully set forth herein.

125.    AIDEN, by virtue of having been assigned the Intellectual Property set forth in the Patent Assignment Agreement (**Exhibit 5**), was  the rightful owner of the "Automotive Data Sharing Platform."

126.    By virtue of the conduct set forth above, Defendants have willfully and without authorization converted and usurped AIDEN's Intellectual Property set forth in the Patent Assignment Agreement for commercial purposes and for its own monetary benefit to AIDEN's detriment.

127.    Defendants' unauthorized conversion and usurping of AIDEN's Intellectual Property constitutes commercial misappropriation in violation of Sections 3426 and 3344 of the California Civil Code.

128.    As a direct, legal and proximate result of Defendants' conduct, Plaintiff has suffered, and will continue to suffer substantial general and special damages, including but not limited to, loss of reputation and business relationships and loss of profits in an amount according to proof at the time of trial.

129.    Defendants have further been unjustly enriched by their misappropriation of AIDEN's Intellectual Property. Accordingly, AIDEN is also entitled to restitution of all income, profits, and other benefits resulting from Defendants' conduct, in an amount to be determined according to proof at trial.

130.    AIDEN is informed and believes that the aforementioned conduct of Defendants and each of them, was carried out as part of a deliberate and systematic scheme of wrongful misappropriation, conversion and misuse of AIDEN's intellectual property, products, and Data Enablement Platform. Such conduct was oppressive, fraudulent, and malicious, and subjected AIDEN to cruel and unjust hardship in a willful and conscious disregard of their rights, warranting exemplary and punitive damages pursuant to Civil Code Section 3294, for the reasons set forth herein and for at least the following reasons:

VERIFIED COMPLAINT

a.     It was done with the purpose and intent of subjecting AIDEN to the foreseeable risks of losing investment funds, its own monetary investment and resources expended in developing AIDEN and hiring people and being prevented from consummating the business so that AIDEN and its investors could each enjoy the fruits of their personal gains through the establishment of business relationships and sales, which Defendants usurped for their own gains, as set forth above;

b.     It was done with the purposeful and intentional design of putting Defendants' own personal interests ahead of the Plaintiff's rights and interests, at the expense of AIDEN's rights to pursue its own business and realize the fruits of its endeavors through the Acquisition Agreements and investor funding, sales and business relationships; and

c.     It was done with the purpose and intent of converting, misappropriating and/or misdirecting AIDEN's intellectual property and products, including the Data Enablement Platform, in furtherance of a willful and conscious disregard of AIDEN and the Acquisition Agreements.

## ELEVENTH CAUSE OF ACTION

### PRELIMINARY AND PERMANENT INJUNCTION

### (Against All Defendants and Does 1-50, inclusive)

131.    Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs of the Complaint as though fully set forth herein.

132.    The wrongful conduct of Defendants in  misappropriating Plaintiff's Intellectual Property, including the Data Enablement Platform, and creating their own platform using that technology for their own commercial purposes, will continue to cause great and irreparable injury to AIDEN, not only because it has damaged AIDEN to the tune of several million dollars – and has deprived AIDEN's current and future investors of their bargained-for opportunities which has cost them several million dollars - but because it destroys AIDEN's very purpose and reason for existence.  As such, irreparable harm will necessarily occur if such conduct on the part of Defendants is permitted to continue.

133.    Accordingly, Plaintiff petitions this Court to issue temporary, preliminary, and permanent injunctive relief against Defendants forever enjoining such conduct.

//

VERIFIED COMPLAINT

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment against Defendants, as follows:

1.     For the First, Second, Third, Fourth, Fifth, Sixth, Eighth, Ninth and Tenth Causes of Action:  general damages, special damages, compensatory damages, and consequential damages, according to proof at trial;

2.     For the Third, Fourth, Fifth, Sixth, Eighth, Ninth and Tenth Causes of Action, and each of them:  punitive damages, according to proof at trial; For the Eighth Cause of Action:

    (a)     The Court adjudge and decree that Defendants' conduct constitutes an illegal restraint of trade and commerce in violation of the Cartwright Act;

    (b)     The Court adjudge and decree that Defendants' agreement and conspiracy to interfere with Plaintiff's business constitutes an illegal restraint of trade and commerce in violation of the Cartwright Act;

    (c)     that Defendants be permanently enjoined and restrained from establishing any similar agreement unreasonably restricting Plaintiff from establishing business relationships as contemplated in the Acquisition Agreements; and,

    (d)     Plaintiff be awarded statutory damages and attorney's fees.

3.     For the Eleventh Cause of Action: For an immediate preliminary and permanent injunction forever enjoining the use of Plaintiff's Intellectual Property, including the Data Enablement Platform, for any purpose.

**AS TO ALL CAUSES OF ACTION**

4.     For costs of suit herein;

5.     For such other and further relief as the Court deems necessary.

Dated:   October 15, 2021                     K&L LAW GROUP, P.C.

 

 

                                     Marc Laze
Attorneys for Plaintiff AIDEN AUTOMOTIVE
TECHNOLOGIES, INC.

VERIFIED COMPLAINT

<u>**VERIFICATION**</u>

**STATE OF CALIFORNIA**
**COUNTY OF SANTA CLARA**

I, SYED SAIFULLAH, have read the foregoing **VERIFIED COMPLAINT** and know its contents.

☐     I am a party to this action.  The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☒     I am ☒ an Officer ☐ a partner of **AIDEN AUTOMOTIVE TECHNOLOGIES, INC., a Delaware corporation,** a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason.

        ☐     I am informed and believe, and on that ground allege that the matters stated in the foregoing document are true.

        ☐     The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☐     I am one of the attorneys for _____ a party to this action.  Such party is absent from the county of aforesaid where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason.  I am informed and believe, and on that ground allege that the matters stated in the foregoing document are true.

Executed on October _15_, 2021, at _____, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.


SYED SAIFULLAH
_____          _____
Type or Print Name                                     Signature

33

VERIFIED COMPLAINT

# EXHIBIT 1

**Subject:**  The Facts Surrounding Project Aiden

**Date:**   Thursday, 11 March 2021 at 01:11:50 Central European Standard Time

**From:**   Millien, Raymond

**To:**    Hemberg, Maria

**BCC:**    Andersson, Emma (PX), Lai, Sharon (A), Budhdev, Pratik, Arvidsson, Pär

**Attachments:** Exh A.pdf, Exh B.pdf

Maria,

I think categorizing the Project Aiden transaction as something "fishy" going on in Silicon Valley mixes apples and oranges.  This has nothing to do with HG's "clean up" of the SV office.  To the contrary, at all times, all the relevant stakeholders in VCTF, Tax, PX, and R&D were fully aware of the transaction and its details, and were fully supportive of it as a "pilot" exercise. The conduct of the VCTF has been fully transparent, ethical, and above board.

To be more clear, the **facts** are as follows:

1.  On or about 18 Aug 2020, the first meeting about Project Aiden is held with **Ödgärd Andersson, Patrik Bengtsson, Sanela Ibrovic, Bobbykin Makwana** and the three Aiden Co-Founders: **Syed Mubeen Saifullah, Niclas Gyllenram, and Jonas Fenn.** It was suggested that Niclas follow up with **Martin Kristensson** to solicit feedback on the idea of a spin-out and if this makes sense.

2. On 24 Sep. 2020, the VCTF Board decided in a meeting that if R&D approved any spin-outs that VCTF could potentially invest and instructed **Ray** to find a way to make it work under the existing VCTF and VCC legal structures and corporate policies.

3. On or about Sep 25, 2020, a follow-up meeting took place with **Patrik Bengtsson, Martin Kristensson, Jonas Ronnkvist, Sanela Ibrovic, Bobbykin Makwana, Ödgärd Andersson, Alena Lshkova, and Aiden Co-Founders**. It was concluded that VCTF should investigate a spin-out so other OEMs would adopt the tech and if/how VCTech in Sunnyvale can conduct an internal PoC of the idea.

4. On 1 Oct. 2020, Ray had a meeting with **Monika Almen** (Global Tax Director) and **Johan Jedeur-Palmgren** (PX Göteborg, Global Comp & Benefits) and got approval to move forward with the Aiden transaction as proposed when R&D approved.

5.  On 2 Oct. 2020, Ray had a meeting with **Allyse Scelfo** (PX, Total Rewards, Volvo Cars USA) and got approval to move forward with the transaction if R&D approved.

6. On 2 Oct. 2020, Ray followed up his meeting with **Allyse**, summarized their conversation and shared the written opinion from outside California Employment Counsel (Reed Smith LLP) raising no "red flags" about the proposed transaction.

7.  On 5 Oct. 2020, **Allyse** confirmed in an email that she saw no issues with the proposed transaction.

8. On 7 Oct. 2020, Ray asked the VCTF to formally approve the proposed transaction where the three Aiden founders would keep their "day jobs." This was done via an email to: **Joakim Alpsten Ödgärd Andersson, Pär Arvidsson, Maria Hemberg, Mårten Levenstam, and Mats Moberg.** <u>See Exhibit A.</u>

9.  On 8 Oct. 2020, **Pär Arvidsson** and **Bobbykin** had a discussion where Bobbykin expressed concerns about the timing of a spin-out. From his perspective, it would have made more sense to spend some additional time (e.g., 1-3 months) to create a proof of concept before spinning this out.

10. On or about 21 Oct 2020, **Patrik Bengtsson** (VP, SW) sent an email to **Mats Moberg**

informing him that both his and **Bobbykin Makwana** recommend spinning project Aiden out of Volvo as there were no resources available with the right capabilities and experience to perform a PoC study **Mats Moberg** replied and agreed.

11.  On or about 22 Oct. 2020, **Bobbykin** informed **Niclas** of the decision from Mats Moberg to spin out Aiden.

12.  On 28 Oct. 2020, **Pär Arvidsson** informed the VCTF Board that after discussions with R&D it was concluded that there were no resources available with the right capabilities and experience to perform a PoC study, and **Mats, Patrik Bengtsson and Bobbykin** agreed the spin-out as Ray proposed was the best way forward.

13.  On 29 Oct. 2020, Pär Arvidsson as the chair of the VCTF Board tallied all the (unanimous) votes and gave Ray permission to move forward via email.

14.  On Nov. 4, 2020, after the email vote, **Daniel Karlson** (Legal Counsel for VCTF) prepared official board minutes to confirm the email vote to approve the transaction.

15.  On 12 Nov 2020, VCTF and Aiden signed the Term Sheet. (**Niclas** then made **Bobbykin** aware of this during his regular 1:1 meeting. And, since then, Niclas has continuously kept Bobbykin updated of Aiden's progress in their  regular 1:1 meetings which are scheduled bi-weekly.

16.  From 4 Nov. 2020 to 22 Dec. 2020, each board member (**Joakim Alpsten Ödgärd Andersson, Pär Arvidsson, Maria Hemberg, Mårten Levenstam, and Mats Moberg**) signed the official meeting minutes as shown in <u>Exhibit B</u> approving the transaction.

17.  On 8 Jan 2021, **Niclas** and **Bobbykin** have a 1:1. Niclas explained that Aiden has raised the required funds and will initiate work. Niclas updates Bobbykin on the work that three Aiden Co-Founders have been doing. During this meeting Bobbykin expressed concern that he would have to back-fill positions for the founders. Niclas proposed a 5-month lead time before any Aiden Co-Founder would departs Volvo Cars. Bobbykin agreed.

Given the above, VCC at all times concluded the Aiden idea was not something we were **not** willing to fund and pursue.  By agreeing to the spin-out we also waived any conflict-of-interests claims against the founders. Thus, not honoring our agreement with Aiden at this point obviously raises significant legal risks for VCTech, VCTF and VCC.

I personally think the "noise" surrounding this transaction is the result of certain parties never expecting the VCTF to figure out how to do this transaction and never expecting that the three founders would be successful in raising US$750k based on a single patent application filed by the VCC IP Dept.

I am happy to discuss this live with anyone who feels otherwise.

Kind regards / Med vänlig hälsning / 美好的祝福

**Raymond Millien**
Chief IP Officer & MD of Volvo Cars Tech Fund
**VOLVO CAR GROUP**
+46.72.888.8687

---

**From:** Maria Hemberg <maria.hemberg@volvocars.com>
**Date:** Wednesday, 10 March 2021 at 20:35
**To:** Raymond Millien <raymond.millien@volvocars.com>
**Subject:** Fwd: NG

I really need your support to get the fact right here.

# EXHIBIT 2

DocuSign Envelope ID: 8FDE0A36-C87D-43BD-8517-EEF3F128A956

**V O L V O**

Raymond Millien
Managing Director
+46.72.888.8687
raymond.millien@volvocars.com

## SPIN-OUT TERM SHEET

*This Term Sheet is intended for discussion purposes only and causes no obligation of any party to enter into any transaction.*

### BACKGROUND

A. The Founders (defined below), as employees of Volvo Cars Technology USA LLC ("VC Tech"), have invented an automotive data sharing platform known as "Project AIDEN" as described in <u>Exhibit A</u>.

B. It was agreed by the management of VC Tech and that of its corporate parent Volvo Cars Corp. ("VCC"), that Project AIDEN was not within the current technology roadmap of the company and that there are no existing resources available with the right capabilities and experience to perform a proof of concept study on the relevant technology.

C. VC Tech and VCC have agreed to allow the employees to spin out Project AIDEN into a new startup company, with Volvo Cars Technology Fund AB – its corporate venture capital arm – holding a minority share of such startup company and entering into agreements in relation thereto, all on the principle terms and conditions as summarized herein.

| | |
|---|---|
| **Entity:** | A newly-formed, USA-based company ("**NewCo**"). |
| **Parties:** | • Volvo Car Technology Fund AB ("**VCTF**") |
| | • Current Volvo Cars US R&D Center employees Syed Mubeen Saifullah, Niclas Gyllenram, and Jonas Fenn (collectively, "**Founders**") |
| **Transaction:** | The outline of this transaction is attached as <u>Exhibit B</u> |
| **NewCo Purpose/Operations:** | Research, develop, test, and commercialize the Automotive Intelligent Data Enablement SaaS ("**Project AIDEN**") intellectual property developed by Founders during their employment. |

---

**VOLVO CAR TECHNOLOGY FUND AB**
SE-405 31 Göteborg
Sweden
volvocars.com

Registered Office Göteborg | Sweden
Registration No. 556887-5760

| | |
|---|---|
| **Agreements:** | • Formation and investor documents for NewCo.<br>• *Service Agreement* between VCTF and NewCo for providing incubations services for one year, to include:<br>   o Office Space and Desk Area<br>   o After-hours big and mini rig access<br>   o After-hours car access<br>   o IT-related services |
| **Founder's Obligations:**[1] | 1. Raise no less than US$500,000 in capital from additional third-party investors identified and closed by Founders ("**Investors**") (with VCTF approval) within 120 days of execution of this Term Sheet (the "**Initial Capitalization**")<br>2. Completion and delivery to VCTF of an acceptable business plan<br>3. Promote and found NewCo<br>4. Only "after-hours" work at NewCo<br>5. Grant of Tag-along/drag-along rights to VCTF |
| **VCTF Obligations Post Initial Capitalization:** | 1. Produce first draft of definitive agreements for NewCo's lawyers to review<br>2. Assign US Prov. Patent entitled "Automotive Data Sharing Platform," Atty. Docket No. P2896US00, filed on 14 Aug. 2020 (the "Provisional Patent Application") to "seed" NewCo<br>3. Assign AIDEN and SIGNALHUB trademarks, logos and domain names<br>4. Procure the release from the IP provisions of Founder's employment agreements<br>5. Procure the continued at-will employment of Founders[2]<br>6. Performance of *Service Agreement* |
| **NewCo Obligations:** | 1. Granting of Board observer rights to VCTF[3]. If NewCo is unable to meet any of the Founders Obligations or NewCo Obligations (other than Initial Capitalization) then VCTF shall be entitled to a voting Board seat.<br>2. Grant of covenant-not-to-sue to VCTF and affiliates (does NOT include Geely) to all its patent assets<br>3. MVP[4] within 12 months of signing the definitive agreements |

---

[1]    Failure to meet any of these obligations (other than the Initial Capitalization) shall allow VCTF to demand, *inter alia*, more frequent reporting requirements and pre-approval of NewCo's extraordinary expenses (e.g., greater than US$10K).

[2]    Note that this Term Sheet shall not be construed as an employment contract (or amendment thereto) and does not give Founders any right to continued employment by Volvo Car Group nor any additional employee benefits. Rather, Founders will be expected to continue the performance of their "day jobs" to the satisfaction of their current, respective managers.

[3]    Subject to input and approval from VCC Tax Dept.

[4]    MVP = NewCo should ship a working prototype of a product that can be deployed in a testing environment to an early-adopter customer to get feedback/early results and constantly iterate the product from thereon.

4. Demonstration of sales and/or partnership pipeline within 18 months of signing the definitive agreements to the satisfaction of VCTF
5. Submission of monthly and quarterly financial reports for the first 24 months of signing the definitive agreements with basic P&L and cash flow items

**Equity:**

- 18% as preferred equity to VCTF paid for in US$110,000 worth of IP and in-kind services via *Service Agreement*
- 82% to Founders/Investors with Initial Capitalization

**Dilution:**

In the event the NewCo enters into any arrangement with Investors – after the Initial Capitalization – where monies or other equity or non-equity consideration are payable to the Investors in consideration of such capital, such payments or other dilution will come equally from the parties; provided, however, in no case shall VCTF's interest equal less than 5% of the NewCo for the first US$10M of outside capital raised by NewCo. VCTF shall have full flexibility to exit complete or part of the investment at any time after the Initial Capitalization.

**Non-compete**

VCTF and its affiliates within the Volvo Car Group (but not including its portfolio companies) shall not compete with NewCo in the field(s) described in the Provisional Patent Application for 2 years from effective date of closing.

**Non-solicitation**

NewCo shall not solicit any employees or contractors of VCTF and its affiliates for a period of two years from the effective date of closing

**Representations/ Warranties:**

Ordinary and customary representations and warranties to be granted by NewCo and the Founders

**Disputes:**

Any and all disputes shall be resolved by expedited binding arbitration in the English language in San Francisco, CA before a single neutral arbitrator chosen by AAA and using California law

**Costs:**

Each party shall bear its own costs in forming the NewCo and related agreements

**Closing:**

Promptly following the execution of a Term Sheet, the parties will undertake to complete their respective due diligence and to prepare, negotiate and execute definitive transaction documents to implement its terms within 90 days of execution.

Until the closing, each party shall continue normal business operations, and obtain applicable board and shareholder/member approval to undertake the transaction contemplated herewith, and amend any corporate documentation necessary to reflect the terms of this Term Sheet.

| | |
|---|---|
| **Confidentiality:** | During the period between the date hereof and the closing, neither party shall furnish, or authorize any agent or representative to furnish, any information concerning this Term Sheet to any person or entity without the prior written consent of the other party |
| **Publicity:** | There shall be no publicity with respect to any aspects of this transaction, including contemplation or the closing of such transaction, without written approval of VCTF (which approval shall be deemed granted for potential Investors) |

Except for the paragraph above pertaining to confidentiality, the terms set forth in this Term Sheet are intended only to describe our mutual present intentions as reflected in our conversations regarding the proposed transaction and are not intended to create any binding obligations on the part of each of the parties, or to be construed as an agreement to enter into any binding agreements or consummate the proposed transaction. No such obligations shall arise unless and until each party shall have conducted business and legal diligence to its satisfaction and there shall have been prepared, executed and delivered definitive agreements setting forth such terms and such additional understanding as the parties may develop in the course of their negotiations leading up to such agreements.

*[SIGNATURE PAGE FOLLOWS]*

**VOLVO CAR TECHNOLOGY FUND AB:**

By: _____
Signature

**Pär Arvidsson**
Chairman of the Board
november 12, 2020
_____
Date

By: _____
Signature

**Raymond Millien**
Managing Director
November 12, 2020
_____
Date

**FOUNDERS:**

By: _____
Signature

**Syed Mubeen Saifullah**
11 November 2020
_____
Date

By: _____
Signature

**Niclas Gyllenram**
11 November 2020
_____
Date

By: _____
Signature

**Jonas Fenn**
Nov 11, 2020
_____
Date

# EXHIBIT 3

EXECUTION VERSION

**SEED PREFERRED STOCK PURCHASE AGREEMENT**

## SEED PREFERRED STOCK PURCHASE AGREEMENT

**THIS SEED PREFERRED STOCK PURCHASE AGREEMENT** (this "**Agreement**") is made as of the 8th day of March, 2021 by and among Aiden Automotive Technologies, Inc., a Delaware corporation (the "**Company**"), Volvo Car Technology Fund AB, reg. no. 556877-5760, a Sweden private limited liability company ("**Purchaser**") and the persons listed as "Founders" on the signature pages to this Agreement (each a "**Founder**" and together the "**Founders**").

The parties hereby agree as follows:

1. <u>Purchase and Sale of Seed Preferred Stock</u>.

    1.1 <u>Sale and Issuance of Seed Preferred Stock</u>.

        (a) The Company shall adopt and file with the Secretary of State of the State of Delaware on or before the Closing (as defined below) the Amended and Restated Certificate of Incorporation of the Company in the form of <u>Exhibit B</u> hereto (the "**Restated Certificate**").

        (b) Subject to the terms and conditions of this Agreement, Purchaser agrees to purchase, and the Company agrees to sell and issue to Purchaser, at the Closing, that number of shares of the Company's Seed Convertible Preferred Stock, par value $0.00001 per share (the "**Preferred Stock**") set forth opposite Purchaser's name on <u>Exhibit A</u> hereto, for a deemed purchase price of $0.11 per share of Preferred Stock which shall be paid-in-kind and shall consist of the Transferred IP and the Services Agreement (the "**Purchase Price**"). The shares of Preferred Stock issued to Purchaser pursuant to this Agreement shall be referred to herein as the "**Shares**."

    1.2 <u>Closing; Delivery</u>. The purchase and sale of the Shares shall take place remotely via the exchange of documents and signatures on the date hereof (which time and place are designated as the "**Closing**"). At the Closing, the Company shall deliver to Purchaser a Carta electronic certificate representing the Shares.

    1.3 <u>Use of Proceeds</u>. In accordance with the directions of the Company's Board of Directors (the "**Board**"), as it shall be constituted in accordance with the Voting Agreement, the Company will use the proceeds from the sale of the Shares to expand the Company's team, accelerate product development, fund the Company's working capital requirements and for other general corporate purposes.

    1.4 <u>Defined Terms Used in this Agreement</u>. In addition to the terms defined above, the following terms used in this Agreement shall be construed to have the meanings set forth or referenced below.

        (a) "**Affiliate**" means, when used with respect to any specified Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with the Person specified, where "**control**" means the possession, directly or indirectly,

by agreement or otherwise, of at least 50% of the voting stock, partnership interest or other ownership interest, or the power (a) to appoint or remove a majority of the board of directors or other governing body of such Person, or (b) to cause the direction of the management of such Person.

(b)  "**Code**" means the Internal Revenue Code of 1986, as amended.

(c)  "**Company Covered Person**" means, with respect to the Company as an "issuer" for purposes of Rule 506 promulgated under the Securities Act, any Person listed in the first paragraph of Rule 506(d)(1).

(d)  "**IP Assignment**" means the intellectual property assignment between Purchaser and the Company, dated as of the date of the Closing, assigning to the Company the Transferred IP, in a form satisfactory to the Company and Purchaser.

(e)  "**Investor Rights Agreement**" means the agreement among the Company, Purchaser and the Founders, dated as of the date of the Closing, in a form satisfactory to the Company and Purchaser.

(f)  "**Key Employee**" means any Founder, as well as any employee or consultant who either alone or in concert with others develops, invents, programs or designs any Company Intellectual Property.

(g)  "**Knowledge**" including the phrase "**to the Company's Knowledge**" shall mean the actual knowledge after reasonable investigation of the Founders.

(h)  "**Material Adverse Effect**" means a material adverse effect on the business, assets (including intangible assets), liabilities, financial condition, property or results of operations of the Company.

(i)  "**Person**" means any individual, corporation, partnership, trust, limited liability company, association or other entity.

(j)  "**Right of First Refusal and Co-Sale Agreement**" means the agreement among the Company, Purchaser and certain other stockholders of the Company, dated as of the date of the Closing, in a form satisfactory to the Company and Purchaser.

(k)  "**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

(l)  "**Services Agreement**" means the services agreement between Volvo Car Technology USA and the Company, in a form satisfactory to the Company and Purchaser.

(m)  "**Transaction Agreements**" means this Agreement, the Investor Rights Agreement, the Right of First Refusal and Co-Sale Agreement, the Voting Agreement, the Restated Certificate, the Services Agreement, the IP Assignment and the other documents and certificates executed in connection therewith.

(n)     "**Transferred IP**" means (i) the United States Provisional Patent Application entitled "Automotive Data Sharing Platform, "Atty. Docket No. P2896US00 and any improvements thereon, and (ii) the AIDEN and SIGNALHUB unregistered trademarks.

(o)     "**Voting Agreement**" means the agreement among the Company, Purchaser and certain other stockholders of the Company, dated as of the date of the Closing, in a form satisfactory to the Company and Purchaser.

2.     <u>Representations and Warranties of the Company</u>. The Company represents and warrants to Purchaser that, except as set forth on the Disclosure Schedule attached as <u>Exhibit C</u> to this Agreement, which exceptions shall be deemed to be part of the representations and warranties made hereunder, the following representations are true and complete as of the date of each Closing, except as otherwise indicated.

2.1     <u>Organization, Good Standing, Corporate Power and Qualification</u>. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as presently conducted and as proposed to be conducted. The Company is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a Material Adverse Effect.

2.2     <u>Capitalization</u>.

(a)     The authorized capital of the Company consists, immediately prior to the Closing, of:

(i)     100,000,000 shares of common stock, par value $0.00001 per share, ("**Common Stock**"), 4,100,000 shares of which are issued and outstanding. All of the outstanding shares of Common Stock have been duly authorized, are fully paid and nonassessable and were issued in compliance with all applicable federal and state securities laws. The Company holds no Common Stock in its treasury.

(ii)     10,000,000 shares of preferred stock, par value $0.00001 per share, none of which are issued and outstanding. The rights, privileges and preferences of the Preferred Stock are as stated in the Restated Certificate and as provided by the Delaware General Corporation Law. The Company holds no Preferred Stock in its treasury.

(b)     Section 2.2(b) of the Disclosure Schedule sets forth the capitalization of the Company immediately following the Closing, including the number of shares of the following: (i) issued and outstanding Common Stock and Preferred Stock and (ii) shares of Common Stock reserved for future award grants.. Except for (A) the conversion privileges of the Shares to be issued under this Agreement, (B) the rights provided in <u>Section 3</u> of the Investor Rights Agreement and (C) the securities and rights described in <u>Section 2.2(c)</u> of the Disclosure Schedule, there are no outstanding options, warrants, rights (including conversion or preemptive rights and rights of first refusal or similar rights) or agreements, orally or in writing, to purchase or acquire from the Company any shares of capital stock of the Company, or any securities convertible into or exchangeable for shares of capital stock of the Company.

(c)     None of the Company's stock purchase agreements or stock option documents contains a provision for acceleration of vesting (or lapse of a repurchase right) or other changes in the vesting provisions or other terms of such agreement or understanding upon the occurrence of any event or combination of events, including without limitation in the case where the Stock Plan is not assumed in an acquisition. The Company has no obligation (contingent or otherwise) to purchase or redeem any of its capital stock.

(d)     <u>409A</u>. The Company believes in good faith that any "nonqualified deferred compensation plan" (as such term is defined under Section 409A(d)(1) of the Code and the guidance thereunder) under which the Company makes, is obligated to make or promises to make, payments (each, a "**409A Plan**") complies in all material respects, in both form and operation, with the requirements of Section 409A of the Code and the guidance thereunder. To the Company's Knowledge, no payment to be made under any 409A Plan is, or will be, subject to the penalties of Section 409A(a)(1) of the Code.

(e)     The Company has obtained valid waivers of any rights by other parties to purchase any of the Shares covered by this Agreement.

2.3     <u>Subsidiaries</u>. The Company does not currently own or control, directly or indirectly, any interest in any other corporation, partnership, trust, joint venture, limited liability company, association, or other business entity. The Company is not a participant in any joint venture, partnership or similar arrangement.

2.4     <u>Authorization</u>. All corporate action required to be taken by the Board and stockholders in order to authorize the Company to enter into the Transaction Agreements, and to issue the Shares at the Closing and the Common Stock issuable upon conversion of the Shares, has been taken or will be taken prior to the Closing. All action on the part of the officers of the Company necessary for the execution and delivery of the Transaction Agreements, the performance of all obligations of the Company under the Transaction Agreements to be performed as of the Closing, and the issuance and delivery of the Shares has been taken or will be taken prior to the Closing. The Transaction Agreements, when executed and delivered by the Company, shall constitute valid and legally binding obligations of the Company, enforceable against the Company in accordance with their respective terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies, or (iii) to the extent the indemnification provisions contained in the Investor Rights Agreement may be limited by applicable federal or state securities laws.

2.5     <u>Valid Issuance of Shares</u>

(a)     The Shares, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement, will be validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Right of First Refusal and Co-Sale Agreement, applicable state and federal securities laws and liens or encumbrances created by or imposed by Purchaser. Assuming the accuracy of the representations of Purchaser in <u>Section 3</u> of this Agreement and subject to the filings described

in Section 2.6(b)(ii) below, the Shares will be issued in compliance with all applicable federal and state securities laws. The Common Stock issuable upon conversion of the Shares has been duly reserved for issuance, and upon issuance in accordance with the terms of the Restated Certificate, will be validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Transaction Agreements, applicable federal and state securities laws and liens or encumbrances created by or imposed by Purchaser. Based in part upon the representations of Purchaser in Section 3 of this Agreement, and subject to Section 2.5(b) below, the Common Stock issuable upon conversion of the Shares will be issued in compliance with all applicable federal and state securities laws.

(b)     No "bad actor" disqualifying event described in Rule 506(d)(1)(i)-(viii) of the Securities Act (a "**Disqualification Event**") is applicable to the Company or, to the Company's knowledge, any Company Covered Person, except for a Disqualification Event as to which Rule 506(d)(2)(ii–iv) or (d)(3), is applicable.·

2.6     Governmental Consents and Filings. Assuming the accuracy of the representations made by Purchaser in Section 3 of this Agreement, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority is required on the part of the Company in connection with the consummation of the transactions contemplated by this Agreement, except for (i) the filing of the Restated Certificate, which will have been filed as of the Closing, and (ii) filings pursuant to Regulation D of the Securities Act, and applicable state securities laws, which have been made or will be made.

2.7     Litigation. Except as described in Section 2.7 of the Disclosure Schedule, (i) there is no claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending or to the Company's Knowledge, currently threatened in writing (x) against the Company, any Founder, or any officer or director of the Company arising out of their employment or board relationship with the Company or Affiliates of Purchaser; (y) that questions the validity of the Transaction Agreements or the right of the Company to enter into them, or to consummate the transactions contemplated by the Transaction Agreements; or (z) to the Company's Knowledge, that would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, and (ii) neither the Company nor, to the Company's Knowledge, any Founder or officer or director of the Company is a party or is named as subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality (in the case of Founders, officers or directors, such as would affect the Company). There is no action, suit, proceeding or investigation by the Company pending or which the Company intends to initiate. The foregoing includes, without limitation, actions, suits, proceedings or investigations pending or threatened in writing (or any basis therefor known to the Company) involving the prior employment of any of the Company's employees, their services provided in connection with the Company's business, any information or techniques allegedly proprietary to any of their former employers or their obligations under any agreements with prior employers.

2.8     Intellectual Property.

(a)     After giving effect to the transactions contemplated by the Transaction Agreements, the Company owns or possess a sufficient legal right to use, free and clear of all liens, encumbrances, charges or claims by any other Person (including prior employers of the Founders, employees, or consultants), all patents, trademarks, domain names, service marks, trade names, copyrights, licenses and rights, and all trade secrets protectable by applicable law, including know-how, inventions, designs, processes, works of authorship, computer programs, hardware, software and technical data and information ("**Intellectual Property**") used and sufficient for use in the conduct of its business as presently conducted (collectively herein "**Company Intellectual Property**"), without, to the Company's knowledge, infringing upon or otherwise acting adversely to the right of any other Person (including prior employers of Founders, employees, or consultants) under or with respect to the foregoing, including without limitation (i) the Founders and the past and present employees and consultants and (ii) employers of the Founders and the past and present employees and consultants of the Company. Neither the Company nor, to the Company's knowledge, any Founder or current or former employee or consultant of the Company, has received, or is aware of, any written communications alleging that the Company, or any Founder or any current or former employee or any consultant of the Company has violated, or by conducting the Company's business as now conducted, is violating the patents, trademarks, service marks, trade names, copyrights or trade secrets or other proprietary rights of other Persons, nor is the Company aware of any similar violation of the Company Intellectual Property by others, nor is the Company is  aware of any basis therefore.

(b)     Section 2.8(b) of the Disclosure Schedule identifies each: (a) patent, registered trademark, registered copyright, or registered domain name that has been issued to the Company with respect to any of the Company Intellectual Property; (b) pending patent, trademark, domain name or copyright application that the Company has made with respect to any of the Company Intellectual Property; (c) each material unregistered trade name or unregistered trademark used by the Company; and (d) material license, agreement, or other permission pursuant to which the Company has received from or granted to any third party with respect to any of the Company Intellectual Property (excluding in each case, contracts for commercially available technology or software or otherwise having an annual value of less than $50,000).

(c)     Other than with respect to commercially available software products under standard end-user object code license agreements, and other than pursuant to license agreements whereby the Company licenses its software products to customers, there are no outstanding options, licenses, or agreements of any kind relating to the foregoing, nor is the Company bound by or a party to any options, licenses or agreements of any kind with respect to the patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, proprietary rights and processes of any other Person. Neither the Company nor, to the Company's knowledge, any Founder or current or former employee or consultant of the Company is obligated or under any liability whatsoever to make any payments by way of royalties, fees or otherwise to any owner or licensee of, or other claimant to, any patent, trademark, service mark, trade name, copyright or other intangible asset, with respect to the use thereof or in connection with the conduct of its business or as currently proposed to be conducted.

(d)     Any and all rights, title and interest of Intellectual Property of any kind which has been developed or is currently being developed, by any Founder or current or former employee or consultant of the Company in the scope of their duties for the Company is, and shall be, the sole and exclusive property owned by the Company. For avoidance of doubt, none of the Company Intellectual Property owned by the Company including the Transferred IP was conceived during, originated from, or was derived from, any work done by the Founders for the benefit of any Person including prior employers of any Founder or current or former employee or consultant, other than Affiliates of Purchaser. The Company has taken commercially reasonable security measures to protect the secrecy, confidentiality and value of all the Intellectual Property. All of the Company's Founders and any current employees or consultants responsible for the development of, or that have developed, Intellectual Property for the Company have entered into written agreements with the Company assigning to the Company all rights in such Intellectual Property developed for the Company. All of the Company's Founders and current employees and other persons who have substantive knowledge of the trade secrets or other confidential information within the Company Intellectual Property have entered into a written agreement, which includes confidentiality obligations with the Company. To the Company's knowledge it is not necessary to utilize any of the developments, ideas, inventions, trade secrets or proprietary information of any of its Founders, employees or consultants made prior to their employment or engagement by the Company, other than the Transferred IP and that Intellectual Property that has been duly assigned to the Company by such persons. None of the foregoing Persons is or was ever employed by or engaged as a consultant with any academic or other governmental institution, whereby such academic or governmental institution has obtained any rights in any Intellectual Property developed by such Founder or current or former employee or consultant. No facilities of any university, government-owned institution, college, other educational institution or research center was used in the development of any of the Company Intellectual Property.

(e)     None of the Open Source Software that is or has been used by the Company will restrict the Company's ability to charge for distribution of, or to use its products for commercial purposes. With respect to any open source software that is or has been used by the Company, the Company is in material compliance with all applicable licenses with respect thereto. Neither the Company, nor any Founder, employee or consultant or any other Person acting on behalf of the Company, has disclosed or delivered to any third party any non-open source software related source code owned by the Company and included in the Company's products. To the Company's knowledge, no event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time) will, or would reasonably be expected to, result in the disclosure or delivery by the Company, or any Person acting on behalf of the Company, of any such non open source software related source code.

2.9     Compliance with Other Instruments. Except as set forth in Section 2.9 of the Disclosure Schedule, the Company is not in violation or default (i) of any provisions of its Restated Certificate or Bylaws, (ii) of any instrument, judgment, order, writ or decree, (iii) under any note, indenture or mortgage, (iv) under any lease, agreement, contract or purchase order to which it is a party or by which it is bound that is required to be listed on the Disclosure Schedule, or (v) of any provision of federal or state statute, rule or regulation applicable to the Company, the violation of which would have a Material Adverse Effect. The execution, delivery and performance of the Transaction Agreements and the consummation of the transactions

contemplated by the Transaction Agreements will not result in any such violation or be in conflict with or constitute, with or without the passage of time and giving of notice, either (i) a default under any such provision, instrument, judgment, order, writ, decree, contract or agreement; or (ii) an event which results in the creation of any lien, charge or encumbrance upon any assets of the Company or the suspension, revocation, forfeiture, or nonrenewal of any material permit or license applicable to the Company.

2.10  <u>Title to Property and Assets</u>. Except as set forth in <u>Section 2.10</u> of the Disclosure Schedule, the Company owns its properties and assets free and clear of all mortgages, deeds of trust, liens, encumbrances and security interests except for statutory liens for the payment of current taxes that are not yet delinquent and liens, encumbrances and security interests which arise in the ordinary course of business and which do not affect material properties and assets of the Company. With respect to the property and assets it leases, the Company is in material compliance with each such lease and holds a valid leasehold interest free of any liens, claims or encumbrances other than those of the lessors of such property or assets. The Company does not own any real property.

2.11  <u>Agreements</u>.

(a)  Except for the Transaction Agreements and as set forth on <u>Section 2.11(a)</u> of the Disclosure Schedule, there are no agreements, understandings, instruments, contracts or proposed transactions to which the Company is a party or by which it is bound that involve (i) obligations (contingent or otherwise) of, or payments to, the Company in excess of $50,000, (ii) the license of any patent, copyright, trademark, trade secret or other proprietary right to or from the Company, (iii) the grant of rights to manufacture, produce, assemble, license, market, or sell its products to any other Person that limit the Company's exclusive right to develop, manufacture, assemble, distribute, market or sell its products, or (iv) indemnification by the Company with respect to infringements of proprietary rights.

(b)  Except as set forth on <u>Section 2.11(b)</u> of the Disclosure Schedule, the Company has not (i) declared or paid any dividends, or authorized or made any distribution upon or with respect to any class or series of its capital stock, (ii) incurred any indebtedness for money borrowed or incurred any other liabilities individually in excess of $10,000 or in excess of $50,000 in the aggregate, (iii) made any loans or advances to any Person, other than ordinary advances for travel expenses, or (iv) sold, exchanged or otherwise disposed of any of its assets or rights, other than the sale of its inventory in the ordinary course of business. For the purposes of (a) and (b) of this <u>Section 2.11</u>, all indebtedness, liabilities, agreements, understandings, instruments, contracts and proposed transactions involving the same Person (including Persons the Company has reason to believe are affiliated with each other) shall be aggregated for the purpose of meeting the individual minimum dollar amounts of such Section.

(c)  The Company is not a guarantor or indemnitor of any indebtedness of any other Person.

(d)  The Company has not engaged in the past three (3) months in any discussion with any representative of any Person regarding (i) a sale or exclusive license of all or

substantially all of the Company's assets, or (ii) any merger, consolidation or other business combination transaction of the Company with or into another Person.

2.12    Certain Transactions.

(a)    Other than (i) standard employee benefits generally made available to all employees, (ii) standard director and officer indemnification agreements approved by the Board, (iii) standard proprietary information and assignment of inventions agreements in favor of the Company, (iii) the purchase of shares of the Company's capital stock and (iv) the Transaction Agreements, in each instance, approved in the written minutes of the Board (previously provided to Purchaser or its counsel), there are no agreements, understandings or proposed transactions between the Company and any of its officers, directors, consultants or Key Employees, or any Affiliate thereof.

(b)    The Company is not indebted, directly or indirectly, to any of the Founders or its directors, officers or employees or to their respective spouses or children or to any Affiliate of any of the foregoing, other than in connection with expenses or advances of expenses incurred in the ordinary course of business expenses and for other customary employee benefits made generally available to all employees. None of the Founders or the Company's directors, officers or employees, or any members of their immediate families, or any Affiliate of the foregoing are, directly or indirectly, indebted to the Company or, have any (i) material commercial, industrial, banking, consulting, legal, accounting, charitable or familial relationship with any of the Company's customers, suppliers, service providers, joint venture partners, licensees and competitors, (ii) direct or indirect ownership interest in any firm or corporation with which the Company is affiliated or with which the Company has a business relationship, or any firm or corporation which competes with the Company, except that the Founders and directors, officers, employees or stockholders of the Company may own stock in (but not exceeding two percent (2%) of the outstanding capital stock of) publicly traded companies that may compete with the Company; or (iii) financial interest in any material contract to which the Company is a party.

2.13    Rights of Registration and Voting Rights. Except as provided in the Investor Rights Agreement, the Company is not under any obligation to register under the Securities Act any of its currently outstanding securities or any securities issuable upon exercise or conversion of its currently outstanding securities. To the Company's knowledge, except as contemplated in the Voting Agreement, no stockholder of the Company has entered into any agreements with respect to the voting of capital stock of the Company.

2.14    Changes. Except as described in Section 2.14 of the Disclosure Schedule, since the date of the incorporation of the Company, there has not been:

(a)    any damage, destruction or loss, whether or not covered by insurance, that would have a Material Adverse Effect;

(b)    any waiver or compromise by the Company of a valuable right or of a material debt owed to it;

(c)     any satisfaction or discharge of any lien, claim, or encumbrance or payment of any obligation by the Company, except in the ordinary course of business and the satisfaction or discharge of which would not have a Material Adverse Effect;

(d)     any material change to a material contract or agreement by which the Company or any of its assets is bound or subject;

(e)     any material change in any compensation arrangement or agreement with any employee, officer, director or stockholder;

(f)     any resignation or termination of employment of any officer of the Company;

(g)     any mortgage, pledge, transfer of a security interest in, or lien, created by the Company, with respect to any of its material properties or assets, except liens for taxes not yet due or payable and liens that arise in the ordinary course of business and do not materially impair the Company's ownership or use of such property or assets;

(h)     any loans or guarantees made by the Company to or for the benefit of its employees, officers or directors, or any members of their immediate families, other than travel advances and other advances made in the ordinary course of its business;

(i)     any declaration, setting aside or payment or other distribution in respect of any of the Company's capital stock, or any direct or indirect redemption, purchase, or other acquisition of any of such stock by the Company;

(j)     any sale, assignment or transfer of any Company Intellectual Property that could reasonably be expected to result in a Material Adverse Effect;

(k)     receipt of notice that there has been a loss of, or material order cancellation by, any major customer of the Company;

(l)     any other event or condition of any character, other than events affecting the economy or the Company's industry generally, that could reasonably be expected to result in a Material Adverse Effect; or

(m)     any arrangement or commitment by the Company to do any of the things described in this Section 2.14.

2.15     Employee Matters.

(a)     As of the date hereof, the Company employs no full-time employees, no part-time employees and engages two consultants or independent contractors. Section 2.15(a) of the Disclosure Schedule sets forth a detailed description of all compensation, paid or payable for each Key Employee, consultant and independent contractor of the Company.

(b)     Except as set forth on Section 2.15(b) of the Disclosure Schedule, to the Company's knowledge, none of its employees is obligated under any contract (including

licenses, covenants or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that would materially interfere with such employee's ability to promote the interest of the Company or that would conflict with the Company's business. Neither the execution or delivery of the Transaction Agreements, nor the carrying on of the Company's business by the employees of the Company, nor the conduct of the Company's business as now conducted and as presently proposed to be conducted, will, to the Company's knowledge, conflict with or result in a breach of the terms, conditions, or provisions of, or constitute a default under, any contract, covenant or instrument under which any such employee is now obligated.

(c)     Except as set forth on <u>Section 2.15(c)</u> of the Disclosure Schedule, the Company is not delinquent in payments to any of its employees, consultants, or independent contractors for any wages, salaries, commissions, bonuses, or other direct compensation for any service performed for it to the date hereof or amounts required to be reimbursed to such employees, consultants or independent contractors. The Company has complied in all material respects with all applicable state and federal equal employment opportunity laws and with other laws related to employment, including those related to wages, hours, worker classification and collective bargaining. The Company has withheld and paid to the appropriate governmental entity or is holding for payment not yet due to such governmental entity all amounts required to be withheld from employees of the Company and is not liable for any arrears of wages, taxes, penalties or other sums for failure to comply with any of the foregoing.

(d)     To the Company's knowledge, no Key Employee intends to terminate its service relationship with the Company or is otherwise likely to become unavailable to continue as a Key Employee. The employment of each employee of the Company, if any, is terminable at the will of the Company. Except as required by law, upon termination of the employment of any such employees, no severance or other payments will become due. The Company has no policy, practice, plan or program of paying severance pay or any form of severance compensation in connection with the termination of employment services.

(e)     The Company has not made any representations regarding equity incentives to any officer, employee, director or consultant that are inconsistent with the share amounts and terms set forth in the minutes of meetings of the Company's board of directors.

(f)     The Company has no employee benefit plans.

(g)     The Company is not bound by or subject to (and none of its assets or properties is bound by or subject to) any written or oral, express or implied, contract, commitment or arrangement with any labor union, and no labor union has requested or, to the knowledge of the Company, has sought to represent any of the employees, representatives or agents of the Company. There is no strike or other labor dispute involving the Company pending, or to the Company's knowledge, threatened, which could have a Material Adverse Effect, nor is the Company aware of any labor organization activity involving its employees.

(h)     To the Company's Knowledge, none of the Founders has been (i) subject to voluntary or involuntary petition under the federal bankruptcy laws or any state insolvency law or the appointment of a receiver, fiscal agent or similar officer by a court for his

or her business or property; (ii) convicted in a criminal proceeding or named as a subject of a pending criminal proceeding (excluding traffic violations and other minor offenses); (iii) subject to any order, judgment or decree (not subsequently reversed, suspended, or vacated) of any court of competent jurisdiction permanently or temporarily enjoining him or her from engaging, or otherwise imposing limits or conditions on his or her engagement in any securities, investment advisory, banking, insurance, or other type of business or acting as an officer or director of a public company; or (iv) found by a court of competent jurisdiction in a civil action or by the Securities and Exchange Commission or the Commodity Futures Trading Commission to have violated any federal or state securities, commodities, or unfair trade practices law, which such judgment or finding has not been subsequently reversed, suspended, or vacated.

2.16    <u>Tax Returns and Payments</u>. There are no federal, state, county, local or foreign taxes due and payable by the Company which have not been timely paid. There are no accrued and unpaid federal, state, country, local or foreign taxes of the Company which are due, whether or not assessed or disputed. There have been no examinations or audits of any tax returns or reports by any applicable federal, state, local or foreign governmental agency. The Company has duly and timely filed all federal, state, county, local and foreign tax returns required to have been filed by it and there are in effect no waivers of applicable statutes of limitations with respect to taxes for any year.

2.17    <u>Insurance</u>. The Company has, or will obtain when appropriate, in full force and effect insurance policies concerning such casualties as would be reasonable and customary for companies like the Company with extended coverage, sufficient in amount (subject to reasonable deductions) to allow it to replace any of its properties that might be damaged or destroyed. ):  A list of the Company's insurance policies is set forth in <u>Section 2.17</u> of the Disclosure Schedule. There is no claim by the Company pending under any of such policies. All premiums due under such policies have been paid and the Company is otherwise in full compliance with the material terms and conditions of all such policies where the failure to do so could reasonably be expected to result in a Material Adverse Effect.

2.18    <u>Proprietary Information Agreements</u>. Each Founder has executed the Company's Proprietary Information, Assignment of Inventions, Non-Solicitation and Non-Competition Agreement in the form attached hereto as <u>Exhibit D</u> (the "**Proprietary Information Agreements**") and each other Key Employee has executed an agreement containing comparable proprietary information, assignment of inventions and non-solicitation provisions as the Proprietary Information Agreements. The Company is not aware that any of its Key Employees is in violation of any of their agreements with the Company.

2.19    <u>Permits</u>. The Company has or will have, as appropriate, any applicable franchises, permits, licenses and any similar authority necessary for the conduct of its business. The Company is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

2.20    <u>Qualified Small Business Stock</u>. As of and immediately following the Closing:  (i) the Company will be an eligible corporation as defined in Section 1202(e)(4) of the Code, (ii) the Company will not have made purchases of its own stock described in Code Section 1202(c)(3)(B) during the one (1) year period preceding the Closing, except for purchases that are

disregarded for such purposes under Treasury Regulation Section 1.1202-2, and (iii) the Company's aggregate gross assets, as defined by Code Section 1202(d)(2), at no time between its incorporation and through the Closing have exceeded $50 million, taking into account the assets of any corporations required to be aggregated with the Company in accordance with Code Section 1202(d)(3); provided, however, that in no event shall the Company be liable to Purchaser or any other party for any damages arising from any subsequently proven or identified error in the Company's determination with respect to the applicability or interpretation of Code Section 1202, unless such determination shall have been given by the Company in a manner either grossly negligent or fraudulent.

2.21    Foreign Corrupt Practices Act. Neither the Company, nor to the Company's knowledge, any of its directors, officers, employees or agents have, directly or indirectly, made, offered, promised or authorized any payment or gift of any money or anything of value to or for the benefit of any "foreign official" (as such term is defined in the U.S. Foreign Corrupt Practices Act of 1977, as amended (the "**FCPA**")), foreign political party or official thereof or candidate for foreign political office for the purpose of (i) influencing any official act or decision of such official, party or candidate, (ii) inducing such official, party or candidate to use his, her or its influence to affect any act or decision of a foreign governmental authority, or (iii) securing any improper advantage, in the case of (i), (ii) and (iii) above in order to assist the Company or any of its affiliates in obtaining or retaining business for or with, or directing business to, any Person. Neither the Company, nor to the Company's knowledge, any of its directors, officers, employees or agents have made or authorized any bribe, rebate, payoff, influence payment, kickback or other unlawful payment of funds or received or retained any funds in violation of any law, rule or regulation. Neither the Company, nor to the Company's knowledge, any of its officers, directors or employees are the subject of any allegation, voluntary disclosure, investigation, prosecution, or other enforcement action related to the FCPA or any other anti-corruption law. Company further represents that it has not and does not engage in activities prohibited to Persons subject to the jurisdiction of the United States by the United States Trading with the Enemy Act of 1917, as amended, or the United States International Emergency Economic Powers Act of 1977, as amended, or the regulations promulgated under either such Act. The Company further represents that it does not have its principal place of business in either Myanmar or Sudan, or that it does not generates more than 50% of its revenue from either of these countries.

2.22    Disclosure. No representation or warranty of the Company contained in this Agreement, as qualified by the Disclosure Schedule, and no certificate furnished or to be furnished to Purchaser at the Closing contains any untrue statement of a material fact or, to the Company's knowledge, omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances under which they were made. It is understood that this representation is qualified by the fact that the Company has not delivered to Purchaser, and has not been requested to deliver, a private placement or similar memorandum or any written disclosure of the types of information customarily furnished to purchasers of securities.

2.23    Data Privacy. The Company has taken commercially reasonable measures to protect the privacy of any Personal Information collected or processed by the Company and to maintain in confidence such Personal Information and is in compliance in all material respects,

with all applicable laws in all relevant jurisdictions (including applicable regulations promulgated thereunder and guidelines published by the applicable privacy governmental authorities), the Company's privacy policies and the requirements of any contract or codes of conduct to which the Company is a party. No action, or to the knowledge of the Company, no claim, proceeding, compliant, inquiry, audit or investigation, is pending or threatened against the Company or any of its officers, directors, or employees (in their capacity as such) by any private party or any governmental authority, foreign or domestic, with respect to Personal Information. There has been no material loss, unauthorized access to or other misuse by the Company or on its behalf of such Personal Information, and, to the knowledge of the Company, no third party misused any Personal Information (as defined below) collected or processed by the Company. "**Personal Information**" means any personally identifiable information from any individuals, including, without limitation, any customers, prospective customers, employees and/or other third parties (including information that alone or in combination with other information can be used to specifically identify a person or any financial services data collected or used by the Company).

3. <u>Representations and Warranties of Purchaser</u>. Purchaser hereby represents and warrants to the Company that:

3.1 <u>Authorization</u>. Purchaser has full power and authority to enter into the Transaction Agreements. The Transaction Agreements to which Purchaser is a party, when executed and delivered by Purchaser, will constitute valid and legally binding obligations of Purchaser, enforceable in accordance with their terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies, or (b) to the extent the indemnification provisions contained in the Investor Rights Agreement may be limited by applicable federal or state securities laws.

3.2 <u>Purchase Entirely for Own Account</u>. This Agreement is made with Purchaser in reliance upon Purchaser's representation to the Company, which by Purchaser's execution of this Agreement, Purchaser hereby confirms, that the Shares to be acquired by Purchaser will be acquired for investment for Purchaser's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, Purchaser further represents that Purchaser does not presently have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Shares. Purchaser has not been formed for the specific purpose of acquiring the Shares.

3.3 <u>Disclosure of Information</u>. Purchaser has had an opportunity to discuss the Company's business, management, financial affairs and the terms and conditions of the offering of the Shares with the Company's management. The foregoing, however, does not limit or modify the representations and warranties of the Company in <u>Section 2</u> of this Agreement or the right of Purchaser to rely thereon.

3.4    Restricted Securities. Purchaser understands that the Shares have not been, and will not be, registered under the Securities Act, by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of Purchaser's representations as expressed herein. Purchaser understands that the Shares are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, Purchaser must hold the Shares indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available. Purchaser acknowledges that the Company has no obligation to register or qualify the Shares, or the Common Stock into which it may be converted, for resale, except as set forth in the Investor Rights Agreement. Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Shares, and on requirements relating to the Company which are outside of Purchaser's control, and which the Company is under no obligation and may not be able to satisfy.

3.5    No Public Market. Purchaser understands that no public market now exists for the Shares, and that the Company has made no assurances that a public market will ever exist for the Shares.

3.6    Legends. Purchaser understands that the Shares, to the extent certificated, and any securities issued in respect of or exchange for the Shares, may bear one or all of the following legends:

"THE SHARES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933."

(a)    Any legend set forth in, or required by, the other Transaction Agreements.

(b)    Any legend required by the securities laws of any state to the extent such laws are applicable to the Shares represented by the certificate, instrument, or book entry so legended.

3.7    Accredited Investor. Purchaser is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

3.8    Foreign Investors. If Purchaser is not a United States person (as defined by Section 7701(a)(30) of the Code), Purchaser hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Shares or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Shares, (ii) any foreign exchange restrictions applicable to

DocuSign Envelope ID: EC0DB867-A6B7-4D3D-A74D-9CA7D289E8FD

such purchase, (iii) any foreign governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Shares. Purchaser's subscription and payment for and continued beneficial ownership of the Shares will not violate any applicable securities or other laws of Purchaser's jurisdiction.

3.9     No General Solicitation. Neither Purchaser, nor any of its officers, directors, employees, agents, stockholders or partners has either directly or indirectly, including, through a broker or finder (a) engaged in any general solicitation or (b) published any advertisement in connection with the offer and sale of the Shares.

3.10     Exculpation Among Purchaser. Purchaser acknowledges that it is not relying upon any Person, other than the Founders and the Company in making its investment or decision to invest in the Company.

3.11     Residence. If Purchaser is an individual, then Purchaser resides in the state or province identified in the address of Purchaser set forth on Purchaser's signature page hereto; if Purchaser is a partnership, corporation, limited liability company or other entity, then the office or offices of Purchaser in which its principal place of business is identified in the address or addresses of Purchaser set forth on Purchaser's signature page hereto.

3.12     "Bad Actor". No Disqualification Event is applicable to Purchaser, except for a Disqualification Event as to which Rule 506(d)(2)(ii–iv) or (d)(3), is applicable.

4.     Conditions to Purchaser' Obligations at Closing. The obligations of Purchaser to purchase Shares at the Closing are subject to the fulfillment, on or before the Closing, of each of the following conditions, unless otherwise waived:

4.1     Representations and Warranties. The representations and warranties of the Company and the Founders contained in Section 2 shall be true and correct in all respects as of the Closing.

4.2     Performance. The Company shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by the Company on or before the Closing.

4.3     Compliance Certificate. The Chief Executive Officer of the Company shall deliver to Purchaser at the Closing a certificate certifying that the conditions specified in Sections 4.1 and 4.2 have been fulfilled.

4.4     Qualifications. All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Shares pursuant to this Agreement shall be obtained and effective as of the Closing.

4.5     Opinion of Company Counsel. Purchaser shall have received from Khan Law Group, LLC, Masood Khan, counsel for the Company, an opinion, dated as of the Closing, in substantially the form satisfactory to counsel to Purchaser.

4.6 <u>Board of Directors</u>. As of the Closing, the authorized size of the Board shall be three (3), and the Board shall consist of the Founders.

4.7 <u>Investor Rights Agreement</u>. The Company, Purchaser and the other stockholders of the Company named as parties thereto shall have executed and delivered the Investor Rights Agreement.

4.8 <u>Right of First Refusal and Co-Sale Agreement</u>. The Company, Purchaser and the other stockholders of the Company named as parties thereto shall have executed and delivered the Right of First Refusal and Co-Sale Agreement.

4.9 <u>Voting Agreement</u>. The Company, Purchaser and the other stockholders of the Company named as parties thereto shall have executed and delivered the Voting Agreement.

4.10 <u>Restated Certificate</u>. The Company shall have filed the Restated Certificate with the Secretary of State of Delaware on or prior to the Closing, which shall continue to be in full force and effect as of the Closing.

4.11 <u>Secretary's Certificate</u>. The Secretary of the Company shall have delivered to Purchaser at the Closing a certificate certifying (i) the Restated Certificate, (ii) the Bylaws of the Company, (iii) resolutions of the Board approving the Transaction Agreements and the transactions contemplated under the Transaction Agreements, (iv) resolutions of the stockholders of the Company approving the Restated Certificate and (v) as to the good standing of the Company.

4.12 <u>Proceedings and Documents</u>. All corporate and other proceedings in connection with the transactions contemplated at the Closing and all documents incident thereto shall be reasonably satisfactory in form and substance to Purchaser, and Purchaser (or its counsel) shall have received all such counterpart original and certified or other copies of such documents as reasonably requested.

4.13 <u>Preemptive Rights</u>. The Company shall have fully satisfied (including with respect to rights of timely notification) or obtained enforceable waivers in respect of any preemptive or similar rights directly or indirectly affecting any of its securities.

4.14 <u>Proprietary Information Agreements</u>. Each Founder shall have entered into a Proprietary Information Agreement in the form attached hereto as <u>Exhibit D</u> and Purchaser shall have received a copy of all similar agreements executed by other Key Employees.

5. <u>Conditions of the Company's Obligations at Closing</u>. The obligations of the Company to sell Shares to Purchaser at the Closing are subject to the fulfillment, on or before the Closing, of each of the following conditions, unless otherwise waived:

5.1 <u>Representations and Warranties</u>. The representations and warranties of Purchaser contained in <u>Section 3</u> shall be true and correct in all respects as of the Closing.

5.2     <u>Performance</u>. Purchaser shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by them on or before the Closing.

5.3     <u>Qualifications</u>. All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Shares pursuant to this Agreement shall be obtained and effective as of the Closing.

5.4     <u>Investor Rights Agreement</u>. Purchaser and the Founders shall have executed and delivered the Investor Rights Agreement.

5.5     <u>Right of First Refusal and Co-Sale Agreement</u>. Purchaser and the other stockholders of the Company named as parties thereto shall have executed and delivered the Right of First Refusal and Co-Sale Agreement.

5.6     <u>Voting Agreement</u>. Purchaser and the other stockholders of the Company named as parties thereto shall have executed and delivered the Voting Agreement.

5.7     <u>Services Agreement</u>. Volvo Cars Technology (USA) shall have executed and delivered the Services Agreement.

5.8     <u>IP Assignment</u>. Purchaser shall have executed and delivered the IP Assignment.

6.     <u>Survival of Representations and Warranties; Transaction Related Indemnification</u>.

6.1     <u>Survival</u>.

(a)     All representations, warranties, covenants, and agreements of the Company, the Founders and Purchaser made in this Agreement, in the Disclosure Schedule delivered to Purchaser and all agreements, documents and instruments executed and delivered in connection herewith (i) shall be deemed to have been relied upon by the party or parties to whom they are made and (ii) shall bind the parties' successors and assigns (including, without limitation, any successor to the Company by way of acquisition, merger or otherwise), whether so expressed or not, and, except as otherwise provided in this Agreement, all such representations, warranties, covenants and agreements shall inure to the benefit of the parties (subject to <u>Section 7.2</u>) and their respective successors and assigns and permitted transferees of the Securities, whether so expressed or not.

(b)     The representations and warranties of the parties contained in this Agreement or in any certificates or other writing delivered pursuant to this Agreement or in connection herewith will survive the Closing until the 12 month anniversary of the Closing; <u>provided</u>, that the representations and warranties set out in <u>Section 2.1</u> (*Organization, Good Standing, Corporate Power and Qualification*), <u>Section 2.2</u> (*Capitalization*), <u>Section 2.3</u> (*Subsidiaries*), <u>Section 2.4</u> (*Authorization*), <u>Section 2.5</u> (*Valid Issuance of Shares*) and <u>Section 2.16</u> (*Tax Returns and Payments*) shall survive the Closing until 30 days following the expiration of the maximum statutory limitations period permitted under applicable law. Notwithstanding the

foregoing, any claim for breach of a representation or warranty in respect of which indemnity may be sought under this Agreement shall survive the time at which it would otherwise terminate pursuant to this section if written notice of such claim has been given to the party against whom such indemnification may be sought prior to the end of the applicable survival period described in this <u>Section 6.1</u>. Subject to any applicable statutes of limitations, all covenants and agreements of the parties contained in this Agreement will survive the Closing indefinitely in accordance with their terms.

7.    <u>Covenants.</u>  In consideration of the transactions contemplated hereby, the parties agree as follows:

7.1    <u>Non-Solicitation</u>. For a period of two years from the date of the Closing, none of the Company or any Founder shall directly or indirectly through one or more of any of their respective Affiliates, hire or solicit, or encourage any other Person to hire or solicit, any individual who has been employed by, or has an independent contracting arrangement with, Purchaser or any of its Affiliates within two (2) years prior to the date of such hiring or solicitation, or encourage any such individual to leave such employment.

7.2    <u>Non-Competition Agreement</u>.  For a period of two years from the date of the Closing, Purchaser and its Affiliates (as defined below) shall not operate a Competitive Business; provided, that nothing in this Section 7.2 shall prohibit Purchaser, or any of its Affiliates or successors and assigns, from (a) acquiring or owning, directly or indirectly, voting securities of any publicly traded Person, (b) conducting any business that Purchaser conducts as of the date hereof so long as it does not utilize the Transferred IP, or (c) utilizing technology from any Competitive Business for purposes of its vehicle production operations. For purposes of this <u>Section 7.2</u>, (i) "**Competitive Business**" means any other Person engaged, directly or indirectly, in whole or in part, in the commercialization of a data enablement and/or data sharing system that communicates data to and from vehicles using the Android operating system, and (ii) "**Affiliates**" means Volvo Car AB and any Person controlled by Volvo Car AB.

7.3    <u>Release Regarding Transferred IP</u>. Purchaser, on behalf of itself and its Affiliates, hereby releases each of the Founders from any breach by them of their agreements with Purchaser or its Affiliates arising from the Founder's activities pertaining to the development of the Transferred IP prior to the date of this Agreement.

7.4    <u>Dilution Protection</u>.  In the event that the Company shall, at any time and from time to time after the date hereof and continuing until the Company has received aggregate gross proceeds from the sale of equity securities of the Company in excess of $10,000,000, issues or is deemed to have issued in accordance with Subsection 4.4.3 of the Restated Certificate any Additional Shares of Common Stock (as defined in the Restated Certificate), and as a result of such issuance, Purchaser's Pro Rata Portion (as defined below) will fall below 5%, then the Company will issue to Purchaser such number of Additional Shares of Common Stock as necessary to increase Purchaser's Pro Rata Portion to 5%. For the purposes of this <u>Section 7.4</u>, "**Pro Rata Portion**" means a fraction determined by dividing (i) the number of shares of Common Stock and shares of Common Stock issuable on the conversion of the Preferred Stock then held by Purchaser or its successors and assigns, by (ii) the total number of shares of

Common Stock then outstanding, in each case determined on a fully-diluted, as-converted basis as of immediately prior to such issuance.

8. <u>Miscellaneous</u>.

8.1 <u>Publication</u>. For so long as Purchaser holds any shares of capital stock of the Company, none of the Company or its Affiliates or any of their respective officers, directors or employees shall (a) use the corporate name, trade name or logo of Purchaser or any of its Affiliates (including the "Volvo" name or trademark) in a public manner or format (including reference on or links to websites, press releases, etc.) or (b) issue any statement or communication to any third party (other than to their legal, accounting and financial advisors, Company's advisory board members, and other than to current and potential investors, customers, or acquirers under a duty of confidentiality) regarding the investment in the Company by Purchaser without the prior written approval of Purchaser; provided, that the forgoing will not apply for a disclosure or publication of such information that is required to be made by order or requirement of a court, administrative body or other governmental body (a "**Compelled Disclosure**"); provided, further that in the event of a request for any Compelled Disclosure, the Company will to the extent permitted under applicable law provide Purchaser with prompt written notice of such request and cooperate reasonably with Purchaser in seeking to minimize the extent of disclosure required that uses the corporate name, trade name or logo of Purchaser or any of its Affiliates.

8.2 <u>Successors and Assigns</u>. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

8.3 <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

8.4 <u>Titles and Subtitles</u>. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

8.5 <u>Notices</u>.

(a) All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt, or (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five days after having been

sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective parties at their address as set forth on the signature page, or to such e-mail address, facsimile number or address as subsequently modified by written notice given in accordance with this Section 8.5(a). If notice is given to the Company, a copy shall also be sent to 231 Market Place, Suite 226, San Ramon, CA 94583; Attention: Syed M. Saifullah; mubeen@aidenabled.com, with a copy to Khan Law Group, LC, 9431 Haven Ave., Suite 100, Rancho Cucamonga, CA 91730, Attention Masood Khan; mkhan@khanlegal.com; and if notice is given to Purchaser, a copy shall also be given to such other person as may be set forth on Schedule A and a copy shall be sent to Volvo Car Technology Fund AB, 380 N. Pastoria Ave., Sunnyvale, CA 94087, Attention: Daniel Karlsson, danielkarlsson.3@volvocars.com, with a copy to McKennon, Shelton & Henn LLP, 401 East Pratt Street, Suite 2600, Baltimore, MD 21202, Attention: Sulee Stinson Clay; sulee.clay@mshllp.com.

(b)     Subject to the limitations set forth in Delaware General Corporation Law §232(e), Purchaser consents to the delivery of any notice to stockholders given by the Company under the Delaware General Corporation Law or the Company's certificate of incorporation or bylaws by (i) facsimile telecommunication to the facsimile number set forth on the signature page (or to any other facsimile number for Purchaser or other security holder in the Company's records), (ii) electronic mail to the electronic mail address set forth on the signature page (or to any other electronic mail address for Purchaser or other security holder in the Company's records), (iii) posting on an electronic network together with separate notice to Purchaser or other security holder of such specific posting or (iv) any other form of electronic transmission (as defined in the Delaware General Corporation Law) directed to Purchaser. This consent may be revoked by a Purchaser by written notice to the Company and may be deemed revoked in the circumstances specified in Delaware General Corporation Law §232.

8.6     No Finder's Fees. Each party represents that it neither is nor will be obligated for any finder's fee or commission in connection with this transaction. Purchaser agrees to indemnify and to hold harmless the Company from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which Purchaser or any of its officers, employees or representatives is responsible.

8.7     Expenses. The parties will each pay their own expenses with respect to the transactions contemplated by this Agreement.

8.8     Amendments and Waivers. Any term of this Agreement may be amended, terminated or waived only with the written consent of the Company and the holders of at least a majority of the then outstanding Shares, including Purchaser. Any amendment or waiver effected in accordance with this Section 8.8 shall be binding upon Purchaser and each transferee of the Shares (or the Common Stock issuable upon conversion thereof), each future holder of all such securities, and the Company.

8.9     Severability. If any arbitrator or court finds any provision of this Agreement to be invalid or unenforceable, then: (a) the arbitrator or court shall enforce the

provision to the maximum lawful extent and (b) the arbitrator's or court's finding of invalidity or unenforceability shall not affect the validity or enforceability of any other provision of this Agreement.

8.10    Delays or Omissions. No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

8.11    Entire Agreement. This Agreement (including the exhibits hereto), the Restated Certificate and the other Transaction Agreements constitute the full and entire understanding and agreement between the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties are expressly canceled.

8.12    Dispute Resolution. Any unresolved controversy or claim arising out of or relating to this Agreement, except as (i) otherwise provided in this Agreement, or (ii) any such controversies or claims arising out of either party's intellectual property rights for which a provisional remedy or equitable relief is sought, shall be submitted to arbitration by one arbitrator mutually agreed upon by the parties, and if no agreement can be reached within thirty (30) days after names of potential arbitrators have been proposed by the American Arbitration Association (the "**AAA**"), then by one arbitrator having reasonable experience in corporate finance transactions of the type provided for in this Agreement and who is chosen by the AAA. The arbitration shall take place in San Francisco, California, in accordance with the AAA rules then in effect, and judgment upon any award rendered in such arbitration will be binding and may be entered in any court having jurisdiction thereof.  There shall be limited discovery prior to the arbitration hearing as follows: (a) exchange of witness lists and copies of documentary evidence and documents relating to or arising out of the issues to be arbitrated, (b) depositions of all party witnesses and (c) such other depositions as may be allowed by the arbitrators upon a showing of good cause.  Depositions shall be conducted in accordance with the California Code of Civil Procedure, the arbitrator shall be required to provide in writing to the parties the basis for the award or order of such arbitrator, and a court reporter shall record all hearings, with such record constituting the official transcript of such proceedings. Each party will bear its own costs in respect of any disputes arising under this Agreement. The prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled.

8.13 <u>Governing Law</u>. This Agreement shall be governed by the internal law of the State of Delaware, without regard to conflict of law principles that would result in the application of any law other than the law of the State of Delaware.

8.14 <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

***Signature Page Follows***

**IN WITNESS WHEREOF**, the parties have executed this Seed Preferred Stock Purchase Agreement as of the date first written above.

**AIDEN AUTOMOTIVE TECHNOLOGIES, INC.**

By: _Niclas Gyllenram_ _____
Name: Niclas Gyllenram
Title: President

**FOUNDERS**:

_____
SYED MUBEEN SAIFULLAH

_Niclas Gyllenram_ _____
NICLAS GYLLENRAM

_Jonas Fenn_ _____
JONAS FENN

**PURCHASER**:

**VOLVO CAR TECHNOLOGY FUND AB**

By: _Raymond Millien_ _____
Name: Raymond Millien
Title: Managing Director

By: _Pär Arvidsson_ _____
Name: Pär Arvidsson
Title: Chairman of the Board

24

## <u>EXHIBIT A</u>

### PURCHASER SCHEDULE

| <u>Name</u> | <u>Shares of Seed Preferred Stock</u> |
|---|---|
| Volvo Car Technology Fund AB | 900,000 |
| **<u>TOTAL</u>** | **<u>900,000</u>** |

DocuSign Envelope ID: EC0DB867-A6B7-4D3D-A74D-9CA7D289E8ED

## **EXHIBIT B**

**RESTATED CERTIFICATE**

{See attached.}

## **EXHIBIT C**

**DISCLOSURE SCHEDULE**

{See Attached.}

Exhibit C

## EXHIBIT D

PROPRIETARY INFORMATION, ASSIGNMENT OF INVENTIONS, NON-SOLICITATION
AND NON-COMPETITION AGREEMENT.

{See attached.}

# EXHIBIT 4

# VOTING AGREEMENT

THIS VOTING AGREEMENT (this "**Agreement**"), is made and entered into as of March 8, 2021 (the "**Effective Date**") by and among Aiden Automotive Technologies, Inc., a Delaware corporation (the "**Company**"), Volvo Car Technology Fund AB, reg no. 556877-5760, a Sweden private limited liability company (together with its successors and assigns, "**Volvo**") and each other holder of the Company's Seed Preferred Stock, $0.00001 par value per share ("**Preferred Stock**") listed on Schedule A (collectively with Volvo and any subsequent investors, or transferees, who become parties hereto as "Investors" pursuant to Sections 7.1(a) or 7.2 below, the "**Investors**"), and those certain stockholders of the Company and holders of options and warrants to acquire shares of the capital stock of the Company listed on Schedule B (together with any subsequent stockholders, option holders, warrant holders or any transferees, who become parties hereto as "Key Holders" pursuant to Sections 7.1(b) or 7.2 below, the "**Key Holders**," and together collectively with the Investors, the "**Stockholders**").

## RECITALS

A.    Concurrently with the execution of this Agreement, the Company and Volvo are entering into a Seed Preferred Stock Purchase Agreement (the "**Purchase Agreement**") providing for the sale of shares of the Preferred Stock, and in connection with that agreement the parties desire to provide the Investors with the right, among other rights, to designate the election of certain members of the board of directors of the Company (the "**Board**") in accordance with the terms of this Agreement.

B.    The Amended and Restated Certificate of Incorporation of the Company (the "**Restated Certificate**") provides that (a) the holders of record of a majority of the outstanding shares of the Company's common stock, par value $0.00001 per share ("**Common Stock**"), exclusively and as a separate class, shall be entitled to elect three directors of the Company, and (b) if the Company or the Founders (as defined in the Purchaser Agreement) default or otherwise breach any of their obligations contained in the Transaction Documents (each, a "**Company Default**"), and such default or breach is not cured within any applicable cure period or waived by Volvo, then Volvo shall thereafter be entitled to elect one director of the Company (the "**Preferred Director**").

C.    The parties also desire to enter into this Agreement to set forth their agreements and understandings with respect to how shares of the Company's capital stock held by them will be voted on, or tendered in connection with, an acquisition of the Company an increase in the number of shares of Common Stock required to provide for the conversion of the Preferred Stock.

NOW, THEREFORE, the parties agree as follows:

1.    Voting Provisions Regarding the Board.

1.1    Size of the Board. Each Stockholder agrees to vote, or cause to be voted, all Shares (as defined below) owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that the size of the Board shall be set and remain at three (3) directors, and not to exceed

nine (9); unless the Preferred Director has been designated to the Board in which event the size of the Board shall be increased by one (1).For purposes of this Agreement, the term "**Shares**" shall mean and include any securities of the Company that the holders of which are entitled to vote for members of the Board, including without limitation, all shares of Common Stock and Preferred Stock, by whatever name called, now owned or subsequently acquired by a Stockholder, however acquired, whether through stock splits, stock dividends, reclassifications, recapitalizations, similar events or otherwise.

      1.2   <u>Board Composition</u>. Each Stockholder agrees to vote, or cause to be voted, all Shares owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that at each annual or special meeting of stockholders at which an election of directors is held or pursuant to any written consent of the stockholders, subject to Section 5, the following persons shall be elected to the Board:

      (a)   At any time after a Company Default (as defined below) and continuing only thereafter, for so long as Volvo and its Affiliates continue to own Shares, one person designated from time to time by Volvo (the "**Preferred Director**"); and

      (b)   The remaining directors permitted by the Restated Certificate shall be designated from time to time by the holders of a majority of the shares of Common Stock outstanding, which individuals shall initially be Niclas Gyllenram, Jonas Fenn and Syed M. Saifullah.

      For purposes of this Agreement, (i) an individual, firm, corporation, partnership, association, limited liability company, trust or any other entity (collectively, a "**Person**") shall be deemed an "**Affiliate**" of another Person who, directly or indirectly, controls, is controlled by, or is under common control with the Person specified, where "**control**" means the possession, directly or indirectly, by agreement or otherwise, of at least 50% of the voting stock, partnership interest or other ownership interest, or the power to appoint or remove a majority of the board of directors or other governing body of such Person, or to cause the direction of the management of such Person and (ii) "**Company Default**" means, collectively, any default or breach by the Company under any of the Transaction Documents of any of the Founder Obligations or the Company Obligations set forth on <u>Schedule C</u> hereto and made a part of this Agreement as if fully set forth herein and, to the extent such default or breach is curable, such default or breach continues for 15 days after written notice thereof to the Company.

      1.3   <u>Board Observer</u>. So long as Volvo holds shares of Preferred Stock or Common Stock, it shall have the right to appoint one representative (a "**Board Observer**") to observe all meetings of the Board in a non-voting capacity, and in this respect, the Company shall give such Board Observer copies of all notices, minutes, consents, and other materials that it provides to the Board at the same time and in the same manner as provided to such directors; <u>provided</u>, <u>however</u> that such representative shall agree to hold in confidence and trust all information so provided.  The Board Observer shall not have a right to vote on any matters presented to the Board.

      1.4   <u>Failure to Designate a Board Member</u>. In the absence of any designation from the Persons or groups with the right to designate a director as specified above, the director

previously designated by them and then serving shall be reelected if still eligible and willing to serve as provided herein and otherwise, such Board seat shall remain vacant.

1.5     Removal of Board Members. Each Stockholder also agrees to vote, or cause to be voted, all Shares owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that:

(a)     no director elected or appointed pursuant to Section 1.2 may be removed from office unless (i) such removal is directed or approved by the affirmative vote of the Person(s), or of the holders of at least a majority of the Shares entitled under Section 1.2 to designate that director; or (ii) the Person(s) originally entitled to designate or approve such director pursuant to Section 1.2 is no longer so entitled to designate or approve such director;

(b)     any vacancies created by the resignation, removal or death of a director elected or appointed pursuant to Sections 1.2, 1.4 or 1.5 shall be filled pursuant to the provisions of Section 1.2; and

(c)     upon the request of any party entitled to designate a director as provided in Section 1.2(a) or 1.2(b) to remove such director, such director shall be removed.

All Stockholders agree to execute any written consents required to perform the obligations of this Section 1.2, and the Company agrees at the request of any Person or group entitled to designate directors to call a special meeting of stockholders for the purpose of electing directors.

1.6     No Liability for Election of Recommended Directors. No Stockholder, nor any Affiliate of any Stockholder, shall have any liability as a result of designating a person for election as a director for any act or omission by such designated person in his or her capacity as a director of the Company, nor shall any Stockholder have any liability as a result of voting for any such designee in accordance with the provisions of this Agreement.

1.7     No "Bad Actor" Designees. Each Person with the right to designate or participate in the designation of a director as specified above hereby represents and warrants to the Company that, to such Person's knowledge, none of the "bad actor" disqualifying events described in Rule 506(d)(1)(i)-(viii) promulgated under the Securities Act of 1933, as amended (the "Securities Act") (each, a "**Disqualification Event**"), is applicable to such Person's initial designee named above except, if applicable, for a Disqualification Event as to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable. Any director designee to whom any Disqualification Event is applicable, except for a Disqualification Event to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable, is hereinafter referred to as a "**Disqualified Designee**". Each Person with the right to designate or participate in the designation of a director as specified above hereby covenants and agrees (A) not to designate or participate in the designation of any director designee who, to such Person's knowledge, is a Disqualified Designee and (B) that in the event such Person becomes aware that any individual previously designated by any such Person is or has become a Disqualified Designee, such Person shall as promptly as practicable take such actions as are necessary to remove such Disqualified Designee from the Board and designate a replacement designee who is not a Disqualified Designee.

2.     <u>Matters Requiring Preferred Director Approval</u>. At any time that the Preferred Director is designated to the Board of Directors, the Company hereby covenants and agrees that it shall not, without approval of the Board of Directors, which approval must include the affirmative vote of the Preferred Director:

2.1     change the principal business of the Company, enter new lines of business, or exit the current line of business;

2.2     grant or issue any option or other equity incentive grant with non-standard vesting or acceleration provisions;

2.3     issue any shares of capital stock of the Company, other than Exempted Securities (as defined in the Certificate of Incorporation);

2.4     increase the number of shares available for issuance under any equity incentive plan;

2.5     approve the budget and any strategic operating plan for the Company for each fiscal year;

2.6     file for bankruptcy or consent to the filing of any involuntary petition in bankruptcy;

2.7     make, or permit any subsidiary to make, any loan or advance to, or own any stock or other securities of, any subsidiary or other corporation, partnership, or other entity unless it is wholly owned by the Company;

2.8     make, or permit any subsidiary to make, any loan or advance to any Person, including, without limitation, any employee or director of the Company or any subsidiary, except advances and similar expenditures in the ordinary course of business or under the terms of an employee stock or option plan approved by the Board of Directors;

2.9     enter into any joint venture, partnership, collaboration or other strategic commercial relationship with any strategic partner, vendor or supplier with a value in excess of $500,000, other than in the ordinary course of business;

2.10     mortgage or pledge, or create a security interest in, or permit any subsidiary to mortgage, pledge or create a security interest in, any assets of the Company other than in connection with equipment leases which are secured only by the leased equipment or pursuant to indebtedness permitted by Subsection 5.4(l);

2.11     incur or guarantee any aggregate indebtedness in excess of $500,000 that is not already included in a budget approved by the Board of Directors;

2.12     make any capital expenditures in excess of $500,000 that are not already included in a budget approved by the Board of Directors;

2.13     otherwise enter into or be a party to any transaction with any director, officer, or employee of the Company or any "associate" (as defined in Rule 12b-2 promulgated

under the Exchange Act) of any such Person, except for transactions made in the ordinary course of business and pursuant to reasonable requirements of the Company's business and upon fair and reasonable terms that are approved by a majority of the Board of Directors;

2.14   hire, terminate, or change the compensation of the executive officers, including approving any option grants or stock awards to executive officers;

2.15   sell, assign, license, pledge, or encumber material technology or intellectual property, other than licenses granted in the ordinary course of business;

2.16   enter into any corporate strategic relationship involving the payment, contribution, or assignment by the Company or to the Company of money or assets greater than $500,000 or

2.17   enter into any agreement regarding any of the foregoing items.

3.     Board Matters. At any time that the Preferred Director has been designated to the Board of Directors, unless otherwise determined by the vote of a majority of the directors then in office, the Board of Directors shall meet at least quarterly in accordance with an agreed-upon schedule. The Company shall reimburse the nonemployee directors for all reasonable out-of-pocket travel expenses incurred (consistent with the Company's travel policy) in connection with attending meetings of the Board of Directors. The Preferred Director, if any, shall be entitled in such person's discretion to be a member of any committee of the Board of Directors.

4.     Vote to Increase Authorized Common Stock . Each Stockholder agrees to vote or cause to be voted all Shares owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to increase the number of authorized shares of Common Stock from time to time to ensure that there will be sufficient shares of Common Stock available for conversion of all of the shares of Preferred Stock outstanding at any given time.

5.     Drag-Along Right.

5.1   Definitions. A "**Sale of the Company**" shall mean either: (a) a transaction or series of related transactions in which a Person, or a group of related Persons, acquires from stockholders of the Company shares representing more than 50% of the outstanding voting power of the Company (a "**Stock Sale**"); or (b) a transaction that qualifies as a "**Deemed Liquidation Event**" as defined in the Restated Certificate.

5.2   Actions to be Taken. In the event that the Board and Volvo approve a Sale of the Company specifying that this Section 5 shall apply to such transaction, then, subject to satisfaction of each of the conditions set forth in Section 5.3 below, each Stockholder and the Company hereby agree:

(a)   if such transaction requires stockholder approval, with respect to all Shares that such Stockholder owns or over which such Stockholder otherwise exercises voting power, to vote (in person, by proxy or by action by written consent, as applicable) all Shares in favor of, and adopt, such Sale of the Company (together with any related amendment

DocuSign Envelope ID: EC0DB867-A6B7-4D3D-A74D-8CA7D289E8FD

or restatement to the Restated Certificate required to implement such Sale of the Company) and to vote in opposition to any and all other proposals that could reasonably be expected to delay or impair the ability of the Company to consummate such Sale of the Company;

   (b) if such transaction is a Stock Sale, to sell the same proportion of shares of capital stock of the Company beneficially held by such Stockholder as is being sold by Volvo to the Person to whom Volvo proposes to sell its Shares, and, except as permitted in Section 5.3 below, on the same terms and conditions as the other stockholders of the Company;

   (c) to execute and deliver all related documentation and take such other action in support of the Sale of the Company as shall reasonably be requested by the Company in order to carry out the terms and provision of this Section 5, including, without limitation, executing and delivering instruments of conveyance and transfer, and any purchase agreement, merger agreement, any associated indemnity agreement, or escrow agreement, any associated voting, support, or joinder agreement, consent, waiver, governmental filing, share certificates duly endorsed for transfer (free and clear of impermissible liens, claims and encumbrances), and any similar or related documents;

   (d) not to deposit, and to cause their Affiliates not to deposit, except as provided in this Agreement, any Shares of the Company owned by such party or Affiliate in a voting trust or subject any Shares to any arrangement or agreement with respect to the voting of such Shares, unless specifically requested to do so by the acquirer in connection with the Sale of the Company;

   (e) to refrain from (i) exercising any dissenters' rights or rights of appraisal under applicable law at any time with respect to such Sale of the Company, or (ii) asserting any claim or commencing any suit (x) challenging the Sale of the Company or this Agreement, or (y) alleging a breach of any fiduciary duty of the Board (including, without limitation, aiding and abetting breach of fiduciary duty) in connection with the evaluation, negotiation or entry into the Sale of the Company, or the consummation of the transactions contemplated thereby;

   (f) if the consideration to be paid in exchange for the Shares pursuant to this Section 5 includes any securities and due receipt thereof by any Stockholder would require under applicable law (x) the registration or qualification of such securities or of any person as a broker or dealer or agent with respect to such securities; or (y) the provision to any Stockholder of any information other than such information as a prudent issuer would generally furnish in an offering made solely to "accredited investors" as defined in Regulation D promulgated under the Securities Act of 1933, as amended (the "**Securities Act**"), the Company may cause to be paid to any such Stockholder in lieu thereof, against surrender of the Shares which would have otherwise been sold by such Stockholder, an amount in cash equal to the fair value (as determined in good faith by the Board) of the securities which such Stockholder would otherwise receive as of the date of the issuance of such securities in exchange for the Shares; and

   (g) in the event that Volvo, in connection with such Sale of the Company, appoints a stockholder representative (the "**Stockholder Representative**") with respect to matters affecting the Stockholders under the applicable definitive transaction agreements following consummation of such Sale of the Company, (x) to consent to (i) the

appointment of such Stockholder Representative, (ii) the establishment of any applicable escrow, expense or similar fund in connection with any indemnification or similar obligations, and (iii) the payment of such Stockholder's pro rata portion (from the applicable escrow or expense fund or otherwise) of any and all reasonable fees and expenses to such Stockholder Representative in connection with such Stockholder Representative's services and duties in connection with such Sale of the Company and its related service as the representative of the Stockholders, and (y) not to assert any claim or commence any suit against the Stockholder Representative or any other Stockholder with respect to any action or inaction taken or failed to be taken by the Stockholder Representative, within the scope of the Stockholder Representative's authority, in connection with its service as the Stockholder Representative, absent fraud, bad faith, or willful misconduct.

5.3     Conditions. Notwithstanding anything to the contrary set forth herein, a Stockholder will not be required to comply with Section 5.2 above in connection with any proposed Sale of the Company (the "**Proposed Sale**"), unless:

(a)     any representations and warranties to be made by such Stockholder in connection with the Proposed Sale are limited to representations and warranties related to authority, ownership and the ability to convey title to such Shares, including, but not limited to, representations and warranties that (i) the Stockholder holds all right, title and interest in and to the Shares such Stockholder purports to hold, free and clear of all liens and encumbrances, (ii) the obligations of the Stockholder in connection with the transaction have been duly authorized, if applicable, (iii)  the documents to be entered into by the Stockholder have been duly executed by the Stockholder and delivered to the acquirer and are enforceable (subject to customary limitations) against the Stockholder in accordance with their respective terms; and (iv) neither the execution and delivery of documents to be entered into by the Stockholder in connection with the transaction, nor the performance of the Stockholder's obligations thereunder, will cause a breach or violation of the terms of any agreement to which the Stockholder is a party, or any law or judgment, order or decree of any court or governmental agency that applies to the Stockholder;

(b)     such Stockholder is not required to agree (unless such Stockholder is a Company officer or employee) to any restrictive covenant in connection with the Proposed Sale (including without limitation any covenant not to compete or covenant not to solicit customers, employees or suppliers of any party to the Proposed Sale);

(c)     such Stockholder and its affiliates are not required to amend, extend or terminate any contractual or other relationship with the Company, the acquirer or their respective affiliates, except that the Stockholder may be required to agree to terminate the investment-related documents between or among such Stockholder, the Company and/or other stockholders of the Company;

(d)     the Stockholder is not liable for the breach of any representation, warranty or covenant made by any other Person in connection with the Proposed Sale, other than the Company (except to the extent that funds may be paid out of an escrow established to cover breach of representations, warranties and covenants of the Company as well as breach by any stockholder of any of identical representations, warranties and covenants provided by all stockholders);

(e)    liability shall be limited to such Stockholder's applicable share (determined based on the respective proceeds payable to each Stockholder in connection with such Proposed Sale in accordance with the provisions of the Restated Certificate) of a negotiated aggregate indemnification amount that applies equally to all Stockholders but that in no event exceeds the amount of consideration otherwise payable to such Stockholder in connection with such Proposed Sale, except with respect to claims related to fraud by such Stockholder, the liability for which need not be limited as to such Stockholder;

(f)    upon the consummation of the Proposed Sale (i) each holder of each class or series of the capital stock of the Company will receive the same form of consideration for their shares of such class or series as is received by other holders in respect of their shares of such same class or series of stock, and if any holders of any capital stock of the Company are given a choice as to the form of consideration to be received as a result of the Proposed Sale, all holders of such capital stock will be given the same option, (ii) each holder of a series of Preferred Stock will receive the same amount of consideration per share of such series of Preferred Stock as is received by other holders in respect of their shares of such same series, (iii) each holder of Common Stock will receive the same amount of consideration per share of Common Stock as is received by other holders in respect of their shares of Common Stock, and (iv) unless waived pursuant to the terms of the Restated Certificate and as may be required by law, the aggregate consideration receivable by all holders of the Preferred Stock and Common Stock shall be allocated among the holders of Preferred Stock and Common Stock on the basis of the relative liquidation preferences to which the holders of each respective series of Preferred Stock and the holders of Common Stock are entitled in a Deemed Liquidation Event (assuming for this purpose that the Proposed Sale is a Deemed Liquidation Event) in accordance with the Company's Certificate of Incorporation in effect immediately prior to the Proposed Sale; provided, however, that, notwithstanding the foregoing provisions of this Section 5.3(f), if the consideration to be paid in exchange for the Key Holder Shares or Investor Shares, as applicable, pursuant to this Section 5.3(f) includes any securities and due receipt thereof by any Key Holder or Investor would require under applicable law (x) the registration or qualification of such securities or of any person as a broker or dealer or agent with respect to such securities; or (y) the provision to any Key Holder or Investor of any information other than such information as a prudent issuer would generally furnish in an offering made solely to "accredited investors" as defined in Regulation D promulgated under the Securities Act, the Company may cause to be paid to any such Key Holder or Investor in lieu thereof, against surrender of the Key Holder Shares or Investor Shares, as applicable, which would have otherwise been sold by such Key Holder or Investor, an amount in cash equal to the fair value (as determined in good faith by the Board) of the securities which such Key Holder or Investor would otherwise receive as of the date of the issuance of such securities in exchange for the Key Holder Shares or Investor Shares, as applicable;

(g)    subject to clause (f) above, requiring the same form of consideration to be available to the holders of any single class or series of capital stock, if any holders of any capital stock of the Company are given an option as to the form and amount of consideration to be received as a result of the Proposed Sale, all holders of such capital stock will be given the same option; provided, however, that nothing in this Section 5.3(g) shall entitle any holder to receive any form of consideration that such holder would be ineligible to receive as a

result of such holder's failure to satisfy any condition, requirement or limitation that is generally applicable to the Company's stockholders.

(h)    the Electing Holders shall exercise its rights pursuant to this <u>Section 5</u> by delivering a written notice (the "**Drag-along Notice**") to each Stockholder no later than 20 days prior to the closing date of such Proposed Sale. The Drag-along Notice shall make reference to the Electing Holder's rights and obligations hereunder and shall describe in reasonable detail:

(i)    the number of shares of Common Stock to be sold by Volvo, if the Proposed Sale is structured as a Stock Sale;

(ii)    the identity of the third party purchaser;

(iii)    the proposed date, time and location of the closing of the Proposed Sale;

(iv)    the per share purchase price and the other material terms and conditions of the Proposed Sale, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof; and

(v)    a copy of any form of all definitive agreements proposed to be executed in connection therewith.

5.4    <u>Restrictions on Sales of Control of the Company</u>. No Stockholder shall be a party to any Stock Sale unless (a) all holders of Preferred Stock are allowed to participate in such transaction(s) and (b) the consideration received pursuant to such transaction is allocated among the parties thereto in the manner specified in the Company's Certificate of Incorporation in effect immediately prior to the Stock Sale (as if such transaction(s) were a Deemed Liquidation Event), unless the holders of at least the requisite percentage required to waive treatment of the transaction(s) as a Deemed Liquidation Event pursuant to the terms of the Restated Certificate, elect to allocate the consideration differently by written notice given to the Company at least 10 days prior to the effective date of any such transaction or series of related transactions.

6.    <u>Remedies</u>.

6.1    <u>Covenants of the Company</u>. The Company agrees to use its commercially reasonable best efforts, within the requirements of applicable law, to ensure that the rights granted under this Agreement are effective and that the parties enjoy the benefits of this Agreement. Such actions include, without limitation, the use of the Company's commercially reasonable best efforts to cause the nomination and election of the directors as provided in this Agreement.

6.2    <u>Irrevocable Proxy and Power of Attorney</u>. Each party to this Agreement hereby constitutes and appoints as the proxies of the party and hereby grants a power of attorney to the Chief Executive Officer of the Company, and a designee of Volvo, and each of them, with full power of substitution, with respect to the matters set forth herein, including, without

limitation, votes to increase authorized shares pursuant to <u>Section 2</u> hereof and votes regarding any Sale of the Company pursuant to <u>Section 5</u> hereof, and hereby authorizes each of them to represent and vote, if and only if the party (i) fails to vote, or (ii) attempts to vote (whether by proxy, in person or by written consent), in a manner which is inconsistent with the terms of <u>Sections 2</u> and <u>5</u> of this Agreement, all of such party's Shares in favor of the election of persons as members of the Board determined pursuant to and in accordance with the terms and provisions of this Agreement or the increase of authorized shares or approval of any Sale of the Company pursuant to and in accordance with the terms and provisions of <u>Sections 2</u> and <u>5</u>, respectively, of this Agreement or to take any action reasonably necessary to effect <u>Sections 2</u> and <u>5</u>, respectively, of this Agreement.  The power of attorney granted hereunder shall authorize the Chief Executive Officer of the Company to execute and deliver the documentation referred to in <u>Section 5.2(c)</u> on behalf of any party failing to do so within five business days of a request by the Company.  Each of the proxy and power of attorney granted pursuant to this <u>Section 6.2</u> is given in consideration of the agreements and covenants of the Company and the parties in connection with the transactions contemplated by this Agreement and, as such, each is coupled with an interest and shall be irrevocable unless and until this Agreement terminates or expires pursuant to <u>Section 6</u> hereof. Each party hereto hereby revokes any and all previous proxies or powers of attorney with respect to the Shares and shall not hereafter, unless and until this Agreement terminates or expires pursuant to <u>Section 6</u> hereof, purport to grant any other proxy or power of attorney with respect to any of the Shares, deposit any of the Shares into a voting trust or enter into any agreement (other than this Agreement), arrangement or understanding with any person, directly or indirectly, to vote, grant any proxy or give instructions with respect to the voting of any of the Shares, in each case, with respect to any of the matters set forth herein.

    6.3 <u>Specific Enforcement</u>. Each party acknowledges and agrees that each party hereto will be irreparably damaged in the event any of the provisions of this Agreement are not performed by the parties in accordance with their specific terms or are otherwise breached. Accordingly, it is agreed that each of the Company and the Stockholders shall be entitled to an injunction to prevent breaches of this Agreement, and to specific enforcement of this Agreement and its terms and provisions in any action instituted in any court of the United States or any state having subject matter jurisdiction.

    6.4 <u>Remedies Cumulative</u>. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

   7. "<u>Bad Actor" Matters</u>.

    7.1 <u>Definitions</u>. For purposes of this Agreement:

     (a) "**Company Covered Person**" means, with respect to the Company as an "issuer" for purposes of Rule 506 promulgated under the Securities Act, any Person listed in the first paragraph of Rule 506(d)(1).

     (b) "**Disqualified Designee**" means any director designee to whom any Disqualification Event is applicable, except for a Disqualification Event as to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable.

     (c) "**Disqualification Event**" means a "bad actor" disqualifying event

10

described in Rule 506(d)(1)(i)-(viii) promulgated under the Securities Act.

(d) "**Rule 506(d) Related Party**" means, with respect to any Person, any other Person that is a beneficial owner of such first Person's securities for purposes of Rule 506(d) under the Securities Act.

7.2    Representations.

(a) Each Person with the right to designate or participate in the designation of a director pursuant to this Agreement hereby represents that (i) such Person has exercised reasonable care to determine whether any Disqualification Event is applicable to such Person, any director designee designated by such Person pursuant to this Agreement or any of such Person's Rule 506(d) Related Parties, except, if applicable, for a Disqualification Event as to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable and (ii) no Disqualification Event is applicable to such Person, any Board member designated by such Person pursuant to this Agreement or any of such Person's Rule 506(d) Related Parties, except, if applicable, for a Disqualification Event as to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable. Notwithstanding anything to the contrary in this Agreement, each Investor makes no representation regarding any Person that may be deemed to be a beneficial owner of the Company's voting equity securities held by such Investor solely by virtue of that Person being or becoming a party to (x) this Agreement, as may be subsequently amended, or (y) any other contract or written agreement to which the Company and such Investor are parties regarding (1) the voting power, which includes the power to vote or to direct the voting of, such security; and/or (2) the investment power, which includes the power to dispose, or to direct the disposition of, such security.

(b) The Company hereby represents and warrants to the Investors that no Disqualification Event is applicable to the Company or, to the Company's knowledge, any Company Covered Person, except for a Disqualification Event as to which Rule 506(d)(2)(ii–iv) or (d)(3) is applicable.

7.3    Covenants. Each Person with the right to designate or participate in the designation of a director pursuant to this Agreement covenants and agrees (i) not to designate or participate in the designation of any director designee who, to such Person's knowledge, is a Disqualified Designee, (ii) to exercise reasonable care to determine whether any director designee designated by such person is a Disqualified Designee, (iii) that in the event such Person becomes aware that any individual previously designated by any such Person is or has become a Disqualified Designee, such Person shall as promptly as practicable take such actions as are necessary to remove such Disqualified Designee from the Board and designate a replacement designee who is not a Disqualified Designee, and (iv) to notify the Company promptly in writing in the event a Disqualification Event becomes applicable to such Person or any of its Rule 506(d) Related Parties, or, to such Person's knowledge, to such Person's initial designee named in Section 1, except, if applicable, for a Disqualification Event as to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable.

8.    Term. This Agreement shall be effective as of the date hereof and shall continue in effect until and shall terminate upon the earliest to occur of (a) the consummation of the Company's first underwritten public offering of its Common Stock (other than a registration

statement relating either to the sale of securities to employees of the Company pursuant to its stock option, stock purchase or similar plan or an SEC Rule 145 transaction); (b) the consummation of a Sale of the Company and distribution of proceeds to or escrow for the benefit of the Stockholders in accordance with the Restated Certificate, provided that the provisions of Section 3 hereof will continue after the closing of any Sale of the Company to the extent necessary to enforce the provisions of Section 3 with respect to such Sale of the Company; and (c) termination of this Agreement in accordance with Section 9.8 below.

9.      Miscellaneous.

9.1      Additional Parties.

(a)      Notwithstanding anything to the contrary contained herein, if the Company issues additional shares of Preferred Stock after the date hereof, as a condition to the issuance of such shares the Company shall require that any purchaser of such shares become a party to this Agreement by executing and delivering (i) the Adoption Agreement attached to this Agreement as Exhibit A, or (ii) a counterpart signature page hereto agreeing to be bound by and subject to the terms of this Agreement as an Investor and Stockholder hereunder. In either event, each such person shall thereafter be deemed an Investor and Stockholder for all purposes under this Agreement.

(b)      In the event that after the date of this Agreement, the Company enters into an agreement with any Person to issue shares of capital stock to such Person (other than to a purchaser of Preferred Stock described in Section 9.1(a) above), then, the Company shall cause such Person, as a condition precedent to entering into such agreement, to become a party to this Agreement by executing an Adoption Agreement in the form attached hereto as Exhibit A, agreeing to be bound by and subject to the terms of this Agreement as a Stockholder and thereafter such person shall be deemed a Stockholder for all purposes under this Agreement.

9.2      Transfers. Each transferee or assignee of any Shares subject to this Agreement shall continue to be subject to the terms hereof, and, as a condition precedent to the Company's recognition of such transfer, each transferee or assignee shall agree in writing to be subject to each of the terms of this Agreement by executing and delivering an Adoption Agreement substantially in the form attached hereto as Exhibit A. Upon the execution and delivery of an Adoption Agreement by any transferee, such transferee shall be deemed to be a party hereto as if such transferee were the transferor and such transferee's signature appeared on the signature pages of this Agreement and shall be deemed to be an Investor and Stockholder, or Key Holder and Stockholder, as applicable. The Company shall not permit the transfer of the Shares subject to this Agreement on its books or issue a new certificate representing any such Shares unless and until such transferee shall have complied with the terms of this Section 9.2. Each certificate instrument, or book entry representing the Shares subject to this Agreement if issued on or after the date of this Agreement shall be notated by the Company with the legend set forth in Section 9.12.

9.3      Successors and Assigns. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations,

DocuSign Envelope ID: EC0DB867-A6B7-4D3D-A74D-9CA7D289E8FD

or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

       9.4    <u>Governing Law</u>. This Agreement shall be governed by the internal law of the State of Delaware, without regard to conflict of law principles that would result in the application of any law other than the law of the State of Delaware.

       9.5    <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

       9.6    <u>Titles and Subtitles</u>. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

       9.7    <u>Notices</u>.

       (a) All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after the business day of deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective parties at their address as set forth on <u>Schedule A</u> or <u>Schedule B</u> hereto, or to such email address, facsimile number or address as subsequently modified by written notice given in accordance with this <u>Section 7.7</u>. If notice is given to the Company, a copy shall also be sent to  231 Market Place, Suite 226, San Ramon, CA 94583 Attention: Syed M. Saifullah]; mubeen@aidenabled.com, with a copy to Khan Law Group LC, 9431 Haven Ave., Suite 100, Rancho Cucamonga, CA  91730, mkhan@khanlegal.com; and if notice is given to Stockholders, a copy shall also be given to Volvo Car Technology Fund AB, SE-405 31 Göteborg, Sweden, Attention: Daniel Karlsson, <u>danielkarlsson.3@volvocars.com</u>, with a copy to McKennon Shelton & Henn, LLP, 401 East Pratt Street, Suite 2600, Baltimore, MD 21202, Attention: Sulee S. Clay; <u>sulee.clay@mshllp.com</u>.

       (b)    <u>Consent to Electronic Notice</u>.  Each Investor and Key Holder consents to the delivery of any stockholder notice pursuant to the Delaware General Corporation Law (the "**DGCL**"), as amended or superseded from time to time, by electronic transmission pursuant to Section 232 of the DGCL (or any successor thereto) at the electronic mail address or the facsimile number set forth below such Investor's or Key Holder's name on the Schedules hereto, as updated from time to time by notice to the Company, or as on the books of the Company.  To the extent that any notice given by means of electronic transmission is returned or undeliverable for any reason, the foregoing consent shall be deemed to have been revoked until a new or corrected electronic mail address has been provided, and such attempted Electronic

Notice shall be ineffective and deemed to not have been given. Each Investor and Key Holder agrees to promptly notify the Company of any change in its electronic mail address, and that failure to do so shall not affect the foregoing.

9.8    Consent Required to Amend, Modify, Terminate or Waive. This Agreement may be amended, modified or terminated (other than pursuant to Section 8) and the observance of any term hereof may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a written instrument executed by (a) the Company; (b) the Key Holders holding a majority of the Shares then held by the Key Holders who are then providing services to the Company as officers, employees or consultants; and (c) the holders of a majority of the shares of Common Stock issued or issuable upon conversion of the shares of Preferred Stock held by the Investors (voting together as a single class), including Volvo. Notwithstanding the foregoing:

(a)    this Agreement may not be amended, modified or terminated and the observance of any term of this Agreement may not be waived with respect to any Investor or Key Holder without the written consent of such Investor or Key Holder unless such amendment, modification, termination or waiver applies to all Investors or Key Holders, as the case may be, in the same fashion;

(b)    the provisions of Sections 1.2(a) and this Section 9.8(b) may not be amended, modified, terminated or waived without the written consent of Volvo;

(c)    the consent of the Key Holders shall not be required for any amendment, modification, termination or waiver if such amendment, modification, termination, or waiver either (A) is not directly applicable to the rights of the Key Holders hereunder; or (B) does not adversely affect the rights of the Key Holders in a manner that is different than the effect on the rights of the other parties hereto;

(d)    Schedule A hereto may be amended by the Company from time to time in accordance with Section 1.3 of the Purchase Agreement to add information regarding additional Purchasers (as defined in the Purchase Agreement) without the consent of the other parties hereto; and

(e)    any provision hereof may be waived by the waiving party on such party's own behalf, without the consent of any other party.

The Company shall give prompt written notice of any amendment, modification, termination, or waiver hereunder to any party that did not consent in writing thereto. Any amendment, modification, termination, or waiver effected in accordance with this Section 7.8 shall be binding on each party and all of such party's successors and permitted assigns, whether or not any such party, successor or assignee entered into or approved such amendment, modification, termination or waiver. For purposes of this Section 9.8, the requirement of a written instrument may be satisfied in the form of an action by written consent of the Stockholders circulated by the Company and executed by the Stockholder parties specified, whether or not such action by written consent makes explicit reference to the terms of this Agreement.

9.9     <u>Delays or Omissions</u>. No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default previously or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

9.10     <u>Severability</u>. The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.

9.11     <u>Entire Agreement</u>. This Agreement (including the Exhibits hereto), the Restated Certificate and the other Transaction Agreements (as defined in the Purchase Agreement) constitute the full and entire understanding and agreement between the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties is expressly canceled.

9.12     <u>Share Certificate Legend</u>. Each certificate, instrument, or book entry representing any Shares issued after the date hereof shall be notated by the Company with a legend reading substantially as follows:

"THE SHARES REPRESENTED HEREBY ARE SUBJECT TO A VOTING AGREEMENT, AS MAY BE AMENDED FROM TIME TO TIME, (A COPY OF WHICH MAY BE OBTAINED UPON WRITTEN REQUEST FROM THE COMPANY), AND BY ACCEPTING ANY INTEREST IN SUCH SHARES THE PERSON ACCEPTING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF THAT VOTING AGREEMENT, INCLUDING CERTAIN RESTRICTIONS ON TRANSFER AND OWNERSHIP SET FORTH THEREIN."

The Company, by its execution of this Agreement, agrees that it will cause the certificates instruments, or book entry evidencing the Shares issued after the date hereof to be notated with the legend required by this <u>Section 7.12</u> of this Agreement, and it shall supply, free of charge, a copy of this Agreement to any holder of such Shares upon written request from such holder to the Company at its principal office. The parties to this Agreement do hereby agree that the failure to cause the certificates, instruments, or book entry evidencing the Shares to be notated with the legend required by this <u>Section 7.12</u> herein and/or the failure of the Company to supply, free of charge, a copy of this Agreement as provided hereunder shall not affect the validity or enforcement of this Agreement.

9.13     <u>Stock Splits, Stock Dividends, etc.</u> In the event of any issuance of Shares or the voting securities of the Company hereafter to any of the Stockholders (including, without limitation, in connection with any stock split, stock dividend, recapitalization, reorganization, or

the like), such Shares shall become subject to this Agreement and shall be notated with the legend set forth in Section 9.12.

9.14    Manner of Voting. The voting of Shares pursuant to this Agreement may be effected in person, by proxy, by written consent or in any other manner permitted by applicable law.  For the avoidance of doubt, voting of the Shares pursuant to this Agreement need not make explicit reference to the terms of this Agreement.

9.15    Further Assurances. At any time or from time to time after the date hereof, the parties agree to cooperate with each other, and at the request of any other party, to execute and deliver any further instruments or documents and to take all such further action as the other party may reasonably request in order to carry out the intent of the parties hereunder.

9.16    Costs of Enforcement. If any party to this Agreement seeks to enforce its rights under this Agreement by legal proceedings, the non-prevailing party shall pay all costs and expenses incurred by the prevailing party, including, without limitation, all reasonable attorneys' fees.

9.17    Aggregation of Stock. All Shares held or acquired by a Stockholder and/or its Affiliates shall be aggregated together for the purpose of determining the availability of any rights under this Agreement, and such Affiliated persons may apportion such rights as among themselves in any manner they deem appropriate.

9.18    Spousal Consent. If any individual Stockholder is married on the date of this Agreement, such Stockholder's spouse shall execute and deliver to the Company a consent of spouse in the form of Exhibit B hereto ("**Consent of Spouse**"), effective on the date hereof. Notwithstanding the execution and delivery thereof, such consent shall not be deemed to confer or convey to the spouse any rights in such Stockholder's Shares that do not otherwise exist by operation of law or the agreement of the parties. If any individual Stockholder should marry or remarry subsequent to the date of this Agreement, such Stockholder shall within 30 days thereafter obtain his/her new spouse's acknowledgement of and consent to the existence and binding effect of all restrictions contained in this Agreement by causing such spouse to execute and deliver a Consent of Spouse acknowledging the restrictions and obligations contained in this Agreement and agreeing and consenting to the same.

9.19    Arbitration. Any unresolved controversy or claim arising out of or relating to this Agreement, except as (i) otherwise provided in this Agreement, or (ii) any such controversies or claims arising out of either party's intellectual property rights for which a provisional remedy or equitable relief is sought, shall be submitted to arbitration by one arbitrator mutually agreed upon by the parties, and if no agreement can be reached within 30 days after names of potential arbitrators have been proposed by the American Arbitration Association (the "**AAA**"), then by one arbitrator having reasonable experience in corporate finance transactions of the type provided for in this Agreement and who is chosen by the AAA. The arbitration shall take place in San Francisco, California, in accordance with the AAA rules then in effect, and judgment upon any award rendered in such arbitration will be binding and may be entered in any court having jurisdiction thereof.  There shall be limited discovery prior to the arbitration hearing as follows: (a) exchange of witness lists and copies of documentary evidence and documents relating to or arising out of the issues to be arbitrated, (b) depositions of

all party witnesses and (c) such other depositions as may be allowed by the arbitrators upon a showing of good cause. Depositions shall be conducted in accordance with the California Code of Civil Procedure, the arbitrator shall be required to provide in writing to the parties the basis for the award or order of such arbitrator, and a court reporter shall record all hearings, with such record constituting the official transcript of such proceedings. Each party will bear its own costs in respect of any disputes arising under this Agreement. The prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled.

      9.20  <u>Governing Law</u>. This Agreement shall be governed by the internal law of the State of Delaware, without regard to conflict of law principles that would result in the application of any law other than the law of the State of Delaware.

      9.21  <u>WAIVER OF JURY TRIAL</u>: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have executed this Voting Agreement as of the date first written above.

**AIDEN AUTOMOTIVE TECHNOLOGIES, INC.**

By: _Niclas Gyllenram_____

Name:  Niclas Gyllenram

Title:  President

DocuSign Envelope ID: EC0BD867-A6B7-4D3D-A74D-8CA7D389E8FD

IN WITNESS WHEREOF, the parties have executed this Voting Agreement as of the date first written above.

**INVESTOR:**

**VOLVO CAR TECHNOLOGY FUND AB**

By: _____
Name: Raymond Millien
Title: Managing Director

By: _____
Name: Pär Arvidsson
Title: Chairman of the Board

IN WITNESS WHEREOF, the parties have executed this Voting Agreement as of the date first written above.

**KEY HOLDERS**:

DocuSigned by:

*Jonas Fenn*

JONAS FENN

DocuSigned by:

SYED MUBEEN SAIFULLAH

DocuSigned by:

*Niclas Gyllenram*

NICLAS GYLLENRAM

## **SCHEDULE A**

### **INVESTORS**

**Name and Address**                                    **Number of Shares Held**

Volvo Car Technology Fund AB                    900,000 shares of Seed Preferred Stock
SE-405 31 Göteborg
Sweden

## **SCHEDULE B**

## **KEY HOLDERS**

| **Name and Address** | **Number of Shares Held** |
|---|---|
| Syed Mubeen Saifullah<br>23 Pebble Ct.<br>San Ramon, CA 94583 | 1,312,000 Common Stock |
| Niclas Gyllenram<br>129 Lowell Ave<br>Palo Alto, CA  94301 | 1,476,000 Common Stock |
| Jonas Fenn<br>63 A Manchester St.<br>San Francisco, CA 94110 | 1,312,000 Common Stock |

## SCHEDULE C

## INITIAL OBLIGATIONS

**Founder Obligations:**

1. The Company has received, or on or prior to March 11, 2021 shall have received, gross proceeds of at least $500,000 from the sale of SAFE instruments to purchasers other than Volvo in accordance with the Seed Stock Purchase Agreement among the Company and the purchaser of Preferred Stock (the "**Purchase Agreement**").

2. Within 120 days following the Effective Date, the Key Holders (the "**Founders**") shall complete or have completed and delivered to Volvo an acceptable Business Plan (as defined in the Investor Rights Agreement between the Company and Volvo dated as of the Effective Date) to the reasonable satisfaction of Volvo.

3. Founders shall make every reasonable effort to organize, promote and market the Company and its products and services, and shall deliver to Volvo an acceptable marketing plan within 120 days following the Effective Date, to the reasonable satisfaction of Volvo.

4. Founders will continue their employment with Volvo Car Group to the reasonable satisfaction of their current, respective managers, and agree that any of their obligations to the Company shall be subordinate to their obligations to Volvo Car Group. The development of any Company products shall occur outside the Founder's normal work schedule at Volvo Car Group.

5. The Founders' obligations under that certain Right of First Refusal and Co-Sale Agreement dated as of the Effective Date among the Company and the stockholders of the Company party thereto (the "**Co-Sale Agreement**")

**Company Obligations:**

1. Within 12 months following the Effective Date, the Company shall ship a working prototype of a product that can be deployed in a testing environment to an early-adopter customer to get feedback/early results and constantly iterate the product from thereon.

2. Within 18 months following the Effective Date, the Company shall demonstrate a sales and/or partnership pipeline, in each case subject to the reasonable satisfaction of Volvo.

3. The Company shall submit monthly and quarterly financial reports to Volvo for the first 24 months following the Effective Date, with basic P&L and cash flow items.

4. The Company's obligations under the Co-Sale Agreement.

DocuSign Envelope ID: EC0BD867-A6B7-4D3D-A74D-8CA7D389E8FD

## EXHIBIT A

## ADOPTION AGREEMENT

This Adoption Agreement ("**Adoption Agreement**") is executed on _____, 20__, by the undersigned (the "**Holder**") pursuant to the terms of that certain Voting Agreement dated as of March 8, 2021 (the "**Agreement**"), by and among the Company and certain of its Stockholders, as such Agreement may be amended or amended and restated hereafter. Capitalized terms used but not defined in this Adoption Agreement shall have the respective meanings ascribed to such terms in the Agreement. By the execution of this Adoption Agreement, the Holder agrees as follows.

1.1     Acknowledgement. Holder acknowledges that Holder is acquiring certain shares of the capital stock of the Company (the "**Stock**"), for one of the following reasons (Check the correct box):

☐     As a transferee of Shares from a party in such party's capacity as an "Investor" bound by the Agreement, and after such transfer, Holder shall be considered an "Investor" and a "Stockholder" for all purposes of the Agreement.

☐     As a transferee of Shares from a party in such party's capacity as a "Key Holder" bound by the Agreement, and after such transfer, Holder shall be considered a "Key Holder" and a "Stockholder" for all purposes of the Agreement.

☐     As a new Investor in accordance with Section 7.1(a) of the Agreement, in which case Holder will be an "Investor" and a "Stockholder" for all purposes of the Agreement.

☐     In accordance with Section 7.1(b) of the Agreement, as a new party who is not a new Investor, in which case Holder will be a "Stockholder" for all purposes of the Agreement.

1.2     Agreement. Holder hereby (a) agrees that the Stock, and any other shares of capital stock or securities required by the Agreement to be bound thereby, shall be bound by and subject to the terms of the Agreement and (b) adopts the Agreement with the same force and effect as if Holder were originally a party thereto.

1.3     Notice. Any notice required or permitted by the Agreement shall be given to Holder at the address or facsimile number listed below Holder's signature hereto.

**HOLDER:**

_____
Name and Title of Signatory

Address: _____
_____
Email: _____


**ACCEPTED AND AGREED**:
**AIDEN AUTOMOTIVE TECHNOLOGIES, INC.**


**By:** _____
**Name:** _____
**Title:** _____

DocuSign Envelope ID: EC0BD867-A6B7-4D3D-A74D-8CA7D389E8FD

## EXHIBIT B

### CONSENT OF SPOUSE

I, [_____], spouse of [_____], acknowledge that I have read the Voting Agreement, dated as of March 8, 2021, to which this Consent is attached as Exhibit B (the "**Agreement**"), and that I know the contents of the Agreement. I am aware that the Agreement contains provisions regarding the voting and transfer of shares of capital stock of the Company that my spouse may own, including any interest I might have therein.

I hereby agree that my interest, if any, in any shares of capital stock of the Company subject to the Agreement shall be irrevocably bound by the Agreement and further understand and agree that any community property interest I may have in such shares of capital stock of the Company shall be similarly bound by the Agreement.

I am aware that the legal, financial and related matters contained in the Agreement are complex and that I am free to seek independent professional guidance or counsel with respect to this Consent. I have either sought such guidance or counsel or determined after reviewing the Agreement carefully that I will waive such right.

Dated:_____    _____

*[Name of Key Holder's Spouse]*

# EXHIBIT 5

# PATENT ASSIGNMENT AGREEMENT

This Patent Assignment and License Agreement ("**_Agreement_**"), dated 8 March 2021 (the "**_Effective Date_**"), is made by and between:

**VOLVO CAR TECHNOLOGY FUND AB**, reg. No. 556877-5760, a company organized and existing under the laws of Sweden and having offices Assar Gabrielssons Väg 9, 405 31 Göteborg, Sweden ("**_Tech Fund_**");

**AIDEN AUTOMOTIVE TECHNOLOGIES, INC.**, a Delaware corporation with its principal place of business at 231 Market Place, Suite 226, San Ramon, CA 94583, USA ("**_Aiden_**");

Tech Fund and Aiden are sometimes individually referred to as "**_Party_**" and collectively referred to as "**_Parties_**".

**WHEREAS**, Tech Fund owns U.S. Provisional Patent Application Ser. No. 63/065,559, entitled "Automotive Data Sharing Platform," Atty. Docket No. P2896US00, filed on 14 August 2020 (the "**_Patent_**"); and

**WHEREAS**, Aiden desires to obtain title to the Patent in connection with its business, and Tech Fund desires to assign such Patent, subject to the terms and conditions for such assignment as set out in this Agreement.

**WHEREAS**, Aiden, in consideration for the assignment of the aforementioned Patent, shall allocate an equity interest in Aiden to Tech Fund, subject to specific terms and conditions in a separate writing.

**NOW, THEREFORE**, in consideration of the above premises and mutual covenants contained herein and intending to be legally bound hereby, the Parties hereto agree as follows:

**SECTION 1      ASSIGNMENT AND LICENSE**

1.1     **Patent Rights.** As used herein "**_Patent Rights_**" means: **(a)** the Patent; **(b)** any reissues, reexaminations, extensions, continuations, continuing prosecution applications, requests for continuing examinations, divisions, and registrations of any item in any of the foregoing categories (a) and (b); **(c)** all foreign patents, patent applications, and counterparts relating to any item in any of the foregoing categories (a) through (b), including, without limitation, certificates of invention, utility models, industrial design protection, design patent protection, and other governmental grants or issuances**; (d)** all inventions, invention disclosures, and discoveries described in any of the items of categories (a), (b) and (c) (referred to herein as "**_Categories (a)-(c) Items_**") that: (i) are included in any claim in the Categories (a)-(c) Items, (ii) are subject matter capable of being reduced to a patent claim in a reissue or reexamination proceedings brought on the Categories (a)-(c) Items, and/or (iii) could have been included as a claim in the Categories (a)-(c) Items; **(e)** all rights to apply in any or all countries of the world for patents, certificates of invention, utility models, industrial design protections, design patent protections, or other governmental grants or issuances of any type related to any item in any of the foregoing categories (a) through (d), including, without limitation, under the Paris Convention for the Protection of Industrial Property, the International Patent Cooperation Treaty, or any other convention, treaty, agreement, or understanding**; and (f)** all causes of action (whether known or unknown, or whether currently pending, filed or otherwise) and other enforcement rights under, or on account of, the Patent, including, without limitation, all causes of action and other enforcement rights for: (i) damages, (ii) injunctive relief, and (iii) any other remedies of any kind for past, current and future infringement.

1.2     **Assignment of Patent Rights.** Subject to the pre-existing grant-back license to Volvo Car Corporation as disclosed to Aiden, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, Tech Fund hereby sells, conveys, transfers, assigns and delivers to Aiden on the

Effective Date, and Aiden hereby acquires from Tech Fund, all right, title, and interest in and to the Patent Rights, including, without limitation: (a) all right, title and interest in and to the Patent; and (b) all right, title and interest to sue and collect for past infringement of the Patent.

1.3     **Documents.** As used herein, "***Documents***" means: **(a)** the recordable *Assignment of Patent Rights* in the form attached hereto as **Exhibit A**, duly executed by Tech Fund; **(b)** all agreements assigning ownership of the Patent Rights from the inventors and/or prior owners to Tech Fund; **(c)** all files, documents and tangible things constituting, comprising or relating to the investigation, evaluation, preparation, prosecution, maintenance, defense, filing, issuance, registration, assertion or enforcement of the Patent; and **(d)** such additional documents as Aiden may reasonably request in order to ascertain the accuracy of Tech Fund' representations and warranties in this Agreement, or to effect, perfect and evidence the transactions contemplated by this Agreement. Any exchange of information by the Parties (or their respective legal counsel) related to the Patent Rights will be pursuant to a common interest privilege, if applicable.

1.4     **Closing.** Subject to the terms and conditions of this Agreement, Aiden and Tech Fund will use commercially reasonable efforts to complete the assignment of the Patent Rights contemplated herein within 30 days of the Effective Date (the "***Closing***"); provided, however, that prior to the Closing Tech Fund shall deliver to Aiden the Documents and notify Aiden of any action required with respect to any Patent Rights within 60 days after the Closing Date and will facilitate Aiden's taking such action.

1.5     **Maintenance of Patent Rights**.  Aiden shall have the exclusive right to maintain, enforce, and monetize the Patent Rights, which exclusive right shall include, but not be limited to, filing, applying for, or registering patents in respect of any creations and inventions embodied in the Patent Rights, in its own name, at its expense and in such jurisdictions as it deems appropriate.

1.6     **Right of First Refusal**.  Should Aiden desire to sell any of the Patent Rights separate and apart from a merger or acquisition transaction, it shall offer Tech Fund a right of first refusal to purchase such Patent Rights from Aiden. In the event that Aiden is required to offer Tech Fund a right of first refusal pursuant to this Section 1.6, it shall provide written notice of such offer (the "***Offer Notice***") to Tech Fund not later than 45 days prior to commencing any discussions with one or more third parties with regard to such sale opportunity. Following delivery of an Offer Notice, Aiden will respond to reasonable requests from Tech Fund for information regarding the potential sale opportunity.  Tech Fund shall have the option, for a period of 30 days following its receipt of an Offer Notice (the "***Notice Period***"), to elect whether to commence negotiations with Aiden pertaining to such opportunity and to notify Aiden accordingly.  In the event Tech Fund elects to commence such negotiations with Aiden, Tech Fund shall have 30 days after notifying Aiden thereof (the "***Negotiation Period***") to sign a mutually agreed definitive agreement with Aiden with regard to such sale opportunity. During the Notice Period and the Negotiation Period (if any), Aiden shall negotiate exclusively with Tech Fund and in good faith regarding the terms of a purchase agreement with regard to such opportunity.  Aiden shall not be permitted to negotiate or consummate an agreement pertaining to such opportunity with any person(s) or entity(ies) other than Tech Fund during the Notice Period and Negotiation Period (if any).  In the event that (a) Tech Fund does not elect to commence the Negotiation Period, (b) Tech Fund does not respond to the Offer Notice within the Notice Period, or (c) the Parties do not sign a definitive agreement with regard to such opportunity on mutually agreed terms prior to expiration of the Negotiation Period, then the Aiden shall be permitted to enter into an agreement with any third party with regard to such opportunity; provided, however, that with respect to this subparagraph (c), in no event shall Aiden offer or agree to terms and conditions with any third party that, on the whole, are more favorable to such third party than the most favorable terms and conditions offered to Tech Fund without first providing Tech Fund written notice thereof and a reasonable period of time (but in any event not less than 10 days after receiving written notice thereof) to accept such more favorable terms and sign a definitive agreement with regard to such opportunity with Aiden. The foregoing notwithstanding, Tech Fund shall have no obligation to commence negotiations for, or to sign a definitive agreement with regard to, an such opportunity.

## SECTION 2        REPRESENTATIONS AND WARRANTIES

2.1        **Tech Fund's Representations and Warranties**. Tech Fund hereby represents and warrants to Aiden as follows:

(a)        **Authority**. Tech Fund has the full power and authority and has obtained all third-party consents, approvals, and/or other authorizations required to enter into this Agreement and to carry out its obligations hereunder, including, without limitation, the assignment of the Patent Rights to Aiden.

(b)        **Title and Contest**. Tech Fund owns all right, title, and interest to the Patent Rights, including, without limitation, all right, title, and interest to sue and collect for past infringement of the Patents. There are no actions, suits, investigations, claims, or proceedings threatened, pending, or in progress relating in any way to the Patent Rights. There are no existing contracts, agreements, options, commitments, proposals, bids, offers, or rights with, to, or in any person to acquire any of the Patent Rights.

(c)        **Validity and Enforceability**. The Patent has never been found invalid, unpatentable, or unenforceable for any reason in any administrative, arbitration, judicial or other proceeding, and Tech Fund does not know of and has not received any notice or information of any kind from any source suggesting that the Patent may be invalid or unenforceable.

(d)        **Documents**. All Documents supplied to Aiden are originals or true and correct copies of the originals.

2.2        **Aiden's Representations and Warranties**. Aiden hereby represents and warrants to Tech Fund that: Aiden is a company duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation; and Aiden has the full power and authority and has obtained all third-party consents, approvals, and/or other authorizations required to enter into this Agreement and to carry out its obligations hereunder, including, without limitation, the acquisition of the Patent Rights from Tech Fund.

2.3        **Negation of Implications**. Nothing in this Agreement shall be construed as: (a) a requirement that Tech Fund shall, in any country, file any patent application, secure any patent or maintain any patent in force; (b) an obligation that Tech Fund bring, prosecute, cooperate or join any actions or suits against third parties for infringement of the Patent Rights; (c) an obligation that Tech Fund furnish to Aiden any hardware, software, manufacturing or technical information, or know-how; (d) conferring to Aiden the right to use in advertising, publicity or otherwise any trademark or trade name of Tech Fund; or (e) granting by implication, estoppel, or otherwise, any licenses or rights under any patents owned by Tech Fund other than the Patent Rights, regardless of whether such other patents are related to, dominant of, or subordinate to, the Patent Rights.

## SECTION 3        GENERAL PROVISIONS

3.1        **Further Cooperation**. Tech Fund will, at the reasonable request of Aiden and without demanding any consideration therefore, do all things necessary, proper, or advisable, including without limitation, the execution, acknowledgment, and recordation of specific assignments, oaths, declarations, and other documents on a jurisdiction-by-jurisdiction basis, to assist Aiden in obtaining, perfecting, sustaining, and/or enforcing the Patent Rights; provided, however, that any expenses incident to the execution of papers or providing testimony shall be borne by Aiden, its successors and assigns.

3.2        **Limitation of Liability**. EXCEPT IN THE EVENT OF BREACH OF ANY OF THE WARRANTIES IN SECTION 2.1, TECH FUND' TOTAL LIABILITY UNDER THIS AGREEMENT WILL NOT EXCEED US$10,000.00.

3.3        **Limitation on Consequential Damages**. EXCEPT IN THE EVENT OF BREACH OF ANY OF THE WARRANTIES IN SECTION 2.1, NEITHER PARTY WILL HAVE ANY OBLIGATION OR LIABILITY (WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, AND NOTWITHSTANDING ANY

FAULT, NEGLIGENCE (WHETHER ACTIVE, PASSIVE OR IMPUTED), REPRESENTATION, STRICT LIABILITY OR PRODUCT LIABILITY), FOR COVER OR FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL, MULTIPLIED, PUNITIVE, SPECIAL, OR EXEMPLARY DAMAGES OR LOSS OF REVENUE, PROFIT, SAVINGS OR BUSINESS ARISING FROM OR OTHERWISE RELATED TO THIS AGREEMENT, EVEN IF A PARTY OR ITS REPRESENTATIVES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

3.4     **Compliance with Laws**. Notwithstanding anything contained in this Agreement to the contrary, the obligations of the Parties with respect to the consummation of the transactions contemplated by this Agreement shall be subject to all laws, present and future, of any government having jurisdiction over the Parties and this transaction, and to orders, regulations, directions or requests of any such government.

3.5     **Confidentiality of Terms**. The Parties hereto will keep the terms of this Agreement confidential and will not now or hereafter divulge any of this information to any third party except: **(a)** with the prior written consent of the other Party; **(b)** as otherwise may be required by law or legal process; **(c)** during the course of litigation, so long as the disclosure of such terms and conditions is restricted in the same manner as is the confidential information of other litigating parties; **(d)** in confidence to its legal counsel, accountants, banks, and financing sources and their advisors solely in connection with complying with or administering its obligations with respect to this Agreement; **(e)** by Aiden, to potential purchasers or licensees of the Patent Rights; **(f)** in order to perfect Aiden's interest in the Patent Rights with any governmental patent office; or **(g)** to enforce Aiden's right, title, and interest in and to the Patent Rights; provided that, in (b) and (c) above: (i) to the extent permitted by law, the disclosing Party will use all legitimate and legal means available to minimize the disclosure to third parties, including, without limitation, seeking a confidential treatment request or protective order whenever appropriate or available, and (ii) the disclosing Party will provide the other Party with at least ten days' prior written notice of such disclosure. Both Parties acknowledge that the breach of this Section 3.5 will immediately give rise to continuing irreparable injury to the non-disclosing Party inadequately compensable in damages at law and without prejudice to any other remedy available to the non-disclosing Party, and may entitle the non-disclosing Party to obtain injunctive relief.

3.6     **Notices**. All notices given hereunder will be given in writing, and will be delivered to the address set forth on the first page to this Agreement by personal delivery or delivery postage prepaid by an internationally-recognized express courier service. Notices are deemed given on the date of receipt if delivered personally or by express courier, or if delivery refused, the date of refusal. Notice given in any other manner will be deemed to have been given only if and when received at the address of the Party to be notified. Either Party may from time to time change its address for notices under this Agreement by giving the other Party written notice of such change in accordance with this Section 3.6.

3.7     **Relationship of Parties.** The Parties hereto are independent contractors. Nothing in this Agreement will be construed to create a partnership, joint venture, franchise, fiduciary, employment or agency relationship between the Parties. Neither Party has any express or implied authority to assume or create any obligations on behalf of the other or to bind the other to any contract, agreement or undertaking with any third party.

3.8     **Waiver**. Failure by either Party to enforce any term of this Agreement will not be deemed a waiver of future enforcement of that or any other term in this Agreement or any other agreement that may be in place between the Parties.

3.9     **Governing Law and Disputes**. This Agreement will be interpreted, construed, and enforced in all respects in accordance with the laws the state of California, without reference to its choice of law principles. Any dispute, controversy or claim arising out of or in connection with this Agreement, or the breach, termination or invalidity thereof, shall be finally settled by arbitration in accordance with the Arbitration Rules of the American Arbitration Association and the laws of the state of California in San Francisco, California. The arbitral tribunal shall be composed of one arbitrator.

3.10 **Assignment.** Either Party may assign or transfer or transfer any rights or delegate any obligations under this Agreement without the other Party's consent. All of the terms, conditions and provisions of this Agreement shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective Parties hereto.

3.11 **Entire Agreement.** The Agreement, including its exhibits, constitutes the entire agreement between the Parties with respect to the subject matter hereof, and merges and supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions. Neither of the Parties will be bound by any conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof other than as expressly provided herein. No oral explanation or oral information by either Party hereto will alter the meaning or interpretation of this Agreement. The terms and conditions of this Agreement will prevail notwithstanding any different, conflicting or additional terms and conditions that may appear on any letter, email or other communication or other writing not expressly incorporated into this Agreement.

3.12 **Amendments.** No amendments or modifications will be effective unless in a writing signed by authorized representatives of both Parties.

3.13 **Agreement is Controlling.** The section headings contained in this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement.

3.14 **Severability.** If any provision of this Agreement is found to be invalid or unenforceable, then the remainder of this Agreement will have full force and effect, and the invalid provision will be modified, or partially enforced, to the maximum extent permitted to effectuate the original objective.

3.15 **No Rights in Third Parties.** The Agreement is not intended to confer any right or benefit on any third party (including, but not limited to, any employee or beneficiary of any Party), and no action may be commenced or prosecuted against a Party by any third party claiming as a third-party beneficiary of this Agreement or any of the transactions contemplated by this Agreement.

3.16 **Counterparts.** This Agreement shall become binding when any one or more counterparts hereof, individually or taken together, shall bear the signatures each of the Parties hereto. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original as against the Party whose signature appears thereon, but all of which taken together shall constitute but one and the same instrument.

**IN WITNESS WHEREOF**, the Parties have entered into this Agreement as of the Effective Date.

**VOLVO CAR TECHNOLOGY FUND AB:**       **AIDEN AUTOMOTIVE TECHNOLOGIES, INC:**





By: _____       By: _____
       [Signature]                                        [Signature]

Raymond Millien                             Niclas Gyllenram
_____             _____
       [Printed Name]                                     [Printed Name]

3/9/2021                                    3/8/2021
_____             _____
       [Date]                                             [Date]

By: _____
       [Signature]

Pär Arvidsson
_____
       [Printed Name]

3/9/2021
_____
       [Date]

## EXHIBIT A
### Recordable Assignment of Patent Rights

For good and valuable consideration, the receipt of which is hereby acknowledged, **Volvo Car Technology Fund AB**, reg. no. 556877-5760, a company organized and existing under the laws of Sweden and having offices Assar Gabrielssons Väg 9, 405 31 Göteborg, Sweden ("**Assignor**"), does hereby sell, assign, transfer, and convey unto **Aiden Automotive Technologies, Inc.**, a Delaware corporation with its principal place of business at 231 Market Place, Suite 226, San Ramon, CA, USA ("**Aiden**"), or its designees, all right, title, and interest that exist today and may exist in the future in and to any and all of the following:

(a)      U.S. Provisional Patent Application Ser. No. 63/065,559, entitled "Automotive Data Sharing Platform," Atty. Docket No. P2896US00, filed on 14 August 2020 (the "**Patent**"):

(b)      all reissues, reexaminations, extensions, continuations, continuing prosecution applications, requests for continuing examinations, divisions, registrations of the Patent;

(c)      all foreign patents, patent applications, and counterparts relating to any item in any of the foregoing including, without limitation, certificates of invention, utility models, industrial design protection, design patent protection, and other governmental grants or issuances;

(d)      all inventions, invention disclosures, and discoveries described in any of the items of categories (a), (b) and (c) (referred to herein as "**Categories (a)-(c) Items**") that: (i) are included in any claim in the Categories (a)-(c) Items, (ii) are subject matter capable of being reduced to a patent claim in any of the Categories (a)-(c) Items, and/or (iii) could have been included as a claim in any of the Categories (a)-(c) Items;

(e)      all rights to apply in any or all countries of the world for patents, certificates of invention, utility models, industrial design protections, design patent protections, or other governmental grants or issuances of any type related to any item in any of the foregoing categories (a) through (d), including, without limitation, under the Paris Convention for the Protection of Industrial Property, the International Patent Cooperation Treaty, or any other convention, treaty, agreement, or understanding; and

(f)      all causes of action (whether known or unknown or whether currently pending, filed, or otherwise) and other enforcement rights under, or on account of, the Patent and/or any item in any of the foregoing categories (c) through (e), including, without limitation, all causes of action and other enforcement rights for (i) damages, (ii) injunctive relief, and (iii) any other remedies of any kind for past, current, and future infringement;

((a)-(f) collectively, the "**Patent Rights**").

Assignor hereby authorizes the respective patent office or governmental agency in each jurisdiction to issue any and all patents, certificates of invention, utility models or other governmental grants or issuances that may be granted upon any of the Patent Rights in the name of Aiden, as the assignee to the entire interest therein. The terms and conditions of this Assignment of Patent Rights will inure to the benefit of Aiden, its successors, assigns, and other legal representatives and will be binding upon Assignor, its successors, assigns, and other legal representatives.

**IN WITNESS WHEREOF**, this Assignment of Patent Rights is executed on 8 March 2021:

ASSIGNOR: **VOLVO CAR TECHNOLOGY FUND AB**

By: _Raymond Millien_                        By: _Pär Arvidsson_

Name:   Raymond Millien                      Name:   Pär Arvidsson

Title:    Managing Director                    Title:    Chairman of the Board

# EXHIBIT 6

# SERVICES AGREEMENT

This Services Agreement ("**Agreement**"), is entered into March 8, 2021 (the "**Effective Date**") by and between:

**VOLVO CAR TECHNOLOGY FUND AB**, reg. No. 556877-5760, a company organized and existing under the laws of Sweden and having at offices Assar Gabrielssons Väg 9, 405 31 Göteborg, Sweden ("***Tech Fund***"); and

**VOLVO CAR TECHNOLOGY  USA, LLC,** a Delaware corporation having offices at 231 Market Place, Suite 226, San Ramon, CA 94583. ("***Volvo Cars***").

Tech Fund and Volvo Cars are hereinafter collectively referred to as "**Parties**" and individually referred to as "**Party**"; and Tech Fund is also referred to as "**Purchaser**"; Volvo Cars is also referred to as "**Service Provider**".

1.  **Background.** The Parties have determined that Service Provider shall provide to Purchaser (and/or its respective Affiliates and Portfolio Companies) certain office, equipment, and technology services, and R&D project management services as they may request in writing from time to time (collectively, the "**Services**"). Purchaser now wishes to enter into this Agreement for the purpose of receiving the Services and Service Provider wishes to provide the Services in accordance with the terms set forth in this Agreement.

2.  **Definitions:**

    2.1  **Affiliate** means any other legal entity that, directly or indirectly, is controlled by or is under common control with a Party; and control means the possession, directly or indirectly, by agreement or otherwise, of: (i) at least 50% of the voting stock, partnership interest or other ownership interest; or (ii) the power to: (a) appoint or remove a majority of the board of directors or other governing body of an entity, or (b) cause the direction of the management of an entity; provided, however, the Purchaser shall not be considered Affiliates of each other hereunder.

    2.2  **Background IP** means all IP that were either developed or otherwise acquired by Purchaser before the Effective Date, or are developed or otherwise acquired by Purchaser outside of this Agreement and disclosed to Service Provider hereunder in order to effectuate any of the Services.

    2.3  **Confidential Information** means information, other than the Excluded Information, relating to the Disclosing Party and its business (whether in written, verbal, or digital form), including without limitation ideas, concepts, designs, specifications, drawings, notes, technology, methods, intellectual property, know-how, trade secrets, future (business) plans and programs, operations, services, products, costs, processes, models, procedures, manuals, customer lists, this Agreement, negotiations of and any activities conducted under this Agreement, and information that the Parties shared regarding the Purpose prior to the signing of this Agreement.

    2.4  **Disclosing Party** means the Party disclosing Confidential Information hereunder.

    2.5  **Excluded Information** means information that: (i) is or becomes public through no fault of the Receiving Party; (ii) is lawfully obtained from someone other than the Disclosing Party that is not under an obligation to the Disclosing Party to keep that information confidential; (iii) was already in the possession of the Receiving Party prior to the date of disclosure without an obligation to keep that information confidential; or (iv) the Receiving Party develops independently without use of Confidential Information.

    2.6  **IP** means all proprietary technology, software, methods, processes, know-how, inventions, data or technical information, and all Patents and other intellectual and industrial property rights thereto.

    2.7  **Patents** means utility models, industrial designs and all patents (including, without limitation, patents of importation, patents of confirmation, patents of improvement, design patents,

certificates of addition and utility patents, as well as divisions, reissues, continuations, continuations-in-part, reexamination certificates, provisional applications, renewals and extensions of any of the foregoing, and applications therefor).

**2.8**     **Personnel** means employees and non-employee consultants of a Party (or its Affiliates or Portfolio Companies) that participate in the Services or other matters relevant to this Agreement.

**2.9**     **Portfolio Company** means any entity in which the Tech Fund has made an equity and/or debt investment, and has identified to Service Provider as a third-party beneficiary to this Agreement pursuant to <u>Section 15</u>.

**2.10**   **Receiving Party** means the Party receiving Confidential Information hereunder.

**2.11**   **Results** means any outcome of the Services, as described in the relevant specification, plan, statement of work, or other requesting documentation, made by Service Provider hereunder (including, but not limited to, any IP, deliverables, objects, products, documentation, and any modifications or improvements to any Background IP), irrespective of whether the performance of any part of the Services has been completed.

**2.12**   **Use** means to use (in object and source code form, if applicable), exploit, make, develop, change, transmit, copy, and distribute (including sell and offer for sale) goods or services; including having a third party at any tier do any of the foregoing on a Party's behalf.

**3.**     **Services.** Service Provider shall provide sufficient Personnel to support and carry out its Service commitments under this Agreement. Service Provider hereby warrants that the Services shall be of professional quality and performed consistent with generally accepted industry standards. Service Provider provides the Services "as is". Service Provider does not warrant or represent that any Services provided or delivered to Purchaser hereunder are functional for the business needs of Purchaser, otherwise suitable for any specific purpose, or are not infringing any IP of any third party. Service Provider gives no representations or warranties regarding the merchantability of the Results nor any other representations or warranties of any kind whatsoever concerning the Services. Purchaser acknowledges that the price of the Services is set in consideration of the foregoing.

**4.**     **Confidentiality.**

**4.1**    The Receiving Party will with respect to Disclosing Party's Confidential Information: (a) hold it in strict confidence; (b) use it only for the performance of the Services and, if applicable, exercising any license rights granted hereunder; (c) protect it from misappropriation, unauthorized use or disclosure using all reasonable precautions that the Receiving Party uses to protect its own confidential information (but not less than a commercially-reasonable degree of care); (d) not modify, reverse engineer, or disassemble it without the Disclosing Party's consent, provided that Receiving Party may perform such activities to exercise license rights granted hereunder; and (e) not share it with anyone except its Affiliates', Personnel and advisors who have a "need to know" and have agreed in writing to keep it confidential.

**4.2**    The Receiving Party may disclose Confidential Information to comply with any applicable law or a court order if that Receiving Party notifies the Disclosing Party (if allowed by law) and takes reasonable and lawful actions to limit the extent of the disclosure.

**5.**     **Intellectual Property Rights.**

**5.1**    As used in this <u>Section 5</u>, "Purchaser" shall include Purchaser and/or any of its relevant Affiliate(s) or Portfolio Companies receiving the relevant Services from Service Provider producing the relevant Results hereunder.

**5.2**    All Background IP owned by Purchaser will continue to be owned by such Purchaser. Purchaser hereby grants and agrees to grant Service Provider a royalty-free, fully-paid-up, revocable, non-exclusive, worldwide license to Use its respective Background IP only to the extent necessary for purposes of the Service Provider carrying out the Services.

**5.3**    Unless agreed upon by Purchaser in a separate writing, the Parties agree that Purchaser shall be the exclusive owner of all Results and are hereby assigned such Results.

**5.4** If applicable, each Party and its Personnel shall, at no cost to the other Party, provide all support and sign all documents to: (a) assign or otherwise evidence the owning Purchaser's ownership in its Results, and all IP rights thereto; and (b) enable the owning Party to obtain Patents or other IP rights in the Results.

**5.5** Any compensation due to a Party's Personnel in connection with any Patent or the creation of any other IP, whether by agreement, statute, regulation or otherwise, shall be paid entirely by such Party.

**6.** **Service Charges and Payments.** In consideration of the Service Provider's performance of the Services under this Agreement, the Parties agree that Purchaser shall pay to Service Provider the sums specified in Exhibit A (which may be amended from time to time by mutual agreement of the Parties) monthly in arrears and invoiced by Service Provider on a net-90 basis.

**7.** **Term.** The term of this Agreement will begin on the Effective Date and will continue for one year thereafter unless terminated as specified herein. Purchaser, together with the written consent of the Third Party Beneficiary (defined in Paragraph 15) may terminate this Agreement at any time, with or without cause, by providing the Service Provider with written notice. Termination is effective immediately unless otherwise specified in the termination notice. Termination of the Agreement shall result in termination of all then outstanding requests for Services. Termination shall not relieve Purchaser of its obligation to pay any fees that have accrued as of the effective date of such termination.

**8.** **Export Control.** The Parties will comply with all national and foreign export control laws and regulations, and all national and foreign trade restrictions related to any Confidential Information.

**9.** **Governing Law and Disputes.**

**9.1** This Agreement shall be governed by and interpreted in accordance with the laws of Sweden, excluding any choice of law rules that direct the application of the law of any other jurisdiction.

**9.2** Any dispute, controversy or claim arising out of or in connection with this Agreement, or the breach, termination or invalidity thereof, shall be finally settled by arbitration administered by the Arbitration Institute of the Stockholm Chamber of Commerce (the "**SCC**"). The Rules for Expedited Arbitrations shall apply, and the Arbitral Tribunal shall be composed of one arbitrator. The seat of arbitration shall be Gothenburg, Sweden and the language to be used in the arbitral proceedings shall be English. However, the foregoing shall not preclude or restrict any of the Parties to seek specific performance and other injunctive relief in an appropriate court of competent jurisdiction. All information disclosed, and all documents submitted or issued by or on behalf of any of the Parties or the arbitrators in any arbitral proceedings, as well as all decisions and awards made or declared in the course of any such proceedings, shall be kept strictly confidential and may not be used for any purpose other than these proceedings or the enforcement of any such decision or award nor be disclosed to any third party without the prior written consent of the Party to which the information relates.

**9.3** No right or remedy available to a Party under this Agreement will exclude other rights and remedies available by law.

**10.** **Relationship.** The Parties are independent contractors. This Agreement does not create any agency, partnership or joint venture between the Parties.

**11.** **Assignment.** No Party will assign any rights or delegate any obligations under this Agreement without all the other Parties' written consent.

**12.** **Entire Agreement.** This Agreement is the entire agreement of the Parties relating to the subject matter hereof and supersedes all other oral or written agreements.

**13.** **Conflicts.** Nothing contained in this Agreement shall supersede, modify, limit, eliminate or otherwise affect any of the representations and warranties, covenants, agreements or indemnities set forth in the JVA.

**14.** **Amendment and Waiver.** No amendment of this Agreement will be effective unless it is in writing and signed by all the Parties. A waiver of any default is not a waiver of any later default and will not affect the validity of this Agreement.

15. **Third-Party Beneficiary.** The Parties agree and acknowledge that Aiden Automotive Technologies, Inc., a Delaware corporation with its principal place of business at 231 Market Place, Suite 226, San Ramon CA 94583, shall be a Portfolio Company hereunder and beneficiary of this Agreement.

16. **Severability.** Unenforceable provisions will be modified to reflect the Parties' intention and only to the extent necessary to make them enforceable, and the remaining provisions of this Agreement will remain in effect.

17. **Notices.** All notices and other communications under this Agreement will be in writing. Each Party will send notices to the other Party at the address stated in the first paragraph, to the attention of such Party's authorized signatory.

18. **Survival.** The terms of this Agreement that expressly are to, or by implication ought to, survive, will survive this Agreement.

19. **Counterparts.** This Agreement may be signed electronically and in counterparts, which together will constitute one instrument. The Parties agree that a scanned or electronic copy of this Agreement signed by all Parties' authorized signatories will constitute a binding agreement.

**VOLVO CAR TECHNOLOGY FUND AB:**

By: _Raymond Millien_
DD5BF6117C8BC4F5...
[Signature]

Raymond Millien    CEO
[Printed Name]

3/9/2021
[Date]

By: _Pär Arvidsson_
502SF67C493D443...
[Signature]

Pär Arvidsson    Chairman
[Printed Name]

3/10/2021
[Date]

**VOLVO CAR TECHNOLOGY USA, LLC:**

By: _Courtney Murray_
Courtney Murray (May 13, 2021 16:52 EDT)
[Signature]

Courtney Murray
[Printed Name]

5/13/2021
[Date]

By: _Michael (G) Thomas_
Michael (G) Thomas (May 13, 2021 16:53 EDT)
[Signature]

Michael Thomas
[Printed Name]

5/13/2021
[Date]

## EXHBIT A

| Service | Cost Basis (USD) | Unit | 12-Month Total |
|---|---|---|---|
| Office Space (Area) | $      80.00 | per sqft/year | $  16 000.00 |
| Big Rig | $ 10 000.00 | per unit | $  20 000.00 |
| Mini Rig | $  2 000.00 | per unit | $  10 000.00 |
| Desk Space | $ 13 661.00 | per person/year | $  40 983.00 |
| Car Access | $ 12 000.00 | per car/year | $  12 000.00 |
| | | | |
| **Estimated Term Total** | | US$ 98 983.00    1 year | |

EXHIBIT 7

**VOLVO**

# Press Release

Jun 30, 2021 | ID: 283544

## Volvo Cars To Harness Real-Time Data From Customer Cars To Set New Safety Standards

The next generation of Volvo cars are set to be the company's safest ever, thanks to cutting-edge software and hardware levels, coupled with continuous and more rapid improvements to safety features with the help of real-time data.

Volvo Cars has always taken a data-driven approach to safety, using traffic data from real-life situations to develop new safety technologies and make its cars even safer. For its next generation of cars, Volvo Cars is now looking towards processing data from customer cars in real time, if customers choose to share data and help Volvo Cars make its cars safer.

By allowing customers to choose and be a part of improving safety levels and traffic safety in this way, Volvo Cars can make continuous and much faster improvements to its cars, constantly improving safety levels. This data would include continuous inputs on the car's environment from sensors like the high-resolution LiDAR delivered by technology company Luminar.

Volvo Cars engineers would be able to validate and verify autonomous drive (AD) features quicker, to promote a safe roll-out of AD technology. Thanks to the data generated from millions of kilometres driven by tens of thousands of Volvo drivers around the globe, engineers would be able to validate AD features for specific geographic locations much quicker than with a limited number of cars on a test track.

Verified updates to existing systems and new features can be rolled out rapidly through over-the-air-updates, increasing the safety of Volvo cars step by step. The first car to benefit from this new approach to safety development is the company's first SUV on a completely new electric-only technology base.

"With help from real-life data we can speed up our development processes and go from years to days," said Ödgärd Andersson, CEO at Zenseact, Volvo Cars' autonomous driving software arm. "As real-time collection generates a lot more data, we can create better and higher-quality data sets that allow us to make better and quicker decisions on the next advancements in safety. We're taking a giant leap to increase safety in and around our cars."

To process the real-time traffic data they will collect, Volvo Cars and Zenseact are investing in a data factory that will contain over 200 PebiBytes (225 million gigabytes) of data within the next few years. By using artificial intelligence (AI) capabilities, data can be crunched at record times. Customers will be able to choose whether this data is collected about them, and all collected data will be aggregated with adequate safeguards for customer privacy.

"Safety is part of our heritage and the backbone of our company, but software is a crucial part of our modern-day DNA," said Mats Moberg, head of R&D at Volvo Cars. "So while we continue to build on the 50-year expertise of the industry-leading Volvo Cars Accident Research Team, we can now also leverage AI as a new, virtual accident research team."

The use of real-time data is part of Volvo Cars' longer term vision for a future where collisions simply no longer happen, by equipping its cars with some of the best sensors available and advanced, continuously improving safety and autonomous drive systems.

Volvo Cars' forthcoming fully electric flagship SUV will have industry-leading safety technology as standard, helping the company to save even more lives as it sets a new standard for automotive safety. It will come with state-of-the-art sensors, including a LiDAR developed by Luminar and an autonomous driving computer powered by the NVIDIA DRIVE Orin™ system-on-a-chip, as standard.

By combining this state-of-the-art hardware with software by Volvo Cars, Zenseact and Luminar for the next generation of its well-established collision avoidance technology, Volvo Cars expects its new safety package to reduce fatalities and accidents as a whole.

Over time the car will improve and have the hardware and software capabilities to allow the car to take over on its own, in case the driver does not respond in life-threatening situations after repeated warnings. So while the driver always remains in ultimate control, the car and its safety technology can both support and watch over the driver like an extra pair of eyes and brains.

-------------------------------

*Volvo Car Group in 2020*
*For the 2020 financial year, Volvo Car Group recorded an operating profit of 8.5 BSEK (14.3 BSEK in 2019). Revenue over the period amounted to 262.8 BSEK (274.1 BSEK). For the full year of 2020, global sales reached 661,713 cars (705,452), a decline of 6.2 per cent compared to 2019.*

*About Volvo Car Group*
*Volvo Cars was founded in 1927. Today, it is one of the most well-known and respected car brands in the world with sales of 661,713 cars in 2020 in about 100 countries. Volvo Cars has been under the ownership of the Zhejiang Geely Holding since 2010.*

*As of December 2020, Volvo Cars employed approximately 40,000 (41,500) full-time employees. Volvo Cars head office, product development, marketing and administration functions are mainly located in Gothenburg, Sweden. Volvo Cars head office for APAC is located in Shanghai. The company's main car production plants are located in Gothenburg (Sweden), Ghent (Belgium), South Carolina (US), Chengdu and Daqing (China), while engines are manufactured in Skövde (Sweden) and Zhangjiakou (China) and body components in Olofström (Sweden).*

*Under its new company purpose, Volvo Cars aims to provide customers with the Freedom to Move in a personal, sustainable and safe way. This purpose is reflected into a number of business ambitions: for example, by the middle of this decade it aims for half of its global sales to be fully electric cars and to establish five million direct consumer relationships. Volvo Cars is also committed to an ongoing reduction of its carbon footprint, with the ambition to be a climate-neutral company by 2040.*

Keywords:
Safety, Press Releases, Connectivity

Descriptions and facts in this press material relate to Volvo Cars' international car range. Described features might be optional. Vehicle specifications may vary from one country to another and may be altered without prior notification.

# Media Contacts

## Volvo Cars Media Relations
Phone: +46 31-596525
media@volvocars.com

media.volvocars.com >        volvocars.com >

Copyright © 2020 Volvo Car Corporation (or its affiliates or licensors).

**V O L V O**

# Press Release

Jun 30, 2021 | ID: 283545

# Future Volvo Cars To Run On Volvo Operating System As Company Takes Software Development In-House

Volvo Cars will take software development in-house as a car's appeal increasingly becomes more defined by software-driven functions and features, rather than traditional automotive attributes.

The next generation of pure electric Volvo models, including the company's first SUV on a completely new electric-only technology base, will run on Volvo Cars' own operating system (OS), called VolvoCars.OS, for faster and more flexible development. Coupled with more frequent over-the-air updates to customer cars through their lifetime, the company's aim is to make Volvo cars better every day.

VolvoCars.OS will act as an umbrella system for electric Volvo cars. It incorporates the company's various operating systems across the car and the cloud, creating one coherent software OS environment. The underlying operating systems include Android Automotive OS, QNX, AUTOSAR and Linux.

Through a variety of application programming interfaces (APIs), including the previously announced Extended Vehicle API, the VolvoCars.OS gives developers access to in-car features such as vehicle sensor data, user interfaces and cloud-based features such as fleet data, subject to customer consent. This allows developers to create new services and applications for Volvo cars.

"By developing software in-house we can boost development speeds and improve your Volvo faster than we can today," said Henrik Green, chief technology officer. "Just like on your smartphone or computer, new software and features can be rolled out swiftly through over-the-air updates, making your Volvo better and even more enjoyable over time."

To truly benefit from developing software in-house, Volvo Cars is also centralising computing inside its fully electric cars into a core system, removing a lot of complexity. Rather than relying on multiple electronic control units around the car that control individual features and systems, an increasing amount of in-house developed software will run in a powerful core computing system in the car.

The core computing system, which will first be introduced on a new Volvo model set to be revealed in 2022, is made up of three main computers. These support each other in operating vision processing and artificial intelligence, general computing and infotainment respectively.

The shift to centralised computing also allows Volvo Cars to gradually separate hardware from software. This means the company can introduce more frequent hardware cycles, so that new Volvo models can be equipped with the latest available hardware.

Volvo Cars is making the shift to in-house development and central computing working together with leading technology firms. These include NVIDIA, with whom the company is working with on the core systems, and Google, its co-development partner for its infotainment systems.

"We have a deliberate strategy of partnering with true technology leaders where it makes sense," added Henrik Green. "Google is a true leader in user experience and services, from Google Maps to Google Assistant, while NVIDIA gives us access to some of the fastest and best computing available. This approach of selected strategic partnerships is much more effective than trying to do everything on our own."

Volvo Cars' successful collaboration with technology leaders to give its customers the best possible user experience is also a driving factor behind its decision to open up its VolvoCars.OS to third-party innovation through open APIs.

Today's announcement is made in conjunction with the first Volvo Cars Tech Moment. You can catch the event live and on demand here.

-------------------------------

### Volvo Car Group in 2020
*For the 2020 financial year, Volvo Car Group recorded an operating profit of 8.5 BSEK (14.3 BSEK in 2019). Revenue over the period amounted to 262.8 BSEK (274.1 BSEK). For the full year of 2020, global sales reached 661,713 cars (705,452), a decline of 6.2 per cent compared to 2019.*

### About Volvo Car Group
*Volvo Cars was founded in 1927. Today, it is one of the most well-known and respected car brands in the world with sales of 661,713 cars in 2020 in about 100 countries. Volvo Cars has been under the ownership of the Zhejiang Geely Holding since 2010.*

*As of December 2020, Volvo Cars employed approximately 40,000 (41,500) full-time employees. Volvo Cars head office, product development, marketing and administration functions are mainly located in Gothenburg, Sweden. Volvo Cars head office for APAC is located in Shanghai. The company's main car production plants are located in Gothenburg (Sweden), Ghent (Belgium), South Carolina (US), Chengdu and Daqing (China), while engines are manufactured in Skövde (Sweden) and Zhangjiakou (China) and body components in Olofström (Sweden).*

*Under its new company purpose, Volvo Cars aims to provide customers with the Freedom to Move in a personal, sustainable and safe way. This purpose is reflected in a number of business ambitions: for example, by the middle of this decade it aims for half of its global sales to be fully electric cars, to sell half of its global volume online and to establish five million direct consumer relationships. Volvo Cars is also committed to an ongoing reduction of its carbon footprint, with the ambition to be a climate-neutral company by 2040.*

## Keywords:
Safety, Press Releases, Connectivity

Descriptions and facts in this press material relate to Volvo Cars' international car range. Described features might be optional. Vehicle specifications may vary from one country to another and may be altered without prior notification.

# Media Contacts

**Volvo Cars Media Relations**
Phone: +46 31-596525
media@volvocars.com

media.volvocars.com >            volvocars.com >

Copyright © 2020 Volvo Car Corporation (or its affiliates or licensors).