# EXHIBIT B

AT-105

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*

Marc Lazo, Esq. - SBN 215998
K&L LAW GROUP, P.C.
2646 Dupot Drive, Suite 60340, Irvine, CA 92612
TELEPHONE NO.: (949) 216-4000     FAX NO. *(Optional):*
E-MAIL ADDRESS *(Optional):*
ATTORNEY FOR *(Name):* Plaintiff

**FOR COURT USE ONLY**

Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 12/29/2021 10:11 AM
Reviewed By: F. Miller
Case #21CV389918
Envelope: 7949056

SUPERIOR COURT OF CALIFORNIA, COUNTY OF CONTRA COSTA
STREET ADDRESS: 191 North First Street
MAILING ADDRESS: 191 North First Street
CITY AND ZIP CODE: San Jose, CA 95113
BRANCH NAME:

PLAINTIFF: Aiden Automotive Technologies, Inc.

DEFENDANT: Volvo Car Group, et al.,

| APPLICATION FOR | CASE NUMBER: |
|---|---|
| ☐ RIGHT TO ATTACH ORDER   ☑ TEMPORARY PROTECTIVE ORDER<br>☐ ORDER FOR ISSUANCE OF WRIT OF ATTACHMENT<br>☐ ORDER FOR ISSUANCE OF ADDITIONAL WRIT OF ATTACHMENT<br>  ☐ After Hearing   ☑ Ex Parte<br>  ☐ Against Property of Nonresident | 21CV389918 |

1. Plaintiff *(name):* Aiden Automotive Technologies, Inc.

   applies   ☐ after hearing   ☑ ex parte   for
   a. ☐ a right to attach order and writ of attachment.
   b. ☐ an additional writ of attachment.
   c. ☑ a temporary protective order.
   d. ☐ an order directing the defendant to transfer to the levying officer possession of
      (1) ☐ property in defendant's possession.
      (2) ☐ documentary evidence in defendant's possession of title to property.
      (3) ☐ documentary evidence in defendant's possession of debt owed to defendant.

2. Defendant *(name):* Please see attached for names of Defendants

   a. ☐ is a natural person who
      (1) ☐ resides in California.
      (2) ☐ does not reside in California.
   b. ☐ is a corporation
      (1) ☐ qualified to do business in California.
      (2) ☐ not qualified to do business in California.
   c. ☐ is a California partnership or other unincorporated association.
   d. ☐ is a foreign partnership that
      (1) ☐ has filed a designation under Corporations Code section 15800.
      (2) ☐ has not filed a designation under Corporations Code section 15800.
   e. ☐ is other *(specify):*

3. Attachment is sought to secure recovery on a claim upon which attachment may issue under *(check one):*
   ☐ Code of Civil Procedure section 483.010   ☐ Welfare and Institutions Code section 15657.01.

4. Attachment is not sought for a purpose other than the recovery on a claim upon which the attachment is based.

5. Plaintiff has no information or belief that the claim is discharged or the prosecution of the action is stayed in a proceeding under title 11 of the United States Code (Bankruptcy).

Page 1 of 3

Form Approved for Optional Use
Judicial Council of California
AT-105 [Rev. July 1, 2010]

**APPLICATION FOR RIGHT TO ATTACH ORDER,
TEMPORARY PROTECTIVE ORDER, ETC. (Attachment)**

Code of Civil Procedure, §§ 482.030, 484.010 et seq.;
Welfare. & Institutions. Code, § 16657.01
www.courtinfo.ca.gov

AT-105

| SHORT TITLE | CASE NUMBER: |
|---|---|
| Aiden Automotive Technologies, Inc. v. Volvo Car Group, et al., | 21CV389918 |

6. a. [✓] Plaintiff's claim or claims arise out of conduct by the defendant who is a natural person of a trade, business, or profession. The claim or claims are not based on the sale or lease of property, a license to use property, the furnishing of services, or the loan of money where any of the foregoing was used by the defendant primarily for personal, family, or household purposes.

   b. [✓] Plaintiff's claim or claims arise out of conduct of a natural person who or an entity that has taken, secreted, appropriated, obtained or retained, or assisted in taking, secreting, appropriating, obtaining, or retaining real or personal property of an elder or dependent adult for a wrongful use, with intent to defraud, or by using undue influence.

7. The facts showing plaintiff is entitled to a judgment on the claim up on which the attachment is based are set forth with particularity in the

   a. [✓] verified complaint.

   b. [✓] attached affidavit or declaration.

   c. [  ] following facts *(specify)*:

      **See attached Verified Complaint, Application for Temporary Restraining Order (Points and Authorities) and Declarations of Niclas Gyllenram and Syed Saifullah**

8. The amount to be secured by the attachment is: $

   a. [  ] which includes estimated costs of: $

   b. [  ] which includes estimated allowable attorney fees of: $

9. Plaintiff is informed and believes that the following property sought to be attached for which a method of levy is provided is subject to attachment:

   a. [  ] Any property of a defendant who is **not** a natural person.

   b. [  ] Any property of a nonresident defendant.

   c. [  ] Property of a defendant who is a natural person that is subject to attachment under Code of Civil Procedure section 487.010 *(specify)*:

   d. [  ] Property covered by a bulk sales notice with respect to a bulk transfer by defendant on the proceeds of the sale of such property *(describe)*:

   e. [  ] Plaintiff's pro rata share of proceeds from an escrow in which defendant's liquor license is sold *(specify license number)*:

10. Plaintiff is informed and believes that the property sought to be attached is not exempt from attachment.

11. [  ] The court issued a Right to Attach Order on *(date)*:
     *(Attach a copy.)*

12. [  ] Nonresident defendant has not filed a general appearance.

**APPLICATION FOR RIGHT TO ATTACH ORDER,
TEMPORARY PROTECTIVE ORDER, ETC. (Attachment)**

AT-105

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Aiden Automotive Technologies, Inc. v. Volvo Car Group, et al., | 21CV389918 |

13. a.   Plaintiff ☐ alleges on ex parte application for order for writ of attachment
         ☑ is informed and believes on application for temporary protective order
    that plaintiff will suffer great or irreparable injury if the order is not issued before the matter can be heard on notice because

(1) ☑ it may be inferred that there is a danger that the property sought to be attached will be
    (a) ☐ concealed.
    (b) ☑ substantially impaired in value.
    (c) ☐ made unavailable to levy by other than concealment or impairment in value.

(2) ☐ defendant has failed to pay the debt underlying the requested attachment and is insolvent as defined in Code of Civil
    Procedure section 485.010(b)(2).

(3) ☐ a bulk sales notice was recorded and published pursuant to division 6 of the Commercial Code with respect to a bulk
    transfer by the defendant.

(4) ☐ an escrow has been opened under the provisions of Business and Professions Code section 24074 with respect to
    the sale by the defendant.

(5) ☑ other circumstances (specify):

   Defendants MUST be enjoined from further misappropriating Plaintiff's Intellectual
   Property, including the Data Enablement Platform technology that Plaintiff owns and
   was designed to only be used as specified in the agreements between Volvo and
   Plaintiff. Defendants are in direct violation of the Non-Compete clause.

b.  The statements in item 13a are established by ☑ the attached affidavit or declaration
    ☐ the following facts (specify):

    Declarations of Niclas Gyllenram and Syed Saifullah

14. ☑ Plaintiff requests the following relief by temporary protective order (specify):

    SEE ATTACHED PROPOSED ORDER

15. Plaintiff
    a. ☐ has filed an undertaking in the amount of: $
    b. ☑ has not filed an undertaking.

Date:  December 27, 2021

Marc Lazo
_____
(TYPE OR PRINT NAME OF PLAINTIFF OR PLAINTIFF's ATTORNEY)

▶ _____
(SIGNATURE OF PLAINTIFF OR PLAINTIFF'S ATTORNEY)

---

**DECLARATION**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:   December 27, 2021

     Marc Lazo
_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF DECLARANT)

16. Number of pages attached: _____173_____

**APPLICATION FOR RIGHT TO ATTACH ORDER,**
**TEMPORARY PROTECTIVE ORDER, ETC. (Attachment)**

Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 12/29/2021 10:11 AM
Reviewed By: F. Miller
Case #21CV389918
Envelope: 7949056

1  MARC Y. LAZO, SBN: 215998
   WILLIAM B. WELDEN, SBN: 117056
2  K&L LAW GROUP, P.C.
   2646 Dupont Drive, Suite 60340
3  Irvine, California 92612
   Phone No.:      (949) 216-4000
4  Fax No.:        (800) 596-0370

5  MASOOD R. KHAN, SBN: 231020
   KHAN LAW GROUP, LC
6  9431 Haven Avenue, Suite 100
   Rancho Cucamonga, CA 91730
7  Phone No:     (626) 262-4012
   Fax No:       (626) 628-3275
8  Email:        mkhan@khanlegal.com
   Attorneys for PLAINTIFF
9  AIDEN AUTOMOTIVE TECHNOLOGIES, INC.

10

11          **IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

12              **FOR THE COUNTY OF SANTA CLARA**

13

14  AIDEN AUTOMOTIVE TECHNOLOGIES,       )   CASE NO: 21CV389918
    INC., a Delaware corporation,        )
15                      PLAINTIFF,       )   **PLAINTIFF'S EX PARTE**
                                         )   **APPLICATION FOR TEMPORARY**
16  v.                                   )   **RESTRAINING ORDER AND**
                                         )   **ISSUANCE OF ORDER TO SHOW**
17  VOLVO CAR GROUP; VOLVO CAR           )   **CAUSE RE PRELIMINARY**
    TECHNOLOGY FUND AB; VOLVO CAR        )   **INJUNCTION; DECLARATIONS OF**
18  CORPORATION, a corporation; VOLVO    )   **NICLAS GYLLENRAM, SYED**
    CAR TECHNOLOGY USA LLC; a            )   **SAIFULLAH AND ROSIE CANTILLO IN**
19  California limited liability company; )   **SUPPORT THEREOF**
    ZENSEACT; POLESTAR AUTOMOTIVE        )
20  USA, INC., a Delaware corporation; HÅKAN )  ([Proposed] Order and Request for Judicial
    SAMUELSSON, an individual;  ÖDGÄRD   )   Notice Submitted Concurrently Herewith)
21  ANDERSSON, an individual;   HENRIK   )
    GREEN, an individual;  MARIA HEMBERG, )
22  an individual;  MATS MOBERG, an      )
    individual; SANELA IBROVIC, an       )   **DUE TO THE EMERGENT NATURE OF**
23  individual; PÄR ARVIDSSON, an individual; )  **THE RELIEF, NO HEARING IS**
    BOBBYKIN MAKWANA, an individual;     )   **REQUESTED**
24  JOAKIM ALPSTEN, and individual;      )
    MÅRTEN LEVENSTAM, an individual;     )
25  PATRIK BENGTSSON, an individual;     )
    DENNIS NOBELIUS, an individual , an  )
26  individual DOES 1-100, inclusive,    )
                                         )
27                      DEFENDANTS.      )
                                         )
28  _____     )

-1-

APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ISSUANCE OF ORDER TO SHOW CAUSE RE
PRELIMINARY INJUNCTION

1   **TO THE CLERK OF THE COURT, ALL INTERESTED PARTIES HEREIN, AND**

2   **THEIR ATTORNEYS OF RECORD:**

3       **PLEASE TAKE NOTICE** that PLAINTIFF AIDEN AUTOMOTIVE TECHNOLOGIES,

4   INC., a Delaware corporation (hereafter "PLAINTIFF" or "AIDEN") hereby moves the court for a

5   temporary restraining order to enjoin DEFENDANTS VOLVO CAR GROUP; VOLVO CAR

6   TECHNOLOGY FUND AB; VOLVO CAR CORPORATION, a corporation; VOLVO CAR

7   TECHNOLOGY USA LLC; a California limited liability company; ZENSEACT; POLESTAR

8   AUTOMOTIVE USA, INC., a Delaware corporation; HÅKAN SAMUELSSON, an individual;

9   ÖDGÄRD ANDERSSON, an individual; HENRIK GREEN, an individual; MARIA HEMBERG, an

10  individual; MATS MOBERG, an individual; SANELA IBROVIC, an individual; PÄR ARVIDSSON,

11  an individual; BOBBYKIN MAKWANA, an individual; JOAKIM ALPSTEN, and individual;

12  MÅRTEN LEVENSTAM, an individual; PATRIK BENGTSSON, an individual; DENNIS

13  NOBELIUS, an individual, and individual DOES 1-100, inclusive (hereafter collectively

14  "DEFENDANTS" or "VOLVO"), and DEFENDANTS' Affiliates from engaging in any "Competitive

15  Business" including but not limited to continuing their misappropriation of PLAINTIFF's Data

16  Enablement Platform, as further set forth below.

17      VOLVO and at least two of their "Affiliates" (POLESTAR and ZENSEACT) are currently

18  commercializing, by way of developing, marketing and attempting to sell, virtually identical to

19  PLAINTIFF'S Data Enablement Platform using PLAINTIFF'S technology for VOLVO's own

20  commercial purposes and in violation of agreements between VOLVO and PLAINTIFF.  Specifically,

21  Section 7.2 of the **SEED PREFERRED STOCK PURCHASE AGREEMENT** that VOLVO signed

22  with AIDEN (**Exhibit 3** to the Verified Complaint attached as **Exhibit "A"** to the Request for Judicial

23  Notice filed concurrently herewith) provides:

24          "For a period of two years from the date of the Closing, **Purchaser and its Affiliates**

25          (as defined below) **shall not operate a Competitive Business**; provided, that nothing

26          in this Section 7.2 shall prohibit Purchaser, or any of its Affiliates or successors and

27          assigns, from (a) acquiring or owning, directly or indirectly, voting securities of any

28          publicly traded Person, (b) conducting any business that Purchaser conducts as of the

APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ISSUANCE OF ORDER TO SHOW CAUSE RE
PRELIMINARY INJUNCTION

date hereof so long as it does not utilize the Transferred IP, or (c) utilizing technology from any Competitive Business for purposes of its vehicle production operations. For purposes of this Section 7.2, (i) **"Competitive Business" means any other Person engaged, directly or indirectly, in whole or in part, in the commercialization of a data enablement and/or data sharing system that communicates data to and from vehicles using the Android operating system, and (ii) "Affiliates" means Volvo Car AB and any Person controlled by Volvo Car AB.**"

Also, Section 1.2 (b) of the **VOTING AGREEMENT** VOLVO signed with AIDEN (**Exhibit 4** to the Verified Complaint in this matter) provides, that an Affiliate includes a corporation that is controlled by another person or entity that owns at least 50% of shares, or can replace a majority of the board, "or to cause the direction of the management" of that corporation, is an Affiliate. Under these definitions, POLESTAR and ZENSEACT Affiliates of VOLVO when, as set forth below, POLESTAR refused to cooperate with AIDEN in providing crucial testing equipment and personnel; whereas ZENSEACT developed its own data enabling system virtually identical to AIDEN's platform.

As set forth below, VOLVO has been in direct breach of Section 7.2 for months, and has in fact been directly competing with PLAINTIFF – and has even directed its Affiliates to do so - in furtherance of its conduct designed to ensure the eradication of PLAINTIFF, which would directly inure to VOLVO's benefit.

Section 1.5 of the INVESTORS RIGHTS AGREEMENT (**Exhibit 9** to the accompanying Declaration of Niclas Gyllenram ("Gyllenram Dec.")) defines "**Competitor**" as "a Person engaged, directly or indirectly (including through any partnership, limited liability company, corporation, joint venture or similar arrangement (whether now existing or formed hereafter)) in the commercialization of a data enablement and/or data sharing system that communicates data to and from vehicles using the Android operating system."

In addition, Section 6.3 of the **VOTING AGREEMENT** (**Exhibit 4** to the Verified Complaint in this matter) provides that DEFENDANTS *have already acknowledged* that a contractual breach will result in irreparable harm, and *__have already agreed to injunctive relief__* in the event of a contractual breach:

1    "6.3    Specific Enforcement. Each party acknowledges and agrees that each party hereto **will**
2    **be irreparably damaged** in the event any of the provisions of this Agreement are not performed by
3    the parties in accordance with their specific terms or are otherwise breached. Accordingly, **it is**
4    **agreed that each of the Company and the Stockholders shall be entitled to an injunction to**
5    **prevent breaches of this Agreement,** and to specific enforcement of this Agreement and its terms
6    and provisions in any action instituted in any court of the United States or any state having subject
7    matter jurisdiction."

8        Allowing VOLVO's continued misappropriation of AIDEN's Intellectual Property (i.e., the
9    Data Enablement Platform) and permitting VOLVO to continue to engage in the competitive conduct
10   described below will cause great and irreparable injury to AIDEN, not only because the
11   misappropriation is a direct violation of the parties' agreed upon contractual obligations and because
12   the entire reason AIDEN was formed as a spin-off was to allow the AIDEN FOUNDERS (also VOLVO
13   employees at the time) to develop the Data Enablement Platform independent of VOLVO, but because
14   doing so prevents AIDEN from fulfilling its own contractual obligations and consummating
15   development of its Data Enablement Platform.  As set forth below, VOLVO is continuing to market
16   PLAINTIFF's platform as its own technology while it is continuing to prevent PLAINTIFF from
17   developing its Data Enablement Platform as was contractually agreed to at the inception of the parties'
18   relationship, thereby ensuring PLAINTIFF's demise.

19       In addition, PLAINTIFF would be irreparably harmed if an injunction does not issue because
20   VOLVO is virtually the only automobile manufacturer using Android technology that enables AIDEN
21   to further refine  its  Data Enablement Platform.  (Gyllenram Decl., ¶18; Saifullah Decl., ¶10; Verified
22   Complaint ¶ 32, 89(b), 109. As such, without the requisite support incumbent on VOLVO to provide
23   PLAINTIFF, PLAINTIFF would simply cease to exist, as there is no other manufacturer in the global
24   automobile industry that could carry out these obligations. *Id.*

25       In addition, AIDEN has already been damaged to the tune of several million dollars in lost
26   investments and its current investors have confirmed they will sue AIDEN if VOLVO's conduct is not
27   immediately enjoined, further necessitating the issuance of immediate injunctive relief.  As further set
28   forth below, DEFENDANTS are refusing to abide by the contractually mandated obligations requiring

them to provide proper testing equipment, facilitation and resources that are crucial to AIDEN's development of its Data Enablement Platform and its ability to create a "sales pipeline" as required by the same Agreements of which VOLVO is in breach.  As VOLVO has already contractually agreed, irreparable harm has occurred and an injunction must be granted to prevent further harm.

VOLVO has also engaged – and if immediate injunctive relief is not issued will continue to engage – in retaliatory conduct against PLAINTIFF's principals. In this regard, VOLVO just recently fired AIDEN's co-founder Syed Saifullah for no reason. See Declaration of Niclas Gyllenram ¶ 28; and Declaration of Syed Saifullah Decl., ¶11.  Also, in or around September 2021, VOLVO cut access to Niclas Gyllenram's wife's work email, although she has been a longtime VOLVO employee, and it appears she will also be terminated.  Gyllenram Decl., at ¶ 28.  Because of VOLVO's retaliatory behavior - along with VOLVO's misappropriation of AIDEN's data enablement technology, continued sabotage of AIDEN's testing efforts, and directly competitive conduct - IMMEDIATE INJUNCTIVE RELIEF (RESTRAINING ORDER) is an urgent necessity. Gyllenram Decl., ¶ 25, 29; Saifullah Decl., ¶¶14-15.

PLAINTIFF brings this Application requesting that this Court issue **(1) An immediate Temporary Restraining Order enjoining DEFENDANTS and DEFENDANTS' Affiliates from engaging in any "Competitive Business" including but not limited to continuing their misappropriation of PLAINTIFF's Data Enablement Platform**; and **(2) An Order to Show Cause why a Preliminary Injunction should not issue enjoining the same conduct**.  The [Proposed] Order submitted herewith more specifically describes the requested relief.

This Application is made pursuant to California Code of Civil Procedure §§128, 526 and 527 and is based on the supporting Memorandum of Points and Authorities, Declarations of Niclas Gyllenram, Syed Saifullah and Rosie Cantillo, the papers and records on file, and such other additional evidence and arguments, as may be presented to this Court at the hearing.

As set forth in the accompanying declaration of Rosie Cantillo ["Cantillo Decl."], PLAINTIFF has complied with the notice requirements governing *Ex Parte* applications, as set forth in Rule 3.1203, subdivision (a) of the California Rules of Court, by notifying all parties before 10:00 a.m. of the ex parte application.  Cantillo Decl., ¶ 2.  There have been no previous applications for the same or similar

relief sought by PLAINTIFF.

The Court should grant the relief requested here because:

1.      PLAINTIFF will ultimately prevail on the merits of its claims;

2.      The imminent and irreparable harm to PLAINTIFF far outweighs any potential speculative prejudice to DEFENDANTS from a temporary order; and

3.      PLAINTIFF has made no previous Application for the same or similar relief.

Dated:  December 27, 2021                              K&L LAW GROUP, P.C.


_____
Marcel Lazo
William B. Welden
Attorneys for Plaintiff

APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ISSUANCE OF ORDER TO SHOW CAUSE RE
PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

I.     INTRODUCTION AND SUMMARY OF POINTS WHY IMMEDIATE     1
       INJUNCTIVE RELIEF MUST BE GRANTED

II.    LEGAL STANDARDS GOVERNING PLAINTIFF'S REQUESTED     3
       INJUNCTIVE RELIEF

III.   SUMMARY OF RELEVANT FACTS                          4

       A.    Additional Background Facts                  4

       B.    Material Provisions In The Acquisition Agreements     7

             1.    Stock Voting Agreement                 7

             2.    Seed Preferred Stock Purchase Agreement     7

             3.    Investors Rights Agreement             7

       C.    Volvo's Conduct Giving Rise To Aiden's Irreparable Harm     8

             1.    Volvo's And Its Affiliates' Conduct Aimed At Ending     8
                   Aiden

             2.    Volvo's Retaliatory Termination        11

IV.    THIS COURT MUST ISSUE A TEMPORARY RESTRAINING ORDER     11
       TO PREVENT AIDEN FROM SUFFERING GREAT AND IRREPARABLE
       HARM

       A.    Plaintiff Can Easily Demonstrate A Reasonable Probability Of Success     11
             On The Merits Against Defendants

       B.    Defendants Are In Breach Of The Acquisition Agreements     12

       C.    Plaintiff Will Prevail On Any Contract-Based Claim Because Of     16
             Volvo's Misappropriation Of Aiden's Data Enablement Platform,
             Necessarily Resulting in Irreparable Harm to Plaintiff

V.     DEFENDANTS' MISAPPROPRIATION OF PLAINTIFF'S INTELLECTUAL     17
       PROPERTY AND USURPATION OF ITS CORPORATE OPPORTUNITIES
       WILL FURTHER CAUSE IRREPARABLE HARM TO PLANTIFF UNLESS
       ENJOINED

1

## **TABLE OF CONTENTS (con't)**

2

VI.     THE IMMEDIATE  HARM TO PLAINTIFF IS FAR GREATER IF THE          19
        INJUNCTION IS NOT ISSUED

VII.    CONCLUSION                                                        20

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ISSUANCE OF ORDER TO SHOW CAUSE RE
PRELIMINARY INJUNCTION

1

## **TABLE OF AUTHORITIES**

2

**Cases**

3  *Center for Healthcare Education v International Congress* (2020) 57 Cal.App.5th 1108, 1132 ........ 19

4  *Church of Christ in Hollywood v. Superior Court* (2002) 99 Cal.App.4th 1244, 1251 ........................ 3

5  *Gray v. Bybee* (1943) 60 Cal.App.2d 564, 571 ................................................................................ 3

6  *Kelegian v. Mgrdichian* (1995) 33 Cal.App.4th 982, 988 ........................................................... 18, 19

7

**Statutes**

8  Cal. Civ. Code § 1559 ........................................................................................................................ 8

9  Cal. Civ. Code §3426.1(a) ............................................................................................................... 17

10 Cal. Civ. Code §3426.1(b) ............................................................................................................... 17

11 Cal. Civ. Code §3426.1(d) ............................................................................................................... 18

12 Cal. Civ. Code §3426.2 .................................................................................................................... 17

13 Cal. Code Civ. Proc. § 527(c)(1) ...................................................................................................... 3

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ISSUANCE OF ORDER TO SHOW CAUSE RE
PRELIMINARY INJUNCTION

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.   INTRODUCTION AND SUMMARY OF POINTS WHY IMMEDIATE INJUNCTIVE RELIEF MUST BE GRANTED**

AIDEN was formed at VOLVO's urging to develop a Data Enablement Platform technology for use in VOLVO automobiles. VOLVO's continuing contractual breaches and tortious conduct are destroying AIDEN's entire existence.   Verified Complaint, ¶¶26, 45.  AIDEN has raised $1.72 million from outside investors, has hired test developers, and has expended significant resources to develop the Data Enablement Platform, all in reliance on VOLVO's false promises and breached contracts. See Declaration of Niclas Gyllenram ("Gyllenram Decl."), ¶¶ 21, 26; See Declaration of Syed Saifullah ("Saifullah Decl."), ¶5.

AIDEN brings this Application requesting that the Court restrain and enjoin DEFENDANTS from engaging in their misappropriation of PLAINTIFF's Data Enablement Platform technology in furtherance of their direct breach of Section 7.2 of the **SEED PREFERRED STOCK PURCHASE AGREEMENT** and attempt to commercially profit from the intellectual property AIDEN created, i.e., the Data Enablement Platform.  Verified Complaint, ¶¶ 35, 43, 72;  Gyllenram Decl., ¶¶ 10, 21, 25.  As set forth in the accompanying declarations, VOLVO and its affiliates are engaging in "Competitive Businesses" and in conduct directly aimed at preventing AIDEN from developing its Data Enablement Platform by refusing to supply the agreed-to equipment, management support and testing environment that is crucial to AIDEN's efforts to develop a sales pipeline for its product within the 18-month window required under the Acquisition Agreements with VOLVO. Verified Complaint, ¶ 32, **Exhibit 4 (VOTING AGREEMENT)** at Sect, 7.2.  Saifullah Decl., ¶¶ 6-7.

The parties signed the Acquisition Agreements on or about March 8, 2021; these Agreements by their terms were effective the same March date.  Verified Complaint ¶¶ 33-35; **Exhibits 3, 4 and 5** (**also 6**, to which AIDEN is not a signatory, but is an express third party beneficiary); Gyllenram Decl., ¶¶ 8.  In engaging in the competitive conduct the parties strictly contracted to avoid, VOLVO is ensuring that AIDEN cannot complete the development of its platform – much less abide by its contractual obligations – which will not only cause the assigned intellectual property to revert back to VOLVO; it will allow VOLVO to take complete control over AIDEN's operations.  Verified Complaint

¶¶ 36-37, 89(b),109-110; Gyllenram Decl., ¶¶ 26.As detailed below, without access to the materials and services to which VOLVO entities contractually agreed under the **SERVICES AGREEMENT** (Verified Complaint ¶¶ 36, 39 and **Exhibit 6**, **SERVICES AGREEMENT**, at ¶¶1, 3, 5, 15), ), AIDEN is completely prevented from completing development of its Data Enablement Program – much less developing its sales pipeline - as it is contractually bound to do. Verified Complaint ¶¶ 38-39, 44, 54 (a)(d),  Meanwhile, VOLVO has hijacked AIDEN's intellectual property, specifically the Data Enablement Platform, and is commercializing a nearly identical platform as VOLVO's own technology. Gyllenram Decl., ¶16; Saifullah Decl., ¶¶ 6-7.

To add insult to injury, VOLVO is also fostering the Competitive Business (as defined in the **SEED PREFERRED STOCK PURCHASE AGREEMENT** [**Exhibit 3**], Sect. 7.2) of VOLVO's Affiliate, ZENSEACT, which is currently developing a competing data enablement platform.  Verified Complaint ¶¶ 40-43; Saifullah Decl., ¶10; Gyllenram Decl., ¶¶ 5, 17-18, 24-25.

VOLVO's conduct does not stop there.  VOLVO has actually directed POLESTAR not to do business with PLAINTIFF so as to further stifle PLAINTIFF'S development of its Data Enablement Platform and render it impossible for Plaintiff to conduct the necessary installation and testing to bring the product's technology to fruition. Verified Complaint ¶¶ 40-41; Saifullah Decl., ¶ 10; Gyllenram Decl., ¶¶ 17, 20.

Pending a hearing on a Preliminary Injunction, a Temporary Restraining Order ("TRO") must be issued to restrain and enjoin DEFENDANTS from the above acts, as set forth in the accompanying Proposed Order. PLAINTIFF will suffer great and immediate irreparable harm if DEFENDANTS are allowed to continue misappropriating and commercializing PLAINTIFF's intellectual property, the Data Enablement Platform, for which VOLVO did not pay and to which VOLVO is not entitled absent a court order confirming a default by AIDEN under the terms of the Acquisition Agreements (hereinafter defined), which VOLVO's conduct is directly aimed at causing. Verified Complaint, ¶¶ 24, 43,132; Gyllenram Decl., ¶¶ 2, 26; Saifullah Decl., ¶¶ 8-10.

As set forth below, immediate injunctive relief is warranted because PLAINTIFF will necessarily incur irreparable harm from VOLVO's and their Affiliates' engagement in Competitive Businesses through their continued misappropriation of PLAINTIFF'S Data Enablement Platform for

1   their own commercial purposes, coupled with VOLVO's intentional sabotaging of AIDEN's ability to

2   develop its own technology and perform its contractual obligations. Moreover, AIDEN has a substantial

3   likelihood of prevailing on the merits of this action, thereby tremendously balancing the equities in

4   favor of the issuance of injunctive relief, particularly in light of the short lifespan of the temporary

5   injunctive relief initially being sought by AIDEN.

6   **II.    LEGAL STANDARDS GOVERNING PLAINTIFF'S REQUESTED INJUNCTIVE**

7   **RELIEF**

8          A temporary restraining order may be issued when it appears from the facts shown by affidavit

9   that great or irreparable injury will result to the applicant before the matter can be heard on notice. Cal.

10  Code Civ. Proc. § 527(c)(1). In deciding whether to issue a temporary restraining order, the court should

11  evaluate: (1) the likelihood that the party bringing the temporary restraining order will prevail on the

12  merits at trial, (2) the harm the party bringing the temporary restraining order is likely to sustain should

13  the restraining order be denied and (3) comparatively, the harm the opposing party is likely to suffer

14  should the order be issued. *Church of Christ in Hollywood v. Superior Court* (2002) 99 Cal.App.4th

15  1244, 1251.  Whether to grant or deny the application for a temporary restraining order is within the

16  Court's discretion and amounts to a mere preliminary or interlocutory order to keep the subject of the

17  litigation in status quo pending a final determination on the merits. *Gray v. Bybee* (1943) 60 Cal.App.2d

18  564, 571.

19          Here, as set forth below, VOLVO's intentional acts in not only failing to abide by its contractual

20  promises to deliver equipment, office space, technology, all research and development needed, project

21  management support and the proper testing environment, but even instructing its Affiliates not to

22  cooperate with AIDEN in the necessary installation and testing processes, have wholly stifled AIDEN's

23  ability to develop its Data Enablement Platform and threatened AIDEN's existence.  Without a testing

24  environment and access to the resources VOLVO promised to provide, AIDEN cannot develop its

25  technology, much less create the requisite sales pipeline that it is obligated to deliver. Verified

26  Complaint ¶¶ 39, 44, 54 (a), 81 (a); Gyllenram Decl., ¶¶ 14-15, 22, 26.  In doing so, VOLVO has

27  guaranteed AIDEN's demise, which will not only ensure that VOLVO will redeem the intellectual

28  property AIDEN created, it will ensure that VOLVO will take complete control of AIDEN, in fact

1   causing AIDEN's eradication, all as the result of VOLVO's bad faith in utilizing AIDEN's data

2   enablement technology to develop a competing data enablement platform to its Affiliates

3   ZENSEACT's Competing Businesses.. Gyllenram Decl.¶ 26; Saifullah Decl., ¶ 15

4        Accordingly, unless a TRO and injunction issue, AIDEN will be destroyed and VOLVO will

5   be unjustly enriched with the valuable technology AIDEN was created – at VOLVO's behest – to

6   develop. Such is the very definition of irreparable harm, though it is important to take note of the

7   enormity of the monetary damages that will ensue if injunctive relief is not issued. In this regard,

8   AIDEN has raised $1.72 million from outside investors, has hired developers, and has expended

9   significant resources to develop the Data Enablement Platform, all in reliance on VOLVO's false

10  promises. Verified Complaint ¶¶ 39,44, 54 (a), 81 (a); Gyllenram Decl., ¶¶  21, 26.

11       As set forth below, injunctive relief must issue to prevent the multitude of damages that will

12  result from the continuance of VOLVO's tortious conduct.

13  **III.    SUMMARY OF RELEVANT FACTS**

14       The relevant facts are summarized in Paragraphs 26 through 54f the Verified Complaint

15  submitted in this matter, which are incorporated by reference herein.

16       **A.    Additional Background Facts**

17       AIDEN is a Delaware corporation that was formed by its three founders, Nicolas Gyllenram,

18  Jonas Fenn and Syed Mubeen Saifullah ("AIDEN FOUNDERS"), at the behest and encouragement of

19  VOLVO management. Verified Complaint ¶¶ 26, 45; Gyllenram Decl., ¶¶ 5-7.  All three AIDEN

20  FOUNDERS were originally full-time employees of the VOLVO CAR TECHNOLOGY USA LLC, a

21  subsidiary of VOLVO Cars, also known as Defendant, VOLVO CAR GROUP, located in Silicon

22  Valley, California. Verified Complaint ¶¶ 26-28; Gyllenram Decl., ¶9.  Their roles within VOLVO

23  were to develop and find electronic solutions to allow VOLVO automobiles to expand their digital data

24  utilization through partnerships with other technology companies in Silicon Valley and elsewhere.

25  Verified Complaint ¶¶ 26-28; Gyllenram Decl., 5

26       In the course of their development work, the AIDEN FOUNDERS discovered that a gap existed

27  in the automobile industry, that being the ability to capture automobile data generated by cars and to

28  feed that data back to cars in real time in a manner that would allow the drivers to access the data.

-4-

Verified Complaint ¶ 28; Gyllenram Decl., ¶¶ 8-9.  Realizing that this gap could be filled, and the solution could potentially spawn a multi-billion dollar industry, the AIDEN FOUNDERS proposed to VOLVO corporate management a revolutionary and novel Data Enablement Platform utilizing the Android operating system. Verified Complaint ¶ 28; Gyllenram Decl., ¶ 3-5; Saifullah Decl., ¶¶ 2-3. In the automotive industry, VOLVO and POLESTAR have effectively enjoyed a monopoly of cars with Android technology since the summer of 2020.  (Gyllenram Decl., ¶18; Saifullah Decl., ¶10; Verified Complaint ¶ 32, 89(b), 109. Defendant VOLVO CAR GROUP managers along with directors of defendant VOLVO CAR TECHNOLOGY FUND AB, namely defendants BOBBYKIN MAKWANA, SANELA IBROVIC, ÖDGÄRD ANDERSSON, PATRIK BENGTSSON, JOAKIM ALPSTEN, PÄR ARVIDSSON, MARIA HEMBERG, MÅRTEN LEVENSTAM, and MATS MOBERG, were highly impressed with the AIDEN FOUNDERS' Data Enablement Platform as proposed by the AIDEN FOUNDERS. Verified Complaint ¶¶ 29-31, 45; Gyllenram Decl., ¶ 4, 6; Saifullah Decl., ¶¶ 2-3, 12.  As such, the VOLVO CAR TECHNOLOGYN FUND Board of Directors, in October of 2020, voted unanimously that this Data Enablement Platform would be better developed through a separate spin-out entity of VOLVO and would be better positioned as a startup entity owned only in part by VOLVO but controlled by the AIDEN FOUNDERS.  Verified Complaint ¶¶ 29-31, 45; Gyllenram Decl., ¶ 4, 6.  The steps toward approval of this spin-out entity, unanimously approved by VOLVO CAR GROUP's Board of Directors in November 2020, were set out in a March 11, 2021 email which set out the history of AIDEN and stated that the AIDEN FOUNDERS were to raise most of the funding themselves.  Verified Complaint ¶¶ 29-31, 45; Gyllenram Decl., ¶ 6 and **Exhibit 1.**

VOLVO and the AIDEN FOUNDERS then negotiated the terms of AIDEN in a "Spin-Out Term Sheet" that was signed on or around November 11, 2020.  Gyllenram Decl., ¶ 6 and  **Exhibit 2.** Spin-Out Sheet. The new spinout entity was called "AIDEN AUTOMOTIVE TECHNOLOGIES, INC." VOLVO was to own 18 percent of AIDEN. Verified Complaint ¶¶ 30,33.  In addition, VOLVO was to assign the intellectual property rights, i.e. Data Enablement Platform, to AIDEN, and AIDEN was to develop the Data Enablement Platform using AIDEN's own resources. The AIDEN FOUNDERS were also to raise a minimum of $500,000 in outside investment. Verified Complaint ¶¶ 31-33; Saifullah Decl., ¶ 5; Gyllenram Decl., ¶ 6 and **Exhibit 2.**

The Spin-Out Term Sheet also specified that the AIDEN FOUNDERS were to maintain their current employment positions with VOLVO. Gyllenram Decl., ¶ 6 and **Exhibit 2, note 2**; Saifullah Decl.,¶ 11. If AIDEN was able to raise the minimum $500,000 in outside capital, VOLVO would enter into formal Acquisition Agreements and provide AIDEN with equipment, office space, R&D project management support, along with - *most critically* - the testing environment in which to deploy and test the Data Enablement Platform in VOLVO vehicles. Gyllenram Decl., ¶¶ 6-8; Saifullah Decl., at ¶¶ 6-7.   AIDEN's obligations under the term sheet were to develop a minimally viable product and a sales pipeline within 18 months after VOLVO and AIDEN executed the Acquisition Agreements. Gyllenram Decl., ¶ 6 and **Exhibit 2.**  Development of the sales pipeline would only be possible if VOLVO provided the testing equipment and other agreed upon resources through which AIDEN could demonstrate the functionality of the Data Enablement Platform to potential clients.   Verified Complaint ¶¶ 32, 35; Gyllenram Decl., ¶¶ 18-19.

The AIDEN FOUNDERS were successful in raising the $500,000 in outside capital by December 2020; thereafter, DEFENDANTS and AIDEN entered into a formal set of agreements ("Acquisition Agreements") whereby VOLVO would formally own the 18 percent of AIDEN's shares, assign the Data Enablement Platform intellectual property to AIDEN, and became contractually obligated to deliver equipment, office space, technology, all research and development needed, project management support and the proper testing environment for AIDEN in order to allow AIDEN to ultimately develop a sales pipeline for AIDEN's technology products.  Verified Complaint ¶¶ 33-35; Gyllenram Decl., ¶¶ 7-8, **Exhibits 3, 4, 5 and 6.**

The parties signed the Acquisition Agreements on or about March 8, 2021. These Agreements by their terms were effective the same March date.  Verified Complaint ¶¶ 33-35; Gyllenram Decl., ¶¶ 8-10, **Exhibits 3, 4, 5 and 6[1]**).

The Acquisition Agreements signed by VOLVO and AIDEN consist of 1) the **SEED PREFERRED STOCK PURCHASE AGREEMENT** (Gyllenram Decl, **Exhibit 3**); 2) the **VOTING AGREEMENT** (Gyllenram Decl., **Exhibit 4**); 3) **IP ASSIGNMENT AGREEMENT** (Gyllenram

---

[1] Exhibit 6 to the Declaration of N. Gyllenram, the SERVICES AGREEMENT, is entered into by and between VOLVO  CAR TECHNOLOGY FUND AB, and VOLVO CAR TECHNOLOGY USA, LLC,  dated May 13, 2021. The SERVICES AGREEMENT made AIDEN an express third-party beneficiary to the agreement.

APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ISSUANCE OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

Decl., **Exhibit 5**) and thereafter, a May 13, 2021, **SERVICES AGREEMENT** to which AIDEN is a third party beneficiary. (Gyllenram Decl., **Exhibit 7-8**; Verified Complaint ¶ 51. As set forth below, VOLVO is purposefully engaging in conduct that is not only directly violating the material provisions in these agreements; it is aimed at ensuring AIDEN's demise in order to allow VOLVO to convert the intellectual property for which AIDEN was formed to develop and commercialize.

      **B.**    **Material Provisions In The Acquisition Agreements**

           **1.**    **Stock Voting Agreement**

Importantly, as stated above, the **STOCK VOTING AGREEMENT**, Sect. 6.3 "Specific Enforcement," states that the Parties agreed that any party who breaches that agreement **necessarily** irreparably damages the others and as such the parties agreed to injunctive relief as a non-exclusive remedy. AIDEN seeks such relief herein. Verified Complaint ¶¶ 33-35; Gyllenram Decl., ¶ 8, **Exhibit 4**; Saifullah Decl., ¶ 12.

           **2.**    **Seed Preferred Stock Purchase Agreement**

As further set forth above, Sect. 7.2 of the **SEED PREFERRED STOCK PURCHASE AGREEMENT** prohibits VOLVO from engaging in any "Competitive Business" **which is very broadly defined** as engaging, "directly or indirectly, in the commercialization of a data enablement and/or data sharing system **that communicates data to and from vehicles using the Android operating system**." Verified Complaint, **Exhibit 3**; Saifullah Decl., ¶¶ 6-7. Likewise, Sect. 7.2 broadly defines "**Affiliates**" as any company controlled by VOLVO.

           **3.**    **Investors Rights Agreement**

Finally, Sect. 1.5 of the **INVESTORS RIGHTS AGREEMENT** also **very broadly defines** "**Competitor**" as an entity engaged, "directly or indirectly . . . in the commercialization of a data enablement and/or data sharing system that communicates data to and from vehicles using the Android operating system." VOLVO and ZENSEACT, by their actions in using AIDEN's data enablement technology to create very similar data sharing platforms in line for development, marketing and sale, are undoubtedly AIDEN's Competitors, acting in direct contravention of Section 7.2 of the **SEED PREFERRED STOCK PURCHASE AGREEMENT**. As set forth below, VOLVO's subsequent conduct after executing the Acquisition Agreements shows VOLVO never intended to honor these

obligations.  Instead, VOLVO induced the AIDEN FOUNDERS to agree to raise their own capital and develop a viable Data Enablement Platform so that VOLVO could steal the technology and use it for their own pecuniary gain.  Once AIDEN developed the Data Enablement Platform and raised capital, VOLVO intentionally withheld the necessary equipment, technology, office space, and testing environment required for AIDEN to bring the product to fruition, ensuring that it can never develop its sales pipeline. Saifullah Decl., ¶¶ 9-10; Gyllenram Decl., ¶ 21.  Such will necessarily result in VOLVO reclaiming the intellectual property and assuming control of AIDEN. Gyllenram Decl., ¶¶ 26.  As set forth below, VOLVO's intent all along had been to sabotage AIDEN and misappropriate the Data Enablement Platform for VOLVO's sole financial benefit. Verified Complaint ¶¶ 35, 60; Gyllenram Decl., ¶¶ 12, 18.

C.    **Volvo's Conduct Giving Rise To Aiden's Irreparable Harm**

1.    **Volvo's And Its Affiliates' Conduct Aimed At Ending Aiden**

AIDEN is an express third party beneficiary of the **SERVICES AGREEMENT**. Gyllenram Decl., ¶¶ 12-1, **Exhibit 6**, at Sects. 1, 3 and 15.   Sect. 1 of this agreement references "….certain office, equipment, and technology services,  and R&D project management services…" and Sect. 3 promises "Service Provider shall provide sufficient Personnel to support and carry out its Service Commitments."   Sect. 15 also says "The Parties agree and acknowledge that Aiden Automotive Technologies, Inc…[is] beneficiary of this Agreement."    As the beneficiary, AIDEN is entitled to enforce all the rights and obligations contained therein. Civil Code §1559.  To date, VOLVO has yet to fulfill the provisions of the Services Agreement and has not delivered the necessary equipment technology, project management services, testing environment or any other provisions necessary for PLAINTIFF to fully develop its product and have a chance at creating the requisite sales pipeline incumbent on it to develop. Verified Complaint ¶¶ 31-32, 38; Gyllenram Decl., ¶¶ 12-13. Saifullah Decl., ¶¶ 7-10.

Rather than comply with these obligations, VOLVO's own conduct has been intentionally aimed at ensuring AIDEN's demise. In this regard, VOLVO's development of Competing Products and its refusal to provide AIDEN with resources, test environment, and project management support renders AIDEN entirely unable to test the platform. Gyllenram Decl., ¶¶  13, 18, 26; Saifullah Decl., ¶¶ 7-10.

VOLVO committed to a Non-Competition agreement (**Exhibit 3**, Sect. 7.2) , and also committed to providing the necessary internal resources to support AIDEN (**Exhibit 6**, Para. 3 ) .   AIDEN cannot possibly compete with VOLVO's internal products, which was the entire reason for the Non-Compete agreement.   Gyllenram Decl., ¶ 10; Saifullah Decl., ¶¶ 7-10..   If AIDEN cannot test the platform, and cannot market its product to potential third party customers, AIDEN cannot fulfill its contractual obligations to VOLVO to demonstrate a sales pipeline. Gyllenram Decl., ¶¶ 26-27; Saifullah Decl., ¶ 10.

Moreover, as noted above, VOLVO and POLESTAR have effectively enjoyed a monopoly of cars with Android technology since the summer of 2020. Gyllenram Decl., ¶18; Saifullah Decl., ¶10; Verified Complaint ¶ 32, 89(b), 109. As such, without the requisite support incumbent on VOLVO to provide PLAINTIFF, PLAINTIFF would see its end, **as no other manufacturer in the world could assume VOLVO's obligations**. *Id*.

VOLVO has also intentionally interfered with AIDEN's relationship with defendant POLESTAR by instructing its executives not to work with AIDEN in order to destroy AIDEN's ability to perform.  Verified Complaint ¶ 40; Gyllenram Decl., ¶ 17.   In this regard, in furtherance of VOLVO's sabotaging of AIDEN's ability to develop its product, **Defendant and VOLVO executive HENRIK GREEN also instructed VOLVO's Affiliates and subsidiaries to halt all collaboration with AIDEN to provide the testing environment necessary for AIDEN to develop its Data Enablement Platform**.  Verified Complaint ¶¶ 39, 44, 59, 61, 63-64 98 (c ); Gyllenram Decl., ¶¶ 17, 20, 24.

In compliance with this directive, defendant POLESTAR, a VOLVO subsidiary and affiliate, which was to have utilized and deployed AIDEN's technology on a test basis, suddenly informed AIDEN that POLESTAR was not interested in working further with AIDEN without explanation. AIDEN's subsequent inquiries were met with silence.  Verified Complaint ¶¶ 40-41, 59, 61-64, 98 (c); Gyllenram Decl., ¶¶17-18, 2, **Exhibit 8.**  AIDEN later learned that Defendant HENRIK GREEN had given explicit instructions to POLESTAR and other affiliates within VOLVO not to work with AIDEN in any capacity.  Verified Complaint ¶¶ 40-41, 59, 61-64, 98 (c) Gyllenram Decl., ¶ 20.

Thereafter, AIDEN learned that VOLVO was developing its own almost identical data enablement and data sharing platforms in direct competition with AIDEN's. Verified Complaint ¶ 42; Gyllenram Decl., ¶¶ 21, 22.   VOLVO's misappropriation is further evidenced in their own press releases of June 30, 2021, declaring that that their new "cloud-based features" allow developers access to "in-car features such as vehicle sensor data" and "user data" - an almost perfect description of AIDEN's Data Enablement Platform. Verified Complaint ¶43; Gyllenram, Decl., ¶ 17, **Exhibit 7.**

Even more egregiously, AIDEN recently learned that VOLVO's Affiliate, defendant ZENSEACT, is also currently developing a data sharing platform based entirely on AIDEN's original design. Gyllenram Decl., ¶¶ 4, 17, 24-25.   AIDEN Founder Niclas Gyllenram learned this during a presentation of the AIDEN Data Enablement Platform. To no surprise, VOLVO is a majority stakeholder in ZENSEACT, and the CEO is the domestic partner of VOLVO's CTO, HENRIK GREEN, who instructed ZENSEACT not to cooperate with AIDEN's product testing or otherwise facilitate the development of its Data Enabling Platform.  Gyllenram Decl., ¶¶ 4, 17, 24-25.

VOLVO has used its keen insight into AIDEN's affairs to steal AIDEN's technology.   As evidenced in the accompanying declarations, HENRIK GREEN is the domestic partner of ÖDGÄRD ANDERSSON, who sits on the Board of Directors of VOLVO CAR TECHNOLOGY FUND and is the acting CEO of ZENSEACT, which allows both of them access to AIDEN's development and progress. Gyllenram Decl., ¶ 17. In the words of ÖDGÄRD ANDERSSON herself in one of the June 30 press releases*, "With help from real-life data we can speed up our development processes and go from years to days."*  AIDEN's Data Enablement Platform has a potential to revolutionize the auto industry and is projected to have a future worth in the billions of dollars – a fact clearly recognized by VOLVO – which is the impetus of VOLVO's conduct that must be enjoined.  Verified Complaint ¶¶ 35, 43: Gyllenram Decl., ¶17, **Exhibit 7.**

The writing is on the wall.  It is clear that VOLVO has aimed to sabotage AIDEN's ability to complete the development of its Data Enabling Platform so it could steal that intellectual property and usurp AIDEN's opportunities for VOLVO's own pecuniary benefit.  Not only has VOLVO taken every measure to bring AIDEN's development to an abrupt halt; they have converted AIDEN's technology for their own use and the use of their Affiliates.

AIDEN's demise would cause AIDEN's investors to lose their investments based on VOLVO's breach of contract and cause the reputations of the founders to be severely damaged.  Verified Complaint ¶¶ 44-45; Gyllenram Decl., ¶¶ 2, 26-27; Saifullah Decl., at ¶10.   In fact, AIDEN's current investors are intent on bringing suit against AIDEN if VOLVO's conduct continues. (Saifullah Decl., ¶15; Gyllenram Decl., ¶29. For these additional reasons, VOLVO's conduct cannot continue for the sake of AIDEN's continued existence.

### 2.    Volvo's Retaliatory Termination

To drive a nail in AIDEN's coffin, VOLVO has now taken retaliatory measures since the filing of this lawsuit. On or about December 2021, VOLVO informed Founder Niclas Gyllenram's wife, a VOLVO employee since 2006, of their intention to fire her and have given no reasonable justification. This was after her work email was completely turned off.  Gyllenram Decl., ¶ 28.In addition, on December 21, 2021, VOLVO actually did terminate AIDEN co-founder Syed Saifullah for no reason they could provide.  This occurred despite Mr. Saifullah having excellent employer reviews and despite an agreement with VOLVO that the Founders were to continue their employment at AIDEN while remaining VOLVO employees.  See Gyllenram Decl., **Exhibit 4 - VOTING AGREEMENT**, Sched. C, ¶4 of the "Founders Obligations."  See also Syed Saifullah's Declaration, ¶11-13. Because of VOLVO's retaliatory behavior and VOLVO's continued sabotage of AIDEN's testing efforts, IMMEDIATE INJUNCTIVE RELIEF (RESTRAINING ORDER) is an urgent necessity.  Gyllenram Decl., ¶¶ 25, 29; Saifullah Decl., ¶10.

## IV.    THIS COURT MUST ISSUE A TEMPORARY RESTRAINING ORDER TO PREVENT AIDEN FROM SUFFERING GREAT AND IRREPARABLE HARM

### A.    Plaintiff Can Easily Demonstrate A Reasonable Probability Of Success On The Merits Against Defendants

PLAINTIFF is certain to prevail against DEFENDANTS on the causes of action set forth in PLAINTIFF's Verified Complaint.  Gyllenram Decl., ¶¶ 15-20.  For example, VOLVO's deliberate sabotaging of its obligation to provide a proper testing environment that is crucial to AIDEN performing its contractual obligations, at minimum, amounts to breach of contract (Verified Complaint, First Cause of Action);  inducing breach of contract (Second Cause of Action), breach of the implied covenant of

1   good faith and fair dealing (Third Cause of Action), unfair business practices (Fourth Cause of Action),

2   fraudulent misrepresentation (Fifth Cause of Action), and intentional and negligent interference with

3   contractual relations (Sixth and Seventh Causes of Action).   Verified Complaint ¶¶ 89; Gyllenram

4   Decl., ¶¶ 15-20.   As set forth below, AIDEN's likelihood of success on the merits is more than

5   substantial.

6         **B.**    **Defendants Are In Breach Of The Acquisition Agreements**

7        On about March 8, 2021, AIDEN entered into three contracts with DEFENDANTS, which were

8   each signed by Defendant VOLVO CAR TECHNOLOGY FUND AB, and by AIDEN. Each agreement

9   was also signed and witnessed by AIDEN FOUNDERS, except for the **SERVICES AGREEMENT**,

10  to which AIDEN is an expressly named third party beneficiary.

11       The agreements set forth as **Exhibits 3 through 5** are collectively referred to as the "Acquisition

12  Agreements."  Verified Complaint ¶¶ 44, 49-50, 52-54.  Additionally, the **SERVICES AGREEMENT**

13  (**Exhibit 6**) was entered into between specifically and expressly for the benefit of AIDEN.  Verified

14  Complaint ¶ 39.

15       AIDEN fully performed its obligations under the Acquisition Agreements, having raised more

16  than sufficient investor funding and having developed the Data Enablement Platform as a minimally

17  viable product and essentially taking it as far as it could without VOLVO's required contributions.

18  Saifullah Decl., at ¶¶ 4-5. DEFENDANTS breached their duties and obligations under the Acquisition

19  Agreements and the **SERVICES AGREEMENT** by, *inter alia*:

20          a.    Withholding its obligations to provide the necessary equipment, office space,

21  technology services, research and development support, and a testing environment, which were

22  necessary for PLAINTIFF to develop its product and create the requisite sales pipeline, all of which

23  were breaches of the following provisions in the following agreements:

24            •  Verified Complaint's **Exhibit 3, SEED PREMIUM STOCK PURCHASE**

25               **AGREEMENT,** including but not limited to Sect. 2.8 (a) through (e )

26               Intellectual Property; Sect. 7.2 Non-Competition.

27            •  Verified Complaint's **Exhibit 4, VOTING AGREEMENT**, including but not

28               limited to Sect. 63, Specific Enforcement (VOLVO agrees to TRO); Schedule

C, Initial Obligations at Founders Obligations Nos. 1-5 and Company Obligations Nos. 1-4,

- Verified Complaint's **Exhibit 5**, **ASSIGNMENT OF PATENT RIGHTS**, including but not limited to Sects.1.2 Assignment of Patent Rights, 1.5 Maintenance of Patent Rights

- Verified Complaint's **Exhibit 6**, **SERVICES AGREEMENT**, made between VOLVO CAR TECHNOLOGY USA, LLC, and VOLVO CAR TECHNOLOGY FUND AB for the express benefiird party beneficiary AIDEN;  including but not limited to Sects. 1 Background, 3 Services, 5 Intellectual Property Rights, 15 Third Party Beneficiaries

b.      Intentionally depriving PLAINTIFF of the ability to deploy and test the Data Enablement platform in VOLVO vehicles, which was a breach of the following provisions in the following agreements:

- Verified Complaint's **Exhibit 3**, **SEED PREMIUM STOCK PURCHASE AGREEMENT,** including but not limited to Sect. 2.8 (a) through (e ) Intellectual Property; Sect. 7.2 Non-Competition.

- Verified Complaint's **Exhibit 4**, **VOTING AGREEMENT**, including but not limited to Sect. 63, Specific Enforcement (VOLVO agrees to TRO); Schedule C, Initial Obligations at Founders Obligations Nos. 1-5 and Company Obligations Nos. 1-4,

- Verified Complaint's **Exhibit 5**, **ASSIGNMENT OF PATENT RIGHTS**, including but not limited to Sects.1.2 **ASSIGNMENT OF PATENT RIGHTS**, 1.5 Maintenance of Patent Rights

- Verified Complaint's **Exhibit 6**, **SERVICES AGREEMENT**, made between VOLVO CAR TECHNOLOGY USA, LLC, and VOLVO CAR TECHNOLOGY FUND AB for the express benefit of third party beneficiary AIDEN;  including but not limited to Sects. 1 Background, 3 Services, 5 Intellectual Property Rights, 15 Third Party Beneficiaries.

APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ISSUANCE OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

1         c.     Terminating from his position AIDEN Founder Syed Saifullah on December

2  21, 2021, was a breach of the **VOTING AGREEMENT**, Verified Complaint's **Exhibit 4**, **VOTING**

3  **AGREEMENT**, including but not limited to Sect. 6.3, Specific Enforcement (VOLVO agrees to TRO);

4  Schedule C, Initial Obligations at Founders Obligations Nos. 1-5 and Company Obligations Nos. 1-4.

5         d.     Instructing defendant POLESTAR to halt all contractually agreed upon

6  collaboration efforts with PLAINF to provide the necessary resources for AIDEN to be able to test its

7  product and develop a sales pipeline as contemplated in the Acquisition Agreements, which was a

8  breach of Verified Complaint's **Exhibit 3**, **SEED PREMIUM STOCK PURCHASE**

9  **AGREEMENT**, including but not limited to Sect. 2.8 (a) through (e ) Intellectual Property; Sect. 7.2

10  Non-Competition.

11       • Verified Complaint's **Exhibit 4**, **VOTING AGREEMENT**, including but not

12         limited to Sect. 63, Specific Enforcement (VOLVO agrees to TRO); Schedule

13         C, Initial Obligations at Founders Obligations Nos. 1-5 and Company

14         Obligations Nos. 1-4,

15       • Verified Complaint's **Exhibit 5**, **ASSIGNMENT OF PATENT RIGHTS**,

16         including but not limited to Sects.1.2 **ASSIGNMENT OF PATENT**

17         **RIGHTS**, 1.5 Maintenance of Patent Rights

18       • Verified Complaint's **Exhibit 6**, **SERVICES AGREEMENT,** made between

19         VOLVO CAR TECHNOLOGY USA, LLC, and VOLVO CAR

20         TECHNOLOGY FUND AB for the express benefit of third party beneficiary

21         AIDEN;  including but not limited to Sects. 1 Background, 3 Services, 5

22         Intellectual Property Rights, 15 Third Party Beneficiaries.

23         e.     Usurping AIDEN's intellectual property and developing its own versions of a

24  nearly identical data enablement and data sharing platform in direct competition with PLAINTIFF's,

25  which was a breach Section 7.2 of **Exhibit 3**; and of others as well:

26       • Verified Complaint's **Exhibit 3**, **SEED PREMIUM STOCK PURCHASE**

27         **AGREEMENT**, including but not limited to Sect. 2.8 (a) through (e)

28         Intellectual Property; Sect. 7.2 Non-Competition.

APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ISSUANCE OF ORDER TO SHOW CAUSE RE
PRELIMINARY INJUNCTION

1    • Verified Complaint's **Exhibit 4**, including but not limited to Sect. 63, Specific

2    Enforcement (VOLVO agrees to TRO); Schedule C, Initial Obligations at

3    Founders Obligations Nos. 1-5 and Company Obligations Nos. 1-4,

4    • Verified Complaint's **Exhibit 5, ASSIGNMENT OF PATENT RIGHTS**,

5    including but not limited to Sects.1.2 Assignment of Patent Rights, 1.5

6    Maintenance of Patent Rights

7    • Verified Complaint's **Exhibit 6, SERVICES AGREEMENT**,  made between

8    VOLVO   CAR   TECHNOLOGY   USA,   LLC,   and   VOLVO   CAR

9    TECHNOLOGY FUND AB for the express benefit of third party beneficiary

10   AIDEN;  including but not limited to Sects. 1 Background, 3 Services, 5

11   Intellectual Property Rights, 15 Third Party Beneficiaries.

12   f.   Maliciously causing PLAINTIFF to expend time, resources and money to make

13   capital raises, hire labor, and expend significant resources to develop the intended product without

14   compensating PLAINTIFF, under the false pretenses that DEFENDANTS would keep their end of the

15   bargain and perform their obligations to bring the Data Enablement Platform to fruition, instead of

16   stealing it for their own pecuniary gain, which was a breach of the covenant of good faith and fair

17   dealing all of the Acquisition Agreements and the **SERVICES AGREEMENT**:  Verified Complaint's

18   **Exhibit 3, SEED PREMIUM STOCK PURCHASE AGREEMENT,** including but not limited to

19   Sect. 2.8 (a) through (e ) Intellectual Property; Sect. 7.2 Non-Competition.

20   • Verified Complaint's **Exhibit 4, VOTING AGREEMENT**, including but not

21   limited to Sect. 63, Specific Enforcement (VOLVO agrees to TRO); Schedule

22   C, Initial Obligations at Founders Obligations Nos. 1-5 and Company

23   Obligations Nos. 1-4,

24   • Verified Complaint's **Exhibit 5, ASSIGNMENT OF PATENT RIGHTS**,

25   including but not limited to Sects.1.2 Assignment of Patent Rights, 1.5

26   Maintenance of Patent Rights

27   • Verified Complaint's **Exhibit 6, SERVICES AGREEMENT**,  made between

28   VOLVO   CAR   TECHNOLOGY   USA,   LLC,   and   VOLVO   CAR

-15-

1    TECHNOLOGY FUND AB for the express benefit of third party beneficiary
2    AIDEN;   including but not limited to Sects. 1 Background, 3 Services, 5
3    Intellectual Property Rights, 15 Third Party Beneficiaries.

4    See Verified Complaint ¶¶54 (a)-(f); Gyllenram Decl., ¶¶ 22-29; Saifullah Decl., ¶¶ 9-10, 15.
5    As such, as further set forth below, AIDEN is certain to prevail on any contract based claim alleged in
6    the Verified Complaint.

7    **C.**     **Plaintiff Will Prevail On Any Contract-Based Claim Because Of Volvo's**
8            **Misappropriation Of Aiden's Data Enablement Platform, Necessarily Resulting in**
9            **Irreparable Harm to Plaintiff**

10   DEFENDANTS' ongoing conduct continues causing PLAINTIFF harm because of the
11   aforementioned conduct that amounts to tortious contractual breaches aimed at ensuring PLAINTIFF's
12   demise.  PLAINTIFF has suffered substantial harm including but not limited to, loss of reputation and
13   business relationships and loss of profits in millions of dollars.  Verified Complaint ¶¶ 43, 57.

14   The aforementioned conduct not only satisfies the elements of AIDEN's contractual based
15   claims (First through Third Causes of Action  in the Verified Complaint), it also satisfies AIDEN's
16   claims for Unfair Business Practices (Fourth Cause of Action) and Interference with Contractual
17   Relations or Prospective Economic Relations (Sixth and Seventh Causes of Action.  Verified Complaint
18   ¶ 91; Gyllenram Decl., ¶¶ 15-20. In this regard, as set forth above, VOLVO's conduct has been
19   intentionally aimed at sabotaging AIDEN's relationship with POLESTAR and any other VOLVO
20   Affiliate.  Verified Complaint ¶¶ 59-63, Gyllenram Decl., ¶¶ 17.  DEFENDANTS' conduct aimed at
21   ensuring AIDEN will not be able to satisfy its contractual relations in particular solidifies PLAINTIFF's
22   third cause of action for Breach of Implied Covenant of Good Faith and Fair Dealing, as such conduct
23   necessarily  serves to destroy AIDEN's investor relations and virtually any potential third party
24   customer that could otherwise become a part of the sales pipeline VOLVO has made it incumbent upon
25   AIDEN to develop. Saifullah Decl., ¶¶ 5, 10, 15; Gyllenram Decl., ¶ 29.

26   Notwithstanding the monetary damages, PLAINTIFF's harm is irreparable because
27   PLAINTIFF – with only a few months left of monetary resources (Gyllenram Decl., ¶¶ 7-9, 26) –
28   simply cannot continue as a going concern unless DEFENDANTS' conduct is enjoined. Gyllenram

Decl., ¶¶ 25-26, 29. Not only will PLAINTIFF be unable to complete the development of its Data Enablement Platform, but VOLVO and its Affiliates will have successfully misappropriated AIDEN's intellectual property, and will assume control of AIDEN's operations unless DEFENDANTS are enjoined from continuing with their Competing Businesses. Gyllenram Decl., ¶ 26.

In addition, AIDEN's outside investors will sue if AIDEN does not enjoin VOLVO's conduct to protect their investment. Gyllenram Decl., ¶ 29; Saifullah Decl., ¶ 15.    This lawsuit will not only ensure AIDEN's demise; it will spark even more litigation with no foreseeable end.

Matters can only get worse as VOLVO continues to pilfer the Data Enablement Platform technology and withhold the agreed-to testing equipment and other assistance promised under the **SERVICES AGREEMENT**.  Verified Complaint ¶¶ 55-57; Gyllenram Decl., ¶¶ 10-19.

Based on the foregoing, PLAINTIFF has a high likelihood of success on the merits of the claims set forth in PLAINTIFF's Complaint, mandating issuance of the requested preliminary injunctive relief.

## V.   **DEFENDANTS' MISAPPROPRIATION OF PLAINTIFF'S INTELLECTUAL PROPERTY AND USURPATION OF ITS CORPORATE OPPORTUNITIES WILL FURTHER CAUSE IRREPARABLE HARM TO PLANTIFF UNLESS ENJOINED**

This Court must issue the requested injunctive relief to prevent irreparable harm to PLAINTIFF, which will necessarily occur through VOLVO's continued misappropriation of PLAINTIFF's intellectual property and usurpation of corporate opportunities thereof.

First, "Misappropriation" is defined as the "Acquisition of another's trade secret by a person who knows or has reason to know that the trade secret was acquired by improper means. . . ." Cal, Civ. Code §3426.1(b)1.In this context, "Improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Cal. Civ. Code, § 3426.1(a).

In addition, a court may enjoin actual or threatened trade secret misappropriation. Civ. Code §3426.2.

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1)     Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

(2)     Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Civ. Code § 3426.1(d).)

"[B]y definition, a trade secret is something which has not been placed in the public domain." (*Sinclair v. Aquarius Electronics, Inc.* (1974) 42 Cal.App.3d 216.)

Additionally, the corporate opportunity doctrine "prohibits one who occupies a fiduciary relationship to a corporation from acquiring, in opposition to the corporation, property in which the corporation has an interest or tangible expectancy or that is essential to its existence." *Kelegian v. Mgrdichian* (1995) 33 Cal.App.4th 982, 988. A corporate opportunity exists when a proposed activity is reasonably incident to the corporation's present or prospective business and is one in which the corporation has the capacity to engage…"  *Kelegian v. Mgrdichian* (1995) 33 Cal.App.4th at 988.

Here, as set forth above, VOLVO, as a shareholder of AIDEN, had direct access to PLAINTIFF's trade secrets, i.e., the Data Enablement Platform.   Gyllenram Decl.,¶¶   This is compounded by the fact that  HENRIK GREEN, the CTO for VOLVO, is the domestic partner of ÖDGÄRD ANDERSSON, who sits on the Board of Directors of VOLVO CAR TECHNOLOGY FUND AB and also acting CEO of ZENSEACT, which gave VOLVO direct access to AIDEN's development and progress).   Verified Complaint ¶ 43.   Through VOLVO's own conduct, and the conduct of its Affiliates, primarily defendant ZENSEACT, almost exact replicas of the Data Enablement Platform are being developed, marketed and otherwise commercialized to AIDEN's direct detriment.   Verified   Complaint,   **Exhibit   3**, **SEED   PREMIUM   STOCK   PURCHASE AGREEMENT**, including but not limited to Sect. 2.8 (a) through (e ) and Intellectual Property; Sect. 7.2 Non-Competition; Gyllenram Decl.,¶¶ 16, 17; Saifullah Decl.,¶¶  9,10.   VOLVO is undoubtedly deriving "independent economic value" from AIDEN's Data Enablement Platform, which it is contractually bound not to disclose to the public or otherwise exploit for their own economic benefit. VOLVO was under a contractual duty to keep PLAINTIFF's trade secrets confidential and to avoid any such disclosure – much less intentionally cause the disclosure and even use of – the Data

1    Enablement Platform.  **Exhibit 3**,  Sect. 2.8 (a) through (e ), Intel; Sect. 7.2 Non-Competition. Any

2    disclosure or use of such trade secrets by DEFENDANTS constitute a misappropriation.

3            Further, VOLVO is a joint venture partner and controlling shareholder of AIDEN and therefore

4    owes a fiduciary obligation to AIDEN to refrain from usurping any corporate opportunity from AIDEN.

5    *Kelegian v. Mgrdichian* (1995) 33 Cal.App.4th 982, 988. VOLVO had an obligation to provide AIDEN

6    with resources, facilities and testing platforms to develop its product. VOLVO also agreed to the Non-

7    Compete provision in the **STOCK PURCHASE AGREEMENT**, which prohibits VOLVO from

8    competing with AIDEN directly or through an affiliate. Verified Complaint, **Exhibit 3**, Sect. 2.8 (a)

9    through (e ), Sect. 7.2; **Exhibit 6**, Sects. 1, 3, 5, 15.  As set forth above, the opportunity to develop the

10   platform is essential to AIDEN's existence, and by refusing to fulfill those obligations and stealing

11   such opportunity for its own benefit – and the benefit of its Affiliates - VOLVO is acquiring "property

12   in which [AIDEN] has an interest or tangible expectancy or that is essential to its existence." *Center*

13   *for Healthcare Education v International Congress* (2020) 57 Cal.App.5th 1108, 1132.  In perpetrating

14   the aforementioned conduct, VOLVO's aim from the beginning has been to usurp the corporate

15   opportunities it was contractually obligated to create for AIDEN's benefit – consistent with the parties'

16   intent in entering into the Acquisition Agreements and creating AIDEN to begin with – and for this

17   additional reason VOLVO's ongoing conduct must be enjoined.

18            AIDEN requires protection here from VOLVO's continuing conversion of AIDEN's

19   intellectual property, the AIDEN Data Enablement Platform, created at VOLVO's behest but taken

20   from AIDEN in an underhanded, scoff-law manner.  For these additional reasons, issuance of the

21   requested injunctive relief is mandated.

22   **VI.      THE IMMEDIATE  HARM TO PLAINTIFF IS FAR GREATER IF THE INJUNCTION**

23   **          IS NOT ISSUED**

24            PLAINTIFF has established that significant, irreparable and immediate harm will ensue if the

25   injunctive relief is not granted, to the point where PLAINTIFF will entirely cease to exist if the violative

26   conduct is not enjoined, particularly because among automobile manufacturers, VOLVO and

27   POLESTAR were the only automotive companies building Android vehicles for more than 12 months,

28   and are still effectively the only mass producers at scale of such cars. (Gyllenram Decl., ¶18; Saifullah

APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ISSUANCE OF ORDER TO SHOW CAUSE RE
PRELIMINARY INJUNCTION

Decl., ¶10; Verified Complaint ¶ 32, 89(b), 109, 132). .  PLAINTIFF has also provided facts to support a high likelihood of prevailing in this action. PLAINTIFF has further demonstrated the extreme prejudice that has resulted and will continue to result if the injunction is not issued when compared to the minor restrictions on VOLVO.  In this regard, VOLVO has reaped the benefits of the Data Enablement Platform without having to perform under the Acquisition Agreements' terms. PLAINTIFF has been and continues to suffer great and irreparable harm to the company's entire existence, as well as its business reputation, threats from its investors, the diminution of value to the company's goodwill, the lost business opportunities, and the theft of its valuable intellectual property unless the requested injunctive relief is issued.  Gyllenram Decl., ¶¶ 2-3, 14-18, 26.

## VII.    CONCLUSION

Without this Court's orders enjoining the ongoing conduct of the DEFENDANTS, PLAINTIFF will necessarily suffer irreparable harm. PLAINTIFF will lose all the years, money and effort that went in to developing the AIDEN Data Enablement Platform forever.  In addition, PLAINTIFF has shown a substantial likelihood of prevailing on the merits of its claims. DEFENDANTS and their Affiliates should not be able to benefit from the misappropriation of AIDEN's intellectual property. As such, PLAINTIFF respectfully requests that this Court order the injunctive relief set forth in the accompanying Proposed Order.

Dated: December 27, 2021                    K&L LAW GROUP, P.C.

                                            By: _____
                                            MARC Y. LAZO
                                            WILLIAM B. WELDEN
                                            Attorneys for PLAINTIFF

## DECLARATION OF ROSIE CANTILLO

I, ROSIE CANTILLO, declare as follows:

1.    I am over the age of 18 and am a paralegal with K&L Law Group, P.C., attorneys of record for Plaintiff AIDEN AUTOMOTIVE TECHNOLOGIES, INC. herein.   I have personal knowledge of the facts stated herein and if called upon to testify, I could and would competently do so as to the following:

2.    On December 27, 2021, prior to 10:00 a.m., I emailed attorney Colm A. Moran, counsel for all Defendants in the within action to advise that Plaintiff AIDEN AUTOMOTIVE TECHNOLOGIES, INC., intends on filing the within ex parte application for a temporary restraining order and issuance of order to show cause re preliminary injunction for an order enjoining Defendants from engaging in any competitive business including but not limited to continuing their misappropriation of PLAINTIFF'S Data Enablement Platform.   A true and correct of my email to Mr. Moran is attached hereto as **Exhibit "A"**.

3.    As of the filing of this Declaration, I have not received a response from counsel that they intend on opposing the application.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 27th day of December, 2021, at Irvine, California.


_____
ROSIE CANTILLO

APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ISSUANCE OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

EXHIBIT A

| From: | Rosie Cantillo |
|---|---|
| To: | cmoran@shb.com |
| Cc: | Marc Y. Lazo; TEAM; William Welden; masood khan |
| Subject: | Aiden Automotive Technologies, Inc. v. Volvo Car Group, et al., |
| Date: | Monday, December 27, 2021 9:55:27 AM |

Mr. Moran,

Please be advised that our office, on behalf of Plaintiff AIDEN AUTOMOTIVE
TECHNOLOGIES, INC., intends on filing an ex parte application this morning for a
temporary restraining order and issuance of order to show cause re preliminary injunction for
an order enjoining Defendants from engaging in any competitive business including but not
limited to continuing their misappropriation of Plaintiff's Data Enablement Platform.   Due to
the emergent nature of the relief requested, no hearing is requested.

Please advise if you intend on opposing the application.

Thank you,

---

**Rosie Cantillo  |  Senior Paralegal**
2646 Dupont Drive, Suite 60340; Irvine, CA 92612
T: 949-216-4000  |  D: 949-216-4020  |  F: 800-596-0370
rcantillo@kllawgroup.com  |  www.kllawgroup.com



Please consider the environment before printing this email

NOTICE: This e-mail message and all attachments transmitted with it may contain legally privileged and confidential information intended solely for
the use of the addressee. If the reader of this message is not the intended recipient, you are hereby notified that any reading, dissemination, distribution,
copying, or other use of this message or its attachments is strictly prohibited. If you have received this message in error, please notify the sender
immediately by telephone (949-216-4000) or by electronic mail (**info@kllawgroup.com**) and then delete this message and all copies and backups thereof.
Thank you.

1  MARC Y. LAZO, SBN: 215998
   K&L LAW GROUP, P.C.
2  2646 Dupont Drive, Suite 60340
   Irvine, California 92612
3  Phone No.:    (949) 216-4000
   Fax No.:      (800) 596-0370
4
   MASOOD R. KHAN, SBN: 231020
5  KHAN LAW GROUP, LC
   9431 Haven Avenue, Suite 100
6  Rancho Cucamonga, CA 91730
   Phone No:    (626) 262-4012
7  Fax No:      (626) 628-3275
   Email:    mkhan@khanlegal.com
8  Attorneys for Plaintiff
   AIDEN AUTOMOTIVE TECHNOLOGIES, INC.
9

Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 12/29/2021 10:11 AM
Reviewed By: F. Miller
Case #21CV389918
Envelope: 7949056

10              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11                      **COUNTY OF SANTA CLARA**

12

13

14  AIDEN AUTOMOTIVE TECHNOLOGIES,              )   CASE NO:   21CV389918
    INC., A Delaware Corporation,               )
15                                              )
                                                )
16              Plaintiff,                       )   **DECLARATION OF  SYED**
                                                )   **SAIFULLAH, IN SUPPORT OF**
17  v.                                          )   **APPLICATION FOR TEMPORARY**
                                                )   **RESTRAINING ORDER AND**
18  EN CAR GROUP; VOLVO CAR                     )   **ISSUANCE OF ORDER TO SHOW**
    TECHNOLOGY FUND AB; VOLVO CAR               )   **CAUSE RE PRELIMINARY**
19  CORPORATION, a Corporation; VOLVO CAR       )   **INJUNCTION**
    TECHNOLOGY USA LLC; a California Limited    )
20  Liability Company; ZENSEACT; POLESTAR       )
    AUTOMOTIVE USA, INC., a Delaware            )
21  Corporation; HÅKAN SAMUELSSON, an           )
    individual; ÖDGÄRD ANDERSSON, an            )
22  individual;   HENRIK GREEN, an individual;  )
    MARIA HEMBERG, an individual;  MATS         )
23  MOBERG, an individual; SANELA IBROVIC,      )
    an individual; PÄR ARVIDSSON, an individual;)
24  BOBBYKIN MAKWANA, an individual;            )
    JOAKIM ALPSTEN, an individual;  MÅRTEN      )
25  LEVENSTAM, an individual;   PATRIK          )
    BENGTSSON, an individual;  DENNIS           )
26  NOBELIUS, an individual, and DOES 1-100,    )
    Inclusive,                                  )
27                                              )
                Defendants.                      )
28  _____ )

DECLARATION OF SYED SAIFULLAH IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER
AND ISSUANCE OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

I, SYED SAIFULLAH, declare as follows:

1.      I am over the age of 18, and am Chief Operating Officer of AIDEN AUTOMOTIVE TECHNOLOGIES, INC. ("AIDEN" or "PLAINTIFF"), PLAINTIFF in the above-entitled action. I have personal knowledge of the matters set forth herein. If called as a witness, I could and would competently testify to the following facts:

2.      From August through November of 2020, myself and two other Volvo employees, Niclas Gyllenram and Jonas Fenn, had multiple meetings with Volvo's executive management with a concept for unique technology that has the potential to revolutionize the automotive industry.  This technology involves the capturing of various points of data generated by the automobile and aggregating such data onto a "cloud" platform that can then send the data to third parties.  This data "cloud" can also send data back to the car in what is called a "bi-directional" fashion.  No other company or technology exists to my knowledge which is able to accomplish such data integration, which is what makes AIDEN's technology so valuable.  This platform is known as the "Aiden Data Enablement Platform".

3.      Volvo executives were immediately excited and interested in the AIDEN DATA ENABLEMENT PLATFORM and agreed that this technology is extremely useful, such that they proposed that me and my two colleagues spin-out our idea into a new company, which we named "Aiden Automotive Technologies, Inc."

4.      On or around March 2021, AIDEN and VOLVO entered into a series of investment agreements ("INVESTMENT AGREEMENTS") whereby VOLVO would assign the intellectual property related to the AIDEN DATA ENABLEMENT PLATFORM to AIDEN, provide office space, testing equipment and general support in exchange for an eighteen percent (18%) stake in AIDEN. These agreements were memorialized as follows:

•      Seed Preferred Stock Purchase Agreement (Ex. 3 to Verified Complaint)

•      Voting Agreement (Ex. 4 to Verified Complaint)

•      Patent Transfer Agreement (Ex. 5 to Verified Complaint)

Exhibits 3, 4, and 5 to the Verified Complaint in this action are true and correct copies of the March 8, 2021, "Acquisition Agreements," of which I signed Exhibits 3 and 4 on behalf of AIDEN and which by their terms were effective on the same date.  Exhibit 6 to the Verified Complaint is the true and correct copy of the Services Agreement signed May 13, 2021, by two VOLVO  Affiliates to which AIDEN is a third party beneficiary for those services and with which I am familiar having been involved with the approval of the Services Agreement itself.

5.      As part of this deal, AIDEN in turn was to develop a "minimum viable product" that could be deployed into a Volvo test vehicle and to develop a "sales pipeline" to other third parties who could also deploy and utilize the AIDEN ENABLEMENT PLATFORM. AIDEN was also required to raise from outside investors a minimum of $500,000 to effectuate their support.  AIDEN successfully raised more than the $500,000 from outside investors relying on Volvo's promises. AIDEN was able to raise $1.72 million in outside investments.

6.      In addition, and most importantly, VOLVO agreed as part of this deal, that VOLVO would not compete with AIDEN in the commercialization of a similar data enablement platform for two (2) years.  We as the contracting parties understood commercialization to be the process of developing, marketing and/or selling a similar data enablement platform. This covenant not to compete was memorialized in in Paragraph 7.2 of the Seed Preferred Stock Purchase Agreement (Ex. 3 to Verified Complaint) that VOLVO signed with AIDEN, which provides:

"For a period of two years from the date of the Closing, Purchaser and its Affiliates (as defined below) shall not operate a Competitive Business; provided, that nothing in this Section 7.2 shall prohibit Purchaser, or any of its Affiliates or successors and assigns, from (a) acquiring or owning, directly or indirectly, voting securities of any publicly traded Person, (b) conducting any business that Purchaser conducts as of the date hereof so long as it does not utilize the Transferred IP, or (c) utilizing technology from any Competitive Business for purposes of its vehicle production operations. For purposes of this Section 7.2, (i) "Competitive Business" means any other Person engaged, directly or indirectly, in whole or in part, in the commercialization of a data enablement and/or data sharing system that communicates data to and from vehicles using the Android

-3-

1   operating system, and (ii) "Affiliates" means Volvo Car AB and any Person controlled

2   by Volvo Car AB."

3     7. As set forth in the accompanying Application and Declaration of Niclas Gyllenram,

4   VOLVO not only continues to refuse to provide the necessary testing environment and project

5   management support it promised, but VOLVO also refused to provide the necessary equipment after

6   the agreements were signed and has refused to provide the necessary project management support and

7   has severely harmed AIDEN's continued product development.  Volvo is also violating the Non-

8   Compete agreement and is developing technology competing with AIDEN's DATA ENABLEMENT

9   PLATFORM.   In this regard, VOLVO breached Section 7.2 by developing technology virtually

10   identical to AIDEN's DATA ENABLEMENT PLATFORM in order to direct compete with AIDEN

11   and usurp AIDEN's opportunities.

12     8. It has now been nearly nine (9) months since Volvo entered into the aforementioned

13   INVESTMENT AGREEMENTS and still have not fulfilled their promises.

14     9. It is clear that Volvo entered into the agreements in bad faith so as to sabotage and steal

15   the intellectual property that AIDEN successfully developed in its current minimally viable state.

16     10. Plainly stated, VOLVO's development of Competing Products and its refusal to provide

17   AIDEN with the resources, test environment, and project management support renders AIDEN entirely

18   unable to test the platform.  VOLVO committed to a Non-Competition agreement, and also committed

19   to providing the necessary internal resources to support AIDEN.  AIDEN cannot possibly compete with

20   VOLVO's internal products, which was the entire reason for the Non-Compete agreement.  Obviously,

21   if AIDEN cannot test the platform, and cannot market its product to potential third party customers,

22   AIDEN cannot fulfill its contractual obligations to VOLVO to demonstrate a sales pipeline.  VOLVO

23   has also intentionally interfered with AIDEN's relationship with defendant Polestar by telling its

24   executives not to work with AIDEN, thus furthering its aim to destroy AIDEN's ability to perform.

25   This would not only mean the end of AIDEN; it would cause our investors to lose their investments

26   based on VOLVO's breach of contract and cause the reputations of the founders to be severely damaged

27   in the investment community.

28

11.     In addition to breaching DEFENDANTS' INVESTMENT AGREEMENTS with PLAINTIFF, VOLVO has been behaving in an extremely vindictive and retaliatory manner since at least April 2021.  VOLVO threatened to fire all AIDEN co-founders, and has failed to provide the contractually required testing equipment, testing environment, and project management support. VOLVO continues to deny its contractual obligations to provide a testing environment and project management support for AIDEN and has sabotaged AIDEN's sales efforts with Polestar.  To further exemplify VOLVO's vindictive behavior, on December 21, 2021 at 1pm Pacific, VOLVO terminated my employment.  I was told by a VOLVO executive, Mr. Victor Chen and Head of Human Resources Mrs. Susanne Kleveros, that management had reviewed my "conflict of interest" as an executive in AIDEN and decided to terminate my employment for "cause." When I inquired what "cause" meant, I was told "we don't know.  I am just the messenger." This latest breach is especially harrowing because VOLVO had always agreed to allow the AIDEN founders to be able to keep their jobs at Volvo Cars while developing AIDEN's platform. This is documented in Schedule C of the Voting Agreement, which states in pertinent part as follows:

> "Founders will continue their employment with Volvo Car Group to the reasonable satisfaction of their current, respective managers, and agree that any of their obligations to the Company shall be subordinate to their obligations to Volvo Car Group."

12.     Indeed, I am not and never have been an employee of AIDEN, and have always given top priority to my responsibilities and obligations at Volvo.  Whatever "conflict of interest" which VOLVO cited but could not explain as the pretextual reason for my termination could never even exist. It is indisputable that AIDEN was founded at VOLVO's behest.  VOLVO provided the AIDEN Founders with all legal documents and contracts, and clearly defined obligations for VOLVO and also for the AIDEN Founders.

13.     We have carried out our "Founder Obligations" meticulously, and there is absolutely no cause for VOLVO to fire me.  My VOLVO management reviews have been of the highest levels of achievement and integrity, and my performance has been of the highest caliber.  I also have not accepted

1  any employment from AIDEN (or any other company), and have honored all my agreements with

2  VOLVO.

3      14.     As set forth in the accompanying Application, VOLVO has already agreed to injunctive

4  relief if there is a breach of contract (see PATENT ASSIGNMENT, SERVICES AGREEMENT, and

5  the VOTING AGREEMENT). Because of VOLVO's retaliatory behavior, VOLVO's continued breach

6  of contractual obligations, VOLVO's breach of the Non-Compete agreement, VOLVO's continued

7  sabotaging of AIDEN's sales efforts, and the harm VOLVO is causing to AIDEN's investors,

8  IMMEDIATE INJUNCTIVE RELIEF (RESTRAINING ORDER) is an urgent necessity.

9      15.     Immediate INJUNCTIVE RELIEF is necessary to enjoin VOLVO from continuing the

10  irreparable harm to AIDEN which is occurring by its ongoing development and co-opting of AIDEN's

11  technology.  AIDEN's outside investors have stated that if AIDEN is unable to enjoin VOLVO's

12  conduct to protect their investment, they will file a complaint against AIDEN.  VOLVO's continued

13  actions are causing immediate harm to AIDEN and the numerous outside investors who have invested

14  nearly $2 million AIDEN.

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

-6-

DECLARATION OF SYED SAIFULLAH IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER
AND ISSUANCE OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

1  I declare under penalty of perjury under the laws of California that the foregoing statements are

2  true and correct. Executed this _24_ day of December, 2021, at ___SAN   RAMON   CA___

3

4  _____

5  SYED SAIFULLAH

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

21CV389918
Santa Clara – Civil

MARC Y. LAZO, SBN: 215998
K&L LAW GROUP, P.C.
2646 Dupont Drive, Suite 60340
Irvine, California 92612
Phone No.:    (949) 216-4000
Fax No.:       (800) 596-0370

MASOOD R. KHAN, SBN: 231020
KHAN LAW GROUP, LC
9431 Haven Avenue, Suite 100
Rancho Cucamonga, CA 91730
Phone No:    (626) 262-4012
Fax No:       (626) 628-3275
Email:      mkhan@khanlegal.com
Attorneys for Plaintiff
AIDEN AUTOMOTIVE TECHNOLOGIES, INC.

Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 12/29/2021 10:11 AM
Reviewed By: F. Miller
Case #21CV389918
Envelope: 7949056

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA CLARA

| | |
|---|---|
| AIDEN AUTOMOTIVE TECHNOLOGIES, INC., A Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>EN CAR GROUP; VOLVO CAR TECHNOLOGY FUND AB; VOLVO CAR CORPORATION, a Corporation; VOLVO CAR TECHNOLOGY USA LLC; a California Limited Liability Company; ZENSEACT; POLESTAR AUTOMOTIVE USA, INC., a Delaware Corporation; HÅKAN SAMUELSSON, an individual; ÖDGÄRD ANDERSSON, an individual;   HENRIK GREEN, an individual; MARIA HEMBERG, an individual;  MATS MOBERG, an individual; SANELA IBROVIC, an individual; PÄR ARVIDSSON, an individual; BOBBYKIN MAKWANA, an individual; JOAKIM ALPSTEN, an individual;  MÄRTEN LEVENSTAM, an individual;   PATRIK BENGTSSON, an individual;  DENNIS NOBELIUS, an individual, and DOES 1-100, Inclusive,<br><br>Defendants. | CASE NO:   21CV389918<br><br>**DECLARATION OF NICLAS GYLLENRAM IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ISSUANCE OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION** |

**-1-**

K&L
LAW GROUP

I, NICLAS GYLLENRAM, declare as follows:

1.      I am over the age of 18 and make this declaration as Chief Executive Officer of AIDEN AUTOMOTIVE TECHNOLOGIES, INC. ("AIDEN" or "Plaintiff"), Plaintiff in the above-entitled action. I have personal knowledge of the matters set forth herein. If called as a witness, I could and would competently testify to the following facts:

2.      This lawsuit is the result of the above-named group of Defendants ("VOLVO" or "Defendants") misappropriating intellectual property developed by Plaintiff AIDEN, i.e., the "Aiden Data Enablement platform," by sabotaging AIDEN's initially successful efforts to develop and market that property, and by breaching Defendants' contracts with Plaintiffs.

3.      My employment with VOLVO was most recently as Director of Software Development at VOLVO's Sunnydale, California office.  I worked in management positions at VOLVO February 2, 2015 to July 31, 2021. Attached hereto as **Exhibit 10** is  true and correct copy of my C.V., which shows my M.S. in computer science and electrical engineering and my 20 years of computer engineering experience, including 16 years in sophisticated software development with VOLVO and Mitsubishi Electric.  This background underpins any opinions I express herein regarding the uses of data enablement platforms; the need for testing such platforms, which is crucial to the development and refining of the platforms; the fact that the Aiden Data Enablement platform can only be used in vehicles running Android Automotive, which until recently solely consisted of VOLVO and POLESTAR vehicles; and the stark similarities between the Aiden Data Enablement platform and the platforms VOLVO and its affiliate are attempting to market to existing AIDEN customers after VOLVO reneged on its agreement to enable testing and development of the AIDEN platform and sabotaged our collaboration with POLESTAR.  I was instrumental in developing the Aiden Data Enablement platform. In this regard, I started and led the development team at Volvo that built the Data Collector, which was a Volvo internal data collection tool. The Data Collector was a tool focused on one-way communication from the car to the Volvo cloud, and was developed for Volvo's **internal** use only. I presented this tool multiple times to management, including defendants Henrik Green, Ödgärd Andersson and Mats Moberg, and got extremely positive responses from them; they were all very eager to get this in use in internal test vehicles.

GYLLENRAM DECLARATION IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
ISSUANCE OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

4.      I also separately invented and defined the entire technical solution for the Aiden Data Enablement Platform, which we filed as a patent on VOLVO's behalf, which patent was later assigned to AIDEN as part of the contracts between VOLVO and AIDEN. In contrast to the Data Collector, the AIDEN platform is focused on two-way communication between a vehicle and any third party.  VOLVO and its Affiliates are now building and marketing (as seen in press releases from June 30, 2021) multiple solutions on Android, whose function is to share and enable communication between Volvo vehicles and third parties, which is precisely what the Aiden Data Enablement platform was invented and designed to do. Specifically, VOLVO and its Affiliates are developing technology aimed at attempting to re-purpose the Data Collector to actually share data with third parties; building and marketing Fleet Management software for internal and external fleet operators; and building data sharing platforms for VOLVO's Affiliate Zenseact and for Zenseact's development partners. See attached **Exhibit 7**, a true and correct copy of the press releases from June 30, 2021.

5.      The Aiden Data Enablement platform harnesses the data from the vehicle's embedded Android software system ("Android Automotive"), streams that data to a cloud and then makes the data available to third parties (auto insurance companies, road-side safety companies, fleet management services, etc.).  This data enablement platform is the patent that the AIDEN Founders (Syed Mubeen Saifullah, Jonas Fenn, and I) filed for VOLVO.  We explained this idea to Volvo's Executive Management, many of whom are also members of VOLVO's Tech Fund board.  These executives all immediately saw the merit in the data enablement platform and even said that it was "the best idea they had ever seen" proposed to them. We also explained that the platform could not only be developed for VOLVO only, but that the technological opportunities arising from the platform created a much more expansive data enablement platform for the larger automotive industry.  In or around August 18, 2020, VOLVO's Chief Digital Officer (CDO) told us, "We better do this fast, otherwise someone else will do it."  VOLVO determined after extensive internal research, that VOLVO did **NOT** have the resources to develop a data enablement platform for third parties. The AIDEN Founders also informed VOLVO through multiple presentations and in business plans that VOLVO had an 18-month lead on the rest of the industry on its adoption of Android Automotive as the embedded operating system in its vehicles, and that during this period, VOLVO and its Affiliate, Polestar, would have a monopoly on all vehicles

1    on the road operating through Android technology.  During multiple meetings with VOLVO's Executive

2    Management, the AIDEN Founders also explained that VOLVO's involvement was essential for the

3    development of the data enablement, particularly if AIDEN was to attract investments from Venture

4    Capital (VC) companies in future rounds of funding.  See attached **Exhibit 6**, a true and correct copy of

5    the Services Agreement made for Aiden's express benefit, incorporated by reference.

6         6.     In November 2020, VOLVO's Technical Fund Board of Directors voted unanimously to

7    spin out AIDEN as a separate company to develop the platform.  As part of an extensive internal effort,

8    which involved approvals from VOLVO HR, Legal, Tax Division and the Technical Fund Board of

9    Directors, VOLVO assigned the patent we filed to AIDEN, and in a series of contracts with  AIDEN,

10   made a commitment of resources and a commitment to a Non-Compete covenant as part of their overall

11   commitment to the project in exchange for VOLVO getting 18% preferred ownership in AIDEN. (See

12   the March 8, 2021 Stock Purchase Agreement, Voting Agreement, Patent Assignment Agreement, and

13   Services Agreement discussed below.) The steps toward approval of this spin-out entity, unanimously

14   approved by Volvo Car Group's board of directors in November 2020, were set out in a March 11, 2021

15   email stating that the AIDEN FOUNDERS were to raise all of the funding themselves.  (See **Exhibit 1**,

16   a true and correct copy of the relevant email, attached hereto and incorporated by reference.)

17        7.     VOLVO and the AIDEN FOUNDERS negotiated the terms of VOLVO's relationship

18   with AIDEN in a "Spin-Out Term Sheet" that was signed on or around November 11, 2020.  (See

19   attached **Exhibit 2**, a true and correct copy of the Spin-Out term sheet, incorporated by reference herein.)

20   The new spinout entity was called "AIDEN AUTOMOTIVE TECHNOLOGIES, INC." (AIDEN).

21   VOLVO was to (and does) own 18 percent of AIDEN. In addition, VOLVO was to assign all intellectual

22   property rights, i.e., the Data Enablement Platform, to AIDEN, and AIDEN was to develop the Data

23   Enablement Platform  using AIDEN's own resources.  The AIDEN FOUNDERS were to raise a

24   minimum of $500,000 in outside investment dollars.

25        8.     The AIDEN FOUNDERS did raise the $500,000 in outside capital by December 2020,

26   and thereafter, DEFENDANTS and AIDEN entered into a formal set of acquisition documents

27   ("Acquisition Agreements") whereby VOLVO would formally own the 18 percent of AIDEN's shares

28   and would assign the Data Enablement Platform intellectual property to AIDEN, as well as deliver

-4-

GYLLENRAM DECLARATION IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
ISSUANCE OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

equipment, office space, technology, and all research and development needed and provide project management support and the essential testing environment for AIDEN in order to ultimately deploy a sales pipeline for AIDEN's technology products. See attached **Exhibits 3, 4, and 5** that are true and correct copies of the March 8, 2021, "Acquisition Agreements"; i.e., the Seed Preferred Stock Purchase Agreement (**Ex. 3**); Voting Agreement (**Ex. 4**); Patent Transfer Agreement (**Ex. 5**) all of which I and the other AIDEN Founders signed on behalf of AIDEN. The Service Agreement, a true and correct copy of which is attached hereto as **Exhibit 6**, was between VOLVO corporations but named AIDEN as the beneficiary to the contract. This contract was to provide testing resources for AIDEN's Data Enablement Platform. The parties signed the Acquisition Agreements on or about March 8, 2021 made effective by their terms on the same date.

9. To provide some additional background, while working as employees at VOLVO prior to founding AIDEN, it was us, the three AIDEN Founders, who discovered that VOLVO lacked a data enablement platform to capture meaningful data and share it with third parties. However, VOLVO's embedded Android Automotive Operating System provided an opportunity to create a comprehensive data enablement platform that could do so. I had previously already conceived of, and led the development of a pre-cursor to AIDEN's solution, called "The Data Collector" which focused on one-way data communication of VOLVO proprietary signals for internal use, and which was developed by the small VOLVO software team I headed in Sunnyvale, which development was not only known, but was encouraged by, VOLVO Car Group's Board of Directors.

10. On multiple occasions, we as AIDEN's founders explained to VOLVO that "The Data Collector" was to be used only as an **_internal_** data compilation tool, focused on the collection of data that would be useful for VOLVO's internal operations, and was not meant to be shared with third parties, nor was the Data Collector ever intended to be used by VOLVO to commercialize the data. The Non-Compete clause in Paragraph 7.2 of the Share Purchase Agreement was specifically written by VOLVO's legal team to regulate this usage, and to avoid any conflict that could arise by VOLVO attempting to use the Android Automotive Operating System to develop and commercialize data platforms for third party data access (which would include platforms for auto insurance, fleets, maintenance, road-side assistance and other third party uses). This was because VOLVO had assigned

-5-

GYLLENRAM DECLARATION IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
ISSUANCE OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

the intellectual property of such a data enablement platform to AIDEN, and only the finalized version of the Aiden Data Enablement application and platform was to be used for these commercialization purposes, after the testing and development through VOLVO's c assistance and facilitation was successfully consummated per VOLVO's contracts with AIDEN.

11. We, as the AIDEN FOUNDERS, repeatedly informed VOLVO Car Group's Board of Directors that AIDEN's platform can only run on VOLVO vehicles if the vehicle manufacturer installs the platform. AIDEN's solution cannot be installed by a third party, or by AIDEN itself. Analogous to a mobile smart phone, there are specific applications which come pre-installed by the phone manufacturer and interact with the phone's operating system in a unique way. AIDEN's platform falls into this category. There are other applications that may be installed by the actual end-user, but they would only have access to a very limited set of data, not to deeper levels of the operating system that would be necessary for a fully integrated installation. In order for AIDEN's platform to be successfully and fully integrated, the platform requires a deeper level of access to the operating system, and this cannot be accomplished without the vehicle manufacturer (like VOLVO) installing the platform.

12. Any platform such as the Aiden Data Enablement platform needs to be tested and accessible in a proper test environment, and needs to be repeatedly installed and tested in multiple operating environments to ensure it is working properly. This can only be done with the vehicle manufacturer (in this case VOLVO) allocating test and project management support.

13. In fact, after any platform is delivered to the manufacturer, VOLVO must test and ensure the platform works before it is put out into the marketplace. Because VOLVO has refused to allow the creation of a software build for testing the Aiden Data Enablement platform, as was promised in the Service Agreement (**Exhibit 6**) to which AIDEN is the named beneficiary, AIDEN has been unable to test the data platform in a proper production environment, which has severely stifled the production and development of the platform and defeated the intent of the agreements with VOLVO. All development thus far has for this reason been limited to special test hardware, rendering it impossible to fulfill the contemplation of the Acquisition Agreements and otherwise consummate Aiden Data Enablement platform through the testing and facilitation VOLVO promised it would deliver. We are at a complete impasse because of VOLVO's failure to provide its promised services and facilitation.

14.     In accordance with AIDEN's contractual obligations of delivering a Minimum Viable Product (MVP) under the Voting Agreement (**Exhibit 4**) within 12 months, AIDEN delivered the MVP to VOLVO in June 2021, more than eight months ahead of schedule.  In this regard, in July, we informed VOLVO manager Pratik Budhev that we had delivered the MVP. We asked for confirmation that VOLVO received the MVP and for feedback that VOLVO accepted our MVP, but VOLVO has failed to give any feedback.  VOLVO has never tested our platform; if VOLVO had tested it, we would immediately have been able to determine this through our servers, to which the AIDEN platform is connected and interfaces with.

15.     AIDEN even ran demos for VOLVO showing how the platform worked and how it could be used. VOLVO has still not tested the application AIDEN delivered, and VOLVO has not replied to AIDEN's request for confirmation that AIDEN has met its obligation to deliver an MVP. Any software platform requires a proper test environment.  As explained above, the AIDEN platform needs to be installed by the vehicle manufacturer (in this case VOLVO) with appropriate project management support as an absolute necessity for AIDEN to continue its development.

16.     Rather than test the AIDEN product and work with AIDEN on the installation, VOLVO and its Affiliates launched a competing Data Enablement Platform on Android, taking the same idea of sharing data with third parties in the exact same manner as AIDEN's platform.  Some of these projects are described in the Verified Complaint in Paragraph 43, and are also contained in **Exhibit 7**, attached hereto and incorporated herein are true and correct copies of two June 30, 2021 VOLVO press releases.

17.     Defendant ÖDGÄRD ANDERSSON is defendant HENRIK GREEEN'S domestic partner and is the CEO of ZENSEACT, an Affiliate of VOLVO, which allows both of them to directly access information on AIDEN's development and progress. ÖDGÄRD ANDERSSON is quoted in one of the June 30, 2021, press releases: *"With help from real-life data we can speed up our development processes and go from years to days."*  Verified Complaint ¶¶ 35, 43, see also **Exhibit 7.** In an internal PowerPoint presentation, VOLVO converted the "The Data Collector" (which was specifically designed for internal VOLVO usage) developed by me and my team and used the exact same model to share data from the Android Automotive Operating System with third parties.   As mentioned above, the Data Collector was to strictly be an internal VOLVO tool, and was never designed to shared data with third

parties.  After the numerous demos AIDEN provided to VOLVO, and after AIDEN delivered its platform to VOLVO, VOLVO launched a fleet management data sharing platform that specifically utilizes and interfaces with Android technology, **and even attempted to commercialize this product and sell it to AIDEN's customers**.   This became evident in VOLVO's two press releases of June 30, 2021, in which VOLVO declares that that their new "cloud-based features" allow developers access to "in-car features such as vehicle sensor data" and "user data" - **an almost identical description of AIDEN's Data Enablement Platform**. (See **Exhibit 7,** attached hereto and incorporated by reference.) Recently, I made a presentation of the Aiden Data Enablement Platform to a representative of Defendant ZENSEACT, during which I learned that ZENSEACT is a developing a platform **that is in direct competition with AIDEN's platform** and is employing the same data sharing accessibility. VOLVO is a majority stake holder in ZENSEACT, and the CEO is the domestic partner of defendant HENRIK GREEN, who expressly directed POLESTAR not to cooperate with testing Aiden's Data Enablement Platform. VOLVO has even approached AIDEN customers and presented its competing platform with fleet and insurance based data sharing capabilities, all the while continuing to break its contractual promises to provide a proper testing environment and facilitate AIDEN's development of its platform.

18.   As part of the contracts with Aiden (**Exhibits 3-5**), VOLVO required that AIDEN display a sales pipeline within 18 months.  Because VOLVO (and its Affiliate Polestar) had held a virtual monopoly on the supply of vehicles running the Android Automotive Operating System, it is obviously impossible to deliver any sales pipeline to third parties without any supply.  AIDEN is unable to sell its platform and generate revenue without any supply, further stifling its ability to develop the platform.  If AIDEN fails to display a satisfactory sales pipeline, it is my understanding that the Acquisition Agreements call for VOLVO to keep the AIDEN delivered MVP - which was created by the three founders and paid for by outside investor money - for free, and it is my further understanding that VOLVO would also re-acquire the patent and take control of AIDEN.  VOLVO's conduct in failing to fulfill its obligations is designed to ensure this occurs.

19.   In essence, VOLVO has co-opted the intellectual property assigned to Aiden, the efforts of its Founders and the funding provided by outside investors (amounting to nearly $2 million) for their own benefit.

20.     In addition to VOLVO refusing to test and provide appropriate support to AIDEN, VOLVO has also sabotaged AIDEN's efforts to have Polestar (VOLVO partially owns Polestar) engage with AIDEN in demos and testing. VOLVO's Chief Technical Officer (defendant HENRIK GREEN) explicitly instructed Polestar not to work with AIDEN, and Polestar then informed AIDEN that Polestar would indefinitely terminate any relations with AIDEN, based on Green's instruction. As such, in sabotaging AIDEN's ability to create a sales pipeline, Defendant HENRIK GREEN instructed VOLVO's Affiliates and subsidiaries to halt all collaboration with AIDEN to provide the testing environment necessary for AIDEN to develop its product and the requisite sales pipeline. See **Exhibit 8**, a true and correct copy of which is a June 4, 2021, Polestar email indicating their refusal to continue working with AIDEN.

21.     As mentioned above, VOLVO required AIDEN to raise at least $500,000 in outsider funding as part of the Acquisition Agreements (**Exhibits 3** to **5**). AIDEN raised $1.72 million in outside funding, disclosing to investors the terms of the VOLVO contracts, which include specific highlights of necessary hardware, test environment capabilities, project management support, office space, salaries for founders and a Non-Compete commitment. See Verified Complaint ¶ 42, 45; **Exhibit 3** (Stock Purchase Agreement), at Sect. 7.2; See also, the Investors Rights Agreement, which defines "Competitor" at Sect. 1.5, a true and correct copy of which is attached hereto as **Exhibit 9**.

22.     VOLVO has harmed AIDEN's investors and AIDEN itself by threatening to terminate the employment of AIDEN FOUNDERS; actually terminating Founder Syed Saifullah's employment on December 21, 2021 without any explanation as to why; by continuing to fail to provide project management support and a proper testing environment; by launching competing projects; and by interfering with AIDEN's efforts to have Polestar test the AIDEN platform—all of which I am informed was conduct designed by VOLVO to ensure AIDEN's eradication.

23.     Following the plan that was submitted to and approved by VOLVO, AIDEN attempted to raise investment funds in the Summer of 2021. The same business plan submitted and approved by VOLVO was shown to outside investors. A verbal offer was received from a venture capital firm for $5 million in exchange for a 15% ownership stake in AIDEN, placing the value of AIDEN at approximately $33 million. Because of VOLVO's sabotage with Polestar; VOLVO's launching of competing products;

-9-

GYLLENRAM DECLARATION IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ISSUANCE OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

and VOLVO's failure to meet its testing commitments to AIDEN, the AIDEN founders were forced to advise their interested investors that their funding offer needed to be delayed until further notice, as it became apparent that AIDEN could no longer allow investors to invest because of VOLVO's contractual breaches and tortious conduct, which has sabotaged any chance of consummating any transactions with any venture capital firms.

24.     As mentioned above, VOLVO's Affiliate ZENSEACT has launched a Data Enablement Platform which includes specific aspects of AIDEN's platform such as third-party access to data via standardized API calls (all of which is included in AIDEN's patent). As noted, I learned this during a presentation of the Aiden Data Enablement Platform to a representative of Defendant ZENSEACT, which is particularly disturbing since VOLVO is a majority stake holder in ZENSEACT, and the CEO is the domestic partner of defendant HENRIK GREEN.

25.     My informed understanding is that ZENSEACT's product includes "third-party access to data via standardized API calls," which is included in AIDEN's patent. The definition of competition in Sect. 7.2 of the Stock Purchase Agreement is "the commercialization of a data enablement and/or data sharing system that communicates data to and from vehicles using the Android operating system." **VOLVO and its Affiliates are building and marketing exactly this** - "data enablement and/or data sharing system that communicates data to and from vehicles using the Android operating system," and that is precisely why immediate injunctive relief must be ordered. VOLVO is not even attempting to disguise its conduct, as it has publicized statements informing the public at large of its progress, as stated in their June 30, 2021 Press Releases (**Exhibit 7**).

26.     Based on VOLVO's commitment and VOLVO tasking AIDEN with creating a spin-out operation and raising outside investment dollars to launch its business, AIDEN has spent over $1.1 million in developing, marketing and internally testing its platform.  AIDEN is supposed to deliver a product to VOLVO and demonstrate a sales pipeline. Without VOLVO's commitment, AIDEN is completely handicapped and is also unable to raise additional funds.  VOLVO's conduct has been expressly aimed at achieving this goal, so it can completely usurp all of the opportunities it was supposed to help AIDEN develop. AIDEN will exhaust its current funding in a few months.  With AIDEN failing directly because of VOLVO's failure to honor its promises, VOLVO will take over the AIDEN platform

-10-

GYLLENRAM DECLARATION IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ISSUANCE OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

1   and take control of the company – without having fulfilled its obligations upon which AIDEN relied in

2   entering into the Acquisition Agreements.

3        27.    VOLVO  has clearly tried to sabotage AIDEN from the start and has positioned itself to

4   obtain AIDEN's innovative Data Enablement platform free of charge.  VOLVO's deliberate sabotaging

5   of the agreed upon testing program that is crucial to AIDEN's performance of its own contractual

6   obligations, particularly when a proper testing environment is crucial to AIDEN's ability to develop the

7   Data Enablement platform, ensures that no further development or progress can occur. VOLVO's

8   conduct has ensured the destruction of AIDEN's existence.

9        28.    VOLVO has been behaving in an extremely vindictive and retaliatory manner.  My wife

10  has been a VOLVO employee since 2006, working in Sweden as a Discovery & Liability Manager and

11  in the United States as a Regulatory Expert. In about September 2021, after notice of this lawsuit was

12  provided to VOLVO, VOLVO suddenly locked my wife out of her VOLVO email.  In the past few days,

13  VOLVO informed my wife of its intention to terminate her employment without any reasonable

14  justification.  Likewise, on December 21, 2001, VOLVO fired AIDEN co-founder Syed Mubeen

15  Saifullah without providing any  reason.

16       29.    Because of VOLVO's retaliatory behavior and VOLVO's continued sabotage of

17  AIDEN's testing efforts, IMMEDIATE INJUNCTIVE RELIEF (RESTRAINING ORDER) is an urgent

18  necessity.  Without immediate injunctive relief, AIDEN will suffer irreparable harm in allowing its

19  technology to be marketed, which will not only result in the aforementioned irreparable harm, but will

20  also cause the loss of the entirety of the funds from AIDEN's investors, and spawn more litigation from

21  the Investors, who have threatened to sue us if VOLVO's conduct is not enjoined.  Time is of the essence

22  – further delay in allowing VOLVO  to breach the non-compete provision and develop and

23  commercialize a competing data enablement platform - will result in further irreparable harm to Aiden

24  and its investors.

25  //

26  //

27  //

28  //

GYLLENRAM DECLARATION IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
ISSUANCE OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

1        I declare under penalty of perjury under the laws of California that the foregoing statements are

2   true and correct.  Executed this _24th_ day of December, 2021, at _Palo Alto, California_

3

4

5                NICLAS GYLLENRAM

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT "1"

**Subject:**    The Facts Surrounding Project Aiden

**Date:**    Thursday, 11 March 2021 at 01:11:50 Central European Standard Time

**From:**    Millien, Raymond

**To:**    Hemberg, Maria

**BCC:**    Andersson, Emma (PX), Lai, Sharon (A), Budhdev, Pratik, Arvidsson, Pär

**Attachments:** Exh A.pdf, Exh B.pdf

Maria,

I think categorizing the Project Aiden transaction as something "fishy" going on in Silicon Valley mixes apples and oranges.  This has nothing to do with HG's "clean up" of the SV office.  To the contrary, at all times, all the relevant stakeholders in VCTF, Tax, PX, and R&D were fully aware of the transaction and its details, and were fully supportive of it as a "pilot" exercise. The conduct of the VCTF has been fully transparent, ethical, and above board.

To be more clear, the **facts** are as follows:

1.   On or about 18 Aug 2020, the first meeting about Project Aiden is held with **Ödgärd Andersson, Patrik Bengtsson, Sanela Ibrovic, Bobbykin Makwana** and the three Aiden Co-Founders: **Syed Mubeen Saifullah, Niclas Gyllenram, and Jonas Fenn.** It was suggested that Niclas follow up with **Martin Kristensson** to solicit feedback on the idea of a spin-out and if this makes sense.

2.   On 24 Sep. 2020, the VCTF Board decided in a meeting that if R&D approved any spin-outs that VCTF could potentially invest and instructed **Ray** to find a way to make it work under the existing VCTF and VCC legal structures and corporate policies.

3.   On or about Sep 25, 2020, a follow-up meeting took place with **Patrik Bengtsson, Martin Kristensson, Jonas Ronnkvist, Sanela Ibrovic, Bobbykin Makwana, Ödgärd Andersson, Alena Lshkova, and Aiden Co-Founders**. It was concluded that VCTF should investigate a spin-out so other OEMs would adopt the tech and if/how VCTech in Sunnyvale can conduct an internal PoC of the idea.

4.   On 1 Oct. 2020, Ray had a meeting with **Monika Almen** (Global Tax Director) and **Johan Jedeur-Palmgren** (PX Göteborg, Global Comp & Benefits) and got approval to move forward with the Aiden transaction as proposed when R&D approved.

5.   On 2 Oct. 2020, Ray had a meeting with **Allyse Scelfo** (PX, Total Rewards, Volvo Cars USA) and got approval to move forward with the transaction if R&D approved.

6.   On 2 Oct. 2020, Ray followed up his meeting with **Allyse**, summarized their conversation and shared the written opinion from outside California Employment Counsel (Reed Smith LLP) raising no "red flags" about the proposed transaction.

7.   On 5 Oct. 2020, **Allyse** confirmed in an email that she saw no issues with the proposed transaction.

8.   On 7 Oct. 2020, Ray asked the VCTF to formally approve the proposed transaction where the three Aiden founders would keep their "day jobs." This was done via an email to: **Joakim Alpsten Ödgärd Andersson, Pär Arvidsson, Maria Hemberg, Mårten Levenstam, and Mats Moberg.** <u>See Exhibit A.</u>

9.   On 8 Oct. 2020, **Pär Arvidsson** and **Bobbykin** had a discussion where Bobbykin expressed concerns about the timing of a spin-out. From his perspective, it would have made more sense to spend some additional time (e.g., 1-3 months) to create a proof of concept before spinning this out.

10. On or about 21 Oct 2020, **Patrik Bengtsson** (VP, SW) sent an email to **Mats Moberg**

informing him that both his and **Bobbykin Makwana** recommend spinning project Aiden out of Volvo as there were no resources available with the right capabilities and experience to perform a PoC study **Mats Moberg** replied and agreed.

11. On or about 22 Oct. 2020, **Bobbykin** informed **Niclas** of the decision from Mats Moberg to spin out Aiden.

12. On 28 Oct. 2020, **Pär Arvidsson** informed the VCTF Board that after discussions with R&D it was concluded that there were no resources available with the right capabilities and experience to perform a PoC study, and **Mats, Patrik Bengtsson and Bobbykin** agreed the spin-out as Ray proposed was the best way forward.

13. On 29 Oct. 2020, Pär Arvidsson as the chair of the VCTF Board tallied all the (unanimous) votes and gave Ray permission to move forward via email.

14. On Nov. 4, 2020, after the email vote, **Daniel Karlson** (Legal Counsel for VCTF) prepared official board minutes to confirm the email vote to approve the transaction.

15. On 12 Nov 2020, VCTF and Aiden signed the Term Sheet. (**Niclas** then made **Bobbykin** aware of this during his regular 1:1 meeting. And, since then, Niclas has continuously kept Bobbykin updated of Aiden's progress in their  regular 1:1 meetings which are scheduled bi-weekly.

16. From 4 Nov. 2020 to 22 Dec. 2020, each board member (**Joakim Alpsten Ödgärd Andersson, Pär Arvidsson, Maria Hemberg, Mårten Levenstam, and Mats Moberg**) signed the official meeting minutes as shown in <u>Exhibit B</u> approving the transaction.

17. On 8 Jan 2021, **Niclas** and **Bobbykin** have a 1:1. Niclas explained that Aiden has raised the required funds and will initiate work. Niclas updates Bobbykin on the work that three Aiden Co-Founders have been doing. During this meeting Bobbykin expressed concern that he would have to back-fill positions for the founders. Niclas proposed a 5-month lead time before any Aiden Co-Founder would departs Volvo Cars. Bobbykin agreed.

Given the above, VCC at all times concluded the Aiden idea was not something we were **not** willing to fund and pursue.  By agreeing to the spin-out we also waived any conflict-of-interests claims against the founders. Thus, not honoring our agreement with Aiden at this point obviously raises significant legal risks for VCTech, VCTF and VCC.

I personally think the "noise" surrounding this transaction is the result of certain parties never expecting the VCTF to figure out how to do this transaction and never expecting that the three founders would be successful in raising US$750k based on a single patent application filed by the VCC IP Dept.

I am happy to discuss this live with anyone who feels otherwise.

Kind regards / Med vänlig hälsning / 美好的祝福

**Raymond Millien**
Chief IP Officer & MD of Volvo Cars Tech Fund
**VOLVO CAR GROUP**
+46.72.888.8687

---

**From:** Maria Hemberg <maria.hemberg@volvocars.com>
**Date:** Wednesday, 10 March 2021 at 20:35
**To:** Raymond Millien <raymond.millien@volvocars.com>
**Subject:** Fwd: NG

I really need your support to get the fact right here.

EXHIBIT "2"

DocuSign Envelope ID: 8FDE0A36-C87D-43BD-8517-EEF3F128A956

**V O L V O**

Raymond Millien
Managing Director
+46.72.888.8687
raymond.millien@volvocars.com

# SPIN-OUT TERM SHEET

*This Term Sheet is intended for discussion purposes only and causes no obligation of any party to enter into any transaction.*

## BACKGROUND

A. The Founders (defined below), as employees of Volvo Cars Technology USA LLC ("VC Tech"), have invented an automotive data sharing platform known as "Project AIDEN" as described in <u>Exhibit A</u>.

B. It was agreed by the management of VC Tech and that of its corporate parent Volvo Cars Corp. ("VCC"), that Project AIDEN was not within the current technology roadmap of the company and that there are no existing resources available with the right capabilities and experience to perform a proof of concept study on the relevant technology.

C. VC Tech and VCC have agreed to allow the employees to spin out Project AIDEN into a new startup company, with Volvo Cars Technology Fund AB – its corporate venture capital arm – holding a minority share of such startup company and entering into agreements in relation thereto, all on the principle terms and conditions as summarized herein.

| | |
|---|---|
| **Entity:** | A newly-formed, USA-based company ("**NewCo**"). |
| **Parties:** | ● Volvo Car Technology Fund AB ("**VCTF**") |
| | ● Current Volvo Cars US R&D Center employees Syed Mubeen Saifullah, Niclas Gyllenram, and Jonas Fenn (collectively, "**Founders**") |
| **Transaction:** | The outline of this transaction is attached as <u>Exhibit B</u> |
| **NewCo Purpose/Operations:** | Research, develop, test, and commercialize the Automotive Intelligent Data Enablement SaaS ("**Project AIDEN**") intellectual property developed by Founders during their employment. |

---

**VOLVO CAR TECHNOLOGY FUND AB**
SE-405 31 Göteborg
Sweden
volvocars.com

Registered Office Göteborg | Sweden
Registration No. 556887-5760

| **Agreements:** | • Formation and investor documents for NewCo. |
| | • *Service Agreement* between VCTF and NewCo for providing incubations services for one year, to include: |
| | ○ Office Space and Desk Area |
| | ○ After-hours big and mini rig access |
| | ○ After-hours car access |
| | ○ IT-related services |

**Founder's Obligations:**[1]

1. Raise no less than US$500,000 in capital from additional third-party investors identified and closed by Founders ("**Investors**") (with VCTF approval) within 120 days of execution of this Term Sheet (the "**Initial Capitalization**")
2. Completion and delivery to VCTF of an acceptable business plan
3. Promote and found NewCo
4. Only "after-hours" work at NewCo
5. Grant of Tag-along/drag-along rights to VCTF

**VCTF Obligations Post Initial Capitalization:**

1. Produce first draft of definitive agreements for NewCo's lawyers to review
2. Assign US Prov. Patent entitled "Automotive Data Sharing Platform," Atty. Docket No. P2896US00, filed on 14 Aug. 2020 (the "Provisional Patent Application") to "seed" NewCo
3. Assign AIDEN and SIGNALHUB trademarks, logos and domain names
4. Procure the release from the IP provisions of Founder's employment agreements
5. Procure the continued at-will employment of Founders[2]
6. Performance of *Service Agreement*

**NewCo Obligations:**

1. Granting of Board observer rights to VCTF[3]. If NewCo is unable to meet any of the Founders Obligations or NewCo Obligations (other than Initial Capitalization) then VCTF shall be entitled to a voting Board seat.
2. Grant of covenant-not-to-sue to VCTF and affiliates (does NOT include Geely) to all its patent assets
3. MVP[4] within 12 months of signing the definitive agreements

---

[1]   Failure to meet any of these obligations (other than the Initial Capitalization) shall allow VCTF to demand, *inter alia*, more frequent reporting requirements and pre-approval of NewCo's extraordinary expenses (e.g., greater than US$10K).

[2]   Note that this Term Sheet shall not be construed as an employment contract (or amendment thereto) and does not give Founders any right to continued employment by Volvo Car Group nor any additional employee benefits. Rather, Founders will be expected to continue the performance of their "day jobs" to the satisfaction of their current, respective managers.

[3]   Subject to input and approval from VCC Tax Dept.

[4]   MVP = NewCo should ship a working prototype of a product that can be deployed in a testing environment to an early-adopter customer to get feedback/early results and constantly iterate the product from thereon.

DocuSign Envelope ID: 8FDE0A36-C87D-43BD-8517-5EF3F128A956

4. Demonstration of sales and/or partnership pipeline within 18 months of signing the definitive agreements to the satisfaction of VCTF
5. Submission of monthly and quarterly financial reports for the first 24 months of signing the definitive agreements with basic P&L and cash flow items

| | |
|---|---|
| **Equity:** | • 18% as preferred equity to VCTF paid for in US$110,000 worth of IP and in-kind services via *Service Agreement*<br>• 82% to Founders/Investors with Initial Capitalization |
| **Dilution:** | In the event the NewCo enters into any arrangement with Investors – after the Initial Capitalization – where monies or other equity or non-equity consideration are payable to the Investors in consideration of such capital, such payments or other dilution will come equally from the parties; provided, however, in no case shall VCTF's interest equal less than 5% of the NewCo for the first US$10M of outside capital raised by NewCo. VCTF shall have full flexibility to exit complete or part of the investment at any time after the Initial Capitalization. |
| **Non-compete** | VCTF and its affiliates within the Volvo Car Group (but not including its portfolio companies) shall not compete with NewCo in the field(s) described in the Provisional Patent Application for 2 years from effective date of closing. |
| **Non-solicitation** | NewCo shall not solicit any employees or contractors of VCTF and its affiliates for a period of two years from the effective date of closing |
| **Representations/ Warranties:** | Ordinary and customary representations and warranties to be granted by NewCo and the Founders |
| **Disputes:** | Any and all disputes shall be resolved by expedited binding arbitration in the English language in San Francisco, CA before a single neutral arbitrator chosen by AAA and using California law |
| **Costs:** | Each party shall bear its own costs in forming the NewCo and related agreements |
| **Closing:** | Promptly following the execution of a Term Sheet, the parties will undertake to complete their respective due diligence and to prepare, negotiate and execute definitive transaction documents to implement its terms within 90 days of execution.<br><br>Until the closing, each party shall continue normal business operations, and obtain applicable board and shareholder/member approval to undertake the transaction contemplated herewith, and amend any corporate documentation necessary to reflect the terms of this Term Sheet. |

DocuSign Envelope ID: 8FDE0A36-C87D-43BD-8517-5EF3F128A956

| **Confidentiality:** | During the period between the date hereof and the closing, neither party shall furnish, or authorize any agent or representative to furnish, any information concerning this Term Sheet to any person or entity without the prior written consent of the other party |
| **Publicity:** | There shall be no publicity with respect to any aspects of this transaction, including contemplation or the closing of such transaction, without written approval of VCTF (which approval shall be deemed granted for potential Investors) |

Except for the paragraph above pertaining to confidentiality, the terms set forth in this Term Sheet are intended only to describe our mutual present intentions as reflected in our conversations regarding the proposed transaction and are not intended to create any binding obligations on the part of each of the parties, or to be construed as an agreement to enter into any binding agreements or consummate the proposed transaction. No such obligations shall arise unless and until each party shall have conducted business and legal diligence to its satisfaction and there shall have been prepared, executed and delivered definitive agreements setting forth such terms and such additional understanding as the parties may develop in the course of their negotiations leading up to such agreements.

*[SIGNATURE PAGE FOLLOWS]*

**VOLVO CAR TECHNOLOGY FUND AB:**

By: _____
Signature

**Pär Arvidsson**
Chairman of the Board
november 12, 2020
_____
Date

By: _____
Signature

**Raymond Millien**
Managing Director
November 12, 2020
_____
Date

**FOUNDERS:**

By: _____
Signature

**Syed Mubeen Saifullah**
11 November 2020
_____
Date

By: _____
Signature

**Niclas Gyllenram**
11 November 2020
_____
Date

By: _____
Signature

**Jonas Fenn**
Nov 11, 2020
_____
Date

EXHIBIT "3"

DocuSign Envelope ID: EC0DB867-A6B7-4D3D-A74D-9CA7D389F8FD

EXECUTION VERSION

**SEED PREFERRED STOCK PURCHASE AGREEMENT**

EXECUTION VERSION

## SEED PREFERRED STOCK PURCHASE AGREEMENT

**THIS SEED PREFERRED STOCK PURCHASE AGREEMENT** (this "**Agreement**") is made as of the 8th day of March, 2021 by and among Aiden Automotive Technologies, Inc., a Delaware corporation (the "**Company**"), Volvo Car Technology Fund AB, reg. no. 556877-5760, a Sweden private limited liability company ("**Purchaser**") and the persons listed as "Founders" on the signature pages to this Agreement (each a "**Founder**" and together the "**Founders**").

The parties hereby agree as follows:

1.     Purchase and Sale of Seed Preferred Stock.

    1.1     Sale and Issuance of Seed Preferred Stock.

    (a)     The Company shall adopt and file with the Secretary of State of the State of Delaware on or before the Closing (as defined below) the Amended and Restated Certificate of Incorporation of the Company in the form of Exhibit B hereto (the "**Restated Certificate**").

    (b)     Subject to the terms and conditions of this Agreement, Purchaser agrees to purchase, and the Company agrees to sell and issue to Purchaser, at the Closing, that number of shares of the Company's Seed Convertible Preferred Stock, par value $0.00001 per share (the "**Preferred Stock**") set forth opposite Purchaser's name on Exhibit A hereto, for a deemed purchase price of $0.11 per share of Preferred Stock which shall be paid-in-kind and shall consist of the Transferred IP and the Services Agreement (the "**Purchase Price**"). The shares of Preferred Stock issued to Purchaser pursuant to this Agreement shall be referred to herein as the "**Shares**."

    1.2     Closing; Delivery. The purchase and sale of the Shares shall take place remotely via the exchange of documents and signatures on the date hereof (which time and place are designated as the "**Closing**"). At the Closing, the Company shall deliver to Purchaser a Carta electronic certificate representing the Shares.

    1.3     Use of Proceeds. In accordance with the directions of the Company's Board of Directors (the "**Board**"), as it shall be constituted in accordance with the Voting Agreement, the Company will use the proceeds from the sale of the Shares to expand the Company's team, accelerate product development, fund the Company's working capital requirements and for other general corporate purposes.

    1.4     Defined Terms Used in this Agreement. In addition to the terms defined above, the following terms used in this Agreement shall be construed to have the meanings set forth or referenced below.

    (a)     "**Affiliate**" means, when used with respect to any specified Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with the Person specified, where "**control**" means the possession, directly or indirectly,

by agreement or otherwise, of at least 50% of the voting stock, partnership interest or other ownership interest, or the power (a) to appoint or remove a majority of the board of directors or other governing body of such Person, or (b) to cause the direction of the management of such Person.

(b)     "**Code**" means the Internal Revenue Code of 1986, as amended.

(c)     "**Company Covered Person**" means, with respect to the Company as an "issuer" for purposes of Rule 506 promulgated under the Securities Act, any Person listed in the first paragraph of Rule 506(d)(1).

(d)     "**IP Assignment**" means the intellectual property assignment between Purchaser and the Company, dated as of the date of the Closing, assigning to the Company the Transferred IP, in a form satisfactory to the Company and Purchaser.

(e)     "**Investor Rights Agreement**" means the agreement among the Company, Purchaser and the Founders, dated as of the date of the Closing, in a form satisfactory to the Company and Purchaser.

(f)     "**Key Employee**" means any Founder, as well as any employee or consultant who either alone or in concert with others develops, invents, programs or designs any Company Intellectual Property.

(g)     "**Knowledge**" including the phrase "**to the Company's Knowledge**" shall mean the actual knowledge after reasonable investigation of the Founders.

(h)     "**Material Adverse Effect**" means a material adverse effect on the business, assets (including intangible assets), liabilities, financial condition, property or results of operations of the Company.

(i)     "**Person**" means any individual, corporation, partnership, trust, limited liability company, association or other entity.

(j)     "**Right of First Refusal and Co-Sale Agreement**" means the agreement among the Company, Purchaser and certain other stockholders of the Company, dated as of the date of the Closing, in a form satisfactory to the Company and Purchaser.

(k)     "**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

(l)     "**Services Agreement**" means the services agreement between Volvo Car Technology USA and the Company, in a form satisfactory to the Company and Purchaser.

(m)     "**Transaction Agreements**" means this Agreement, the Investor Rights Agreement, the Right of First Refusal and Co-Sale Agreement, the Voting Agreement, the Restated Certificate, the Services Agreement, the IP Assignment and the other documents and certificates executed in connection therewith.

(n)     "**Transferred IP**" means (i) the United States Provisional Patent Application entitled "Automotive Data Sharing Platform, "Atty. Docket No. P2896US00 and any improvements thereon, and (ii) the AIDEN and SIGNALHUB unregistered trademarks.

(o)     "**Voting Agreement**" means the agreement among the Company, Purchaser and certain other stockholders of the Company, dated as of the date of the Closing, in a form satisfactory to the Company and Purchaser.

2.     Representations and Warranties of the Company. The Company represents and warrants to Purchaser that, except as set forth on the Disclosure Schedule attached as Exhibit C to this Agreement, which exceptions shall be deemed to be part of the representations and warranties made hereunder, the following representations are true and complete as of the date of each Closing, except as otherwise indicated.

2.1     Organization, Good Standing, Corporate Power and Qualification. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as presently conducted and as proposed to be conducted. The Company is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a Material Adverse Effect.

2.2     Capitalization.

(a)     The authorized capital of the Company consists, immediately prior to the Closing, of:

(i)     100,000,000 shares of common stock, par value $0.00001 per share, ("**Common Stock**"), 4,100,000 shares of which are issued and outstanding. All of the outstanding shares of Common Stock have been duly authorized, are fully paid and nonassessable and were issued in compliance with all applicable federal and state securities laws. The Company holds no Common Stock in its treasury.

(ii)     10,000,000 shares of preferred stock, par value $0.00001 per share, none of which are issued and outstanding. The rights, privileges and preferences of the Preferred Stock are as stated in the Restated Certificate and as provided by the Delaware General Corporation Law. The Company holds no Preferred Stock in its treasury.

(b)     Section 2.2(b) of the Disclosure Schedule sets forth the capitalization of the Company immediately following the Closing, including the number of shares of the following: (i) issued and outstanding Common Stock and Preferred Stock and (ii) shares of Common Stock reserved for future award grants.. Except for (A) the conversion privileges of the Shares to be issued under this Agreement, (B) the rights provided in Section 3 of the Investor Rights Agreement and (C) the securities and rights described in Section 2.2(c) of the Disclosure Schedule, there are no outstanding options, warrants, rights (including conversion or preemptive rights and rights of first refusal or similar rights) or agreements, orally or in writing, to purchase or acquire from the Company any shares of capital stock of the Company, or any securities convertible into or exchangeable for shares of capital stock of the Company.

(c)     None of the Company's stock purchase agreements or stock option documents contains a provision for acceleration of vesting (or lapse of a repurchase right) or other changes in the vesting provisions or other terms of such agreement or understanding upon the occurrence of any event or combination of events, including without limitation in the case where the Stock Plan is not assumed in an acquisition. The Company has no obligation (contingent or otherwise) to purchase or redeem any of its capital stock.

(d)     409A. The Company believes in good faith that any "nonqualified deferred compensation plan" (as such term is defined under Section 409A(d)(1) of the Code and the guidance thereunder) under which the Company makes, is obligated to make or promises to make, payments (each, a "**409A Plan**") complies in all material respects, in both form and operation, with the requirements of Section 409A of the Code and the guidance thereunder. To the Company's Knowledge, no payment to be made under any 409A Plan is, or will be, subject to the penalties of Section 409A(a)(1) of the Code.

(e)     The Company has obtained valid waivers of any rights by other parties to purchase any of the Shares covered by this Agreement.

2.3     <u>Subsidiaries</u>. The Company does not currently own or control, directly or indirectly, any interest in any other corporation, partnership, trust, joint venture, limited liability company, association, or other business entity. The Company is not a participant in any joint venture, partnership or similar arrangement.

2.4     <u>Authorization</u>. All corporate action required to be taken by the Board and stockholders in order to authorize the Company to enter into the Transaction Agreements, and to issue the Shares at the Closing and the Common Stock issuable upon conversion of the Shares, has been taken or will be taken prior to the Closing. All action on the part of the officers of the Company necessary for the execution and delivery of the Transaction Agreements, the performance of all obligations of the Company under the Transaction Agreements to be performed as of the Closing, and the issuance and delivery of the Shares has been taken or will be taken prior to the Closing. The Transaction Agreements, when executed and delivered by the Company, shall constitute valid and legally binding obligations of the Company, enforceable against the Company in accordance with their respective terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies, or (iii) to the extent the indemnification provisions contained in the Investor Rights Agreement may be limited by applicable federal or state securities laws.

2.5     <u>Valid Issuance of Shares</u>

(a)     The Shares, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement, will be validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Right of First Refusal and Co-Sale Agreement, applicable state and federal securities laws and liens or encumbrances created by or imposed by Purchaser. Assuming the accuracy of the representations of Purchaser in <u>Section 3</u> of this Agreement and subject to the filings described

in Section 2.6(b)(ii) below, the Shares will be issued in compliance with all applicable federal and state securities laws. The Common Stock issuable upon conversion of the Shares has been duly reserved for issuance, and upon issuance in accordance with the terms of the Restated Certificate, will be validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Transaction Agreements, applicable federal and state securities laws and liens or encumbrances created by or imposed by Purchaser. Based in part upon the representations of Purchaser in Section 3 of this Agreement, and subject to Section 2.5(b) below, the Common Stock issuable upon conversion of the Shares will be issued in compliance with all applicable federal and state securities laws.

(b)  No "bad actor" disqualifying event described in Rule 506(d)(1)(i)-(viii) of the Securities Act (a "**Disqualification Event**") is applicable to the Company or, to the Company's knowledge, any Company Covered Person, except for a Disqualification Event as to which Rule 506(d)(2)(ii–iv) or (d)(3), is applicable.

2.6  Governmental Consents and Filings. Assuming the accuracy of the representations made by Purchaser in Section 3 of this Agreement, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority is required on the part of the Company in connection with the consummation of the transactions contemplated by this Agreement, except for (i) the filing of the Restated Certificate, which will have been filed as of the Closing, and (ii) filings pursuant to Regulation D of the Securities Act, and applicable state securities laws, which have been made or will be made.

2.7  Litigation. Except as described in Section 2.7 of the Disclosure Schedule, (i) there is no claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending or to the Company's Knowledge, currently threatened in writing (x) against the Company, any Founder, or any officer or director of the Company arising out of their employment or board relationship with the Company or Affiliates of Purchaser; (y) that questions the validity of the Transaction Agreements or the right of the Company to enter into them, or to consummate the transactions contemplated by the Transaction Agreements; or (z) to the Company's Knowledge, that would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, and (ii) neither the Company nor, to the Company's Knowledge, any Founder or officer or director of the Company is a party or is named as subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality (in the case of Founders, officers or directors, such as would affect the Company). There is no action, suit, proceeding or investigation by the Company pending or which the Company intends to initiate. The foregoing includes, without limitation, actions, suits, proceedings or investigations pending or threatened in writing (or any basis therefor known to the Company) involving the prior employment of any of the Company's employees, their services provided in connection with the Company's business, any information or techniques allegedly proprietary to any of their former employers or their obligations under any agreements with prior employers.

2.8  Intellectual Property.

(a)     After giving effect to the transactions contemplated by the Transaction Agreements, the Company owns or possess a sufficient legal right to use, free and clear of all liens, encumbrances, charges or claims by any other Person (including prior employers of the Founders, employees, or consultants), all patents, trademarks, domain names, service marks, trade names, copyrights, licenses and rights, and all trade secrets protectable by applicable law, including know-how, inventions, designs, processes, works of authorship, computer programs, hardware, software and technical data and information ("**Intellectual Property**") used and sufficient for use in the conduct of its business as presently conducted (collectively herein "**Company Intellectual Property**"), without, to the Company's knowledge, infringing upon or otherwise acting adversely to the right of any other Person (including prior employers of Founders, employees, or consultants) under or with respect to the foregoing, including without limitation (i) the Founders and the past and present employees and consultants and (ii) employers of the Founders and the past and present employees and consultants of the Company. Neither the Company nor, to the Company's knowledge, any Founder or current or former employee or consultant of the Company, has received, or is aware of, any written communications alleging that the Company, or any Founder or any current or former employee or any consultant of the Company has violated, or by conducting the Company's business as now conducted, is violating the patents, trademarks, service marks, trade names, copyrights or trade secrets or other proprietary rights of other Persons, nor is the Company aware of any similar violation of the Company Intellectual Property by others, nor is the Company is  aware of any basis therefore.

(b)     Section 2.8(b) of the Disclosure Schedule identifies each: (a) patent, registered trademark, registered copyright, or registered domain name that has been issued to the Company with respect to any of the Company Intellectual Property; (b) pending patent, trademark, domain name or copyright application that the Company has made with respect to any of the Company Intellectual Property; (c) each material unregistered trade name or unregistered trademark used by the Company; and (d) material license, agreement, or other permission pursuant to which the Company has received from or granted to any third party with respect to any of the Company Intellectual Property (excluding in each case, contracts for commercially available technology or software or otherwise having an annual value of less than $50,000).

(c)     Other than with respect to commercially available software products under standard end-user object code license agreements, and other than pursuant to license agreements whereby the Company licenses its software products to customers, there are no outstanding options, licenses, or agreements of any kind relating to the foregoing, nor is the Company bound by or a party to any options, licenses or agreements of any kind with respect to the patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, proprietary rights and processes of any other Person. Neither the Company nor, to the Company's knowledge, any Founder or current or former employee or consultant of the Company is obligated or under any liability whatsoever to make any payments by way of royalties, fees or otherwise to any owner or licensee of, or other claimant to, any patent, trademark, service mark, trade name, copyright or other intangible asset, with respect to the use thereof or in connection with the conduct of its business or as currently proposed to be conducted.

DocuSign Envelope ID: EC0DB867-A6B7-4D3D-A74D-9CA7D289F8FD

(d)      Any and all rights, title and interest of Intellectual Property of any kind which has been developed or is currently being developed, by any Founder or current or former employee or consultant of the Company in the scope of their duties for the Company is, and shall be, the sole and exclusive property owned by the Company. For avoidance of doubt, none of the Company Intellectual Property owned by the Company including the Transferred IP was conceived during, originated from, or was derived from, any work done by the Founders for the benefit of any Person including prior employers of any Founder or current or former employee or consultant, other than Affiliates of Purchaser. The Company has taken commercially reasonable security measures to protect the secrecy, confidentiality and value of all the Intellectual Property. All of the Company's Founders and any current employees or consultants responsible for the development of, or that have developed, Intellectual Property for the Company have entered into written agreements with the Company assigning to the Company all rights in such Intellectual Property developed for the Company. All of the Company's Founders and current employees and other persons who have substantive knowledge of the trade secrets or other confidential information within the Company Intellectual Property have entered into a written agreement, which includes confidentiality obligations with the Company. To the Company's knowledge it is not necessary to utilize any of the developments, ideas, inventions, trade secrets or proprietary information of any of its Founders, employees or consultants made prior to their employment or engagement by the Company, other than the Transferred IP and that Intellectual Property that has been duly assigned to the Company by such persons. None of the foregoing Persons is or was ever employed by or engaged as a consultant with any academic or other governmental institution, whereby such academic or governmental institution has obtained any rights in any Intellectual Property developed by such Founder or current or former employee or consultant. No facilities of any university, government-owned institution, college, other educational institution or research center was used in the development of any of the Company Intellectual Property.

(e)      None of the Open Source Software that is or has been used by the Company will restrict the Company's ability to charge for distribution of, or to use its products for commercial purposes. With respect to any open source software that is or has been used by the Company, the Company is in material compliance with all applicable licenses with respect thereto. Neither the Company, nor any Founder, employee or consultant or any other Person acting on behalf of the Company, has disclosed or delivered to any third party any non-open source software related source code owned by the Company and included in the Company's products. To the Company's knowledge, no event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time) will, or would reasonably be expected to, result in the disclosure or delivery by the Company, or any Person acting on behalf of the Company, of any such non open source software related source code.

2.9      <u>Compliance with Other Instruments</u>. Except as set forth in <u>Section 2.9</u> of the Disclosure Schedule, the Company is not in violation or default (i) of any provisions of its Restated Certificate or Bylaws, (ii) of any instrument, judgment, order, writ or decree, (iii) under any note, indenture or mortgage, (iv) under any lease, agreement, contract or purchase order to which it is a party or by which it is bound that is required to be listed on the Disclosure Schedule, or (v) of any provision of federal or state statute, rule or regulation applicable to the Company, the violation of which would have a Material Adverse Effect. The execution, delivery and performance of the Transaction Agreements and the consummation of the transactions

contemplated by the Transaction Agreements will not result in any such violation or be in conflict with or constitute, with or without the passage of time and giving of notice, either (i) a default under any such provision, instrument, judgment, order, writ, decree, contract or agreement; or (ii) an event which results in the creation of any lien, charge or encumbrance upon any assets of the Company or the suspension, revocation, forfeiture, or nonrenewal of any material permit or license applicable to the Company.

2.10    <u>Title to Property and Assets</u>. Except as set forth in <u>Section 2.10</u> of the Disclosure Schedule, the Company owns its properties and assets free and clear of all mortgages, deeds of trust, liens, encumbrances and security interests except for statutory liens for the payment of current taxes that are not yet delinquent and liens, encumbrances and security interests which arise in the ordinary course of business and which do not affect material properties and assets of the Company. With respect to the property and assets it leases, the Company is in material compliance with each such lease and holds a valid leasehold interest free of any liens, claims or encumbrances other than those of the lessors of such property or assets. The Company does not own any real property.

2.11    <u>Agreements</u>.

(a)    Except for the Transaction Agreements and as set forth on <u>Section 2.11(a)</u> of the Disclosure Schedule, there are no agreements, understandings, instruments, contracts or proposed transactions to which the Company is a party or by which it is bound that involve (i) obligations (contingent or otherwise) of, or payments to, the Company in excess of $50,000, (ii) the license of any patent, copyright, trademark, trade secret or other proprietary right to or from the Company, (iii) the grant of rights to manufacture, produce, assemble, license, market, or sell its products to any other Person that limit the Company's exclusive right to develop, manufacture, assemble, distribute, market or sell its products, or (iv) indemnification by the Company with respect to infringements of proprietary rights.

(b)    Except as set forth on <u>Section 2.11(b)</u> of the Disclosure Schedule, the Company has not (i) declared or paid any dividends, or authorized or made any distribution upon or with respect to any class or series of its capital stock, (ii) incurred any indebtedness for money borrowed or incurred any other liabilities individually in excess of $10,000 or in excess of $50,000 in the aggregate, (iii) made any loans or advances to any Person, other than ordinary advances for travel expenses, or (iv) sold, exchanged or otherwise disposed of any of its assets or rights, other than the sale of its inventory in the ordinary course of business. For the purposes of (a) and (b) of this <u>Section 2.11</u>, all indebtedness, liabilities, agreements, understandings, instruments, contracts and proposed transactions involving the same Person (including Persons the Company has reason to believe are affiliated with each other) shall be aggregated for the purpose of meeting the individual minimum dollar amounts of such Section.

(c)    The Company is not a guarantor or indemnitor of any indebtedness of any other Person.

(d)    The Company has not engaged in the past three (3) months in any discussion with any representative of any Person regarding (i) a sale or exclusive license of all or

substantially all of the Company's assets, or (ii) any merger, consolidation or other business combination transaction of the Company with or into another Person.

2.12    Certain Transactions.

(a)    Other than (i) standard employee benefits generally made available to all employees, (ii) standard director and officer indemnification agreements approved by the Board, (iii) standard proprietary information and assignment of inventions agreements in favor of the Company, (iii) the purchase of shares of the Company's capital stock and (iv) the Transaction Agreements, in each instance, approved in the written minutes of the Board (previously provided to Purchaser or its counsel), there are no agreements, understandings or proposed transactions between the Company and any of its officers, directors, consultants or Key Employees, or any Affiliate thereof.

(b)    The Company is not indebted, directly or indirectly, to any of the Founders or its directors, officers or employees or to their respective spouses or children or to any Affiliate of any of the foregoing, other than in connection with expenses or advances of expenses incurred in the ordinary course of business expenses and for other customary employee benefits made generally available to all employees. None of the Founders or the Company's directors, officers or employees, or any members of their immediate families, or any Affiliate of the foregoing are, directly or indirectly, indebted to the Company or, have any (i) material commercial, industrial, banking, consulting, legal, accounting, charitable or familial relationship with any of the Company's customers, suppliers, service providers, joint venture partners, licensees and competitors, (ii) direct or indirect ownership interest in any firm or corporation with which the Company is affiliated or with which the Company has a business relationship, or any firm or corporation which competes with the Company, except that the Founders and directors, officers, employees or stockholders of the Company may own stock in (but not exceeding two percent (2%) of the outstanding capital stock of) publicly traded companies that may compete with the Company; or (iii) financial interest in any material contract to which the Company is a party.

2.13    Rights of Registration and Voting Rights. Except as provided in the Investor Rights Agreement, the Company is not under any obligation to register under the Securities Act any of its currently outstanding securities or any securities issuable upon exercise or conversion of its currently outstanding securities. To the Company's knowledge, except as contemplated in the Voting Agreement, no stockholder of the Company has entered into any agreements with respect to the voting of capital stock of the Company.

2.14    Changes. Except as described in Section 2.14 of the Disclosure Schedule, since the date of the incorporation of the Company, there has not been:

(a)    any damage, destruction or loss, whether or not covered by insurance, that would have a Material Adverse Effect;

(b)    any waiver or compromise by the Company of a valuable right or of a material debt owed to it;

DocuSign Envelope ID: EC0DB867-A6B7-4D3D-A74D-9CA7D289E8FD

(c)     any satisfaction or discharge of any lien, claim, or encumbrance or payment of any obligation by the Company, except in the ordinary course of business and the satisfaction or discharge of which would not have a Material Adverse Effect;

(d)     any material change to a material contract or agreement by which the Company or any of its assets is bound or subject;

(e)     any material change in any compensation arrangement or agreement with any employee, officer, director or stockholder;

(f)     any resignation or termination of employment of any officer of the Company;

(g)     any mortgage, pledge, transfer of a security interest in, or lien, created by the Company, with respect to any of its material properties or assets, except liens for taxes not yet due or payable and liens that arise in the ordinary course of business and do not materially impair the Company's ownership or use of such property or assets;

(h)     any loans or guarantees made by the Company to or for the benefit of its employees, officers or directors, or any members of their immediate families, other than travel advances and other advances made in the ordinary course of its business;

(i)     any declaration, setting aside or payment or other distribution in respect of any of the Company's capital stock, or any direct or indirect redemption, purchase, or other acquisition of any of such stock by the Company;

(j)     any sale, assignment or transfer of any Company Intellectual Property that could reasonably be expected to result in a Material Adverse Effect;

(k)     receipt of notice that there has been a loss of, or material order cancellation by, any major customer of the Company;

(l)     any other event or condition of any character, other than events affecting the economy or the Company's industry generally, that could reasonably be expected to result in a Material Adverse Effect; or

(m)     any arrangement or commitment by the Company to do any of the things described in this Section 2.14.

2.15   Employee Matters.

(a)     As of the date hereof, the Company employs no full-time employees, no part-time employees and engages two consultants or independent contractors. Section 2.15(a) of the Disclosure Schedule sets forth a detailed description of all compensation, paid or payable for each Key Employee, consultant and independent contractor of the Company.

(b)     Except as set forth on Section 2.15(b) of the Disclosure Schedule, to the Company's knowledge, none of its employees is obligated under any contract (including

licenses, covenants or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that would materially interfere with such employee's ability to promote the interest of the Company or that would conflict with the Company's business. Neither the execution or delivery of the Transaction Agreements, nor the carrying on of the Company's business by the employees of the Company, nor the conduct of the Company's business as now conducted and as presently proposed to be conducted, will, to the Company's knowledge, conflict with or result in a breach of the terms, conditions, or provisions of, or constitute a default under, any contract, covenant or instrument under which any such employee is now obligated.

(c)     Except as set forth on <u>Section 2.15(c)</u> of the Disclosure Schedule, the Company is not delinquent in payments to any of its employees, consultants, or independent contractors for any wages, salaries, commissions, bonuses, or other direct compensation for any service performed for it to the date hereof or amounts required to be reimbursed to such employees, consultants or independent contractors. The Company has complied in all material respects with all applicable state and federal equal employment opportunity laws and with other laws related to employment, including those related to wages, hours, worker classification and collective bargaining. The Company has withheld and paid to the appropriate governmental entity or is holding for payment not yet due to such governmental entity all amounts required to be withheld from employees of the Company and is not liable for any arrears of wages, taxes, penalties or other sums for failure to comply with any of the foregoing.

(d)     To the Company's knowledge, no Key Employee intends to terminate its service relationship with the Company or is otherwise likely to become unavailable to continue as a Key Employee. The employment of each employee of the Company, if any, is terminable at the will of the Company. Except as required by law, upon termination of the employment of any such employees, no severance or other payments will become due. The Company has no policy, practice, plan or program of paying severance pay or any form of severance compensation in connection with the termination of employment services.

(e)     The Company has not made any representations regarding equity incentives to any officer, employee, director or consultant that are inconsistent with the share amounts and terms set forth in the minutes of meetings of the Company's board of directors.

(f)     The Company has no employee benefit plans.

(g)     The Company is not bound by or subject to (and none of its assets or properties is bound by or subject to) any written or oral, express or implied, contract, commitment or arrangement with any labor union, and no labor union has requested or, to the knowledge of the Company, has sought to represent any of the employees, representatives or agents of the Company. There is no strike or other labor dispute involving the Company pending, or to the Company's knowledge, threatened, which could have a Material Adverse Effect, nor is the Company aware of any labor organization activity involving its employees.

(h)     To the Company's Knowledge, none of the Founders has been (i) subject to voluntary or involuntary petition under the federal bankruptcy laws or any state insolvency law or the appointment of a receiver, fiscal agent or similar officer by a court for his

or her business or property; (ii) convicted in a criminal proceeding or named as a subject of a pending criminal proceeding (excluding traffic violations and other minor offenses); (iii) subject to any order, judgment or decree (not subsequently reversed, suspended, or vacated) of any court of competent jurisdiction permanently or temporarily enjoining him or her from engaging, or otherwise imposing limits or conditions on his or her engagement in any securities, investment advisory, banking, insurance, or other type of business or acting as an officer or director of a public company; or (iv) found by a court of competent jurisdiction in a civil action or by the Securities and Exchange Commission or the Commodity Futures Trading Commission to have violated any federal or state securities, commodities, or unfair trade practices law, which such judgment or finding has not been subsequently reversed, suspended, or vacated.

2.16    <u>Tax Returns and Payments</u>. There are no federal, state, county, local or foreign taxes due and payable by the Company which have not been timely paid. There are no accrued and unpaid federal, state, country, local or foreign taxes of the Company which are due, whether or not assessed or disputed. There have been no examinations or audits of any tax returns or reports by any applicable federal, state, local or foreign governmental agency. The Company has duly and timely filed all federal, state, county, local and foreign tax returns required to have been filed by it and there are in effect no waivers of applicable statutes of limitations with respect to taxes for any year.

2.17    <u>Insurance</u>. The Company has, or will obtain when appropriate, in full force and effect insurance policies concerning such casualties as would be reasonable and customary for companies like the Company with extended coverage, sufficient in amount (subject to reasonable deductions) to allow it to replace any of its properties that might be damaged or destroyed. ):  A list of the Company's insurance policies is set forth in <u>Section 2.17</u> of the Disclosure Schedule. There is no claim by the Company pending under any of such policies. All premiums due under such policies have been paid and the Company is otherwise in full compliance with the material terms and conditions of all such policies where the failure to do so could reasonably be expected to result in a Material Adverse Effect.

2.18    <u>Proprietary Information Agreements</u>. Each Founder has executed the Company's Proprietary Information, Assignment of Inventions, Non-Solicitation and Non-Competition Agreement in the form attached hereto as <u>Exhibit D</u> (the "**Proprietary Information Agreements**") and each other Key Employee has executed an agreement containing comparable proprietary information, assignment of inventions and non-solicitation provisions as the Proprietary Information Agreements. The Company is not aware that any of its Key Employees is in violation of any of their agreements with the Company.

2.19    <u>Permits</u>. The Company has or will have, as appropriate, any applicable franchises, permits, licenses and any similar authority necessary for the conduct of its business. The Company is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

2.20    <u>Qualified Small Business Stock</u>. As of and immediately following the Closing:  (i) the Company will be an eligible corporation as defined in Section 1202(e)(4) of the Code, (ii) the Company will not have made purchases of its own stock described in Code Section 1202(c)(3)(B) during the one (1) year period preceding the Closing, except for purchases that are

DocuSign Envelope ID: EC0DB867-A6B7-4D3D-A74D-9CA7D289E8FD

disregarded for such purposes under Treasury Regulation Section 1.1202-2, and (iii) the Company's aggregate gross assets, as defined by Code Section 1202(d)(2), at no time between its incorporation and through the Closing have exceeded $50 million, taking into account the assets of any corporations required to be aggregated with the Company in accordance with Code Section 1202(d)(3); provided, however, that in no event shall the Company be liable to Purchaser or any other party for any damages arising from any subsequently proven or identified error in the Company's determination with respect to the applicability or interpretation of Code Section 1202, unless such determination shall have been given by the Company in a manner either grossly negligent or fraudulent.

  2.21 <u>Foreign Corrupt Practices Act</u>. Neither the Company, nor to the Company's knowledge, any of its directors, officers, employees or agents have, directly or indirectly, made, offered, promised or authorized any payment or gift of any money or anything of value to or for the benefit of any "foreign official" (as such term is defined in the U.S. Foreign Corrupt Practices Act of 1977, as amended (the "**FCPA**")), foreign political party or official thereof or candidate for foreign political office for the purpose of (i) influencing any official act or decision of such official, party or candidate, (ii) inducing such official, party or candidate to use his, her or its influence to affect any act or decision of a foreign governmental authority, or (iii) securing any improper advantage, in the case of (i), (ii) and (iii) above in order to assist the Company or any of its affiliates in obtaining or retaining business for or with, or directing business to, any Person. Neither the Company, nor to the Company's knowledge, any of its directors, officers, employees or agents have made or authorized any bribe, rebate, payoff, influence payment, kickback or other unlawful payment of funds or received or retained any funds in violation of any law, rule or regulation. Neither the Company, nor to the Company's knowledge, any of its officers, directors or employees are the subject of any allegation, voluntary disclosure, investigation, prosecution, or other enforcement action related to the FCPA or any other anti-corruption law. Company further represents that it has not and does not engage in activities prohibited to Persons subject to the jurisdiction of the United States by the United States Trading with the Enemy Act of 1917, as amended, or the United States International Emergency Economic Powers Act of 1977, as amended, or the regulations promulgated under either such Act. The Company further represents that it does not have its principal place of business in either Myanmar or Sudan, or that it does not generates more than 50% of its revenue from either of these countries.

  2.22 <u>Disclosure</u>. No representation or warranty of the Company contained in this Agreement, as qualified by the Disclosure Schedule, and no certificate furnished or to be furnished to Purchaser at the Closing contains any untrue statement of a material fact or, to the Company's knowledge, omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances under which they were made. It is understood that this representation is qualified by the fact that the Company has not delivered to Purchaser, and has not been requested to deliver, a private placement or similar memorandum or any written disclosure of the types of information customarily furnished to purchasers of securities.

  2.23 <u>Data Privacy</u>. The Company has taken commercially reasonable measures to protect the privacy of any Personal Information collected or processed by the Company and to maintain in confidence such Personal Information and is in compliance in all material respects,

with all applicable laws in all relevant jurisdictions (including applicable regulations promulgated thereunder and guidelines published by the applicable privacy governmental authorities), the Company's privacy policies and the requirements of any contract or codes of conduct to which the Company is a party. No action, or to the knowledge of the Company, no claim, proceeding, compliant, inquiry, audit or investigation, is pending or threatened against the Company or any of its officers, directors, or employees (in their capacity as such) by any private party or any governmental authority, foreign or domestic, with respect to Personal Information. There has been no material loss, unauthorized access to or other misuse by the Company or on its behalf of such Personal Information, and, to the knowledge of the Company, no third party misused any Personal Information (as defined below) collected or processed by the Company. "**Personal Information**" means any personally identifiable information from any individuals, including, without limitation, any customers, prospective customers, employees and/or other third parties (including information that alone or in combination with other information can be used to specifically identify a person or any financial services data collected or used by the Company).

3. <u>Representations and Warranties of Purchaser</u>. Purchaser hereby represents and warrants to the Company that:

3.1 <u>Authorization</u>. Purchaser has full power and authority to enter into the Transaction Agreements. The Transaction Agreements to which Purchaser is a party, when executed and delivered by Purchaser, will constitute valid and legally binding obligations of Purchaser, enforceable in accordance with their terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies, or (b) to the extent the indemnification provisions contained in the Investor Rights Agreement may be limited by applicable federal or state securities laws.

3.2 <u>Purchase Entirely for Own Account</u>. This Agreement is made with Purchaser in reliance upon Purchaser's representation to the Company, which by Purchaser's execution of this Agreement, Purchaser hereby confirms, that the Shares to be acquired by Purchaser will be acquired for investment for Purchaser's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, Purchaser further represents that Purchaser does not presently have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Shares. Purchaser has not been formed for the specific purpose of acquiring the Shares.

3.3 <u>Disclosure of Information</u>. Purchaser has had an opportunity to discuss the Company's business, management, financial affairs and the terms and conditions of the offering of the Shares with the Company's management. The foregoing, however, does not limit or modify the representations and warranties of the Company in <u>Section 2</u> of this Agreement or the right of Purchaser to rely thereon.

DocuSign Envelope ID: EC0DB867-A6B7-4D3D-A74D-8CA7D289F8FD

3.4    <u>Restricted Securities</u>. Purchaser understands that the Shares have not been, and will not be, registered under the Securities Act, by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of Purchaser's representations as expressed herein. Purchaser understands that the Shares are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, Purchaser must hold the Shares indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available. Purchaser acknowledges that the Company has no obligation to register or qualify the Shares, or the Common Stock into which it may be converted, for resale, except as set forth in the Investor Rights Agreement. Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Shares, and on requirements relating to the Company which are outside of Purchaser's control, and which the Company is under no obligation and may not be able to satisfy.

3.5    <u>No Public Market</u>. Purchaser understands that no public market now exists for the Shares, and that the Company has made no assurances that a public market will ever exist for the Shares.

3.6    <u>Legends</u>. Purchaser understands that the Shares, to the extent certificated, and any securities issued in respect of or exchange for the Shares, may bear one or all of the following legends:

"THE SHARES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933."

(a)    Any legend set forth in, or required by, the other Transaction Agreements.

(b)    Any legend required by the securities laws of any state to the extent such laws are applicable to the Shares represented by the certificate, instrument, or book entry so legended.

3.7    <u>Accredited Investor</u>. Purchaser is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

3.8    <u>Foreign Investors</u>. If Purchaser is not a United States person (as defined by Section 7701(a)(30) of the Code), Purchaser hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Shares or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Shares, (ii) any foreign exchange restrictions applicable to

such purchase, (iii) any foreign governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Shares. Purchaser's subscription and payment for and continued beneficial ownership of the Shares will not violate any applicable securities or other laws of Purchaser's jurisdiction.

3.9    No General Solicitation. Neither Purchaser, nor any of its officers, directors, employees, agents, stockholders or partners has either directly or indirectly, including, through a broker or finder (a) engaged in any general solicitation or (b) published any advertisement in connection with the offer and sale of the Shares.

3.10    Exculpation Among Purchaser. Purchaser acknowledges that it is not relying upon any Person, other than the Founders and the Company in making its investment or decision to invest in the Company.

3.11    Residence. If Purchaser is an individual, then Purchaser resides in the state or province identified in the address of Purchaser set forth on Purchaser's signature page hereto; if Purchaser is a partnership, corporation, limited liability company or other entity, then the office or offices of Purchaser in which its principal place of business is identified in the address or addresses of Purchaser set forth on Purchaser's signature page hereto.

3.12    "Bad Actor". No Disqualification Event is applicable to Purchaser, except for a Disqualification Event as to which Rule 506(d)(2)(ii–iv) or (d)(3), is applicable.

4.    Conditions to Purchaser' Obligations at Closing. The obligations of Purchaser to purchase Shares at the Closing are subject to the fulfillment, on or before the Closing, of each of the following conditions, unless otherwise waived:

4.1    Representations and Warranties. The representations and warranties of the Company and the Founders contained in Section 2 shall be true and correct in all respects as of the Closing.

4.2    Performance. The Company shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by the Company on or before the Closing.

4.3    Compliance Certificate. The Chief Executive Officer of the Company shall deliver to Purchaser at the Closing a certificate certifying that the conditions specified in Sections 4.1 and 4.2 have been fulfilled.

4.4    Qualifications. All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Shares pursuant to this Agreement shall be obtained and effective as of the Closing.

4.5    Opinion of Company Counsel. Purchaser shall have received from Khan Law Group, LLC, Masood Khan, counsel for the Company, an opinion, dated as of the Closing, in substantially the form satisfactory to counsel to Purchaser.

4.6     Board of Directors. As of the Closing, the authorized size of the Board shall be three (3), and the Board shall consist of the Founders.

4.7     Investor Rights Agreement. The Company, Purchaser and the other stockholders of the Company named as parties thereto shall have executed and delivered the Investor Rights Agreement.

4.8     Right of First Refusal and Co-Sale Agreement. The Company, Purchaser and the other stockholders of the Company named as parties thereto shall have executed and delivered the Right of First Refusal and Co-Sale Agreement.

4.9     Voting Agreement. The Company, Purchaser and the other stockholders of the Company named as parties thereto shall have executed and delivered the Voting Agreement.

4.10    Restated Certificate. The Company shall have filed the Restated Certificate with the Secretary of State of Delaware on or prior to the Closing, which shall continue to be in full force and effect as of the Closing.

4.11    Secretary's Certificate. The Secretary of the Company shall have delivered to Purchaser at the Closing a certificate certifying (i) the Restated Certificate, (ii) the Bylaws of the Company, (iii) resolutions of the Board approving the Transaction Agreements and the transactions contemplated under the Transaction Agreements, (iv) resolutions of the stockholders of the Company approving the Restated Certificate and (v) as to the good standing of the Company.

4.12    Proceedings and Documents. All corporate and other proceedings in connection with the transactions contemplated at the Closing and all documents incident thereto shall be reasonably satisfactory in form and substance to Purchaser, and Purchaser (or its counsel) shall have received all such counterpart original and certified or other copies of such documents as reasonably requested.

4.13    Preemptive Rights. The Company shall have fully satisfied (including with respect to rights of timely notification) or obtained enforceable waivers in respect of any preemptive or similar rights directly or indirectly affecting any of its securities.

4.14    Proprietary Information Agreements. Each Founder shall have entered into a Proprietary Information Agreement in the form attached hereto as Exhibit D and Purchaser shall have received a copy of all similar agreements executed by other Key Employees.

5.     Conditions of the Company's Obligations at Closing. The obligations of the Company to sell Shares to Purchaser at the Closing are subject to the fulfillment, on or before the Closing, of each of the following conditions, unless otherwise waived:

5.1     Representations and Warranties. The representations and warranties of Purchaser contained in Section 3 shall be true and correct in all respects as of the Closing.

5.2     Performance. Purchaser shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by them on or before the Closing.

5.3     Qualifications. All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Shares pursuant to this Agreement shall be obtained and effective as of the Closing.

5.4     Investor Rights Agreement. Purchaser and the Founders shall have executed and delivered the Investor Rights Agreement.

5.5     Right of First Refusal and Co-Sale Agreement. Purchaser and the other stockholders of the Company named as parties thereto shall have executed and delivered the Right of First Refusal and Co-Sale Agreement.

5.6     Voting Agreement. Purchaser and the other stockholders of the Company named as parties thereto shall have executed and delivered the Voting Agreement.

5.7     Services Agreement. Volvo Cars Technology (USA) shall have executed and delivered the Services Agreement.

5.8     IP Assignment. Purchaser shall have executed and delivered the IP Assignment.

6.     Survival of Representations and Warranties; Transaction Related Indemnification.

6.1     Survival.

(a)     All representations, warranties, covenants, and agreements of the Company, the Founders and Purchaser made in this Agreement, in the Disclosure Schedule delivered to Purchaser and all agreements, documents and instruments executed and delivered in connection herewith (i) shall be deemed to have been relied upon by the party or parties to whom they are made and (ii) shall bind the parties' successors and assigns (including, without limitation, any successor to the Company by way of acquisition, merger or otherwise), whether so expressed or not, and, except as otherwise provided in this Agreement, all such representations, warranties, covenants and agreements shall inure to the benefit of the parties (subject to Section 7.2) and their respective successors and assigns and permitted transferees of the Securities, whether so expressed or not.

(b)     The representations and warranties of the parties contained in this Agreement or in any certificates or other writing delivered pursuant to this Agreement or in connection herewith will survive the Closing until the 12 month anniversary of the Closing; provided, that the representations and warranties set out in Section 2.1 (*Organization, Good Standing, Corporate Power and Qualification*), Section 2.2 (*Capitalization*), Section 2.3 (*Subsidiaries*), Section 2.4 (*Authorization*), Section 2.5 (*Valid Issuance of Shares*) and Section 2.16 (*Tax Returns and Payments*) shall survive the Closing until 30 days following the expiration of the maximum statutory limitations period permitted under applicable law. Notwithstanding the

foregoing, any claim for breach of a representation or warranty in respect of which indemnity may be sought under this Agreement shall survive the time at which it would otherwise terminate pursuant to this section if written notice of such claim has been given to the party against whom such indemnification may be sought prior to the end of the applicable survival period described in this <u>Section 6.1</u>. Subject to any applicable statutes of limitations, all covenants and agreements of the parties contained in this Agreement will survive the Closing indefinitely in accordance with their terms.

7.      <u>Covenants.</u>  In consideration of the transactions contemplated hereby, the parties agree as follows:

7.1      <u>Non-Solicitation</u>. For a period of two years from the date of the Closing, none of the Company or any Founder shall directly or indirectly through one or more of any of their respective Affiliates, hire or solicit, or encourage any other Person to hire or solicit, any individual who has been employed by, or has an independent contracting arrangement with, Purchaser or any of its Affiliates within two (2) years prior to the date of such hiring or solicitation, or encourage any such individual to leave such employment.

7.2      <u>Non-Competition Agreement</u>.  For a period of two years from the date of the Closing, Purchaser and its Affiliates (as defined below) shall not operate a Competitive Business; provided, that nothing in this Section 7.2 shall prohibit Purchaser, or any of its Affiliates or successors and assigns, from (a) acquiring or owning, directly or indirectly, voting securities of any publicly traded Person, (b) conducting any business that Purchaser conducts as of the date hereof so long as it does not utilize the Transferred IP, or (c) utilizing technology from any Competitive Business for purposes of its vehicle production operations. For purposes of this <u>Section 7.2</u>, (i) "**Competitive Business**" means any other Person engaged, directly or indirectly, in whole or in part, in the commercialization of a data enablement and/or data sharing system that communicates data to and from vehicles using the Android operating system, and (ii) "**Affiliates**" means Volvo Car AB and any Person controlled by Volvo Car AB.

7.3      <u>Release Regarding Transferred IP</u>. Purchaser, on behalf of itself and its Affiliates, hereby releases each of the Founders from any breach by them of their agreements with Purchaser or its Affiliates arising from the Founder's activities pertaining to the development of the Transferred IP prior to the date of this Agreement.

7.4      <u>Dilution Protection</u>.  In the event that the Company shall, at any time and from time to time after the date hereof and continuing until the Company has received aggregate gross proceeds from the sale of equity securities of the Company in excess of $10,000,000, issues or is deemed to have issued in accordance with Subsection 4.4.3 of the Restated Certificate any Additional Shares of Common Stock (as defined in the Restated Certificate), and as a result of such issuance, Purchaser's Pro Rata Portion (as defined below) will fall below 5%, then the Company will issue to Purchaser such number of Additional Shares of Common Stock as necessary to increase Purchaser's Pro Rata Portion to 5%. For the purposes of this <u>Section 7.4</u>, "**Pro Rata Portion**" means a fraction determined by dividing (i) the number of shares of Common Stock and shares of Common Stock issuable on the conversion of the Preferred Stock then held by Purchaser or its successors and assigns, by (ii) the total number of shares of

Common Stock then outstanding, in each case determined on a fully-diluted, as-converted basis as of immediately prior to such issuance.

8.    Miscellaneous.

8.1    Publication. For so long as Purchaser holds any shares of capital stock of the Company, none of the Company or its Affiliates or any of their respective officers, directors or employees shall (a) use the corporate name, trade name or logo of Purchaser or any of its Affiliates (including the "Volvo" name or trademark) in a public manner or format (including reference on or links to websites, press releases, etc.) or (b) issue any statement or communication to any third party (other than to their legal, accounting and financial advisors, Company's advisory board members,  and other than to current and potential investors, customers, or acquirers under a duty of confidentiality) regarding the investment in the Company by Purchaser without the prior written approval of Purchaser; provided, that the forgoing will not apply for a disclosure or publication of such information that is required to be made by order or requirement of a court, administrative body or other governmental body (a "**Compelled Disclosure**"); provided, further that in the event of a request for any Compelled Disclosure, the Company will to the extent permitted under applicable law provide Purchaser with prompt written notice of such request and cooperate reasonably with Purchaser in seeking to minimize the extent of disclosure required that uses the corporate name, trade name or logo of Purchaser or any of its Affiliates.

8.2    Successors and Assigns. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

8.3    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

8.4    Titles and Subtitles. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

8.5    Notices.

(a)    All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt, or (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five days after having been

sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective parties at their address as set forth on the signature page, or to such e-mail address, facsimile number or address as subsequently modified by written notice given in accordance with this Section 8.5(a). If notice is given to the Company, a copy shall also be sent to 231 Market Place, Suite 226, San Ramon, CA 94583; Attention: Syed M. Saifullah; mubeen@aidenabled.com, with a copy to Khan Law Group, LC, 9431 Haven Ave., Suite 100, Rancho Cucamonga, CA 91730, Attention Masood Khan; mkhan@khanlegal.com; and if notice is given to Purchaser, a copy shall also be given to such other person as may be set forth on Schedule A and a copy shall be sent to Volvo Car Technology Fund AB, 380 N. Pastoria Ave., Sunnyvale, CA 94087, Attention: Daniel Karlsson, danielkarlsson.3@volvocars.com, with a copy to McKennon, Shelton & Henn LLP, 401 East Pratt Street, Suite 2600, Baltimore, MD 21202, Attention: Sulee Stinson Clay; sulee.clay@mshllp.com.

(b)    Subject to the limitations set forth in Delaware General Corporation Law §232(e), Purchaser consents to the delivery of any notice to stockholders given by the Company under the Delaware General Corporation Law or the Company's certificate of incorporation or bylaws by (i) facsimile telecommunication to the facsimile number set forth on the signature page (or to any other facsimile number for Purchaser or other security holder in the Company's records), (ii) electronic mail to the electronic mail address set forth on the signature page (or to any other electronic mail address for Purchaser or other security holder in the Company's records), (iii) posting on an electronic network together with separate notice to Purchaser or other security holder of such specific posting or (iv) any other form of electronic transmission (as defined in the Delaware General Corporation Law) directed to Purchaser. This consent may be revoked by a Purchaser by written notice to the Company and may be deemed revoked in the circumstances specified in Delaware General Corporation Law §232.

8.6    No Finder's Fees. Each party represents that it neither is nor will be obligated for any finder's fee or commission in connection with this transaction. Purchaser agrees to indemnify and to hold harmless the Company from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which Purchaser or any of its officers, employees or representatives is responsible.

8.7    Expenses. The parties will each pay their own expenses with respect to the transactions contemplated by this Agreement.

8.8    Amendments and Waivers. Any term of this Agreement may be amended, terminated or waived only with the written consent of the Company and the holders of at least a majority of the then outstanding Shares, including Purchaser. Any amendment or waiver effected in accordance with this Section 8.8 shall be binding upon Purchaser and each transferee of the Shares (or the Common Stock issuable upon conversion thereof), each future holder of all such securities, and the Company.

8.9    Severability. If any arbitrator or court finds any provision of this Agreement to be invalid or unenforceable, then: (a) the arbitrator or court shall enforce the

provision to the maximum lawful extent and (b) the arbitrator's or court's finding of invalidity or unenforceability shall not affect the validity or enforceability of any other provision of this Agreement.

8.10    Delays or Omissions. No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

8.11    Entire Agreement. This Agreement (including the exhibits hereto), the Restated Certificate and the other Transaction Agreements constitute the full and entire understanding and agreement between the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties are expressly canceled.

8.12    Dispute Resolution. Any unresolved controversy or claim arising out of or relating to this Agreement, except as (i) otherwise provided in this Agreement, or (ii) any such controversies or claims arising out of either party's intellectual property rights for which a provisional remedy or equitable relief is sought, shall be submitted to arbitration by one arbitrator mutually agreed upon by the parties, and if no agreement can be reached within thirty (30) days after names of potential arbitrators have been proposed by the American Arbitration Association (the "**AAA**"), then by one arbitrator having reasonable experience in corporate finance transactions of the type provided for in this Agreement and who is chosen by the AAA. The arbitration shall take place in San Francisco, California, in accordance with the AAA rules then in effect, and judgment upon any award rendered in such arbitration will be binding and may be entered in any court having jurisdiction thereof.  There shall be limited discovery prior to the arbitration hearing as follows: (a) exchange of witness lists and copies of documentary evidence and documents relating to or arising out of the issues to be arbitrated, (b) depositions of all party witnesses and (c) such other depositions as may be allowed by the arbitrators upon a showing of good cause.  Depositions shall be conducted in accordance with the California Code of Civil Procedure, the arbitrator shall be required to provide in writing to the parties the basis for the award or order of such arbitrator, and a court reporter shall record all hearings, with such record constituting the official transcript of such proceedings. Each party will bear its own costs in respect of any disputes arising under this Agreement. The prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled.

8.13    <u>Governing Law</u>. This Agreement shall be governed by the internal law of the State of Delaware, without regard to conflict of law principles that would result in the application of any law other than the law of the State of Delaware.

8.14    <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

***Signature Page Follows***

EXECUTION VERSION

**IN WITNESS WHEREOF**, the parties have executed this Seed Preferred Stock Purchase Agreement as of the date first written above.

**AIDEN AUTOMOTIVE TECHNOLOGIES, INC.**

By: _____
Name:  Niclas Gyllenram
Title:  President


**FOUNDERS**:

_____
SYED MUBEEN SAIFULLAH

_____
NICLAS GYLLENRAM

_____
JONAS FENN


**PURCHASER**:


**VOLVO CAR TECHNOLOGY FUND AB**

By: _____
Name: Raymond Millien
Title: Managing Director

By: _____
Name: Pär Arvidsson
Title: Chairman of the Board

24

## EXHIBIT A

## PURCHASER SCHEDULE

| Name | Shares of Seed Preferred Stock |
|------|-------------------------------|
| Volvo Car Technology Fund AB | 900,000 |
| **TOTAL** | **900,000** |

# **EXHIBIT B**

## **RESTATED CERTIFICATE**

{See attached.}

**<u>EXHIBIT C</u>**

**DISCLOSURE SCHEDULE**

{See Attached.}

Exhibit C

# **EXHIBIT D**

PROPRIETARY INFORMATION, ASSIGNMENT OF INVENTIONS, NON-SOLICITATION
AND NON-COMPETITION AGREEMENT.

{See attached.}

EXHIBIT "4"

EXECUTION VERSION

# VOTING AGREEMENT

THIS VOTING AGREEMENT (this "**Agreement**"), is made and entered into as of March 8, 2021 (the "**Effective Date**") by and among Aiden Automotive Technologies, Inc., a Delaware corporation (the "**Company**"), Volvo Car Technology Fund AB, reg no. 556877-5760, a Sweden private limited liability company (together with its successors and assigns, "**Volvo**") and each other holder of the Company's Seed Preferred Stock, $0.00001 par value per share ("**Preferred Stock**") listed on Schedule A (collectively with Volvo and any subsequent investors, or transferees, who become parties hereto as "Investors" pursuant to Sections 7.1(a) or 7.2 below, the "**Investors**"), and those certain stockholders of the Company and holders of options and warrants to acquire shares of the capital stock of the Company listed on Schedule B (together with any subsequent stockholders, option holders, warrant holders or any transferees, who become parties hereto as "Key Holders" pursuant to Sections 7.1(b) or 7.2 below, the "**Key Holders**," and together collectively with the Investors, the "**Stockholders**").

## RECITALS

A.     Concurrently with the execution of this Agreement, the Company and Volvo are entering into a Seed Preferred Stock Purchase Agreement (the "**Purchase Agreement**") providing for the sale of shares of the Preferred Stock, and in connection with that agreement the parties desire to provide the Investors with the right, among other rights, to designate the election of certain members of the board of directors of the Company (the "**Board**") in accordance with the terms of this Agreement.

B.     The Amended and Restated Certificate of Incorporation of the Company (the "**Restated Certificate**") provides that (a) the holders of record of a majority of the outstanding shares of the Company's common stock, par value $0.00001 per share ("**Common Stock**"), exclusively and as a separate class, shall be entitled to elect three directors of the Company, and (b) if the Company or the Founders (as defined in the Purchaser Agreement) default or otherwise breach any of their obligations contained in the Transaction Documents (each, a "**Company Default**"), and such default or breach is not cured within any applicable cure period or waived by Volvo, then Volvo shall thereafter be entitled to elect one director of the Company (the "**Preferred Director**").

C.     The parties also desire to enter into this Agreement to set forth their agreements and understandings with respect to how shares of the Company's capital stock held by them will be voted on, or tendered in connection with, an acquisition of the Company an increase in the number of shares of Common Stock required to provide for the conversion of the Preferred Stock.

NOW, THEREFORE, the parties agree as follows:

1.     <u>Voting Provisions Regarding the Board</u>.

1.1     <u>Size of the Board</u>. Each Stockholder agrees to vote, or cause to be voted, all Shares (as defined below) owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that the size of the Board shall be set and remain at three (3) directors, and not to exceed

nine (9); unless the Preferred Director has been designated to the Board in which event the size of the Board shall be increased by one (1).For purposes of this Agreement, the term "**Shares**" shall mean and include any securities of the Company that the holders of which are entitled to vote for members of the Board, including without limitation, all shares of Common Stock and Preferred Stock, by whatever name called, now owned or subsequently acquired by a Stockholder, however acquired, whether through stock splits, stock dividends, reclassifications, recapitalizations, similar events or otherwise.

  1.2 <u>Board Composition</u>. Each Stockholder agrees to vote, or cause to be voted, all Shares owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that at each annual or special meeting of stockholders at which an election of directors is held or pursuant to any written consent of the stockholders, subject to Section 5, the following persons shall be elected to the Board:

    (a) At any time after a Company Default (as defined below) and continuing only thereafter, for so long as Volvo and its Affiliates continue to own Shares, one person designated from time to time by Volvo (the "**Preferred Director**"); and

    (b) The remaining directors permitted by the Restated Certificate shall be designated from time to time by the holders of a majority of the shares of Common Stock outstanding, which individuals shall initially be Niclas Gyllenram, Jonas Fenn and Syed M. Saifullah.

  For purposes of this Agreement, (i) an individual, firm, corporation, partnership, association, limited liability company, trust or any other entity (collectively, a "**Person**") shall be deemed an "**Affiliate**" of another Person who, directly or indirectly, controls, is controlled by, or is under common control with the Person specified, where "**control**" means the possession, directly or indirectly, by agreement or otherwise, of at least 50% of the voting stock, partnership interest or other ownership interest, or the power to appoint or remove a majority of the board of directors or other governing body of such Person, or to cause the direction of the management of such Person and (ii) "**Company Default**" means, collectively, any default or breach by the Company under any of the Transaction Documents of any of the Founder Obligations or the Company Obligations set forth on <u>Schedule C</u> hereto and made a part of this Agreement as if fully set forth herein and, to the extent such default or breach is curable, such default or breach continues for 15 days after written notice thereof to the Company.

  1.3 <u>Board Observer</u>. So long as Volvo holds shares of Preferred Stock or Common Stock, it shall have the right to appoint one representative (a "**Board Observer**") to observe all meetings of the Board in a non-voting capacity, and in this respect, the Company shall give such Board Observer copies of all notices, minutes, consents, and other materials that it provides to the Board at the same time and in the same manner as provided to such directors; <u>provided</u>, <u>however</u> that such representative shall agree to hold in confidence and trust all information so provided. The Board Observer shall not have a right to vote on any matters presented to the Board.

  1.4 <u>Failure to Designate a Board Member</u>. In the absence of any designation from the Persons or groups with the right to designate a director as specified above, the director

previously designated by them and then serving shall be reelected if still eligible and willing to serve as provided herein and otherwise, such Board seat shall remain vacant.

   1.5 <u>Removal of Board Members</u>. Each Stockholder also agrees to vote, or cause to be voted, all Shares owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that:

    (a) no director elected or appointed pursuant to <u>Section 1.2</u> may be removed from office unless (i) such removal is directed or approved by the affirmative vote of the Person(s), or of the holders of at least a majority of the Shares entitled under <u>Section 1.2</u> to designate that director; or (ii) the Person(s) originally entitled to designate or approve such director pursuant to <u>Section 1.2</u> is no longer so entitled to designate or approve such director;

    (b) any vacancies created by the resignation, removal or death of a director elected or appointed pursuant to <u>Sections 1.2</u>, <u>1.4</u> or <u>1.5</u> shall be filled pursuant to the provisions of <u>Section 1.2</u>; and

    (c) upon the request of any party entitled to designate a director as provided in <u>Section 1.2(a)</u> or <u>1.2(b)</u> to remove such director, such director shall be removed.

All Stockholders agree to execute any written consents required to perform the obligations of this <u>Section 1.2</u>, and the Company agrees at the request of any Person or group entitled to designate directors to call a special meeting of stockholders for the purpose of electing directors.

   1.6 <u>No Liability for Election of Recommended Directors</u>. No Stockholder, nor any Affiliate of any Stockholder, shall have any liability as a result of designating a person for election as a director for any act or omission by such designated person in his or her capacity as a director of the Company, nor shall any Stockholder have any liability as a result of voting for any such designee in accordance with the provisions of this Agreement.

   1.7 <u>No "Bad Actor" Designees</u>. Each Person with the right to designate or participate in the designation of a director as specified above hereby represents and warrants to the Company that, to such Person's knowledge, none of the "bad actor" disqualifying events described in Rule 506(d)(1)(i)-(viii) promulgated under the Securities Act of 1933, as amended (the "Securities Act") (each, a "**Disqualification Event**"), is applicable to such Person's initial designee named above except, if applicable, for a Disqualification Event as to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable. Any director designee to whom any Disqualification Event is applicable, except for a Disqualification Event to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable, is hereinafter referred to as a "**Disqualified Designee**". Each Person with the right to designate or participate in the designation of a director as specified above hereby covenants and agrees (A) not to designate or participate in the designation of any director designee who, to such Person's knowledge, is a Disqualified Designee and (B) that in the event such Person becomes aware that any individual previously designated by any such Person is or has become a Disqualified Designee, such Person shall as promptly as practicable take such actions as are necessary to remove such Disqualified Designee from the Board and designate a replacement designee who is not a Disqualified Designee.

2. <u>Matters Requiring Preferred Director Approval</u>. At any time that the Preferred Director is designated to the Board of Directors, the Company hereby covenants and agrees that it shall not, without approval of the Board of Directors, which approval must include the affirmative vote of the Preferred Director:

       2.1    change the principal business of the Company, enter new lines of business, or exit the current line of business;

       2.2    grant or issue any option or other equity incentive grant with non-standard vesting or acceleration provisions;

       2.3    issue any shares of capital stock of the Company, other than Exempted Securities (as defined in the Certificate of Incorporation);

       2.4    increase the number of shares available for issuance under any equity incentive plan;

       2.5    approve the budget and any strategic operating plan for the Company for each fiscal year;

       2.6    file for bankruptcy or consent to the filing of any involuntary petition in bankruptcy;

       2.7    make, or permit any subsidiary to make, any loan or advance to, or own any stock or other securities of, any subsidiary or other corporation, partnership, or other entity unless it is wholly owned by the Company;

       2.8    make, or permit any subsidiary to make, any loan or advance to any Person, including, without limitation, any employee or director of the Company or any subsidiary, except advances and similar expenditures in the ordinary course of business or under the terms of an employee stock or option plan approved by the Board of Directors;

       2.9    enter into any joint venture, partnership, collaboration or other strategic commercial relationship with any strategic partner, vendor or supplier with a value in excess of $500,000, other than in the ordinary course of business;

       2.10    mortgage or pledge, or create a security interest in, or permit any subsidiary to mortgage, pledge or create a security interest in, any assets of the Company other than in connection with equipment leases which are secured only by the leased equipment or pursuant to indebtedness permitted by Subsection 5.4(l);

       2.11    incur or guarantee any aggregate indebtedness in excess of $500,000 that is not already included in a budget approved by the Board of Directors;

       2.12    make any capital expenditures in excess of $500,000 that are not already included in a budget approved by the Board of Directors;

       2.13    otherwise enter into or be a party to any transaction with any director, officer, or employee of the Company or any "associate" (as defined in Rule 12b-2 promulgated

under the Exchange Act) of any such Person, except for transactions made in the ordinary course of business and pursuant to reasonable requirements of the Company's business and upon fair and reasonable terms that are approved by a majority of the Board of Directors;

2.14    hire, terminate, or change the compensation of the executive officers, including approving any option grants or stock awards to executive officers;

2.15    sell, assign, license, pledge, or encumber material technology or intellectual property, other than licenses granted in the ordinary course of business;

2.16    enter into any corporate strategic relationship involving the payment, contribution, or assignment by the Company or to the Company of money or assets greater than $500,000 or

2.17    enter into any agreement regarding any of the foregoing items.

3.    Board Matters. At any time that the Preferred Director has been designated to the Board of Directors, unless otherwise determined by the vote of a majority of the directors then in office, the Board of Directors shall meet at least quarterly in accordance with an agreed-upon schedule. The Company shall reimburse the nonemployee directors for all reasonable out-of-pocket travel expenses incurred (consistent with the Company's travel policy) in connection with attending meetings of the Board of Directors. The Preferred Director, if any, shall be entitled in such person's discretion to be a member of any committee of the Board of Directors.

4.    Vote to Increase Authorized Common Stock . Each Stockholder agrees to vote or cause to be voted all Shares owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to increase the number of authorized shares of Common Stock from time to time to ensure that there will be sufficient shares of Common Stock available for conversion of all of the shares of Preferred Stock outstanding at any given time.

5.    Drag-Along Right.

5.1    Definitions. A "**Sale of the Company**" shall mean either: (a) a transaction or series of related transactions in which a Person, or a group of related Persons, acquires from stockholders of the Company shares representing more than 50% of the outstanding voting power of the Company (a "**Stock Sale**"); or (b) a transaction that qualifies as a "**Deemed Liquidation Event**" as defined in the Restated Certificate.

5.2    Actions to be Taken. In the event that the Board and Volvo approve a Sale of the Company specifying that this Section 5 shall apply to such transaction, then, subject to satisfaction of each of the conditions set forth in Section 5.3 below, each Stockholder and the Company hereby agree:

(a)    if such transaction requires stockholder approval, with respect to all Shares that such Stockholder owns or over which such Stockholder otherwise exercises voting power, to vote (in person, by proxy or by action by written consent, as applicable) all Shares in favor of, and adopt, such Sale of the Company (together with any related amendment

or restatement to the Restated Certificate required to implement such Sale of the Company) and to vote in opposition to any and all other proposals that could reasonably be expected to delay or impair the ability of the Company to consummate such Sale of the Company;

(b)      if such transaction is a Stock Sale, to sell the same proportion of shares of capital stock of the Company beneficially held by such Stockholder as is being sold by Volvo to the Person to whom Volvo proposes to sell its Shares, and, except as permitted in Section 5.3 below, on the same terms and conditions as the other stockholders of the Company;

(c)      to execute and deliver all related documentation and take such other action in support of the Sale of the Company as shall reasonably be requested by the Company in order to carry out the terms and provision of this Section 5, including, without limitation, executing and delivering instruments of conveyance and transfer, and any purchase agreement, merger agreement, any associated indemnity agreement, or escrow agreement, any associated voting, support, or joinder agreement, consent, waiver, governmental filing, share certificates duly endorsed for transfer (free and clear of impermissible liens, claims and encumbrances), and any similar or related documents;

(d)      not to deposit, and to cause their Affiliates not to deposit, except as provided in this Agreement, any Shares of the Company owned by such party or Affiliate in a voting trust or subject any Shares to any arrangement or agreement with respect to the voting of such Shares, unless specifically requested to do so by the acquirer in connection with the Sale of the Company;

(e)      to refrain from (i) exercising any dissenters' rights or rights of appraisal under applicable law at any time with respect to such Sale of the Company, or (ii); asserting any claim or commencing any suit (x) challenging the Sale of the Company or this Agreement, or (y) alleging a breach of any fiduciary duty of the Board (including, without limitation, aiding and abetting breach of fiduciary duty) in connection with the evaluation, negotiation or entry into the Sale of the Company, or the consummation of the transactions contemplated thereby;

(f)      if the consideration to be paid in exchange for the Shares pursuant to this Section 5 includes any securities and due receipt thereof by any Stockholder would require under applicable law (x) the registration or qualification of such securities or of any person as a broker or dealer or agent with respect to such securities; or (y) the provision to any Stockholder of any information other than such information as a prudent issuer would generally furnish in an offering made solely to "accredited investors" as defined in Regulation D promulgated under the Securities Act of 1933, as amended (the "**Securities Act**"), the Company may cause to be paid to any such Stockholder in lieu thereof, against surrender of the Shares which would have otherwise been sold by such Stockholder, an amount in cash equal to the fair value (as determined in good faith by the Board) of the securities which such Stockholder would otherwise receive as of the date of the issuance of such securities in exchange for the Shares; and

(g)      in the event that Volvo, in connection with such Sale of the Company, appoints a stockholder representative (the "**Stockholder Representative**") with respect to matters affecting the Stockholders under the applicable definitive transaction agreements following consummation of such Sale of the Company, (x) to consent to (i) the

appointment of such Stockholder Representative, (ii) the establishment of any applicable escrow, expense or similar fund in connection with any indemnification or similar obligations, and (iii) the payment of such Stockholder's pro rata portion (from the applicable escrow or expense fund or otherwise) of any and all reasonable fees and expenses to such Stockholder Representative in connection with such Stockholder Representative's services and duties in connection with such Sale of the Company and its related service as the representative of the Stockholders, and (y) not to assert any claim or commence any suit against the Stockholder Representative or any other Stockholder with respect to any action or inaction taken or failed to be taken by the Stockholder Representative, within the scope of the Stockholder Representative's authority, in connection with its service as the Stockholder Representative, absent fraud, bad faith, or willful misconduct.

5.3     Conditions. Notwithstanding anything to the contrary set forth herein, a Stockholder will not be required to comply with Section 5.2 above in connection with any proposed Sale of the Company (the "**Proposed Sale**"), unless:

(a)     any representations and warranties to be made by such Stockholder in connection with the Proposed Sale are limited to representations and warranties related to authority, ownership and the ability to convey title to such Shares, including, but not limited to, representations and warranties that (i) the Stockholder holds all right, title and interest in and to the Shares such Stockholder purports to hold, free and clear of all liens and encumbrances, (ii) the obligations of the Stockholder in connection with the transaction have been duly authorized, if applicable, (iii)  the documents to be entered into by the Stockholder have been duly executed by the Stockholder and delivered to the acquirer and are enforceable (subject to customary limitations) against the Stockholder in accordance with their respective terms; and (iv) neither the execution and delivery of documents to be entered into by the Stockholder in connection with the transaction, nor the performance of the Stockholder's obligations thereunder, will cause a breach or violation of the terms of any agreement to which the Stockholder is a party, or any law or judgment, order or decree of any court or governmental agency that applies to the Stockholder;

(b)     such Stockholder is not required to agree (unless such Stockholder is a Company officer or employee) to any restrictive covenant in connection with the Proposed Sale (including without limitation any covenant not to compete or covenant not to solicit customers, employees or suppliers of any party to the Proposed Sale);

(c)     such Stockholder and its affiliates are not required to amend, extend or terminate any contractual or other relationship with the Company, the acquirer or their respective affiliates, except that the Stockholder may be required to agree to terminate the investment-related documents between or among such Stockholder, the Company and/or other stockholders of the Company;

(d)     the Stockholder is not liable for the breach of any representation, warranty or covenant made by any other Person in connection with the Proposed Sale, other than the Company (except to the extent that funds may be paid out of an escrow established to cover breach of representations, warranties and covenants of the Company as well as breach by any stockholder of any of identical representations, warranties and covenants provided by all stockholders);

DocuSign Envelope ID: EC0D867-A6B7-4D3D-A74D-9CA7D389E8FD

(e)      liability shall be limited to such Stockholder's applicable share (determined based on the respective proceeds payable to each Stockholder in connection with such Proposed Sale in accordance with the provisions of the Restated Certificate) of a negotiated aggregate indemnification amount that applies equally to all Stockholders but that in no event exceeds the amount of consideration otherwise payable to such Stockholder in connection with such Proposed Sale, except with respect to claims related to fraud by such Stockholder, the liability for which need not be limited as to such Stockholder;

(f)      upon the consummation of the Proposed Sale (i) each holder of each class or series of the capital stock of the Company will receive the same form of consideration for their shares of such class or series as is received by other holders in respect of their shares of such same class or series of stock, and if any holders of any capital stock of the Company are given a choice as to the form of consideration to be received as a result of the Proposed Sale, all holders of such capital stock will be given the same option, (ii) each holder of a series of Preferred Stock will receive the same amount of consideration per share of such series of Preferred Stock as is received by other holders in respect of their shares of such same series, (iii) each holder of Common Stock will receive the same amount of consideration per share of Common Stock as is received by other holders in respect of their shares of Common Stock, and (iv) unless waived pursuant to the terms of the Restated Certificate and as may be required by law, the aggregate consideration receivable by all holders of the Preferred Stock and Common Stock shall be allocated among the holders of Preferred Stock and Common Stock on the basis of the relative liquidation preferences to which the holders of each respective series of Preferred Stock and the holders of Common Stock are entitled in a Deemed Liquidation Event (assuming for this purpose that the Proposed Sale is a Deemed Liquidation Event) in accordance with the Company's Certificate of Incorporation in effect immediately prior to the Proposed Sale; provided, however, that, notwithstanding the foregoing provisions of this Section 5.3(f), if the consideration to be paid in exchange for the Key Holder Shares or Investor Shares, as applicable, pursuant to this Section 5.3(f) includes any securities and due receipt thereof by any Key Holder or Investor would require under applicable law (x) the registration or qualification of such securities or of any person as a broker or dealer or agent with respect to such securities; or (y) the provision to any Key Holder or Investor of any information other than such information as a prudent issuer would generally furnish in an offering made solely to "accredited investors" as defined in Regulation D promulgated under the Securities Act, the Company may cause to be paid to any such Key Holder or Investor in lieu thereof, against surrender of the Key Holder Shares or Investor Shares, as applicable, which would have otherwise been sold by such Key Holder or Investor, an amount in cash equal to the fair value (as determined in good faith by the Board) of the securities which such Key Holder or Investor would otherwise receive as of the date of the issuance of such securities in exchange for the Key Holder Shares or Investor Shares, as applicable;

(g)      subject to clause (f) above, requiring the same form of consideration to be available to the holders of any single class or series of capital stock, if any holders of any capital stock of the Company are given an option as to the form and amount of consideration to be received as a result of the Proposed Sale, all holders of such capital stock will be given the same option; provided, however, that nothing in this Section 5.3(g) shall entitle any holder to receive any form of consideration that such holder would be ineligible to receive as a

result of such holder's failure to satisfy any condition, requirement or limitation that is generally applicable to the Company's stockholders.

(h)    the Electing Holders shall exercise its rights pursuant to this Section 5 by delivering a written notice (the "**Drag-along Notice**") to each Stockholder no later than 20 days prior to the closing date of such Proposed Sale. The Drag-along Notice shall make reference to the Electing Holder's rights and obligations hereunder and shall describe in reasonable detail:

(i)    the number of shares of Common Stock to be sold by Volvo, if the Proposed Sale is structured as a Stock Sale;

(ii)    the identity of the third party purchaser;

(iii)    the proposed date, time and location of the closing of the Proposed Sale;

(iv)    the per share purchase price and the other material terms and conditions of the Proposed Sale, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof; and

(v)    a copy of any form of all definitive agreements proposed to be executed in connection therewith.

5.4    Restrictions on Sales of Control of the Company. No Stockholder shall be a party to any Stock Sale unless (a) all holders of Preferred Stock are allowed to participate in such transaction(s) and (b) the consideration received pursuant to such transaction is allocated among the parties thereto in the manner specified in the Company's Certificate of Incorporation in effect immediately prior to the Stock Sale (as if such transaction(s) were a Deemed Liquidation Event), unless the holders of at least the requisite percentage required to waive treatment of the transaction(s) as a Deemed Liquidation Event pursuant to the terms of the Restated Certificate, elect to allocate the consideration differently by written notice given to the Company at least 10 days prior to the effective date of any such transaction or series of related transactions.

6.    Remedies.

6.1    Covenants of the Company. The Company agrees to use its commercially reasonable best efforts, within the requirements of applicable law, to ensure that the rights granted under this Agreement are effective and that the parties enjoy the benefits of this Agreement. Such actions include, without limitation, the use of the Company's commercially reasonable best efforts to cause the nomination and election of the directors as provided in this Agreement.

6.2    Irrevocable Proxy and Power of Attorney. Each party to this Agreement hereby constitutes and appoints as the proxies of the party and hereby grants a power of attorney to the Chief Executive Officer of the Company, and a designee of Volvo, and each of them, with full power of substitution, with respect to the matters set forth herein, including, without

limitation, votes to increase authorized shares pursuant to <u>Section 2</u> hereof and votes regarding any Sale of the Company pursuant to <u>Section 5</u> hereof, and hereby authorizes each of them to represent and vote, if and only if the party (i) fails to vote, or (ii) attempts to vote (whether by proxy, in person or by written consent), in a manner which is inconsistent with the terms of <u>Sections 2</u> and <u>5</u> of this Agreement, all of such party's Shares in favor of the election of persons as members of the Board determined pursuant to and in accordance with the terms and provisions of this Agreement or the increase of authorized shares or approval of any Sale of the Company pursuant to and in accordance with the terms and provisions of <u>Sections 2</u> and <u>5</u>, respectively, of this Agreement or to take any action reasonably necessary to effect <u>Sections 2</u> and <u>5</u>, respectively, of this Agreement.  The power of attorney granted hereunder shall authorize the Chief Executive Officer of the Company to execute and deliver the documentation referred to in <u>Section 5.2(c)</u> on behalf of any party failing to do so within five business days of a request by the Company.  Each of the proxy and power of attorney granted pursuant to this <u>Section 6.2</u> is given in consideration of the agreements and covenants of the Company and the parties in connection with the transactions contemplated by this Agreement and, as such, each is coupled with an interest and shall be irrevocable unless and until this Agreement terminates or expires pursuant to <u>Section 6</u> hereof. Each party hereto hereby revokes any and all previous proxies or powers of attorney with respect to the Shares and shall not hereafter, unless and until this Agreement terminates or expires pursuant to <u>Section 6</u> hereof, purport to grant any other proxy or power of attorney with respect to any of the Shares, deposit any of the Shares into a voting trust or enter into any agreement (other than this Agreement), arrangement or understanding with any person, directly or indirectly, to vote, grant any proxy or give instructions with respect to the voting of any of the Shares, in each case, with respect to any of the matters set forth herein.

6.3    <u>Specific Enforcement</u>. Each party acknowledges and agrees that each party hereto will be irreparably damaged in the event any of the provisions of this Agreement are not performed by the parties in accordance with their specific terms or are otherwise breached. Accordingly, it is agreed that each of the Company and the Stockholders shall be entitled to an injunction to prevent breaches of this Agreement, and to specific enforcement of this Agreement and its terms and provisions in any action instituted in any court of the United States or any state having subject matter jurisdiction.

6.4    <u>Remedies Cumulative</u>. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

7.    "<u>Bad Actor</u>" Matters.

7.1    <u>Definitions</u>. For purposes of this Agreement:

(a) "**Company Covered Person**" means, with respect to the Company as an "issuer" for purposes of Rule 506 promulgated under the Securities Act, any Person listed in the first paragraph of Rule 506(d)(1).

(b) "**Disqualified Designee**" means any director designee to whom any Disqualification Event is applicable, except for a Disqualification Event as to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable.

(c) "**Disqualification Event**" means a "bad actor" disqualifying event

described in Rule 506(d)(1)(i)-(viii) promulgated under the Securities Act.

(d) "**Rule 506(d) Related Party**" means, with respect to any Person, any other Person that is a beneficial owner of such first Person's securities for purposes of Rule 506(d) under the Securities Act.

7.2     Representations.

(a) Each Person with the right to designate or participate in the designation of a director pursuant to this Agreement hereby represents that (i) such Person has exercised reasonable care to determine whether any Disqualification Event is applicable to such Person, any director designee designated by such Person pursuant to this Agreement or any of such Person's Rule 506(d) Related Parties, except, if applicable, for a Disqualification Event as to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable and (ii) no Disqualification Event is applicable to such Person, any Board member designated by such Person pursuant to this Agreement or any of such Person's Rule 506(d) Related Parties, except, if applicable, for a Disqualification Event as to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable. Notwithstanding anything to the contrary in this Agreement, each Investor makes no representation regarding any Person that may be deemed to be a beneficial owner of the Company's voting equity securities held by such Investor solely by virtue of that Person being or becoming a party to (x) this Agreement, as may be subsequently amended, or (y) any other contract or written agreement to which the Company and such Investor are parties regarding (1) the voting power, which includes the power to vote or to direct the voting of, such security; and/or (2) the investment power, which includes the power to dispose, or to direct the disposition of, such security.

(b) The Company hereby represents and warrants to the Investors that no Disqualification Event is applicable to the Company or, to the Company's knowledge, any Company Covered Person, except for a Disqualification Event as to which Rule 506(d)(2)(ii–iv) or (d)(3) is applicable.

7.3     Covenants. Each Person with the right to designate or participate in the designation of a director pursuant to this Agreement covenants and agrees (i) not to designate or participate in the designation of any director designee who, to such Person's knowledge, is a Disqualified Designee, (ii) to exercise reasonable care to determine whether any director designee designated by such person is a Disqualified Designee, (iii) that in the event such Person becomes aware that any individual previously designated by any such Person is or has become a Disqualified Designee, such Person shall as promptly as practicable take such actions as are necessary to remove such Disqualified Designee from the Board and designate a replacement designee who is not a Disqualified Designee, and (iv) to notify the Company promptly in writing in the event a Disqualification Event becomes applicable to such Person or any of its Rule 506(d) Related Parties, or, to such Person's knowledge, to such Person's initial designee named in Section 1, except, if applicable, for a Disqualification Event as to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable.

8.     Term. This Agreement shall be effective as of the date hereof and shall continue in effect until and shall terminate upon the earliest to occur of (a) the consummation of the Company's first underwritten public offering of its Common Stock (other than a registration

statement relating either to the sale of securities to employees of the Company pursuant to its stock option, stock purchase or similar plan or an SEC Rule 145 transaction); (b) the consummation of a Sale of the Company and distribution of proceeds to or escrow for the benefit of the Stockholders in accordance with the Restated Certificate, provided that the provisions of Section 3 hereof will continue after the closing of any Sale of the Company to the extent necessary to enforce the provisions of Section 3 with respect to such Sale of the Company; and (c) termination of this Agreement in accordance with Section 9.8 below.

9.    Miscellaneous.

  9.1    Additional Parties.

    (a)    Notwithstanding anything to the contrary contained herein, if the Company issues additional shares of Preferred Stock after the date hereof, as a condition to the issuance of such shares the Company shall require that any purchaser of such shares become a party to this Agreement by executing and delivering (i) the Adoption Agreement attached to this Agreement as Exhibit A, or (ii) a counterpart signature page hereto agreeing to be bound by and subject to the terms of this Agreement as an Investor and Stockholder hereunder. In either event, each such person shall thereafter be deemed an Investor and Stockholder for all purposes under this Agreement.

    (b)    In the event that after the date of this Agreement, the Company enters into an agreement with any Person to issue shares of capital stock to such Person (other than to a purchaser of Preferred Stock described in Section 9.1(a) above), then, the Company shall cause such Person, as a condition precedent to entering into such agreement, to become a party to this Agreement by executing an Adoption Agreement in the form attached hereto as Exhibit A, agreeing to be bound by and subject to the terms of this Agreement as a Stockholder and thereafter such person shall be deemed a Stockholder for all purposes under this Agreement.

  9.2    Transfers. Each transferee or assignee of any Shares subject to this Agreement shall continue to be subject to the terms hereof, and, as a condition precedent to the Company's recognition of such transfer, each transferee or assignee shall agree in writing to be subject to each of the terms of this Agreement by executing and delivering an Adoption Agreement substantially in the form attached hereto as Exhibit A. Upon the execution and delivery of an Adoption Agreement by any transferee, such transferee shall be deemed to be a party hereto as if such transferee were the transferor and such transferee's signature appeared on the signature pages of this Agreement and shall be deemed to be an Investor and Stockholder, or Key Holder and Stockholder, as applicable. The Company shall not permit the transfer of the Shares subject to this Agreement on its books or issue a new certificate representing any such Shares unless and until such transferee shall have complied with the terms of this Section 9.2. Each certificate instrument, or book entry representing the Shares subject to this Agreement if issued on or after the date of this Agreement shall be notated by the Company with the legend set forth in Section 9.12.

  9.3    Successors and Assigns. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations,

or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

9.4    Governing Law. This Agreement shall be governed by the internal law of the State of Delaware, without regard to conflict of law principles that would result in the application of any law other than the law of the State of Delaware.

9.5    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

9.6    Titles and Subtitles. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

9.7    Notices.

(a) All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after the business day of deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective parties at their address as set forth on Schedule A or Schedule B hereto, or to such email address, facsimile number or address as subsequently modified by written notice given in accordance with this Section 7.7. If notice is given to the Company, a copy shall also be sent to  231 Market Place, Suite 226, San Ramon, CA 94583 Attention: Syed M. Saifullah]; mubeen@aidenabled.com, with a copy to Khan Law Group LC, 9431 Haven Ave., Suite 100, Rancho Cucamonga, CA  91730, mkhan@khanlegal.com; and if notice is given to Stockholders, a copy shall also be given to Volvo Car Technology Fund AB, SE-405 31 Göteborg, Sweden, Attention: Daniel Karlsson, danielkarlsson.3@volvocars.com, with a copy to McKennon Shelton & Henn, LLP, 401 East Pratt Street, Suite 2600, Baltimore, MD 21202, Attention: Sulee S. Clay; sulee.clay@mshllp.com.

(b)    Consent to Electronic Notice. Each Investor and Key Holder consents to the delivery of any stockholder notice pursuant to the Delaware General Corporation Law (the "**DGCL**"), as amended or superseded from time to time, by electronic transmission pursuant to Section 232 of the DGCL (or any successor thereto) at the electronic mail address or the facsimile number set forth below such Investor's or Key Holder's name on the Schedules hereto, as updated from time to time by notice to the Company, or as on the books of the Company.  To the extent that any notice given by means of electronic transmission is returned or undeliverable for any reason, the foregoing consent shall be deemed to have been revoked until a new or corrected electronic mail address has been provided, and such attempted Electronic

Notice shall be ineffective and deemed to not have been given. Each Investor and Key Holder agrees to promptly notify the Company of any change in its electronic mail address, and that failure to do so shall not affect the foregoing.

9.8 <u>Consent Required to Amend, Modify, Terminate or Waive</u>. This Agreement may be amended, modified or terminated (other than pursuant to <u>Section 8</u>) and the observance of any term hereof may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a written instrument executed by (a) the Company; (b) the Key Holders holding a majority of the Shares then held by the Key Holders who are then providing services to the Company as officers, employees or consultants; and (c) the holders of a majority of the shares of Common Stock issued or issuable upon conversion of the shares of Preferred Stock held by the Investors (voting together as a single class), including Volvo. Notwithstanding the foregoing:

(a) this Agreement may not be amended, modified or terminated and the observance of any term of this Agreement may not be waived with respect to any Investor or Key Holder without the written consent of such Investor or Key Holder unless such amendment, modification, termination or waiver applies to all Investors or Key Holders, as the case may be, in the same fashion;

(b) the provisions of <u>Sections 1.2(a)</u> and this <u>Section 9.8(b)</u> may not be amended, modified, terminated or waived without the written consent of Volvo;

(c) the consent of the Key Holders shall not be required for any amendment, modification, termination or waiver if such amendment, modification, termination, or waiver either (A) is not directly applicable to the rights of the Key Holders hereunder; or (B) does not adversely affect the rights of the Key Holders in a manner that is different than the effect on the rights of the other parties hereto;

(d) <u>Schedule A</u> hereto may be amended by the Company from time to time in accordance with <u>Section 1.3</u> of the Purchase Agreement to add information regarding additional Purchasers (as defined in the Purchase Agreement) without the consent of the other parties hereto; and

(e) any provision hereof may be waived by the waiving party on such party's own behalf, without the consent of any other party.

The Company shall give prompt written notice of any amendment, modification, termination, or waiver hereunder to any party that did not consent in writing thereto. Any amendment, modification, termination, or waiver effected in accordance with this <u>Section 7.8</u> shall be binding on each party and all of such party's successors and permitted assigns, whether or not any such party, successor or assignee entered into or approved such amendment, modification, termination or waiver. For purposes of this <u>Section 9.8</u>, the requirement of a written instrument may be satisfied in the form of an action by written consent of the Stockholders circulated by the Company and executed by the Stockholder parties specified, whether or not such action by written consent makes explicit reference to the terms of this Agreement.

14

9.9     <u>Delays or Omissions</u>. No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default previously or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

9.10    <u>Severability</u>. The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.

9.11    <u>Entire Agreement</u>. This Agreement (including the Exhibits hereto), the Restated Certificate and the other Transaction Agreements (as defined in the Purchase Agreement) constitute the full and entire understanding and agreement between the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties is expressly canceled.

9.12    <u>Share Certificate Legend</u>. Each certificate, instrument, or book entry representing any Shares issued after the date hereof shall be notated by the Company with a legend reading substantially as follows:

"THE SHARES REPRESENTED HEREBY ARE SUBJECT TO A VOTING AGREEMENT, AS MAY BE AMENDED FROM TIME TO TIME, (A COPY OF WHICH MAY BE OBTAINED UPON WRITTEN REQUEST FROM THE COMPANY), AND BY ACCEPTING ANY INTEREST IN SUCH SHARES THE PERSON ACCEPTING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF THAT VOTING AGREEMENT, INCLUDING CERTAIN RESTRICTIONS ON TRANSFER AND OWNERSHIP SET FORTH THEREIN."

The Company, by its execution of this Agreement, agrees that it will cause the certificates instruments, or book entry evidencing the Shares issued after the date hereof to be notated with the legend required by this <u>Section 7.12</u> of this Agreement, and it shall supply, free of charge, a copy of this Agreement to any holder of such Shares upon written request from such holder to the Company at its principal office. The parties to this Agreement do hereby agree that the failure to cause the certificates, instruments, or book entry evidencing the Shares to be notated with the legend required by this <u>Section 7.12</u> herein and/or the failure of the Company to supply, free of charge, a copy of this Agreement as provided hereunder shall not affect the validity or enforcement of this Agreement.

9.13    <u>Stock Splits, Stock Dividends, etc.</u> In the event of any issuance of Shares or the voting securities of the Company hereafter to any of the Stockholders (including, without limitation, in connection with any stock split, stock dividend, recapitalization, reorganization, or

the like), such Shares shall become subject to this Agreement and shall be notated with the legend set forth in Section 9.12.

9.14    Manner of Voting. The voting of Shares pursuant to this Agreement may be effected in person, by proxy, by written consent or in any other manner permitted by applicable law.  For the avoidance of doubt, voting of the Shares pursuant to the Agreement need not make explicit reference to the terms of this Agreement.

9.15    Further Assurances. At any time or from time to time after the date hereof, the parties agree to cooperate with each other, and at the request of any other party, to execute and deliver any further instruments or documents and to take all such further action as the other party may reasonably request in order to carry out the intent of the parties hereunder.

9.16    Costs of Enforcement. If any party to this Agreement seeks to enforce its rights under this Agreement by legal proceedings, the non-prevailing party shall pay all costs and expenses incurred by the prevailing party, including, without limitation, all reasonable attorneys' fees.

9.17    Aggregation of Stock. All Shares held or acquired by a Stockholder and/or its Affiliates shall be aggregated together for the purpose of determining the availability of any rights under this Agreement, and such Affiliated persons may apportion such rights as among themselves in any manner they deem appropriate.

9.18    Spousal Consent. If any individual Stockholder is married on the date of this Agreement, such Stockholder's spouse shall execute and deliver to the Company a consent of spouse in the form of Exhibit B hereto ("**Consent of Spouse**"), effective on the date hereof. Notwithstanding the execution and delivery thereof, such consent shall not be deemed to confer or convey to the spouse any rights in such Stockholder's Shares that do not otherwise exist by operation of law or the agreement of the parties. If any individual Stockholder should marry or remarry subsequent to the date of this Agreement, such Stockholder shall within 30 days thereafter obtain his/her new spouse's acknowledgement of and consent to the existence and binding effect of all restrictions contained in this Agreement by causing such spouse to execute and deliver a Consent of Spouse acknowledging the restrictions and obligations contained in this Agreement and agreeing and consenting to the same.

9.19    Arbitration. Any unresolved controversy or claim arising out of or relating to this Agreement, except as (i) otherwise provided in this Agreement, or (ii) any such controversies or claims arising out of either party's intellectual property rights for which a provisional remedy or equitable relief is sought, shall be submitted to arbitration by one arbitrator mutually agreed upon by the parties, and if no agreement can be reached within 30 days after names of potential arbitrators have been proposed by the American Arbitration Association (the "**AAA**"), then by one arbitrator having reasonable experience in corporate finance transactions of the type provided for in this Agreement and who is chosen by the AAA. The arbitration shall take place in San Francisco, California, in accordance with the AAA rules then in effect, and judgment upon any award rendered in such arbitration will be binding and may be entered in any court having jurisdiction thereof.  There shall be limited discovery prior to the arbitration hearing as follows: (a) exchange of witness lists and copies of documentary evidence and documents relating to or arising out of the issues to be arbitrated, (b) depositions of

all party witnesses and (c) such other depositions as may be allowed by the arbitrators upon a showing of good cause.  Depositions shall be conducted in accordance with the California Code of Civil Procedure, the arbitrator shall be required to provide in writing to the parties the basis for the award or order of such arbitrator, and a court reporter shall record all hearings, with such record constituting the official transcript of such proceedings. Each party will bear its own costs in respect of any disputes arising under this Agreement. The prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled.

9.20   <u>Governing Law</u>. This Agreement shall be governed by the internal law of the State of Delaware, without regard to conflict of law principles that would result in the application of any law other than the law of the State of Delaware.

9.21   <u>WAIVER OF JURY TRIAL</u>: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have executed this Voting Agreement as of the date first written above.

**AIDEN AUTOMOTIVE TECHNOLOGIES, INC.**

By: _Niclas Gyllenram_

Name:  Niclas Gyllenram

Title:  President

IN WITNESS WHEREOF, the parties have executed this Voting Agreement as of the date first written above.

**INVESTOR:**

**VOLVO CAR TECHNOLOGY FUND AB**

By: _Raymond Millien_
Name: Raymond Millien
Title: Managing Director

By: _Pär Arvidsson_
Name: Pär Arvidsson
Title: Chairman of the Board

IN WITNESS WHEREOF, the parties have executed this Voting Agreement as of the date first written above.

**KEY HOLDERS**:

DocuSigned by:

*Jonas Fenn*

JONAS FENN

DocuSigned by:

SYED MUBEEN SAIFULLAH

DocuSigned by:

*Niclas Gyllenram*

NICLAS GYLLENRAM

## SCHEDULE A

### INVESTORS

**Name and Address**                    **Number of Shares Held**

Volvo Car Technology Fund AB            900,000 shares of Seed Preferred Stock
SE-405 31 Göteborg
Sweden

## **SCHEDULE B**

## **KEY HOLDERS**

| **Name and Address** | **Number of Shares Held** |
|---|---|
| Syed Mubeen Saifullah<br>23 Pebble Ct.<br>San Ramon, CA 94583 | 1,312,000 Common Stock |
| Niclas Gyllenram<br>129 Lowell Ave<br>Palo Alto, CA  94301 | 1,476,000 Common Stock |
| Jonas Fenn<br>63 A Manchester St.<br>San Francisco, CA 94110 | 1,312,000 Common Stock |

## SCHEDULE C

## INITIAL OBLIGATIONS

**Founder Obligations:**

1. The Company has received, or on or prior to March 11, 2021 shall have received, gross proceeds of at least $500,000 from the sale of SAFE instruments to purchasers other than Volvo in accordance with the Seed Stock Purchase Agreement among the Company and the purchaser of Preferred Stock (the "**Purchase Agreement**").

2. Within 120 days following the Effective Date, the Key Holders (the "**Founders**") shall complete or have completed and delivered to Volvo an acceptable Business Plan (as defined in the Investor Rights Agreement between the Company and Volvo dated as of the Effective Date) to the reasonable satisfaction of Volvo.

3. Founders shall make every reasonable effort to organize, promote and market the Company and its products and services, and shall deliver to Volvo an acceptable marketing plan within 120 days following the Effective Date, to the reasonable satisfaction of Volvo.

4. Founders will continue their employment with Volvo Car Group to the reasonable satisfaction of their current, respective managers, and agree that any of their obligations to the Company shall be subordinate to their obligations to Volvo Car Group. The development of any Company products shall occur outside the Founder's normal work schedule at Volvo Car Group.

5. The Founders' obligations under that certain Right of First Refusal and Co-Sale Agreement dated as of the Effective Date among the Company and the stockholders of the Company party thereto (the "**Co-Sale Agreement**")

**Company Obligations:**

1. Within 12 months following the Effective Date, the Company shall ship a working prototype of a product that can be deployed in a testing environment to an early-adopter customer to get feedback/early results and constantly iterate the product from thereon.

2. Within 18 months following the Effective Date, the Company shall demonstrate a sales and/or partnership pipeline, in each case subject to the reasonable satisfaction of Volvo.

3. The Company shall submit monthly and quarterly financial reports to Volvo for the first 24 months following the Effective Date, with basic P&L and cash flow items.

4. The Company's obligations under the Co-Sale Agreement.

DocuSign Envelope ID: EC0PD867-A6B7-4D3D-A74D-8CA7D389E8FD

## EXHIBIT A

### ADOPTION AGREEMENT

This Adoption Agreement ("**Adoption Agreement**") is executed on _____, 20___, by the undersigned (the "**Holder**") pursuant to the terms of that certain Voting Agreement dated as of March 8, 2021 (the "**Agreement**"), by and among the Company and certain of its Stockholders, as such Agreement may be amended or amended and restated hereafter. Capitalized terms used but not defined in this Adoption Agreement shall have the respective meanings ascribed to such terms in the Agreement. By the execution of this Adoption Agreement, the Holder agrees as follows:

1.1 <u>Acknowledgement</u>. Holder acknowledges that Holder is acquiring certain shares of the capital stock of the Company (the "**Stock**"), for one of the following reasons (Check the correct box):

☐ As a transferee of Shares from a party in such party's capacity as an "Investor" bound by the Agreement, and after such transfer, Holder shall be considered an "Investor" and a "Stockholder" for all purposes of the Agreement.

☐ As a transferee of Shares from a party in such party's capacity as a "Key Holder" bound by the Agreement, and after such transfer, Holder shall be considered a "Key Holder" and a "Stockholder" for all purposes of the Agreement.

☐ As a new Investor in accordance with <u>Section 7.1(a)</u> of the Agreement, in which case Holder will be an "Investor" and a "Stockholder" for all purposes of the Agreement.

☐ In accordance with <u>Section 7.1(b)</u> of the Agreement, as a new party who is not a new Investor, in which case Holder will be a "Stockholder" for all purposes of the Agreement.

1.2 <u>Agreement</u>. Holder hereby (a) agrees that the Stock, and any other shares of capital stock or securities required by the Agreement to be bound thereby, shall be bound by and subject to the terms of the Agreement and (b) adopts the Agreement with the same force and effect as if Holder were originally a party thereto.

1.3 <u>Notice</u>. Any notice required or permitted by the Agreement shall be given to Holder at the address or facsimile number listed below Holder's signature hereto.

**HOLDER:**

_____
Name and Title of Signatory

Address: _____
_____
Email: _____

**ACCEPTED AND AGREED**:
**AIDEN AUTOMOTIVE TECHNOLOGIES, INC.**

**By:** _____
**Name:** _____
**Title:** _____

DocuSign Envelope ID: EC0BD867-A6B7-4D3D-A74D-8CA7D389E8FD

# EXHIBIT B

## CONSENT OF SPOUSE

I, [_____], spouse of [_____], acknowledge that I have read the Voting Agreement, dated as of March 8, 2021, to which this Consent is attached as <u>Exhibit B</u> (the "**Agreement**"), and that I know the contents of the Agreement. I am aware that the Agreement contains provisions regarding the voting and transfer of shares of capital stock of the Company that my spouse may own, including any interest I might have therein.

I hereby agree that my interest, if any, in any shares of capital stock of the Company subject to the Agreement shall be irrevocably bound by the Agreement and further understand and agree that any community property interest I may have in such shares of capital stock of the Company shall be similarly bound by the Agreement.

I am aware that the legal, financial and related matters contained in the Agreement are complex and that I am free to seek independent professional guidance or counsel with respect to this Consent. I have either sought such guidance or counsel or determined after reviewing the Agreement carefully that I will waive such right.

Dated:_____     _____

*[Name of Key Holder's Spouse]*

EXHIBIT "5"

DocuSign Envelope ID: EC0DD867-A6B7-4D2D-A74D-9CA7D389E8ED

# PATENT ASSIGNMENT AGREEMENT

This Patent Assignment and License Agreement ("***Agreement***"), dated 8 March 2021 (the "***Effective Date***"), is made by and between:

**VOLVO CAR TECHNOLOGY FUND AB**, reg. No. 556877-5760, a company organized and existing under the laws of Sweden and having offices Assar Gabrielssons Väg 9, 405 31 Göteborg, Sweden ("***Tech Fund***");

**AIDEN AUTOMOTIVE TECHNOLOGIES, INC.**, a Delaware corporation with its principal place of business at 231 Market Place, Suite 226, San Ramon, CA 94583, USA ("***Aiden***");

Tech Fund and Aiden are sometimes individually referred to as "***Party***" and collectively referred to as "***Parties***".

**WHEREAS**, Tech Fund owns U.S. Provisional Patent Application Ser. No. 63/065,559, entitled "Automotive Data Sharing Platform," Atty. Docket No. P2896US00, filed on 14 August 2020 (the "***Patent***"); and

**WHEREAS**, Aiden desires to obtain title to the Patent in connection with its business, and Tech Fund desires to assign such Patent, subject to the terms and conditions for such assignment as set out in this Agreement.

**WHEREAS**, Aiden, in consideration for the assignment of the aforementioned Patent, shall allocate an equity interest in Aiden to Tech Fund, subject to specific terms and conditions in a separate writing.

**NOW, THEREFORE**, in consideration of the above premises and mutual covenants contained herein and intending to be legally bound hereby, the Parties hereto agree as follows:

**SECTION 1       ASSIGNMENT AND LICENSE**

1.1     **Patent Rights.** As used herein "***Patent Rights***" means: **(a)** the Patent; **(b)** any reissues, reexaminations, extensions, continuations, continuing prosecution applications, requests for continuing examinations, divisions, and registrations of any item in any of the foregoing categories (a) and (b); **(c)** all foreign patents, patent applications, and counterparts relating to any item in any of the foregoing categories (a) through (b), including, without limitation, certificates of invention, utility models, industrial design protection, design patent protection, and other governmental grants or issuances**; (d)** all inventions, invention disclosures, and discoveries described in any of the items of categories (a), (b) and (c) (referred to herein as "***Categories (a)-(c) Items***") that: (i) are included in any claim in the Categories (a)-(c) Items, (ii) are subject matter capable of being reduced to a patent claim in a reissue or reexamination proceedings brought on the Categories (a)-(c) Items, and/or (iii) could have been included as a claim in the Categories (a)-(c) Items; **(e)** all rights to apply in any or all countries of the world for patents, certificates of invention, utility models, industrial design protections, design patent protections, or other governmental grants or issuances of any type related to any item in any of the foregoing categories (a) through (d), including, without limitation, under the Paris Convention for the Protection of Industrial Property, the International Patent Cooperation Treaty, or any other convention, treaty, agreement, or understanding**; and (f)** all causes of action (whether known or unknown, or whether currently pending, filed or otherwise) and other enforcement rights under, or on account of, the Patent, including, without limitation, all causes of action and other enforcement rights for: (i) damages, (ii) injunctive relief, and (iii) any other remedies of any kind for past, current and future infringement.

1.2     **Assignment of Patent Rights.** Subject to the pre-existing grant-back license to Volvo Car Corporation as disclosed to Aiden, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, Tech Fund hereby sells, conveys, transfers, assigns and delivers to Aiden on the

DocuSign Envelope ID: EC0DD867-A6B7-4D2D-A74B-9CA7D389E8ED

Effective Date, and Aiden hereby acquires from Tech Fund, all right, title, and interest in and to the Patent Rights, including, without limitation: (a) all right, title and interest in and to the Patent; and (b) all right, title and interest to sue and collect for past infringement of the Patent.

1.3     **Documents.** As used herein, "***Documents***" means: **(a)** the recordable *Assignment of Patent Rights* in the form attached hereto as **Exhibit A**, duly executed by Tech Fund; **(b)** all agreements assigning ownership of the Patent Rights from the inventors and/or prior owners to Tech Fund; **(c)** all files, documents and tangible things constituting, comprising or relating to the investigation, evaluation, preparation, prosecution, maintenance, defense, filing, issuance, registration, assertion or enforcement of the Patent; and **(d)** such additional documents as Aiden may reasonably request in order to ascertain the accuracy of Tech Fund' representations and warranties in this Agreement, or to effect, perfect and evidence the transactions contemplated by this Agreement. Any exchange of information by the Parties (or their respective legal counsel) related to the Patent Rights will be pursuant to a common interest privilege, if applicable.

1.4     **Closing.** Subject to the terms and conditions of this Agreement, Aiden and Tech Fund will use commercially reasonable efforts to complete the assignment of the Patent Rights contemplated herein within 30 days of the Effective Date (the "***Closing***"); provided, however, that prior to the Closing Tech Fund shall deliver to Aiden the Documents and notify Aiden of any action required with respect to any Patent Rights within 60 days after the Closing Date and will facilitate Aiden's taking such action.

1.5     **Maintenance of Patent Rights**.  Aiden shall have the exclusive right to maintain, enforce, and monetize the Patent Rights, which exclusive right shall include, but not be limited to, filing, applying for, or registering patents in respect of any creations and inventions embodied in the Patent Rights, in its own name, at its expense and in such jurisdictions as it deems appropriate.

1.6     **Right of First Refusal**.  Should Aiden desire to sell any of the Patent Rights separate and apart from a merger or acquisition transaction, it shall offer Tech Fund a right of first refusal to purchase such Patent Rights from Aiden. In the event that Aiden is required to offer Tech Fund a right of first refusal pursuant to this Section 1.6, it shall provide written notice of such offer (the "***Offer Notice***") to Tech Fund not later than 45 days prior to commencing any discussions with one or more third parties with regard to such sale opportunity. Following delivery of an Offer Notice, Aiden will respond to reasonable requests from Tech Fund for information regarding the potential sale opportunity.  Tech Fund shall have the option, for a period of 30 days following its receipt of an Offer Notice (the "***Notice Period***"), to elect whether to commence negotiations with Aiden pertaining to such opportunity and to notify Aiden accordingly.  In the event Tech Fund elects to commence such negotiations with Aiden, Tech Fund shall have 30 days after notifying Aiden thereof (the "***Negotiation Period***") to sign a mutually agreed definitive agreement with Aiden with regard to such sale opportunity. During the Notice Period and the Negotiation Period (if any), Aiden shall negotiate exclusively with Tech Fund and in good faith regarding the terms of a purchase agreement with regard to such opportunity.  Aiden shall not be permitted to negotiate or consummate an agreement pertaining to such opportunity with any person(s) or entity(ies) other than Tech Fund during the Notice Period and Negotiation Period (if any).  In the event that (a) Tech Fund does not elect to commence the Negotiation Period, (b) Tech Fund does not respond to the Offer Notice within the Notice Period, or (c) the Parties do not sign a definitive agreement with regard to such opportunity on mutually agreed terms prior to expiration of the Negotiation Period, then the Aiden shall be permitted to enter into an agreement with any third party with regard to such opportunity; provided, however, that with respect to this subparagraph (c), in no event shall Aiden offer or agree to terms and conditions with any third party that, on the whole, are more favorable to such third party than the most favorable terms and conditions offered to Tech Fund without first providing Tech Fund written notice thereof and a reasonable period of time (but in any event not less than 10 days after receiving written notice thereof) to accept such more favorable terms and sign a definitive agreement with regard to such opportunity with Aiden. The foregoing notwithstanding, Tech Fund shall have no obligation to commence negotiations for, or to sign a definitive agreement with regard to, an such opportunity.

**SECTION 2          REPRESENTATIONS AND WARRANTIES**

2.1      **Tech Fund's Representations and Warranties**. Tech Fund hereby represents and warrants to Aiden as follows:

      (a)      **Authority**. Tech Fund has the full power and authority and has obtained all third-party consents, approvals, and/or other authorizations required to enter into this Agreement and to carry out its obligations hereunder, including, without limitation, the assignment of the Patent Rights to Aiden.

      (b)      **Title and Contest**. Tech Fund owns all right, title, and interest to the Patent Rights, including, without limitation, all right, title, and interest to sue and collect for past infringement of the Patents. There are no actions, suits, investigations, claims, or proceedings threatened, pending, or in progress relating in any way to the Patent Rights. There are no existing contracts, agreements, options, commitments, proposals, bids, offers, or rights with, to, or in any person to acquire any of the Patent Rights.

      (c)      **Validity and Enforceability**. The Patent has never been found invalid, unpatentable, or unenforceable for any reason in any administrative, arbitration, judicial or other proceeding, and Tech Fund does not know of and has not received any notice or information of any kind from any source suggesting that the Patent may be invalid or unenforceable.

      (d)      **Documents**. All Documents supplied to Aiden are originals or true and correct copies of the originals.

2.2      **Aiden's Representations and Warranties**. Aiden hereby represents and warrants to Tech Fund that: Aiden is a company duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation; and Aiden has the full power and authority and has obtained all third-party consents, approvals, and/or other authorizations required to enter into this Agreement and to carry out its obligations hereunder, including, without limitation, the acquisition of the Patent Rights from Tech Fund.

2.3      **Negation of Implications**. Nothing in this Agreement shall be construed as: (a) a requirement that Tech Fund shall, in any country, file any patent application, secure any patent or maintain any patent in force; (b) an obligation that Tech Fund bring, prosecute, cooperate or join any actions or suits against third parties for infringement of the Patent Rights; (c) an obligation that Tech Fund furnish to Aiden any hardware, software, manufacturing or technical information, or know-how; (d) conferring to Aiden the right to use in advertising, publicity or otherwise any trademark or trade name of Tech Fund; or (e) granting by implication, estoppel, or otherwise, any licenses or rights under any patents owned by Tech Fund other than the Patent Rights, regardless of whether such other patents are related to, dominant of, or subordinate to, the Patent Rights.

**SECTION 3          GENERAL PROVISIONS**

3.1      **Further Cooperation**. Tech Fund will, at the reasonable request of Aiden and without demanding any consideration therefore, do all things necessary, proper, or advisable, including without limitation, the execution, acknowledgment, and recordation of specific assignments, oaths, declarations, and other documents on a jurisdiction-by-jurisdiction basis, to assist Aiden in obtaining, perfecting, sustaining, and/or enforcing the Patent Rights; provided, however, that any expenses incident to the execution of papers or providing testimony shall be borne by Aiden, its successors and assigns.

3.2      **Limitation of Liability**. EXCEPT IN THE EVENT OF BREACH OF ANY OF THE WARRANTIES IN SECTION 2.1, TECH FUND' TOTAL LIABILITY UNDER THIS AGREEMENT WILL NOT EXCEED US$10,000.00.

3.3      **Limitation on Consequential Damages**. EXCEPT IN THE EVENT OF BREACH OF ANY OF THE WARRANTIES IN SECTION 2.1, NEITHER PARTY WILL HAVE ANY OBLIGATION OR LIABILITY (WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, AND NOTWITHSTANDING ANY

FAULT, NEGLIGENCE (WHETHER ACTIVE, PASSIVE OR IMPUTED), REPRESENTATION, STRICT LIABILITY OR PRODUCT LIABILITY), FOR COVER OR FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL, MULTIPLIED, PUNITIVE, SPECIAL, OR EXEMPLARY DAMAGES OR LOSS OF REVENUE, PROFIT, SAVINGS OR BUSINESS ARISING FROM OR OTHERWISE RELATED TO THIS AGREEMENT, EVEN IF A PARTY OR ITS REPRESENTATIVES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

3.4     **Compliance with Laws**. Notwithstanding anything contained in this Agreement to the contrary, the obligations of the Parties with respect to the consummation of the transactions contemplated by this Agreement shall be subject to all laws, present and future, of any government having jurisdiction over the Parties and this transaction, and to orders, regulations, directions or requests of any such government.

3.5     **Confidentiality of Terms**. The Parties hereto will keep the terms of this Agreement confidential and will not now or hereafter divulge any of this information to any third party except: **(a)** with the prior written consent of the other Party; **(b)** as otherwise may be required by law or legal process; **(c)** during the course of litigation, so long as the disclosure of such terms and conditions is restricted in the same manner as is the confidential information of other litigating parties; **(d)** in confidence to its legal counsel, accountants, banks, and financing sources and their advisors solely in connection with complying with or administering its obligations with respect to this Agreement; **(e)** by Aiden, to potential purchasers or licensees of the Patent Rights; **(f)** in order to perfect Aiden's interest in the Patent Rights with any governmental patent office; or **(g)** to enforce Aiden's right, title, and interest in and to the Patent Rights; provided that, in (b) and (c) above: (i) to the extent permitted by law, the disclosing Party will use all legitimate and legal means available to minimize the disclosure to third parties, including, without limitation, seeking a confidential treatment request or protective order whenever appropriate or available, and (ii) the disclosing Party will provide the other Party with at least ten days' prior written notice of such disclosure. Both Parties acknowledge that the breach of this <u>Section 3.5</u> will immediately give rise to continuing irreparable injury to the non-disclosing Party inadequately compensable in damages at law and without prejudice to any other remedy available to the non-disclosing Party, and may entitle the non-disclosing Party to obtain injunctive relief.

3.6     **Notices**. All notices given hereunder will be given in writing, and will be delivered to the address set forth on the first page to this Agreement by personal delivery or delivery postage prepaid by an internationally-recognized express courier service. Notices are deemed given on the date of receipt if delivered personally or by express courier, or if delivery refused, the date of refusal. Notice given in any other manner will be deemed to have been given only if and when received at the address of the Party to be notified. Either Party may from time to time change its address for notices under this Agreement by giving the other Party written notice of such change in accordance with this <u>Section 3.6</u>.

3.7     **Relationship of Parties.** The Parties hereto are independent contractors. Nothing in this Agreement will be construed to create a partnership, joint venture, franchise, fiduciary, employment or agency relationship between the Parties. Neither Party has any express or implied authority to assume or create any obligations on behalf of the other or to bind the other to any contract, agreement or undertaking with any third party.

3.8     **Waiver**. Failure by either Party to enforce any term of this Agreement will not be deemed a waiver of future enforcement of that or any other term in this Agreement or any other agreement that may be in place between the Parties.

3.9     **Governing Law and Disputes**. This Agreement will be interpreted, construed, and enforced in all respects in accordance with the laws the state of California, without reference to its choice of law principles. Any dispute, controversy or claim arising out of or in connection with this Agreement, or the breach, termination or invalidity thereof, shall be finally settled by arbitration in accordance with the Arbitration Rules of the American Arbitration Association and the laws of the state of California in San Francisco, California. The arbitral tribunal shall be composed of one arbitrator.

3.10    **Assignment.** Either Party may assign or transfer or transfer any rights or delegate any obligations under this Agreement without the other Party's consent. All of the terms, conditions and provisions of this Agreement shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective Parties hereto.

3.11    **Entire Agreement**. The Agreement, including its exhibits, constitutes the entire agreement between the Parties with respect to the subject matter hereof, and merges and supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions. Neither of the Parties will be bound by any conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof other than as expressly provided herein. No oral explanation or oral information by either Party hereto will alter the meaning or interpretation of this Agreement. The terms and conditions of this Agreement will prevail notwithstanding any different, conflicting or additional terms and conditions that may appear on any letter, email or other communication or other writing not expressly incorporated into this Agreement.

3.12    **Amendments**. No amendments or modifications will be effective unless in a writing signed by authorized representatives of both Parties.

3.13    **Agreement is Controlling**. The section headings contained in this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement.

3.14    **Severability.** If any provision of this Agreement is found to be invalid or unenforceable, then the remainder of this Agreement will have full force and effect, and the invalid provision will be modified, or partially enforced, to the maximum extent permitted to effectuate the original objective.

3.15    **No Rights in Third Parties.** The Agreement is not intended to confer any right or benefit on any third party (including, but not limited to, any employee or beneficiary of any Party), and no action may be commenced or prosecuted against a Party by any third party claiming as a third-party beneficiary of this Agreement or any of the transactions contemplated by this Agreement.

3.16    **Counterparts**. This Agreement shall become binding when any one or more counterparts hereof, individually or taken together, shall bear the signatures each of the Parties hereto. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original as against the Party whose signature appears thereon, but all of which taken together shall constitute but one and the same instrument.

    **IN WITNESS WHEREOF**, the Parties have entered into this Agreement as of the Effective Date.

**VOLVO CAR TECHNOLOGY FUND AB:**          **AIDEN AUTOMOTIVE TECHNOLOGIES, INC:**



By: _____         By: _____
        [Signature]                                    [Signature]

Raymond Millien                              Niclas Gyllenram
_____              _____
        [Printed Name]                                [Printed Name]

3/9/2021                                     3/8/2021
_____              _____
        [Date]                                       [Date]

By: _____
        [Signature]

Pär Arvidsson
_____
        [Printed Name]

3/9/2021
_____
        [Date]

DocuSign Envelope ID: EC0DD867-A6B7-4D2D-A74D-9CA7D389E8ED

## EXHIBIT A
### Recordable Assignment of Patent Rights

For good and valuable consideration, the receipt of which is hereby acknowledged, **Volvo Car Technology Fund AB**, reg. no. 556877-5760, a company organized and existing under the laws of Sweden and having offices Assar Gabrielssons Väg 9, 405 31 Göteborg, Sweden ("*Assignor*"), does hereby sell, assign, transfer, and convey unto **Aiden Automotive Technologies, Inc.**, a Delaware corporation with its principal place of business at 231 Market Place, Suite 226, San Ramon, CA, USA ("*Aiden*"), or its designees, all right, title, and interest that exist today and may exist in the future in and to any and all of the following:

(a)     U.S. Provisional Patent Application Ser. No. 63/065,559, entitled "Automotive Data Sharing Platform," Atty. Docket No. P2896US00, filed on 14 August 2020 (the "*Patent*"):

(b)     all reissues, reexaminations, extensions, continuations, continuing prosecution applications, requests for continuing examinations, divisions, registrations of the Patent;

(c)     all foreign patents, patent applications, and counterparts relating to any item in any of the foregoing including, without limitation, certificates of invention, utility models, industrial design protection, design patent protection, and other governmental grants or issuances;

(d)     all inventions, invention disclosures, and discoveries described in any of the items of categories (a), (b) and (c) (referred to herein as "*Categories (a)-(c) Items*") that: (i) are included in any claim in the Categories (a)-(c) Items, (ii) are subject matter capable of being reduced to a patent claim in any of the Categories (a)-(c) Items, and/or (iii) could have been included as a claim in any of the Categories (a)-(c) Items;

(e)     all rights to apply in any or all countries of the world for patents, certificates of invention, utility models, industrial design protections, design patent protections, or other governmental grants or issuances of any type related to any item in any of the foregoing categories (a) through (d), including, without limitation, under the Paris Convention for the Protection of Industrial Property, the International Patent Cooperation Treaty, or any other convention, treaty, agreement, or understanding; and

(f)     all causes of action (whether known or unknown or whether currently pending, filed, or otherwise) and other enforcement rights under, or on account of, the Patent and/or any item in any of the foregoing categories (c) through (e), including, without limitation, all causes of action and other enforcement rights for (i) damages, (ii) injunctive relief, and (iii) any other remedies of any kind for past, current, and future infringement;

((a)-(f) collectively, the "*Patent Rights*").

Assignor hereby authorizes the respective patent office or governmental agency in each jurisdiction to issue any and all patents, certificates of invention, utility models or other governmental grants or issuances that may be granted upon any of the Patent Rights in the name of Aiden, as the assignee to the entire interest therein. The terms and conditions of this Assignment of Patent Rights will inure to the benefit of Aiden, its successors, assigns, and other legal representatives and will be binding upon Assignor, its successors, assigns, and other legal representatives.

**IN WITNESS WHEREOF**, this Assignment of Patent Rights is executed on 8 March 2021:

ASSIGNOR: **VOLVO CAR TECHNOLOGY FUND AB**

By: *Raymond Millien*                          By: *Pär Arvidsson*
        ─────────────────                              ─────────────────
        D5BF6117C8BC4F5...                             5025F67C493D443...

Name:   Raymond Millien                    Name:   Pär Arvidsson

Title:    Managing Director                  Title:    Chairman of the Board

EXHIBIT "6"

# SERVICES AGREEMENT

This Services Agreement ("**Agreement**"), is entered into March 8, 2021 (the "**Effective Date**") by and between:

**VOLVO CAR TECHNOLOGY FUND AB**, reg. No. 556877-5760, a company organized and existing under the laws of Sweden and having at offices Assar Gabrielssons Väg 9, 405 31 Göteborg, Sweden ("**Tech Fund**"); and

**VOLVO CAR TECHNOLOGY USA, LLC,** a Delaware corporation having offices at 231 Market Place, Suite 226, San Ramon, CA 94583. ("*Volvo Cars*").

Tech Fund and Volvo Cars are hereinafter collectively referred to as "**Parties**" and individually referred to as "**Party**"; and Tech Fund is also referred to as "**Purchaser**"; Volvo Cars is also referred to as "**Service Provider**".

1.  **Background.** The Parties have determined that Service Provider shall provide to Purchaser (and/or its respective Affiliates and Portfolio Companies) certain office, equipment, and technology services, and R&D project management services as they may request in writing from time to time (collectively, the "**Services**"). Purchaser now wishes to enter into this Agreement for the purpose of receiving the Services and Service Provider wishes to provide the Services in accordance with the terms set forth in this Agreement.

2.  **Definitions:**

    2.1  **Affiliate** means any other legal entity that, directly or indirectly, is controlled by or is under common control with a Party; and control means the possession, directly or indirectly, by agreement or otherwise, of: (i) at least 50% of the voting stock, partnership interest or other ownership interest; or (ii) the power to: (a) appoint or remove a majority of the board of directors or other governing body of an entity, or (b) cause the direction of the management of an entity; provided, however, the Purchaser shall not be considered Affiliates of each other hereunder.

    2.2  **Background IP** means all IP that were either developed or otherwise acquired by Purchaser before the Effective Date, or are developed or otherwise acquired by Purchaser outside of this Agreement and disclosed to Service Provider hereunder in order to effectuate any of the Services.

    2.3  **Confidential Information** means information, other than the Excluded Information, relating to the Disclosing Party and its business (whether in written, verbal, or digital form), including without limitation ideas, concepts, designs, specifications, drawings, notes, technology, methods, intellectual property, know-how, trade secrets, future (business) plans and programs, operations, services, products, costs, processes, models, procedures, manuals, customer lists, this Agreement, negotiations of and any activities conducted under this Agreement, and information that the Parties shared regarding the Purpose prior to the signing of this Agreement.

    2.4  **Disclosing Party** means the Party disclosing Confidential Information hereunder.

    2.5  **Excluded Information** means information that: (i) is or becomes public through no fault of the Receiving Party; (ii) is lawfully obtained from someone other than the Disclosing Party that is not under an obligation to the Disclosing Party to keep that information confidential; (iii) was already in the possession of the Receiving Party prior to the date of disclosure without an obligation to keep that information confidential; or (iv) the Receiving Party develops independently without use of Confidential Information.

    2.6  **IP** means all proprietary technology, software, methods, processes, know-how, inventions, data or technical information, and all Patents and other intellectual and industrial property rights thereto.

    2.7  **Patents** means utility models, industrial designs and all patents (including, without limitation, patents of importation, patents of confirmation, patents of improvement, design patents,

certificates of addition and utility patents, as well as divisions, reissues, continuations, continuations-in-part, reexamination certificates, provisional applications, renewals and extensions of any of the foregoing, and applications therefor).

**2.8** **Personnel** means employees and non-employee consultants of a Party (or its Affiliates or Portfolio Companies) that participate in the Services or other matters relevant to this Agreement.

**2.9** **Portfolio Company** means any entity in which the Tech Fund has made an equity and/or debt investment, and has identified to Service Provider as a third-party beneficiary to this Agreement pursuant to <u>Section 15</u>.

**2.10** **Receiving Party** means the Party receiving Confidential Information hereunder.

**2.11** **Results** means any outcome of the Services, as described in the relevant specification, plan, statement of work, or other requesting documentation, made by Service Provider hereunder (including, but not limited to, any IP, deliverables, objects, products, documentation, and any modifications or improvements to any Background IP), irrespective of whether the performance of any part of the Services has been completed.

**2.12** **Use** means to use (in object and source code form, if applicable), exploit, make, develop, change, transmit, copy, and distribute (including sell and offer for sale) goods or services; including having a third party at any tier do any of the foregoing on a Party's behalf.

**3.** **Services.** Service Provider shall provide sufficient Personnel to support and carry out its Service commitments under this Agreement. Service Provider hereby warrants that the Services shall be of professional quality and performed consistent with generally accepted industry standards. Service Provider provides the Services "as is". Service Provider does not warrant or represent that any Services provided or delivered to Purchaser hereunder are functional for the business needs of Purchaser, otherwise suitable for any specific purpose, or are not infringing any IP of any third party. Service Provider gives no representations or warranties regarding the merchantability of the Results nor any other representations or warranties of any kind whatsoever concerning the Services. Purchaser acknowledges that the price of the Services is set in consideration of the foregoing.

**4.** **Confidentiality.**

**4.1** The Receiving Party will with respect to Disclosing Party's Confidential Information: (a) hold it in strict confidence; (b) use it only for the performance of the Services and, if applicable, exercising any license rights granted hereunder; (c) protect it from misappropriation, unauthorized use or disclosure using all reasonable precautions that the Receiving Party uses to protect its own confidential information (but not less than a commercially-reasonable degree of care); (d) not modify, reverse engineer, or disassemble it without the Disclosing Party's consent, provided that Receiving Party may perform such activities to exercise license rights granted hereunder; and (e) not share it with anyone except its Affiliates', Personnel and advisors who have a "need to know" and have agreed in writing to keep it confidential.

**4.2** The Receiving Party may disclose Confidential Information to comply with any applicable law or a court order if that Receiving Party notifies the Disclosing Party (if allowed by law) and takes reasonable and lawful actions to limit the extent of the disclosure.

**5.** **Intellectual Property Rights.**

**5.1** As used in this <u>Section 5</u>, "Purchaser" shall include Purchaser and/or any of its relevant Affiliate(s) or Portfolio Companies receiving the relevant Services from Service Provider producing the relevant Results hereunder.

**5.2** All Background IP owned by Purchaser will continue to be owned by such Purchaser. Purchaser hereby grants and agrees to grant Service Provider a royalty-free, fully-paid-up, revocable, non-exclusive, worldwide license to Use its respective Background IP only to the extent necessary for purposes of the Service Provider carrying out the Services.

**5.3** Unless agreed upon by Purchaser in a separate writing, the Parties agree that Purchaser shall be the exclusive owner of all Results and are hereby assigned such Results.

DocuSign Envelope ID: 8D17778F-4DD7-477E-8697-77F0AEE60096

**5.4** If applicable, each Party and its Personnel shall, at no cost to the other Party, provide all support and sign all documents to: (a) assign or otherwise evidence the owning Purchaser's ownership in its Results, and all IP rights thereto; and (b) enable the owning Party to obtain Patents or other IP rights in the Results.

**5.5** Any compensation due to a Party's Personnel in connection with any Patent or the creation of any other IP, whether by agreement, statute, regulation or otherwise, shall be paid entirely by such Party.

**6.** **Service Charges and Payments.** In consideration of the Service Provider's performance of the Services under this Agreement, the Parties agree that Purchaser shall pay to Service Provider the sums specified in <u>Exhibit A</u> (which may be amended from time to time by mutual agreement of the Parties) monthly in arrears and invoiced by Service Provider on a net-90 basis.

**7.** **Term.** The term of this Agreement will begin on the Effective Date and will continue for one year thereafter unless terminated as specified herein. Purchaser, together with the written consent of the Third Party Beneficiary (defined in Paragraph 15) may terminate this Agreement at any time, with or without cause, by providing the Service Provider with written notice. Termination is effective immediately unless otherwise specified in the termination notice. Termination of the Agreement shall result in termination of all then outstanding requests for Services. Termination shall not relieve Purchaser of its obligation to pay any fees that have accrued as of the effective date of such termination.

**8.** **Export Control.** The Parties will comply with all national and foreign export control laws and regulations, and all national and foreign trade restrictions related to any Confidential Information.

**9.** **Governing Law and Disputes.**

**9.1** This Agreement shall be governed by and interpreted in accordance with the laws of Sweden, excluding any choice of law rules that direct the application of the law of any other jurisdiction.

**9.2** Any dispute, controversy or claim arising out of or in connection with this Agreement, or the breach, termination or invalidity thereof, shall be finally settled by arbitration administered by the Arbitration Institute of the Stockholm Chamber of Commerce (the "**SCC**"). The Rules for Expedited Arbitrations shall apply, and the Arbitral Tribunal shall be composed of one arbitrator. The seat of arbitration shall be Gothenburg, Sweden and the language to be used in the arbitral proceedings shall be English. However, the foregoing shall not preclude or restrict any of the Parties to seek specific performance and other injunctive relief in an appropriate court of competent jurisdiction. All information disclosed, and all documents submitted or issued by or on behalf of any of the Parties or the arbitrators in any arbitral proceedings, as well as all decisions and awards made or declared in the course of any such proceedings, shall be kept strictly confidential and may not be used for any purpose other than these proceedings or the enforcement of any such decision or award nor be disclosed to any third party without the prior written consent of the Party to which the information relates.

**9.3** No right or remedy available to a Party under this Agreement will exclude other rights and remedies available by law.

**10.** **Relationship.** The Parties are independent contractors. This Agreement does not create any agency, partnership or joint venture between the Parties.

**11.** **Assignment.** No Party will assign any rights or delegate any obligations under this Agreement without all the other Parties' written consent.

**12.** **Entire Agreement.** This Agreement is the entire agreement of the Parties relating to the subject matter hereof and supersedes all other oral or written agreements.

**13.** **Conflicts.** Nothing contained in this Agreement shall supersede, modify, limit, eliminate or otherwise affect any of the representations and warranties, covenants, agreements or indemnities set forth in the JVA.

**14.** **Amendment and Waiver.** No amendment of this Agreement will be effective unless it is in writing and signed by all the Parties. A waiver of any default is not a waiver of any later default and will not affect the validity of this Agreement.

15. **Third-Party Beneficiary.** The Parties agree and acknowledge that Aiden Automotive Technologies, Inc., a Delaware corporation with its principal place of business at 231 Market Place, Suite 226, San Ramon CA 94583, shall be a Portfolio Company hereunder and beneficiary of this Agreement.

16. **Severability.** Unenforceable provisions will be modified to reflect the Parties' intention and only to the extent necessary to make them enforceable, and the remaining provisions of this Agreement will remain in effect.

17. **Notices.** All notices and other communications under this Agreement will be in writing. Each Party will send notices to the other Party at the address stated in the first paragraph, to the attention of such Party's authorized signatory.

18. **Survival.** The terms of this Agreement that expressly are to, or by implication ought to, survive, will survive this Agreement.

19. **Counterparts.** This Agreement may be signed electronically and in counterparts, which together will constitute one instrument. The Parties agree that a scanned or electronic copy of this Agreement signed by all Parties' authorized signatories will constitute a binding agreement.

**VOLVO CAR TECHNOLOGY FUND AB:**

By: _Raymond Milleen_
[Signature]

Raymond Milleen    CEO
[Printed Name]

3/9/2021
[Date]

By: _Pär Arvidsson_
[Signature]

Pär Arvidsson    Chairman
[Printed Name]

3/10/2021
[Date]

**VOLVO CAR TECHNOLOGY USA, LLC:**

By: _Courtney Murray_
Courtney Murray (May 13, 2021 16:52 EDT)
[Signature]

Courtney Murray
[Printed Name]

5/13/2021
[Date]

By: _Michael (G) Thomas_
Michael (G) Thomas (May 13, 2021 16:53 EDT)
[Signature]

Michael Thomas
[Printed Name]

5/13/2021
[Date]

**EXHBIT A**

| Service | Cost Basis (USD) | Unit | 12-Month Total | |
|---|---|---|---|---|
| Office Space (Area) | $    80.00 | per sqft/year | $  16 000.00 | |
| Big Rig | $ 10 000.00 | per unit | $  20 000.00 | |
| Mini Rig | $  2 000.00 | per unit | $  10 000.00 | |
| Desk Space | $ 13 661.00 | per person/year | $  40 983.00 | |
| Car Access | $ 12 000.00 | per car/year | $  12 000.00 | |
| | | | | |
| **Estimated Term Total** | | | US$ 98 983.00 | 1 year |

EXHIBIT "7"

**VOLVO**

# Press Release

Jun 30, 2021 | ID: 283544

## Volvo Cars To Harness Real-Time Data From Customer Cars To Set New Safety Standards

The next generation of Volvo cars are set to be the company's safest ever, thanks to cutting-edge software and hardware levels, coupled with continuous and more rapid improvements to safety features with the help of real-time data.

Volvo Cars has always taken a data-driven approach to safety, using traffic data from real-life situations to develop new safety technologies and make its cars even safer. For its next generation of cars, Volvo Cars is now looking towards processing data from customer cars in real time, if customers choose to share data and help Volvo Cars make its cars safer.

By allowing customers to choose and be a part of improving safety levels and traffic safety in this way, Volvo Cars can make continuous and much faster improvements to its cars, constantly improving safety levels. This data would include continuous inputs on the car's environment from sensors like the high-resolution LiDAR delivered by technology company Luminar.

Volvo Cars engineers would be able to validate and verify autonomous drive (AD) features quicker, to promote a safe roll-out of AD technology. Thanks to the data generated from millions of kilometres driven by tens of thousands of Volvo drivers around the globe, engineers would be able to validate AD features for specific geographic locations much quicker than with a limited number of cars on a test track.

Verified updates to existing systems and new features can be rolled out rapidly through over-the-air-updates, increasing the safety of Volvo cars step by step. The first car to benefit from this new approach to safety development is the company's first SUV on a completely new electric-only technology base.

"With help from real-life data we can speed up our development processes and go from years to days," said Ödgärd Andersson, CEO at Zenseact, Volvo Cars' autonomous driving software arm. "As real-time collection generates a lot more data, we can create better and higher-quality data sets that allow us to make better and quicker decisions on the next advancements in safety. We're taking a giant leap to increase safety in and around our cars."

To process the real-time traffic data they will collect, Volvo Cars and Zenseact are investing in a data factory that will contain over 200 PebiBytes (225 million gigabytes) of data within the next few years. By using artificial intelligence (AI) capabilities, data can be crunched at record times. Customers will be able to choose whether this data is collected about them, and all collected data will be aggregated with adequate safeguards for customer privacy.

"Safety is part of our heritage and the backbone of our company, but software is a crucial part of our modern-day DNA," said Mats Moberg, head of R&D at Volvo Cars. "So while we continue to build on the 50-year expertise of the industry-leading Volvo Cars Accident Research Team, we can now also leverage AI as a new, virtual accident research team."

The use of real-time data is part of Volvo Cars' longer term vision for a future where collisions simply no longer happen, by equipping its cars with some of the best sensors available and advanced, continuously improving safety and autonomous drive systems.

Volvo Cars' forthcoming fully electric flagship SUV will have industry-leading safety technology as standard, helping the company to save even more lives as it sets a new standard for automotive safety. It will come with state-of-the-art sensors, including a LiDAR developed by Luminar and an autonomous driving computer powered by the NVIDIA DRIVE Orin™ system-on-a-chip, as standard.

By combining this state-of-the-art hardware with software by Volvo Cars, Zenseact and Luminar for the next generation of its well-established collision avoidance technology, Volvo Cars expects its new safety package to reduce fatalities and accidents as a whole.

Over time the car will improve and have the hardware and software capabilities to allow the car to take over on its own, in case the driver does not respond in life-threatening situations after repeated warnings. So while the driver always remains in ultimate control, the car and its safety technology can both support and watch over the driver like an extra pair of eyes and brains.

-------------------------------

*Volvo Car Group in 2020*
*For the 2020 financial year, Volvo Car Group recorded an operating profit of 8.5 BSEK (14.3 BSEK in 2019). Revenue over the period amounted to 262.8 BSEK (274.1 BSEK). For the full year of 2020, global sales reached 661,713 cars (705,452), a decline of 6.2 per cent compared to 2019.*

*About Volvo Car Group*
*Volvo Cars was founded in 1927. Today, it is one of the most well-known and respected car brands in the world with sales of 661,713 cars in 2020 in about 100 countries. Volvo Cars has been under the ownership of the Zhejiang Geely Holding since 2010.*

*As of December 2020, Volvo Cars employed approximately 40,000 (41,500) full-time employees. Volvo Cars head office, product development, marketing and administration functions are mainly located in Gothenburg, Sweden. Volvo Cars head office for APAC is located in Shanghai. The company's main car production plants are located in Gothenburg (Sweden), Ghent (Belgium), South Carolina (US), Chengdu and Daqing (China), while engines are manufactured in Skövde (Sweden) and Zhangjiakou (China) and body components in Olofström (Sweden).*

*Under its new company purpose, Volvo Cars aims to provide customers with the Freedom to Move in a personal, sustainable and safe way. This purpose is reflected into a number of business ambitions: for example, by the middle of this decade it aims for half of its global sales to be fully electric cars and to establish five million direct consumer relationships. Volvo Cars is also committed to an ongoing reduction of its carbon footprint, with the ambition to be a climate-neutral company by 2040.*

Keywords:
Safety, Press Releases, Connectivity

Descriptions and facts in this press material relate to Volvo Cars' international car range. Described features might be optional. Vehicle specifications may vary from one country to another and may be altered without prior notification.

# Media Contacts

## Volvo Cars Media Relations
Phone: +46 31-596525
media@volvocars.com

media.volvocars.com >          volvocars.com >

Copyright © 2020 Volvo Car Corporation (or its affiliates or licensors).

**VOLVO**

# Press Release

Jun 30, 2021 | ID: 283545

# Future Volvo Cars To Run On Volvo Operating System As Company Takes Software Development In-House

Volvo Cars will take software development in-house as a car's appeal increasingly becomes more defined by software-driven functions and features, rather than traditional automotive attributes.

The next generation of pure electric Volvo models, including the company's first SUV on a completely new electric-only technology base, will run on Volvo Cars' own operating system (OS), called VolvoCars.OS, for faster and more flexible development. Coupled with more frequent over-the-air updates to customer cars through their lifetime, the company's aim is to make Volvo cars better every day.

VolvoCars.OS will act as an umbrella system for electric Volvo cars. It incorporates the company's various operating systems across the car and the cloud, creating one coherent software OS environment. The underlying operating systems include Android Automotive OS, QNX, AUTOSAR and Linux.

Through a variety of application programming interfaces (APIs), including the previously announced Extended Vehicle API, the VolvoCars.OS gives developers access to in-car features such as vehicle sensor data, user interfaces and cloud-based features such as fleet data, subject to customer consent. This allows developers to create new services and applications for Volvo cars.

"By developing software in-house we can boost development speeds and improve your Volvo faster than we can today," said Henrik Green, chief technology officer. "Just like on your smartphone or computer, new software and features can be rolled out swiftly through over-the-air updates, making your Volvo better and even more enjoyable over time."

To truly benefit from developing software in-house, Volvo Cars is also centralising computing inside its fully electric cars into a core system, removing a lot of complexity. Rather than relying on multiple electronic control units around the car that control individual features and systems, an increasing amount of in-house developed software will run in a powerful core computing system in the car.

The core computing system, which will first be introduced on a new Volvo model set to be revealed in 2022, is made up of three main computers. These support each other in operating vision processing and artificial intelligence, general computing and infotainment respectively.

The shift to centralised computing also allows Volvo Cars to gradually separate hardware from software. This means the company can introduce more frequent hardware cycles, so that new Volvo models can be equipped with the latest available hardware.

Volvo Cars is making the shift to in-house development and central computing working together with leading technology firms. These include NVIDIA, with whom the company is working with on the core systems, and Google, its co-development partner for its infotainment systems.

"We have a deliberate strategy of partnering with true technology leaders where it makes sense," added Henrik Green. "Google is a true leader in user experience and services, from Google Maps to Google Assistant, while NVIDIA gives us access to some of the fastest and best computing available. This approach of selected strategic partnerships is much more effective than trying to do everything on our own."

Volvo Cars' successful collaboration with technology leaders to give its customers the best possible user experience is also a driving factor behind its decision to open up its VolvoCars.OS to third-party innovation through open APIs.

Today's announcement is made in conjunction with the first Volvo Cars Tech Moment. You can catch the event live and on demand here.

--------------------------------

### Volvo Car Group in 2020
*For the 2020 financial year, Volvo Car Group recorded an operating profit of 8.5 BSEK (14.3 BSEK in 2019). Revenue over the period amounted to 262.8 BSEK (274.1 BSEK). For the full year of 2020, global sales reached 661,713 cars (705,452), a decline of 6.2 per cent compared to 2019.*

### About Volvo Car Group
*Volvo Cars was founded in 1927. Today, it is one of the most well-known and respected car brands in the world with sales of 661,713 cars in 2020 in about 100 countries. Volvo Cars has been under the ownership of the Zhejiang Geely Holding since 2010.*

*As of December 2020, Volvo Cars employed approximately 40,000 (41,500) full-time employees. Volvo Cars head office, product development, marketing and administration functions are mainly located in Gothenburg, Sweden. Volvo Cars head office for APAC is located in Shanghai. The company's main car production plants are located in Gothenburg (Sweden), Ghent (Belgium), South Carolina (US), Chengdu and Daqing (China), while engines are manufactured in Skövde (Sweden) and Zhangjiakou (China) and body components in Olofström (Sweden).*

*Under its new company purpose, Volvo Cars aims to provide customers with the Freedom to Move in a personal, sustainable and safe way. This purpose is reflected in a number of business ambitions: for example, by the middle of this decade it aims for half of its global sales to be fully electric cars, to sell half of its global volume online and to establish five million direct consumer relationships. Volvo Cars is also committed to an ongoing reduction of its carbon footprint, with the ambition to be a climate-neutral company by 2040.*

## Keywords:
Safety, Press Releases, Connectivity

Descriptions and facts in this press material relate to Volvo Cars' international car range. Described features might be optional. Vehicle specifications may vary from one country to another and may be altered without prior notification.

# Media Contacts

## Volvo Cars Media Relations
Phone: +46 31-596525
media@volvocars.com

media.volvocars.com >          volvocars.com >

Copyright © 2020 Volvo Car Corporation (or its affiliates or licensors).

EXHIBIT "8"

Case 5:22-cv-00398 Document 1-2 Filed 01/20/22 Page 142 of 298

 Gmail

Niclas Gyllenram <niclas@aidenabled.com>

---

## Email from Polestar, FYI

1 message

---

**Niclas Gyllenram** <niclas@aidenabled.com>                                                                 Fri, Jun 4, 2021 at 9:31 AM
To: Jonas Fenn <jonas@aidenabled.com>, Syed Mubeen Saifullah <mubeen@aidenabled.com>

I got this to my Volvo address today:

Dear Niclas,

We (Polestar) really appreciate the discussions that has been held so far concerning collaboration and PoCs work.

We have decided that we need to put these discussions and activities on hold as of today 2020-06-04, and will come back to you if that decision changes.

I really hope you understand and respect our decision.

Thanks in advance

Roger Hjelm

—

Connected Car

+46 728 888 601

Polestar

Niclas Gyllenram
+1 650 772 2622
niclas@aidenabled.com

EXHIBIT "9"

DocuSign Envelope ID: EC0PD867-A6B7-4D3D-A74D-8CA7D389E8FD

# INVESTOR RIGHTS AGREEMENT

THIS INVESTOR RIGHTS AGREEMENT (this "**Agreement**"), is made as of March 8, 2021 ("**Effective Date**"), by and among Aiden Automotive Technologies, Inc., a Delaware corporation (the "**Company**"), Volvo Car Technology Fund AB, reg. no. 556877-5760, a Sweden private limited liability company (together with its successors and assigns, "**Volvo**"), any other party that becomes an Investor hereunder after the date hereof (collectively with Volvo, "**Investors**"), and certain stockholders of the Company listed on Schedule B hereto (the "**Key Holders**").

## RECITALS

**WHEREAS**, the Company and Volvo are parties to that certain Seed Preferred Stock Purchase Agreement dated as of the date hereof (the "**Purchase Agreement**"); and

**WHEREAS**, in order to induce the Company to enter into the Purchase Agreement and to induce Volvo to consummate the transactions contemplated by the Purchase Agreement, Volvo and the Company hereby agree that this Agreement shall govern the rights of Volvo to cause the Company to register shares of Common Stock issuable to Investors, to receive certain information from the Company, and to participate in future equity offerings by the Company, and shall govern certain other matters as set forth in this Agreement;

**NOW, THEREFORE**, the parties hereby agree as follows:

1. <u>Definitions</u>. <u>For purposes of this Agreement:</u>

1.1 "**Affiliate**" means, when use with respect to any specified Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with such Person, where "**control**" means the possession, directly or indirectly, by agreement or otherwise, of at least 50% of the voting stock, partnership interest or other ownership interest, or the power (a) to appoint or remove a majority of the board of directors or other governing body of such Person, or (b) to cause the direction of the management of such Person.

1.2 "**Board of Directors**" means the board of directors of the Company.

1.3 "**Certificate of Incorporation**" means the Company's Amended and Restated Certificate of Incorporation, as amended and/or restated from time to time.

1.4 "**Common Stock**" means shares of the Company's common stock, par value $0.00001 per share.

1.5 "**Competitor**" means a Person engaged, directly or indirectly (including through any partnership, limited liability company, corporation, joint venture or similar arrangement (whether now existing or formed hereafter)) in the commercialization of a data enablement and/or data sharing system that communicates data to and from vehicles using the Android operating system.

DocuSign Envelope ID: EC0BD867-A6B7-4D3D-A74D-8CA7D389E8FD

1.6 "**Damages**" means any loss, damage, claim or liability (joint or several) to which a party hereto may become subject under the Securities Act, the Exchange Act, or other federal or state law, insofar as such loss, damage, claim or liability (or any action in respect thereof) arises out of or is based upon: (i) any untrue statement or alleged untrue statement of a material fact contained in any registration statement of the Company, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto; (ii) an omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein not misleading; or (iii) any violation or alleged violation by the indemnifying party (or any of its agents or Affiliates) of the Securities Act, the Exchange Act, any state securities law, or any rule or regulation promulgated under the Securities Act, the Exchange Act, or any state securities law.

1.7 "**Derivative Securities**" means any securities or rights convertible into, or exercisable or exchangeable for (in each case, directly or indirectly)**,** Common Stock, including options and warrants.

1.8 "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

1.9 "**Excluded Registration**" means (i) a registration relating to the sale or grant of securities to employees of the Company or a subsidiary pursuant to a stock option, stock purchase, equity incentive or similar plan; (ii) a registration relating to an SEC Rule 145 transaction; (iii) a registration on any form that does not include substantially the same information as would be required to be included in a registration statement covering the sale of the Registrable Securities; or (iv) a registration in which the only Common Stock being registered is Common Stock issuable upon conversion of debt securities that are also being registered.

1.10 "**FOIA Party**" means a Person that, in the reasonable determination of the Board of Directors, may be subject to, and thereby required to disclose non-public information furnished by or relating to the Company under, the Freedom of Information Act, 5 U.S.C. 552 ("**FOIA**"), any state public records access law, any state or other jurisdiction's laws similar in intent or effect to FOIA, or any other similar statutory or regulatory requirement.

1.11 "**Form S-1**" means such form under the Securities Act as in effect on the date hereof or any successor registration form under the Securities Act subsequently adopted by the SEC.

1.12 "**Form S-3**" means such form under the Securities Act as in effect on the date hereof or any registration form under the Securities Act subsequently adopted by the SEC that permits forward incorporation of substantial information by reference to other documents filed by the Company with the SEC.

1.13 "**GAAP**" means generally accepted accounting principles in the United States as in effect from time to time.

DocuSign Envelope ID: EC0DD867-A6B7-4D3D-A74B-8CA7D389E8FD

1.14   **"Holder"** means any holder of Registrable Securities who is a party to this Agreement.

1.15   **"Immediate Family Member"** means a child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, including, adoptive relationships, of a natural person referred to herein.

1.16   **"IPO"** means the Company's first underwritten public offering of its Common Stock under the Securities Act.

1.17   **"Key Employee"** means any executive-level employee (including, division director and vice president-level positions) as well as any employee who, either alone or in concert with others, develops, invents, programs, or designs any Company Intellectual Property (as defined in the Purchase Agreement).

1.18   **"Key Holder Registrable Securities"** means (i) the shares of Common Stock held by the Key Holders, and (ii) any Common Stock issued as (or issuable upon the conversion or exercise of any warrant, right, or other security that is issued as) a dividend or other distribution with respect to, or in exchange for or in replacement of such shares.

1.19   **"Major Investor"** means Volvo and each other Investor that, individually or together with such Investor's Affiliates, continues to hold shares of Common Stock or Preferred Stock representing at least five percent of the issued and outstanding equity securities of the Company (determined on an as-converted basis), as well as rights, options, or warrants to purchase such equity securities.

1.20   **"New Securities"** means, collectively, equity securities of the Company, whether or not currently authorized, as well as rights, options, or warrants to purchase such equity securities, or securities of any type whatsoever that are, or may become, convertible or exchangeable into or exercisable for such equity securities.

1.21   **"Person"** means any individual, corporation, partnership, trust, limited liability company, association or other entity.

1.22   **"Preferred Director"** has the meaning set forth in the Certificate of Incorporation.

1.23   **"Preferred Stock"** means shares of the Company's Seed Preferred Stock, par value $0.00001 per share.

1.24   **"Registrable Securities"** means (i) the Common Stock issuable or issued upon conversion of the Preferred Stock; (ii) any Common Stock, or any Common Stock issued or issuable (directly or indirectly) upon conversion and/or exercise of any other securities of the Company, acquired by any Investor after the date hereof; (iii) the Key Holder Registrable Securities, provided, however, that such Key Holder Registrable Securities shall not be deemed Registrable Securities and the Key Holders shall not be deemed Holders for the purposes of

3

DocuSign Envelope ID: EC0PD867-A6B7-4D3D-A74D-8CA7D389E8FD

Subsections 2.1 (and any other applicable Section or Subsection with respect to registrations under Subsection 2.1), 2.10, 3 and 6.6; and (iv) any Common Stock issued as (or issuable upon the conversion or exercise of any warrant, right, or other security that is issued as) a dividend or other distribution with respect to, or in exchange for or in replacement of, the shares referenced in clauses (i), (ii) and (iii) above; excluding in all cases, however, any Registrable Securities sold by a Person in a transaction in which the applicable rights under this Agreement are not assigned pursuant to Subsection 6.1, and excluding for purposes of Section 2 any shares for which registration rights have terminated pursuant to Subsection 2.13 of this Agreement.

1.25    "**Registrable Securities then outstanding**" means the number of shares determined by adding the number of shares of outstanding Common Stock that are Registrable Securities and the number of shares of Common Stock issuable (directly or indirectly) pursuant to then exercisable and/or convertible securities that are Registrable Securities.

1.26    "**Restricted Securities**" means the securities of the Company required to be notated with the legend set forth in Subsection 2.12(b) hereof.

1.27    "**SEC**" means the Securities and Exchange Commission.

1.28    "**SEC Rule 144**" means Rule 144 promulgated by the SEC under the Securities Act.

1.29    "**SEC Rule 145**" means Rule 145 promulgated by the SEC under the Securities Act.

1.30    "**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

1.31    "**Selling Expenses**" means all underwriting discounts, selling commissions, and stock transfer taxes applicable to the sale of Registrable Securities, and fees and disbursements of counsel for any Holder, except for the fees and disbursements of the Selling Holder Counsel borne and paid by the Company as provided in Subsection 2.5.

2.    Registration Rights. The Company covenants and agrees as follows:

2.1    Demand Registration.

(a)    Form S-1 Demand. If at any time after the earlier of (i) five years after the date of this Agreement, or (ii) one year after the effective date of the registration statement for the IPO, the Company receives a request from Volvo that the Company file a Form S-1 registration statement with respect to the Registrable Securities then outstanding having an anticipated aggregate offering price, net of Selling Expenses, of at least $10,000,000, then the Company shall (x) within 10 days after the date such request is given, give notice thereof (the "**Demand Notice**") to all Holders other than Volvo; and (y) as soon as practicable, and in any event within 60 days after the date such request is given by Volvo, file a Form S-1 registration statement under the Securities Act covering all Registrable Securities that Volvo requested to be registered and any additional Registrable Securities requested to be included in such registration by any

DocuSign Envelope ID: EC0PD867-A6B7-4D3D-A74D-8CA7D389E8FD

other Holders, as specified by notice given by each such Holder to the Company within 20 days of the date the Demand Notice is given, and in each case, subject to the limitations of Subsections 2.1(c) and 2.3.

(b)     Form S-3 Demand. If at any time when it is eligible to use a Form S-3 registration statement, the Company receives a request from Volvo that the Company file a Form S-3 registration statement with respect to outstanding Registrable Securities of such Holder having an anticipated aggregate offering price, net of Selling Expenses, of at least $1,000,000, then the Company shall (i) within 10 days after the date such request is given, give a Demand Notice to all Holders other than Volvo; and (ii) as soon as practicable, and in any event within 45 days after the date such request is given by Volvo, file a Form S-3 registration statement under the Securities Act covering all Registrable Securities requested to be included in such registration by any other Holders, as specified by notice given by each such Holder to the Company within 20 days of the date the Demand Notice is given, and in each case, subject to the limitations of Subsections 2.1(c) and 2.3.

(c)     Notwithstanding the foregoing obligations, if the Company furnishes to Holders requesting a registration pursuant to this Subsection 2.1 a certificate signed by the Company's chief executive officer stating that in the good faith judgment of the Board of Directors it would be materially detrimental to the Company and its stockholders for such registration statement to either become effective or remain effective for as long as such registration statement otherwise would be required to remain effective, because such action would (i) materially interfere with a significant acquisition, corporate reorganization, or other similar transaction involving the Company; (ii) require premature disclosure of material information that the Company has a bona fide business purpose for preserving as confidential; or (iii) render the Company unable to comply with requirements under the Securities Act or Exchange Act, then the Company shall have the right to defer taking action with respect to such filing, and any time periods with respect to filing or effectiveness thereof shall be tolled correspondingly, for a period of not more than 90 days after the request of Volvo is given; provided, however, that the Company may not invoke this right more than once in any 12 month period; and provided further that the Company shall not register any securities for its own account or that of any other stockholder during such 90 day period other than an Excluded Registration.

(d)     The Company shall not be obligated to effect, or to take any action to effect, any registration pursuant to Subsection 2.1(a) (i) during the period that is 60 days before the Company's good faith estimate of the date of filing of, and ending on a date that is 180 days after the effective date of, a Company-initiated registration, provided that the Company is actively employing in good faith commercially reasonable efforts to cause such registration statement to become effective; (ii) after the Company has effected two registrations pursuant to Subsection 2.1(a); or (iii) if Volvo proposes to dispose of shares of Registrable Securities that may be immediately registered on Form S-3 pursuant to a request made pursuant to Subsection 2.1(b). The Company shall not be obligated to effect, or to take any action to effect, any registration pursuant to Subsection 2.1(b) (i) during the period that is 30 days before the Company's good faith estimate of the date of filing of, and ending on a date that is 90 days after the effective date of, a Company-initiated registration; provided, that the Company is actively employing in good faith commercially reasonable efforts to cause such registration statement to become effective; or

DocuSign Envelope ID: EC0DD867-A6B7-4D3D-A74D-8CA7D389E8FD

(ii) if the Company has effected one registration pursuant to Subsection 2.1(b) within the six month period immediately preceding the date of such request. A registration shall not be counted as "effected" for purposes of this Subsection 2.1(d) until such time as the applicable registration statement has been declared effective by the SEC, unless Volvo withdraws its request for such registration, elects not to pay the registration expenses therefor, and forfeits its right to one demand registration statement pursuant to Subsection 2.6, in which case such withdrawn registration statement shall be counted as "effected" for purposes of this Subsection 2.1(d); provided, that if such withdrawal is during a period the Company has deferred taking action pursuant to Subsection 2.1(c), then Volvo may withdraw its request for registration and such registration will not be counted as "effected" for purposes of this Subsection 2.1(d).

2.2     Company Registration. If the Company proposes to register (including, for this purpose, a registration effected by the Company for stockholders other than Volvo) any of its securities under the Securities Act in connection with the public offering of such securities solely for cash (other than in an Excluded Registration), the Company shall, at such time, promptly give each Holder notice of such registration. Upon the request of each Holder given within 20 days after such notice is given by the Company, the Company shall, subject to the provisions of Subsection 2.3, cause to be registered all of the Registrable Securities that each such Holder has requested to be included in such registration. The Company shall have the right to terminate or withdraw any registration initiated by it under this Subsection 2.2 before the effective date of such registration, whether or not any Holder has elected to include Registrable Securities in such registration. The expenses (other than Selling Expenses) of such withdrawn registration shall be borne by the Company in accordance with Subsection 2.6.

2.3     Underwriting Requirements.

(a)     If, pursuant to Subsection 2.1, Volvo intends to distribute the Registrable Securities covered by its request by means of an underwriting, it shall so advise the Company as a part of its request made pursuant to Subsection 2.1, and the Company shall include such information in the Demand Notice. The underwriter(s) will be selected by the Board of Directors and shall be reasonably acceptable to Volvo. In such event, the right of any Holder to include such Holder's Registrable Securities in such registration shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein. All Holders proposing to distribute their securities through such underwriting shall (together with the Company as provided in Subsection 2.4(e)) enter into an underwriting agreement in customary form with the underwriter(s) selected for such underwriting. Notwithstanding any other provision of this Subsection 2.3, if the managing underwriter(s) advise(s) Volvo in writing that marketing factors require a limitation on the number of shares to be underwritten, then the number of Registrable Securities that may be included in the underwriting shall be allocated among such Holders of Registrable Securities in proportion (as nearly as practicable) to the number of Registrable Securities owned by each Holder or in such other proportion as shall mutually be agreed to by all such selling Holders; provided, however, that the number of Registrable Securities held by the Holders to be included in such underwriting shall not be reduced unless all other securities are first entirely excluded from the underwriting. To facilitate the allocation of shares in accordance with the above

provisions, the Company or the underwriters may round the number of shares allocated to any Holder to the nearest 100 shares.

(b)     In connection with any offering involving an underwriting of shares of the Company's capital stock pursuant to Subsection 2.2, the Company shall not be required to include any of the Holders' Registrable Securities in such underwriting unless the Holders accept the terms of the underwriting as agreed upon between the Company and its underwriters, and then only in such quantity as the underwriters in their sole discretion determine will not jeopardize the success of the offering by the Company. If the total number of securities, including Registrable Securities, requested to be included in such offering exceeds the number of securities to be sold (other than by the Company) that the underwriters in their reasonable discretion determine is compatible with the success of the offering, then the Company shall be required to include in the offering only that number of such securities, including Registrable Securities, which the underwriters and the Company in their sole discretion determine will not jeopardize the success of the offering. If the underwriters determine that less than all of the Registrable Securities requested to be registered can be included in such offering, then the Registrable Securities that are included in such offering shall be allocated among the selling Holders in proportion (as nearly as practicable to) the number of Registrable Securities owned by each selling Holder or in such other proportions as shall mutually be agreed to by all such selling Holders. To facilitate the allocation of shares in accordance with the above provisions, the Company or the underwriters may round the number of shares allocated to any Holder to the nearest 100 shares. Notwithstanding the foregoing, in no event shall (i) the number of Registrable Securities included in the offering be reduced unless all other securities (other than securities to be sold by the Company) are first entirely excluded from the offering, or (ii) the number of Registrable Securities included in the offering be reduced below 30% of the total number of securities included in such offering, unless such offering is the IPO, in which case the selling Holders may be excluded further if the underwriters make the determination described above and no other stockholder's securities are included in such offering or (iii)  notwithstanding (ii) above, any Registrable Securities which are not Key Holder Registrable Securities be excluded from such underwriting unless all Key Holder Registrable Securities are first excluded from such offering. For purposes of the provision in this Subsection 2.3(b) concerning apportionment, for any selling Holder that is a partnership, limited liability company, or corporation, the partners, members, retired partners, retired members, stockholders, and Affiliates of such Holder, or the estates and Immediate Family Members of any such partners, retired partners, members, and retired members and any trusts for the benefit of any of the foregoing Persons, shall be deemed to be a single "selling Holder," and any pro rata reduction with respect to such "selling Holder" shall be based upon the aggregate number of Registrable Securities owned by all Persons included in such "selling Holder," as defined in this sentence.

(c)     For purposes of Subsection 2.1, a registration shall not be counted as "effected" if, as a result of an exercise of the underwriter's cutback provisions in Subsection 2.3(a), fewer than 50% of the total number of Registrable Securities that Volvo has requested to be included in such registration statement are actually included.

DocuSign Envelope ID: EC0PD867-A6B7-4D3D-A74D-8CA7D389E8FD

2.4     Obligations of the Company. Whenever required under this Section 2 to effect the registration of any Registrable Securities, the Company shall, as expeditiously as reasonably possible:

(a)     prepare and file with the SEC a registration statement with respect to such Registrable Securities and use its commercially reasonable efforts to cause such registration statement to become effective and, upon the request of the Holders of a majority of the Registrable Securities registered thereunder, keep such registration statement effective for a period of up to 120 days or, if earlier, until the distribution contemplated in the registration statement has been completed; provided, however, that (i) such 120 day period shall be extended for a period of time equal to the period the Holder refrains, at the request of an underwriter of Common Stock (or other securities) of the Company, from selling any securities included in such registration, and (ii) in the case of any registration of Registrable Securities on Form S-3 that are intended to be offered on a continuous or delayed basis, subject to compliance with applicable SEC rules, such 120 day period shall be extended for up to 60 days, if necessary, to keep the registration statement effective until all such Registrable Securities are sold;

(b)     prepare and file with the SEC such amendments and supplements to such registration statement, and the prospectus used in connection with such registration statement, as may be necessary to comply with the Securities Act in order to enable the disposition of all securities covered by such registration statement;

(c)     furnish to the selling Holders such numbers of copies of a prospectus, including a preliminary prospectus, as required by the Securities Act, and such other documents as the Holders may reasonably request in order to facilitate their disposition of their Registrable Securities;

(d)     use its commercially reasonable efforts to register and qualify the securities covered by such registration statement under such other securities or blue-sky laws of such jurisdictions as shall be reasonably requested by the selling Holders; provided that the Company shall not be required to qualify to do business or to file a general consent to service of process in any such states or jurisdictions, unless the Company is already subject to service in such jurisdiction and except as may be required by the Securities Act;

(e)     in the event of any underwritten public offering, enter into and perform its obligations under an underwriting agreement, in usual and customary form, with the underwriter(s) of such offering;

(f)     use its commercially reasonable efforts to cause all such Registrable Securities covered by such registration statement to be listed on a national securities exchange or trading system and each securities exchange and trading system (if any) on which similar securities issued by the Company are then listed;

(g)     provide a transfer agent and registrar for all Registrable Securities registered pursuant to this Agreement and provide a CUSIP number for all such Registrable Securities, in each case not later than the effective date of such registration;

(h)     promptly make available for inspection by the selling Holders, any managing underwriter(s) participating in any disposition pursuant to such registration statement, and any attorney or accountant or other agent retained by any such underwriter or selected by the selling Holders, all financial and other records, pertinent corporate documents, and properties of the Company, and cause the Company's officers, directors, employees, and independent accountants to supply all information reasonably requested by any such seller, underwriter, attorney, accountant, or agent, in each case, as necessary or advisable to verify the accuracy of the information in such registration statement and to conduct appropriate due diligence in connection therewith;

(i)     notify each selling Holder, promptly after the Company receives notice thereof, of the time when such registration statement has been declared effective or a supplement to any prospectus forming a part of such registration statement has been filed; and

(j)     after such registration statement becomes effective, notify each selling Holder of any request by the SEC that the Company amend or supplement such registration statement or prospectus.

In addition, the Company shall ensure that, at all times after any registration statement covering a public offering of securities of the Company under the Securities Act shall have become effective, its insider trading policy shall provide that the Company's directors may implement a trading program under Rule 10b5-1 of the Exchange Act.

2.5     <u>Furnish Information</u>. It shall be a condition precedent to the obligations of the Company to take any action pursuant to this Section 2 with respect to the Registrable Securities of any selling Holder that such Holder shall furnish to the Company such information regarding itself, the Registrable Securities held by it, and the intended method of disposition of such securities as is reasonably required to effect the registration of such Holder's Registrable Securities.

2.6     <u>Expenses of Registration</u>. All expenses (other than Selling Expenses) incurred in connection with registrations, filings, or qualifications pursuant to Section 2, including all registration, filing, and qualification fees; printers' and accounting fees; fees and disbursements of counsel for the Company; and the reasonable fees and disbursements of one counsel  for the selling Holders ("**Selling Holder Counsel**"), shall be borne and paid by the Company; provided, however, that the Company shall not be required to pay for any expenses of any registration proceeding begun pursuant to <u>Subsection 2.1</u> if the registration request is subsequently withdrawn at the request of the Holders of a majority of the Registrable Securities to be registered (in which case all selling Holders shall bear such expenses pro rata based upon the number of Registrable Securities that were to be included in the withdrawn registration), unless the Holders of a majority of the Registrable Securities agree to forfeit their right to one registration pursuant to <u>Subsections 2.1(a)</u> or <u>2.1(b)</u>, as the case may be; provided, further that if, at the time of such withdrawal, the Holders shall have learned of a material adverse change in the condition, business, or prospects of the Company from that known to the Holders at the time of their request and have withdrawn the request with reasonable promptness after learning of such information then the Holders shall not be required to pay any of such expenses and shall not

forfeit their right to one registration pursuant to Subsections 2.1(a) or 2.1(b). All Selling Expenses relating to Registrable Securities registered pursuant to this Section 2 shall be borne and paid by the Holders pro rata on the basis of the number of Registrable Securities registered on their behalf.

2.7 Delay of Registration. No Holder shall have any right to obtain or seek an injunction restraining or otherwise delaying any registration pursuant to this Agreement as the result of any controversy that might arise with respect to the interpretation or implementation of this Section 2.

2.8 Indemnification. If any Registrable Securities are included in a registration statement under this Section 2:

(a)     To the extent permitted by law, the Company will indemnify and hold harmless each selling Holder, and the partners, members, officers, directors, and stockholders of each such Holder; legal counsel and accountants for each such Holder; any underwriter (as defined in the Securities Act) for each such Holder; and each Person, if any, who controls such Holder or underwriter within the meaning of the Securities Act or the Exchange Act, against any Damages, and the Company will pay to each such Holder, underwriter, controlling Person, or other aforementioned Person any legal or other expenses reasonably incurred thereby in connection with investigating or defending any claim or proceeding from which Damages may result, as such expenses are incurred; provided, however, that the indemnity agreement contained in this Subsection 2.8(a) shall not apply to amounts paid in settlement of any such claim or proceeding if such settlement is effected without the consent of the Company, which consent shall not be unreasonably withheld, nor shall the Company be liable for any Damages to the extent that they arise out of or are based upon actions or omissions made in reliance upon and in conformity with written information furnished by or on behalf of any such Holder, underwriter, controlling Person, or other aforementioned Person expressly for use in connection with such registration.

(b)     To the extent permitted by law, each selling Holder, severally and not jointly, will indemnify and hold harmless the Company, and each of its directors, each of its officers who has signed the registration statement, each Person (if any), who controls the Company within the meaning of the Securities Act, legal counsel and accountants for the Company, any underwriter (as defined in the Securities Act), any other Holder selling securities in such registration statement, and any controlling Person of any such underwriter or other Holder, against any Damages, in each case only to the extent that such Damages arise out of or are based upon actions or omissions made in reliance upon and in conformity with written information furnished by or on behalf of such selling Holder expressly for use in connection with such registration; and each such selling Holder will pay to the Company and each other aforementioned Person any legal or other expenses reasonably incurred thereby in connection with investigating or defending any claim or proceeding from which Damages may result, as such expenses are incurred; provided, however, that the indemnity agreement contained in this Subsection 2.8(b) shall not apply to amounts paid in settlement of any such claim or proceeding if such settlement is effected without the consent of the Holder, which consent shall not be unreasonably withheld; and provided further that in no event shall the aggregate amounts payable by any Holder by way of indemnity or contribution under Subsections 2.8(b) and 2.8(d) exceed the proceeds from the

10

offering received by such Holder (net of any Selling Expenses paid by such Holder), except in the case of fraud or willful misconduct by such Holder.

(c)     Promptly after receipt by an indemnified party under this <u>Subsection 2.8</u> of notice of the commencement of any action (including any governmental action) for which a party may be entitled to indemnification hereunder, such indemnified party will, if a claim in respect thereof is to be made against any indemnifying party under this <u>Subsection 2.8</u>, give the indemnifying party notice of the commencement thereof. The indemnifying party shall have the right to participate in such action and, to the extent the indemnifying party so desires, participate jointly with any other indemnifying party to which notice has been given, and to assume the defense thereof with counsel mutually satisfactory to the parties; <u>provided</u>, <u>however</u>, that an indemnified party (together with all other indemnified parties that may be represented without conflict by one counsel) shall have the right to retain one  separate counsel, with the fees and expenses to be paid by the indemnifying party, if representation of such indemnified party by the counsel retained by the indemnifying party would be inappropriate due to actual or potential differing interests between such indemnified party and any other party represented by such counsel in such action. The failure to give notice to the indemnifying party within a reasonable time of the commencement of any such action shall relieve such indemnifying party of any liability to the indemnified party under this <u>Subsection 2.8</u>, to the extent that such failure materially prejudices the indemnifying party's ability to defend such action. The failure to give notice to the indemnifying party will not relieve it of any liability that it may have to any indemnified party otherwise than under this <u>Subsection 2.8</u>.

(d)     To provide for just and equitable contribution to joint liability under the Securities Act in any case in which either: (i) any party otherwise entitled to indemnification hereunder makes a claim for indemnification pursuant to this <u>Subsection 2.8</u> but it is judicially determined (by the entry of a final judgment or decree by a court of competent jurisdiction and the expiration of time to appeal or the denial of the last right of appeal) that such indemnification may not be enforced in such case, notwithstanding the fact that this <u>Subsection 2.8</u> provides for indemnification in such case, or (ii) contribution under the Securities Act may be required on the part of any party hereto for which indemnification is provided under this <u>Subsection 2.8</u>, then, and in each such case, such parties will contribute to the aggregate losses, claims, damages, liabilities, or expenses to which they may be subject (after contribution from others) in such proportion as is appropriate to reflect the relative fault of each of the indemnifying party and the indemnified party in connection with the statements, omissions, or other actions that resulted in such loss, claim, damage, liability, or expense, as well as to reflect any other relevant equitable considerations. The relative fault of the indemnifying party and of the indemnified party shall be determined by reference to, among other things, whether the untrue or allegedly untrue statement of a material fact, or the omission or alleged omission of a material fact, relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information, and opportunity to correct or prevent such statement or omission; <u>provided</u>, <u>however</u>, that, in any such case (x) no Holder will be required to contribute any amount in excess of the public offering price of all such Registrable Securities offered and sold by such Holder pursuant to such registration statement, and (y) no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) will be entitled to contribution from any Person who was not guilty of such fraudulent

11

DocuSign Envelope ID: EC0PD867-A6B7-4D3D-A74D-8CA7D389E8FD

misrepresentation; and provided further that in no event shall a Holder's liability pursuant to this Subsection 2.8(d), when combined with the amounts paid or payable by such Holder pursuant to Subsection 2.8(b), exceed the proceeds from the offering received by such Holder (net of any Selling Expenses paid by such Holder), except in the case of willful misconduct or fraud by such Holder.

(e)     Notwithstanding the foregoing, to the extent that the provisions on indemnification and contribution contained in the underwriting agreement entered into in connection with the underwritten public offering are in conflict with the foregoing provisions, the provisions in the underwriting agreement shall control.

(f)     Unless otherwise superseded by an underwriting agreement entered into in connection with the underwritten public offering, the obligations of the Company and Holders under this Subsection 2.8 shall survive the completion of any offering of Registrable Securities in a registration under this Section 2, and otherwise shall survive the termination of this Agreement.

2.9  Reports Under Exchange Act. With a view to making available to the Holders the benefits of SEC Rule 144 and any other rule or regulation of the SEC that may at any time permit a Holder to sell securities of the Company to the public without registration or pursuant to a registration on Form S-3, the Company shall:

(a)     make and keep available adequate current public information, as those terms are understood and defined in SEC Rule 144, at all times after the effective date of the registration statement filed by the Company for the IPO;

(b)     use commercially reasonable efforts to file with the SEC in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act (at any time after the Company has become subject to such reporting requirements); and

(c)     furnish to any Holder, so long as the Holder owns any Registrable Securities, forthwith upon request (i) to the extent accurate, a written statement by the Company that it has complied with the reporting requirements of SEC Rule 144 (at any time after 90 days after the effective date of the registration statement filed by the Company for the IPO), the Securities Act, and the Exchange Act (at any time after the Company has become subject to such reporting requirements), or that it qualifies as a registrant whose securities may be resold pursuant to Form S-3 (at any time after the Company so qualifies); (ii) a copy of the most recent annual or quarterly report of the Company and such other reports and documents so filed by the Company; and (iii) such other information as may be reasonably requested in availing any Holder of any rule or regulation of the SEC that permits the selling of any such securities without registration (at any time after the Company has become subject to the reporting requirements under the Exchange Act) or pursuant to Form S-3 (at any time after the Company so qualifies to use such form).

2.10   Limitations on Subsequent Registration Rights. From and after the date of this Agreement, the Company shall not, without the prior written consent of Volvo, enter into any

agreement with any holder or prospective holder of any securities of the Company that would (i) provide to such holder or prospective holder the right to include securities in any registration on other than either a pro rata basis with respect to the Registrable Securities or on a subordinate basis after all Holders have had the opportunity to include in the registration and offering all shares of Registrable Securities that they wish to so include; or (ii) allow such holder or prospective holder to initiate a demand for registration of any securities held by such holder or prospective holder; provided, that this limitation shall not apply to Registrable Securities acquired by any additional Investor that becomes a party to this Agreement in accordance with Subsection 6.9.

2.11  "Market Stand-off" Agreement. Each Holder hereby agrees that it will not, without the prior written consent of the managing underwriter, during the period commencing on the date of the final prospectus relating to the registration by the Company for its own behalf of shares of its Common Stock or any other equity securities under the Securities Act on a registration statement on Form S-1 or Form S-3, and ending on the date specified by the Company and the managing underwriter (such period not to exceed 180 days in the case of the IPO, or such other period as may be requested by the Company or an underwriter to accommodate regulatory restrictions on (1) the publication or other distribution of research reports, and (2) analyst recommendations and opinions, including, but not limited to, the restrictions contained in FINRA Rule 2711(f)(4) or NYSE Rule 472(f)(4), or any successor provisions or amendments thereto), or 90 days in the case of any registration other than the IPO, or such other period as may be requested by the Company or an underwriter to accommodate regulatory restrictions on (1) the publication or other distribution of research reports and (2) analyst recommendations and opinions, including, but not limited to, the restrictions contained in FINRA Rule 2711(f)(4) or NYSE Rule 472(f)(4), or any successor provisions or amendments thereto), (i) lend; offer; pledge; sell; contract to sell; sell any option or contract to purchase; purchase any option or contract to sell; grant any option, right, or warrant to purchase; or otherwise transfer or dispose of, directly or indirectly, any shares of Common Stock or any securities convertible into or exercisable or exchangeable (directly or indirectly) for Common Stock (whether such shares or any such securities are then owned by the Holder or are thereafter acquired) or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of such securities, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of Common Stock or other securities, in cash, or otherwise. The foregoing provisions of this Subsection 2.11 shall apply only to the IPO, shall not apply to the sale of any shares to an underwriter pursuant to an underwriting agreement, or the transfer of any shares to any trust for the direct or indirect benefit of the Holder or the immediate family of the Holder, provided that the trustee of the trust agrees to be bound in writing by the restrictions set forth herein, and provided further that any such transfer shall not involve a disposition for value, and shall be applicable to the Holders only if all officers and directors are subject to the same restrictions and the Company uses commercially reasonable efforts to obtain a similar agreement from all stockholders individually owning more than one percent of the Company's outstanding Common Stock (after giving effect to conversion into Common Stock of all outstanding Preferred Stock). The underwriters in connection with such registration are intended third-party beneficiaries of this Subsection 2.11 and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto.

Each Holder further agrees to execute such agreements as may be reasonably requested by the underwriters in connection with such registration that are consistent with this <u>Subsection 2.11</u> or that are necessary to give further effect thereto. Any discretionary waiver or termination of the restrictions of any or all of such agreements by the Company or the underwriters shall apply pro rata to all Company stockholders that are subject to such agreements.

     2.12   <u>Restrictions on Transfer</u>.

     (a)    The Preferred Stock and the Registrable Securities shall not be sold, pledged, or otherwise transferred, and the Company shall not recognize and shall issue stop-transfer instructions to its transfer agent with respect to any such sale, pledge, or transfer, except upon the conditions specified in this Agreement, which conditions are intended to ensure compliance with the provisions of the Securities Act. A transferring Holder will cause any proposed purchaser, pledgee, or transferee of the Preferred Stock and the Registrable Securities held by such Holder to agree to take and hold such securities subject to the provisions and upon the conditions specified in this Agreement.

     (b)    Each certificate (if any), instrument, or book entry representing (i) the Preferred Stock, (ii) the Registrable Securities, and (iii) any other securities issued in respect of the securities referenced in clauses (i) and (ii), upon any stock split, stock dividend, recapitalization, merger, consolidation, or similar event, shall (unless otherwise permitted by the provisions of <u>Subsection 2.12(c)</u>) be notated with a legend substantially in the following form:

     THE SECURITIES REPRESENTED HEREBY HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933. SUCH SHARES MAY NOT BE SOLD, PLEDGED, OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR A VALID EXEMPTION FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SAID ACT.

     THE SECURITIES REPRESENTED HEREBY MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY.

     The Holders consent to the Company making a notation in its records and giving instructions to any transfer agent of the Restricted Securities in order to implement the restrictions on transfer set forth in this <u>Subsection 2.12</u>.

     (c)    The holder of such Restricted Securities, by acceptance of ownership thereof, agrees to comply in all respects with the provisions of this <u>Section 2</u>. Before any proposed sale, pledge, or transfer of any Restricted Securities, unless there is in effect a registration statement under the Securities Act covering the proposed transaction, the Holder thereof shall give notice to the Company of such Holder's intention to effect such sale, pledge, or transfer. Each such notice shall describe the manner and circumstances of the proposed sale, pledge, or transfer in sufficient detail and, if reasonably requested by the Company, shall be accompanied at such

14

Holder's expense by either (i) a written opinion of legal counsel who shall, and whose legal opinion shall, be reasonably satisfactory to the Company, addressed to the Company, to the effect that the proposed transaction may be effected without registration under the Securities Act; (ii) a "no action" letter from the SEC to the effect that the proposed sale, pledge, or transfer of such Restricted Securities without registration will not result in a recommendation by the staff of the SEC that action be taken with respect thereto; or (iii) any other evidence reasonably satisfactory to counsel to the Company to the effect that the proposed sale, pledge, or transfer of the Restricted Securities may be effected without registration under the Securities Act, whereupon the Holder of such Restricted Securities shall be entitled to sell, pledge, or transfer such Restricted Securities in accordance with the terms of the notice given by the Holder to the Company. The Company will not require such a legal opinion or "no action" letter (x) in any transaction in compliance with SEC Rule 144; or (y) in any transaction in which such Holder distributes Restricted Securities to an Affiliate of such Holder for no consideration; provided, that each transferee agrees in writing to be subject to the terms of this Subsection 2.12. Each certificate, instrument, or book entry representing the Restricted Securities transferred as above provided shall be notated with, except if such transfer is made pursuant to SEC Rule 144, the appropriate restrictive legend set forth in Subsection 2.12(b), except that such certificate instrument, or book entry shall not be notated with such restrictive legend if, in the opinion of counsel for such Holder and the Company, such legend is not required in order to establish compliance with any provisions of the Securities Act.

2.13    Termination of Registration Rights. The right of any Holder to request registration or inclusion of Registrable Securities in any registration pursuant to Subsections 2.1 or 2.2 shall terminate upon the earliest to occur of:

(a)    the closing of a Deemed Liquidation Event, as such term is defined in the Certificate of Incorporation;

(b)    such time after consummation of the IPO as Rule 144 or another similar exemption under the Securities Act is available for the sale of all of such Holder's shares without limitation during a three-month period without registration; and

(c)    the sixth anniversary of the IPO.

3.    Information Rights.

3.1    Delivery of Financial Statements. The Company shall deliver to each Major Investor, provided that the Board of Directors has not reasonably determined that such Major Investor is a Competitor:

(a)    for the first 24 months following the Effective Date, as soon as practicable, but in any event within 10 days after the end of each fiscal month, a consolidated balance sheet and related statements of operations, stockholders' equity and cash flows, showing the financial condition of the Company and its subsidiaries as of the end of such month;

DocuSign Envelope ID: EC0PD867-A6B7-4D3D-A74D-8CA7D389E8FD

(b)      for the first 24 months following the Effective Date, as soon as practicable, but in any event within 45 days after the end of each fiscal quarter, its quarterly and year-to-date consolidated balance sheet and related statements of operations, stockholders' equity and cash flows, showing the financial condition of the Company and its subsidiaries as of the end of such quarter and its results of its operations during such fiscal quarter and year-to-date period, setting forth in each case in comparative form the corresponding figures for the corresponding quarter and fiscal year-to-date period of the preceding fiscal year and the corresponding figures for the corresponding quarter and fiscal year-to-date period of the annual forecast;

(c)      as soon as practicable, but in any event within 120 days of the end of each fiscal year, its annual consolidated balance sheet and related statements of operations, stockholders' equity and cash flows, showing the financial condition of the Company and its subsidiaries as of the end of such year and its results of its operations during such fiscal year;

(d)      as soon as practicable, but in any event 30 days before the end of each fiscal year, an operating budget and Business Plan for the next fiscal year (collectively, the "**Budget**"), approved by the Board of Directors (including the Preferred Director, if any) and prepared on a monthly basis, including balance sheets, income statements, and statements of cash flow for such months and, promptly after prepared, any other budgets or revised budgets prepared by the Company; and

(e)      as soon as practicable, but in any event within 45 days after the end of each of the first three quarters of each fiscal year of the Company, a statement showing the number of shares of each class and series of capital stock and securities convertible into or exercisable for shares of capital stock outstanding at the end of the period, the Common Stock issuable upon conversion or exercise of any outstanding securities convertible or exercisable for Common Stock and the exchange ratio or exercise price applicable thereto, and the number of shares of issued stock options and stock options not yet issued but reserved for issuance, if any, all in sufficient detail as to permit the Major Investor to calculate their respective percentage equity ownership in the Company, and certified by the chief financial officer or chief executive officer of the Company as being true, complete, and correct.

If, for any period, the Company has any subsidiary whose accounts are consolidated with those of the Company, then in respect of such period the financial statements delivered pursuant to the foregoing sections shall be the consolidated and consolidating financial statements of the Company and all such consolidated subsidiaries.

Notwithstanding anything else in this Subsection 3.1 to the contrary, the Company may cease providing the information set forth in this Subsection 3.1 during the period starting with the date 60 days before the Company's good-faith estimate of the date of filing of a registration statement if it reasonably concludes it must do so to comply with the SEC rules applicable to such registration statement and related offering; provided, that the Company's covenants under this Subsection 3.1 shall be reinstated at such time as the Company is no longer actively employing its commercially reasonable efforts to cause such registration statement to become effective.

16

3.2     <u>Prototype</u>. Within 12 months following the Effective Date, the Company will complete, and demonstrate to Investor, a working prototype of the Automotive Intelligent Data Enablement product (the "**Product**") that can be deployed in a testing environment by a customer for the purpose of obtaining feedback and early results so that the Company can continue to develop and improve the product,.

3.3     <u>Pipeline</u>. Within 18 months following the Effective Date, the Company will provide to Investor, a sales and partnership pipeline pertaining to the Product,.

3.4     <u>Inspection</u>. The Company shall permit each Major Investor (<u>provided</u>, that the Board of Directors has not reasonably determined that such Major Investor is a Competitor), at such Major Investor's expense, to visit and inspect the Company's properties; examine its books of account and records; and discuss the Company's affairs, finances, and accounts with its officers, during normal business hours of the Company as may be reasonably requested by the Major Investor; <u>provided</u>, <u>however</u>, that the Company shall not be obligated pursuant to this <u>Subsection 3.6</u> to provide access to any information that it reasonably and in good faith considers to be a trade secret or confidential information (unless covered by an enforceable confidentiality agreement, in form acceptable to the Company) or the disclosure of which would adversely affect the attorney-client privilege between the Company and its counsel. For the avoidance of doubt, Investor shall not be deemed to be a Competitor for any purposes hereunder.

3.5     <u>Termination of Information</u>. The covenants set forth in <u>Subsection 3.1</u>, and <u>Subsection 3.4</u> shall terminate and be of no further force or effect (i) immediately before the consummation of the IPO, (ii) when the Company first becomes subject to the periodic reporting requirements of Section 12(g) or 15(d) of the Exchange Act, or (iii) upon the closing of a Deemed Liquidation Event, as such term is defined in the Certificate of Incorporation, whichever event occurs first.

3.6 <u>Confidentiality</u>. Each Investor agrees that such Investor will keep confidential and will not disclose, divulge, or use for any purpose (other than to monitor its investment in the Company and/or report to its shareholders or partners on its investment in the Company) any confidential information obtained from the Company pursuant to the terms of this Agreement (including notice of the Company's intention to file a registration statement), unless such confidential information (a) is known or becomes known to the public in general (other than as a result of a breach of this <u>Subsection 3.6</u> by such Investor), (b) is or has been independently developed or conceived by such Investor without use of the Company's confidential information, or (c) is or has been made known or disclosed to such Investor by a third party without a breach of any obligation of confidentiality such third party may have to the Company; <u>provided</u>, <u>however</u>, that an Investor may disclose confidential information (i) to its attorneys, accountants, consultants, and other professionals to the extent necessary to obtain their services in connection with monitoring its investment in the Company; (ii) to any prospective purchaser of any Registrable Securities from such Investor, if such prospective purchaser agrees to be bound by the provisions of this <u>Subsection 3.6</u>; (iii) to any Affiliate, partner, member, stockholder, or wholly owned subsidiary of such Investor in the ordinary course of business, provided that such Investor informs such Person that such information is confidential and directs such Person to maintain the confidentiality of such information; or (iv) as may otherwise be required by law,

17

regulation, rule, court order or subpoena, provided that such Investor promptly notifies the Company of such disclosure and takes reasonable steps to minimize the extent of any such required disclosure.

4.    Rights to Future Stock Issuances.

4.1    Right of First Offer. Subject to the terms and conditions of this Subsection 4.1 and applicable securities laws, if the Company proposes to offer or sell any New Securities, the Company shall first offer such New Securities to each Major Investor. Each Major Investor shall be entitled to apportion the right of first offer hereby granted to it in such proportions as it deems appropriate, among (i) itself, (ii) its Affiliates and (iii) its beneficial interest holders, such as limited partners, members or any other Person having "beneficial ownership," as such term is defined in Rule 13d-3 promulgated under the Exchange Act, of such Major Investor ("**Investor Beneficial Owners**"); provided, that each such Affiliate or Investor Beneficial Owner (w) is not a Competitor or FOIA Party, unless such party's purchase of New Securities is otherwise consented to by the Board of Directors, (x) agrees to enter into this Agreement and each of the Voting Agreement and Right of First Refusal and Co-Sale Agreement of even date herewith among the Company, Volvo and the other parties named therein as an "**Investor**" under each such agreement (provided, that any Competitor or FOIA Party shall not be entitled to any rights as a Major Investor under Subsections 3.1, 3.2 and 4.1 hereof),  (y) agrees to purchase at least such number of New Securities as are allocable hereunder to the Major Investor holding the fewest number of shares of Preferred Stock and any other Derivative Securities and (z) enters into a subscription agreement in a form reasonably acceptable to the Company.

(a)    The Company shall give notice (the "**Offer Notice**") to each Major Investor, stating (i) its bona fide intention to offer such New Securities, (ii) the number of such New Securities to be offered, and (iii) the price and terms, if any, upon which it proposes to offer such New Securities.

(b)    By notification to the Company within 30 days after the Offer Notice is given, each Major Investor  may elect to purchase or otherwise acquire, at the price and on the terms specified in the Offer Notice, up to that portion of such New Securities which equals the proportion that the Common Stock then held by such Major Investor (including all shares of Common Stock then issuable (directly or indirectly) upon conversion and/or exercise, as applicable, of the Preferred Stock and any other Derivative Securities then held by such Major Investor) bears to the total Common Stock of the Company then outstanding (assuming full conversion and/or exercise, as applicable, of all Preferred Stock and any other Derivative Securities then outstanding). At the expiration of such 20 day period, the Company shall promptly notify each Major Investor that elects to purchase or acquire all the shares available to it (each, a "**Fully Exercising Investor**") of any other Major Investor's failure to do likewise. During the 10 day period commencing after the Company has given such notice, each Fully Exercising Investor may, by giving notice to the Company, elect to purchase or acquire, in addition to the number of shares specified above, up to that portion of the New Securities for which Major Investor were entitled to subscribe but that were not subscribed for by the Major Investor which is equal to the proportion that the Common Stock issued and held, or issuable (directly or indirectly) upon conversion and/or exercise, as applicable, of Preferred Stock and

any other Derivative Securities then held, by such Fully Exercising Investor bears to the Common Stock issued and held, or issuable (directly or indirectly) upon conversion and/or exercise, as applicable, of the Preferred Stock and any other Derivative Securities then held, by all Fully Exercising Investor who wish to purchase such unsubscribed shares. The closing of any sale pursuant to this <u>Subsection 4.1(b)</u> shall occur within the later of 90 days of the date that the Offer Notice is given and the date of initial sale of New Securities pursuant to <u>Subsection 4.1(c)</u>.

(c)     If all New Securities referred to in the Offer Notice are not elected to be purchased or acquired as provided in <u>Subsection 4.1(b)</u>, the Company may, during the 90 day period following the expiration of the periods provided in <u>Subsection 4.1(b)</u>, offer and sell the remaining unsubscribed portion of such New Securities to any Person or Persons at a price not less than, and upon terms no more favorable to the offeree than, those specified in the Offer Notice. If the Company does not enter into an agreement for the sale of the New Securities within such period, or if such agreement is not consummated within 30 days of the execution thereof, the right provided hereunder shall be deemed to be revived and such New Securities shall not be offered unless first reoffered to the Major Investor in accordance with this <u>Subsection 4.1</u>.

(d)     The right of first offer in this <u>Subsection 4.1</u> shall not be applicable to (i) Exempted Securities (as defined in the Certificate of Incorporation); (ii) shares of Common Stock issued in the IPO; and (iii) the issuance of shares of Preferred Stock to Additional Purchasers pursuant to <u>Subsection 1.3</u> of the Purchase Agreement.

4.2     <u>Termination</u>. The covenants set forth in Subsection 4.1 shall terminate and be of no further force or effect (i) immediately before the consummation of the IPO, (ii) when the Company first becomes subject to the periodic reporting requirements of Section 12(g) or 15(d) of the Exchange Act, or (iii) upon the closing of a Deemed Liquidation Event, as such term is defined in the Certificate of Incorporation, whichever event occurs first.

5.     <u>Additional Covenants</u>.

5.1     <u>Insurance</u>. The Company shall obtain, within 90 days of the date hereof, from financially sound and reputable insurers Directors and Officers liability insurance, in an amount and on terms and conditions satisfactory to the Board of Directors (including the Preferred Director, if any), and will use commercially reasonable efforts to cause such insurance policy to be maintained until such time as the Board of Directors determines that such insurance should be discontinued.

5.2     <u>Employee Agreements</u>. The Company will cause (i) each Person now or hereafter employed by it or by any subsidiary (or engaged by the Company or any subsidiary as a consultant/independent contractor) with access to confidential information and/or trade secrets to enter into a nondisclosure and proprietary rights assignment agreement; and (ii) each Key Employee to enter into a noncompetition and nonsolicitation agreement, substantially in the form approved by the Board of Directors. In addition, the Company shall not amend, modify, terminate, waive, or otherwise alter, in whole or in part, any of the above-referenced agreements

DocuSign Envelope ID: EC0DD867-A6B7-4D3D-A74D-8CA7D389E8FD

or any restricted stock agreement between the Company and any employee, without the consent of the Preferred Director, if any.

5.3    <u>Employee Stock</u>. Unless otherwise approved by the Board of Directors, including the Preferred Director, if any, all future employees and consultants of the Company who purchase, receive options to purchase, or receive awards of shares of the Company's capital stock after the date hereof shall be required to execute restricted stock or option agreements, as applicable, providing for (i) vesting of shares over a period of time and percentage as determined by the Board of Directors, , and (ii) a market stand-off provision substantially similar to that in <u>Subsection 2.11</u>.  Without the prior approval by the Board of Directors, including the Preferred Director, if any, the Company shall not amend, modify, terminate, waive or otherwise alter, in whole or in part, any stock purchase, stock restriction or option agreement with any existing employee or service provider if such amendment would cause it to be inconsistent with this <u>Subsection 5.3</u>. In addition, unless otherwise approved by the Board of Directors, including the Preferred Director, if any, the Company shall retain (and not waive) a "right of first refusal" on employee transfers until the Company's IPO and shall have the right to repurchase unvested shares at cost upon termination of employment of a holder of restricted stock.

5.4    <u>Qualified Small Business Stock</u>. The Company shall use commercially reasonable efforts to cause the shares of Preferred Stock issued pursuant to the Purchase Agreement, as well as any shares into which such shares are converted, within the meaning of Section 1202(f) of the Internal Revenue Code (the "**Code**"), to constitute "qualified small business stock" as defined in Section 1202(c) of the Code; <u>provided</u>, <u>however</u>, that such requirement shall not be applicable if the Board of Directors determines, in its good-faith business judgment, that such qualification is inconsistent with the best interests of the Company. The Company shall submit to its stockholders (including Investor) and to the Internal Revenue Service any reports that may be required under Section 1202(d)(1)(C) of the Code and the regulations promulgated thereunder. In addition, within 20 business days after any Investor's written request therefor, the Company shall, at its option, either (i) deliver to such Investor a written statement indicating whether (and what portion of) such Investor's interest in the Company constitutes "qualified small business stock" as defined in Section 1202(c) of the Code or (ii) deliver to such Investor such factual information in the Company's possession as is reasonably necessary to enable such Investor to determine whether (and what portion of) such Investor's interest in the Company constitutes "qualified small business stock" as defined in Section 1202(c) of the Code.

5.5    <u>Board Matters</u>. At any time that the Preferred Director has been designated to the Board of Directors, unless otherwise determined by the vote of a majority of the directors then in office, the Board of Directors shall meet, in person or via video conferencing or telephonically, at the Board's discretion, at least quarterly in accordance with an agreed-upon schedule. The Company shall reimburse the nonemployee directors for all reasonable out-of-pocket travel expenses incurred (consistent with the Company's travel policy) in connection with attending in-person meetings of the Board of Directors. The Preferred Director, if any, shall be entitled in such person's discretion to be a member of any committee of the Board of Directors.

5.6    <u>Successor Indemnification</u>. If the Company or any of its successors or assignees consolidates with or merges into any other Person and is not the continuing or surviving

corporation or entity of such consolidation or merger, then to the extent necessary, proper provision shall be made so that the successors and assignees of the Company assume the obligations of the Company with respect to indemnification of members of the Board of Directors as in effect immediately before such transaction, whether such obligations are contained in the Company's Bylaws, the Certificate of Incorporation, or elsewhere, as the case may be.

5.7     Indemnification Matters. The Company hereby acknowledges that the Preferred Director, if appointed or designated,  may have certain rights to indemnification, advancement of expenses and/or insurance provided by the Investors and certain of their Affiliates (collectively, the "**Investor Indemnitors**"). The Company hereby agrees (a) that it is the indemnitor of first resort (*i.e.*, its obligations to any Preferred Director are primary and any obligation of the Investor Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by any Preferred Director are secondary), (b) that it shall be required to advance the full amount of expenses incurred by such Preferred Director and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement by or on behalf of any Preferred Director to the extent legally permitted and as required by the Certificate of Incorporation or Bylaws of the Company (or any agreement between the Company and any Preferred Director), without regard to any rights any Preferred Director may have against the Investor Indemnitors, and (c) that it irrevocably waives, relinquishes and releases the Investor Indemnitors from any and all claims against the Investor Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Investor Indemnitors on behalf of any Preferred Director with respect to any claim for which such Preferred Director has sought indemnification from the Company shall affect the foregoing and the Investor Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Preferred Director against the Company. The Preferred Director and the Investor Indemnitors are intended third-party beneficiaries of this Subsection 5.7 and shall have the right, power and authority to enforce the provisions of this Subsection 5.7 as though they were a party to this Agreement.

5.8     Right to Conduct Activities. The Company hereby agrees and acknowledges that Investor is a professional investment organization, and as such reviews the business plans and related proprietary information of many enterprises, some of which may compete directly or indirectly with the Company's business (as currently conducted or as currently propose to be conducted). The Company hereby agrees that, to the extent permitted under applicable law, Investor and its Affiliates and related companies shall not be liable to the Company for any claim arising out of, or based upon, (i) the investment by Investor and its Affiliates and related companies in any entity competitive with the Company, or (ii) actions taken by any partner, officer, employee or other representative of Investor or any of its Affiliates or related companies to assist any such competitive company, whether or not such action was taken as a member of the board of directors of such competitive company or otherwise, and whether or not such action has a detrimental effect on the Company; provided, however, that the foregoing shall not relieve (x) any Investor from liability associated with the unauthorized disclosure of the Company's confidential information obtained pursuant to this Agreement, or (y) any director or officer of the Company from any liability associated with his or her fiduciary duties to the Company.

21

5.9    <u>Uncertificated Shares</u>. The Company will use Carta to electronically issue all shares of Common Stock and Preferred Stock, including, without limitation, issuances related to any previous stock split. The Company will provide Investor capitalization tables within 10 days of written request by Investor.

5.10    <u>Termination of Covenants</u>. The covenants set forth in this <u>Section 5</u>, except for <u>Subsections 5.6</u>, <u>5.7</u> and <u>5.8</u>, shall terminate and be of no further force or effect (i) immediately before the consummation of the IPO, (ii) when the Company first becomes subject to the periodic reporting requirements of Section 12(g) or 15(d) of the Exchange Act, or (iii) upon a Deemed Liquidation Event, as such term is defined in the Certificate of Incorporation, whichever event occurs first.

6.    <u>Miscellaneous.</u>

6.1    <u>Successors and Assigns</u>. The rights under this Agreement may be assigned (but only with all related obligations) by a Holder to a transferee of Registrable Securities that (i) is an Affiliate of a Holder; or (ii) is a Holder's Immediate Family Member or trust for the benefit of an individual Holder or one or more of such Holder's Immediate Family Members; <u>provided</u>, <u>however</u>, that (x) the Company is, within a reasonable time after such transfer, furnished with written notice of the name and address of such transferee and the Registrable Securities with respect to which such rights are being transferred; and (y) such transferee agrees in a written instrument delivered to the Company to be bound by and subject to the terms and conditions of this Agreement, including the provisions of <u>Subsections 2.11</u> and <u>2.12</u>. For the purposes of determining the number of shares of Registrable Securities held by a transferee, the holdings of a transferee (1) that is an Affiliate or stockholder of a Holder; (2) who is a Holder's Immediate Family Member; or (3) that is a trust for the benefit of an individual Holder or such Holder's Immediate Family Member shall be aggregated together and with those of the transferring Holder; <u>provided</u> <u>further</u> that all transferees who would not qualify individually for assignment of rights shall, as a condition to the applicable transfer, establish a single attorney-in-fact for the purpose of exercising any rights, receiving notices, or taking any action under this Agreement. The terms and conditions of this Agreement inure to the benefit of and are binding upon the respective successors and permitted assignees of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and permitted assignees any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided herein.

6.2    <u>Governing Law</u>. This Agreement shall be governed by the internal law of the State of Delaware, without regard to conflict of law principles that would result in the application of any law other than the law of the State of Delaware.

6.3    <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes**.**

DocuSign Envelope ID: EC0D8867-A6B7-4D3D-A74D-8CA7D389E8FD

6.4   <u>Titles and Subtitles</u>. The titles and subtitles used in this Agreement are for convenience only and are not to be considered in construing or interpreting this Agreement.

6.5   <u>Notices</u>. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or (i) personal delivery to the party to be notified; (ii) when sent, if sent by electronic mail or facsimile during the recipient's normal business hours, and if not sent during normal business hours, then on the recipient's next business day; (iii) five days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) one business day after the business day of deposit with a nationally recognized overnight courier, freight prepaid, specifying next-day delivery, with written verification of receipt. All communications shall be sent to the respective parties at their addresses as set forth on Schedule A hereto, or to the principal office of the Company and to the attention of the Chief Executive Officer, in the case of the Company, or to such email address, facsimile number, or address as subsequently modified by written notice given in accordance with this <u>Subsection 6.5</u>. If notice is given to the Company, a copy shall also be sent to 231 Market Place, Suite 226, San Ramon, CA 94583 Attention: Syed M. Saifullah;mubeen@aidenabled.com, with a copy to Khan Law Group LC, 9431 Haven Ave., Suite 100, Rancho Cucamonga, CA 91730, Attention:  Masood Khan, mkhan@khanlegal.com; and if notice is given to Investor, a copy shall also be given to Investor, c/o Volvo Car Technology Fund AB, SE-405 31 Göteborg, Sweden, Attention: Daniel Karlsson, <u>danielkarlsson.3@volvocars.com</u>, with a copy to McKennon Shelton & Henn, LLP 100 M Street, SE, Suite 600 Washington, DC 20003, Attention: Sulee S. Clay, <u>sulee.clay@mshllp.com</u>.

6.6   <u>Consent to Electronic Notice</u>. Each Investor and Key Holder consents to the delivery of any stockholder notice pursuant to the Delaware General Corporation Law (the "**DGCL**"), as amended or superseded from time to time, by electronic transmission pursuant to Section 232 of the DGCL (or any successor thereto) at the electronic mail address  as on the books of the Company. To the extent that any notice given by means of electronic transmission is returned or undeliverable for any reason, the foregoing consent shall be deemed to have been revoked until a new or corrected electronic mail address has been provided, and such attempted Electronic Notice shall be ineffective and deemed to not have been given. Each Investor and Key Holder agrees to promptly notify the Company of any change in such stockholder's electronic mail address, and that failure to do so shall not affect the foregoing.

6.7   <u>Amendments and Waivers</u>. Any term of this Agreement may be amended, modified or terminated and the observance of any term of this Agreement may be waived (either generally or in a particular instance, and either retroactively or prospectively) only with the written consent of the Company and the holders of at least a majority of the Registrable Securities then outstanding, including Investor; <u>provided</u>, that the Company may in its sole discretion waive compliance with <u>Subsection 2.12(c)</u> (and the Company's failure to object promptly in writing after notification of a proposed assignment allegedly in violation of <u>Subsection 2.12(c)</u> shall be deemed to be a waiver); and provided further that any provision hereof may be waived by any waiving party on such party's own behalf, without the consent of any other party. Notwithstanding the foregoing, (a) this Agreement may not be amended, modified or terminated and the observance of any term hereof may not be waived with respect to any Investor without the written consent of such Investor, unless such amendment, modification, termination, or

23

DocuSign Envelope ID: EC0BD867-A6B7-4D3D-A74B-8CA7D389E8FD

waiver applies to all Investor in the same fashion (it being agreed that a waiver of the provisions of Section 4 with respect to a particular transaction shall be deemed to apply to all Investor in the same fashion if such waiver does so by its terms, notwithstanding the fact that certain Investor may nonetheless, by agreement with the Company, purchase securities in such transaction) and (b) Subsections 3.1 and 3.2, Section 4 and any other section of this Agreement applicable to the Major Investors (including this clause (b) of this Subsection 6.7) may not be amended, modified, terminated or waived without the written consent of the holders of at least a majority of the Registrable Securities then outstanding and held by the Major Investors. Notwithstanding the foregoing, Schedule A hereto may be amended by the Company from time to time to add transferees of any Registrable Securities in compliance with the terms of this Agreement without the consent of the other parties; and Schedule A hereto may also be amended by the Company after the date of this Agreement without the consent of the other parties to add information regarding any additional Investor who becomes a party to this Agreement in accordance with Subsection 6.10. The Company shall give prompt notice of any amendment, modification or termination hereof or waiver hereunder to any party hereto that did not consent in writing to such amendment, modification, termination, or waiver. Any amendment, modification, termination, or waiver effected in accordance with this Subsection 6.7 shall be binding on all parties hereto, regardless of whether any such party has consented thereto. No waivers of or exceptions to any term, condition, or provision of this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such term, condition, or provision.

6.8     Severability. In case any one or more of the provisions contained in this Agreement is for any reason held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement, and such invalid, illegal, or unenforceable provision shall be reformed and construed so that it will be valid, legal, and enforceable to the maximum extent permitted by law.

6.9     Aggregation of Stock. All shares of Registrable Securities held or acquired by Affiliates shall be aggregated together for the purpose of determining the availability of any rights under this Agreement and such Affiliated persons may apportion such rights as among themselves in any manner they deem appropriate.

6.10    Additional Investor. Notwithstanding anything to the contrary contained herein, if the Company issues additional shares of Preferred Stock after the date hereof, whether pursuant to the Purchase Agreement or otherwise, any purchaser of such shares of Preferred Stock may become a party to this Agreement by executing and delivering an additional counterpart signature page to this Agreement, and thereafter shall be deemed an "Investor" for all purposes hereunder. No action or consent by Investor shall be required for such joinder to this Agreement by such additional Investor, so long as such additional Investor has agreed in writing to be bound by all of the obligations as an "Investor" hereunder.

6.11    Entire Agreement. This Agreement (including any Schedules and Exhibits hereto) constitutes the full and entire understanding and agreement among the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties is expressly canceled.

DocuSign Envelope ID: EC0DD867-A6B7-4D3D-A74D-8CA7D389E8FD

6.12    Arbitration. Any unresolved controversy or claim arising out of or relating to this Agreement, except as (i) otherwise provided in this Agreement, or (ii) any such controversies or claims arising out of either party's intellectual property rights for which a provisional remedy or equitable relief is sought, shall be submitted to arbitration by one arbitrator mutually agreed upon by the parties, and if no agreement can be reached within thirty (30) days after names of potential arbitrators have been proposed by the American Arbitration Association (the "**AAA**"), then by one arbitrator having reasonable experience in corporate finance transactions of the type provided for in this Agreement and who is chosen by the AAA. The arbitration shall take place in San Francisco, California, in accordance with the AAA rules then in effect, and judgment upon any award rendered in such arbitration will be binding and may be entered in any court having jurisdiction thereof. There shall be limited discovery prior to the arbitration hearing as follows: (a) exchange of witness lists and copies of documentary evidence and documents relating to or arising out of the issues to be arbitrated, (b) depositions of all party witnesses and (c) such other depositions as may be allowed by the arbitrators upon a showing of good cause. Depositions shall be conducted in accordance with the California Code of Civil Procedure, the arbitrator shall be required to provide in writing to the parties the basis for the award or order of such arbitrator, and a court reporter shall record all hearings, with such record constituting the official transcript of such proceedings. Each party will bear its own costs in respect of any disputes arising under this Agreement. The prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled.

6.13    WAIVER OF JURY TRIAL: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

6.14    Delays or Omissions. No delay or omission to exercise any right, power, or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power, or remedy of such nonbreaching or nondefaulting party, nor shall it be construed to be a waiver of or acquiescence to any such breach or default, or to any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. All remedies, whether under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

25

IN WITNESS WHEREOF, the parties have executed this Investor Rights Agreement as of the date first written above.

**AIDEN AUTOMOTIVE TECHNOLOGIES, INC.**

By: _____

Name:  Niclas Gyllenram

Title:  President

IN WITNESS WHEREOF, the parties have executed this Investor Rights Agreement as of the date first written above.

**KEY HOLDERS:**

_____
SYED MUBEEN SAIFULLAH

_____
NICLAS GYLLENRAM

_____
JONAS FENN

IN WITNESS WHEREOF, the parties have executed this Investor Rights Agreement as of the date first written above.

**VOLVO CAR TECHNOLOGY FUND AB**

By: _Raymond Millien_
Name: Raymond Millien
Title: Managing Director

By: _Pär Arvidsson_
Name: Pär Arvidsson
Title: Chairman of the Board

## **SCHEDULE A**

### **INVESTOR**

| **Name and Address** | **Number of Shares Held** |
| --- | --- |
| Volvo Car Technology Fund AB<br>SE-405 31 Göteborg, Sweden | 900,000 shares of Seed Preferred Stock |

## <u>SCHEDULE B</u>

### KEY HOLDERS

| <u>Name and Address</u> | <u>Number of Shares Held</u> |
|---|---|
| Syed Mubeen Saifullah<br>23 Pebble Court<br>San Ramon CA 94583 | 1,312,000 shares of Common Stock |
| Niclas Gyllenram<br>129 Lowell Ave<br>Palo Alto CA 94301 | 1,476,000 shares of Common Stock |
| Jonas Fenn<br>63A Manchester St.<br>San Francisco, CA 94110 | 1,312,000 shares of Common Stock |

# EXHIBIT "10"

# NICLAS GYLLENRAM

**Telephone**  + 1-650-772-2622          **Email** niclas.gyllenram@gmail.com          1505 EMERSON STREET
94301 PALO ALTO
CA, USA

## PROFESSIONAL EXPERIENCE

*2018-02-01 –2021—07-31*          **DIRECTOR SOFTWARE DEVELOPMENT**, Volvo Car Corporation, Sunnyvale, CA, USA

Software and Business development, working with partners in Silicon Valley, researching and developing new technologies. Leading the development teams, researching and innovating in Artificial Intelligence & Autonomous Driving, and the complete User Experience for these new functions. The mission is to find new companies to collaborate with and potentially invest in, and strengthen already existing partnerships (i.e. Google, Luminar, nVidia), and develop new functions that eventually will become new products for Volvo Cars.

*2017-04-01 – 2018-01-31*          **DIRECTOR PRODUCT MANAGER**, Volvo Car Corporation, Gothenburg, Sweden

Product Manager for Android software development at Infotainment Department:
- Leading agile software development transformation
- Owning the Product Backlog for the IHU
- Leading Sprint Planning, Sprint Demos, Stakeholder Meetings, Product Management

I built up the development teams from scratch, creating Volvo's first major in-house software development, leading what was done, when it was done, and how it was done with around 60 developers in-house, and another 70 at the supplier. This is what we developed (as of May 2018):
https://www.youtube.com/watch?v=SoGrE6t4ejQ
https://www.digitaltrends.com/cars/volvo-android-infotainment-experience/

*2016-10-01 – 2017-03-31*          **DIRECTOR STRATEGY & CONCEPT**, Volvo Car Corporation, Gothenburg, Sweden

Responsible for Strategy & Concept at Infotainment Department (around 400 engineers):
- Leading Strategy & Concept Section.
- Responsible for early phases across all projects within the Infotainment Department
- Leading development and implementation of new agile way-of-working at the Infotainment Department
- Leading development of new Infotainment architecture for next generation infotainment systems and cars
- Leading sourcing activities from Infotainment Department for next generation systems

Main achievement was to change Volvo's strategy, to take full responsibility and develop an Android based platform in-house, and to build up Volvo's first own development house.

*2015-02-02 – 2016-09-30*          **MANAGER ENTERTAINMENT & APPS**, Volvo Car Corporation, Gothenburg, Sweden

Responsible for the in-car app development, developing apps such as Spotify, Pandora, TuneIn, Glympse, etc. prototypes and demos. Introduced new methods (scrum and Kanban), and releases every 4 weeks (as opposed to twice a year), raising the efficiency and quality significantly.
Also responsible for the Entertainment team, handling FM/AM/DAB/SDARS/HD radio, TV tuner, and media player.

*2012-08-01 – 2015-02-01*          **R&D MANAGER**, Mitsubishi Electric, Gothenburg, Sweden

Responsible for software platform development and leading a team of engineers developing prototypes and demos. The prototype development is used for entering new potential business areas, and approaching new customers.

NICLAS GYLLENRAM

**Telephone**  + 1-650-772-2622          **Email** niclas.gyllenram@gmail.com          1505 EMERSON STREET
94301 PALO ALTO
CA, USA

---

*2011-06-01 – 2012-07-31*          **MANAGEMENT CONSULTANT**, Cybercom, Gothenburg, Sweden

Management consulting for Ericsson to adapt their products and business model to the automotive industry, designing, architecting and building their cloud platform.
Specialized in service delivery platforms, advising top management in a variety of companies to address product development in general, and connectivity in particular, mainly with regards to the Internet-of-things
Product Owner for development for an iOS and Android app for an automotive customer.

*2006-04-01 – 2011-05-31*          **IT MANAGER & ENGINEERING MANAGER**, Mitsubishi Electric, Gothenburg, Sweden

IT manager, responsible for IT systems development and maintenance
Engineering Manager, responsible for product development and sales

*2004-01-08 – 2006-04-01*          **PROJECT LEADER,** Mitsubishi Electric, Gothenburg, Sweden
.
Responsible for Software development for radio and CD-, and mp3-players, supplied to Jaguar, Volvo, Land Rover and Aston Martin

*2002-03-25-2003-01-07*          **CONSULTANT**, Centaur, Gothenburg, Sweden

Consultant at Volvo Cars, working with system integration of GSM phones into cars

*1998-06-30  - 1998-07-31*          **DEVELOPER** , The National Board of Health and Welfare, Stockholm, Sweden.

Database development

*1997-05-01 – 1997-08-30*          **IT SYSTEM ADMINISTRATOR,** XML Group, Stockholm, Sweden

Managing and maintaining IT environment

# NICLAS GYLLENRAM

**Telephone** + 1-650-772-2622

**Email** niclas.gyllenram@gmail.com

1505 EMERSON STREET
94301 PALO ALTO
CA, USA

## EDUCATION

*1997-2001*

**MASTERS OF SCIENCE IN COMPUTER SCIENCE & ELECTRICAL ENGINEERING,** Chalmers University of Technology, Gothenburg, Sweden

Specialized in Computer systems, with special focus on Computer Security, Cryptography and Mathematics

## ADDITIONAL SKILLS

*Management:*    **RESEARCH AND DEVELOPMENT,** long experience of Product Development and IT system and Toolchain Development

*Management:*    **LEADERSHIP,** long experience of leading development teams in diverse fields, building up organizations, all the way from smaller teams to projects involving more than 100 developers

*Software:*    **OPEN SOURCE SOFTWARE,** leader of internal OSS projects, active in OSS community and standardizing organizations

*Software:*    **AGILE DEVELOPMENT,** Project Leader and Product Owner in Agile development projects, and leader in introducing Agile methodology and processes.

*Strategy:*    **DEVELOPMENT STRATEGY,** more than 10 years' experience of working with long term strategic development of tool chains, product line ups and methodology.

*Development:*    **PRODUCT DEVELOPMENT PROCESSES,** more than 10 years' experience of software development and implementation of process and organization changes

*Sales:*    **OPEN SOURCE SOFTWARE,** leader of internal OSS projects, active in OSS community and standardizing organizations

*Languages:*    **SWEDISH** (mother tongue), **ENGLISH** (advanced), **FRENCH** (basic), **SPANISH** (basic)

## EXTRA CURRICULAR ACTIVITIES

*Chairman:*    **GNUF,** chairman of science club 1991-1994

## OTHER

**DRIVERS LICENSE (B).**

NICLAS GYLLENRAM

MARC Y. LAZO, SBN: 215998
WILLIAM B. WELDEN, SBN: 117056
K&L LAW GROUP, P.C.
2646 Dupont Drive, Suite 60340
Irvine, California 92612
Phone No.:      (949) 216-4000
Fax No.:        (800) 596-0370

MASOOD R. KHAN, SBN: 231020
KHAN LAW GROUP, LC
9431 Haven Avenue, Suite 100
Rancho Cucamonga, CA 91730
Phone No:     (626) 262-4012
Fax No:        (626) 628-3275
Email:        mkhan@khanlegal.com
Attorneys for PLAINTIFF
AIDEN AUTOMOTIVE TECHNOLOGIES, INC.

Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 12/29/2021 10:11 AM
Reviewed By: F. Miller
Case #21CV389918
Envelope: 7949056

# IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| AIDEN AUTOMOTIVE TECHNOLOGIES, INC., a Delaware corporation, <br><br> PLAINTIFF, <br><br> v. <br><br> VOLVO CAR GROUP; VOLVO CAR TECHNOLOGY FUND AB; VOLVO CAR CORPORATION, a corporation; VOLVO CAR TECHNOLOGY USA LLC; a California limited liability company; ZENSEACT; POLESTAR AUTOMOTIVE USA, INC., a Delaware corporation; HÅKAN SAMUELSSON, an individual;  ÖDGÄRD ANDERSSON, an individual;   HENRIK GREEN, an individual;  MARIA HEMBERG, an individual;  MATS MOBERG, an individual; SANELA IBROVIC, an individual; PÄR ARVIDSSON, an individual; BOBBYKIN MAKWANA, an individual; JOAKIM ALPSTEN, and individual; MÅRTEN LEVENSTAM, an individual; PATRIK BENGTSSON, an individual; DENNIS NOBELIUS, an individual , an individual DOES 1-100, inclusive, <br><br> DEFENDANTS. | CASE NO: 21CV389918 <br><br> **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ISSUANCE OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION** <br><br> (Application for Temporary Restraining Order and [Proposed] Order Submitted Concurrently Herewith) |

1    **TO THE CLERK OF THE COURT, ALL INTERESTED PARTIES HEREIN, AND**

2    **THEIR ATTORNEYS OF RECORD:**

3    PLEASE TAKE NOTICE THAT Plaintiff AIDEN AUTOMOTIVE TECHNOLOGIES, INC., hereby

4    requests that the Court take judicial notice

5    pursuant to California Evidence Code §§ 450, 451, and 452 of the following documents in support of

6    their Application for Temporary Restraining Order and Issuance of Order to Show Cause Re

7    Preliminary Injunction:

8    **Exhibit "A"**   Verified Complaint filed on October 15, 2021 in the within action.

9

10   Dated: December 27, 2021                              K&L LAW GROUP, P.C.

11

12                                       By: _____

13                                            MARC Y. LAZO
                                             WILLIAM B. WELDEN
14                                           Attorneys for PLAINTIFF

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-

# EXHIBIT A

E-FILED
10/15/2021 4:37 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
21CV389918
Reviewed By: L. Quach-Marcellana

MARC Y. LAZO, SBN: 215998
K&L LAW GROUP, P.C.
2646 Dupont Drive, Suite 60340
Irvine, California 92612
Phone No.:      (949) 216-4000
Fax No.:        (800) 596-0370

MASOOD R. KHAN, SBN: 231020
KHAN LAW GROUP, LC
9431 Haven Avenue, Suite 100
Rancho Cucamonga, CA 91730
Phone No:    (626) 262-4012
Fax No:      (626) 628-3275
Email:       mkhan@khanlegal.com
Attorneys for Plaintiff
AIDEN AUTOMOTIVE TECHNOLOGIES, INC.

**IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF SANTA CLARA**

| | |
|---|---|
| AIDEN AUTOMOTIVE TECHNOLOGIES, INC., a Delaware corporation,<br><br>     Plaintiff,<br><br>v.<br><br>VOLVO CAR GROUP; VOLVO CAR TECHNOLOGY FUND AB; VOLVO CAR CORPORATION, a corporation; VOLVO CAR TECHNOLOGY USA LLC; a California limited liability company; ZENSEACT; POLESTAR AUTOMOTIVE USA, INC., a Delaware corporation; HÅKAN SAMUELSSON, an individual; ÖDGÄRD ANDERSSON, an individual;  HENRIK GREEN, an individual;  MARIA HEMBERG, an individual;  MATS MOBERG, an individual; SANELA IBROVIC, an individual; PÄR ARVIDSSON, an individual; BOBBYKIN MAKWANA, an individual; JOAKIM ALPSTEN, and individual;  MÅRTEN LEVENSTAM, an individual;  PATRIK BENGTSSON, an individual;  DENNIS NOBELIUS, an individual , an individual DOES 1-100, inclusive,<br><br>     Defendants. | CASE NO:   21CV389918<br><br>**VERIFIED COMPLAINT FOR:**<br><br>1. **BREACH OF CONTRACT**<br>2. **INDUCING BREACH OF CONTRACT**<br>3. **TORTIOUS BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br>4. **UNFAIR BUSINESS PRACTICES**<br>5. **FRAUDULENT MISREPRESENTATION**<br>6. **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**<br>7. **NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**<br>8. **VIOLATION OF THE CARTWRIGHT ACT – BUSINESS & PROFESSIONS CODE § 16700 *et seq.***<br>9. **CONVERSION**<br>10. **MISAPPROPRIATION OF INTELLECTUAL PROPERTY**<br>11. **PRELIMINARY AND PERMANENT INJUNCTION**<br><br>**DEMAND FOR JURY TRIAL** |

1

Plaintiff, AIDEN AUTOMOTIVE TECHNOLOGIES, INC., a Delaware corporation ("Plaintiff"), hereby sets forth its claims based upon knowledge, relevant documents and information and belief, and alleges as follows:

**PARTIES**

1. At all relevant times mentioned herein, Plaintiff is a Delaware corporation with its principal place of business in San Ramon, California in the County of Santa Clara.

2. Defendant, VOLVO CAR GROUP, is, upon information and belief, a Swedish company doing business in the State of California.

3. Defendant, VOLVO CAR TECHNOLOGY FUND AB is upon information and belief, a subsidiary of VOLVO CAR GROUP, doing business in the State of California.

4. Defendant, VOLVO CAR CORPORATION, is, upon information and belief, a Swedish corporation doing business in the State of California.

5. Defendant, VOLVO CAR TECHNOLOGY USA LLC, a California limited liability company is, upon information and belief, a Delaware limited liability company with its physical address located at 380 N. Pastoria Avenue, Sunnyvale, California and is conducting business in the State of California.

6. Defendant, ZENSEACT, is, upon information and belief, a subsidiary of VOLVO CAR GROUP, doing business in the State of California.

7. Defendant, POLESTAR AUTOMOTIVE USA, INC. ("POLESTAR"), a Delaware corporation is, upon information and belief, an affiliate of VOLVO CAR GROUP, doing business in the State of California.

8. Plaintiff is informed and believes that at all relevant times mentioned herein, the following Defendants are individuals, who are both employees of VOLVO CAR GROUP and members of the Board of Directors of Defendant, VOLVO CAR TECHNOLOGY FUND AB.  They include as follows:  MARIA HEMBERG, Head of Group Legal & Corporate Governance; MATS MOBERG, SVP of Research & Development

//

//

2

9.     Plaintiff is informed and believes that at all relevant times mentioned herein Defendant, HÅKAN SAMUELSSON is Member of the Board of Directors and Chief Executive Officer of Defendant, VOLVO CAR GROUP.

10.     Plaintiff is informed and believes that at all relevant times mentioned herein, Defendant HENRIK GREEN is the Chief Technology Officer (CTO) of Defendant VOLVO CAR GROUP.

11.     Plaintiff is informed and believes that at all relevant times mentioned herein, Defendant SANELA IBROVIC is the VP & Head of Connected Experience of Defendant VOLVO CAR GROUP.

12.     Plaintiff is informed and believes that at all relevant times mentioned herein, Defendant, PÄR ARVIDSSON is and was Head Corporate Development & Governance of VOLVO CAR GROUP and Chairman of the Board of VOLVO CAR TECHNOLOGY FUND AB.

13.     Additionally, Plaintiff is informed and believes that at all relevant times mentioned herein Defendants, JOAKIM ALPSTEN and MÅRTEN LEVENSTAM, are or were members of the Board of Directors of Defendant, VOLVO CAR TECHNOLOGY FUND AB.

14.     Plaintiff is informed and believes that at all relevant times mentioned herein Defendant, ÖDGÄRD ANDERSSON is CEO of Defendant, ZENSEACT, the autonomous driving software development subsidiary of VOLVO CAR GROUP as well as a current member of the Board of Directors of Defendant, VOLVO CAR TECHNOLOGY FUND AB, and former Chief Digital Officer of VOLVO CAR GROUP.

15.     Plaintiff is informed and believes that at all relevant times mentioned herein Defendant BOBBYKIN MAKWANA is VP & General Manager of Defendant, VOLVO CAR TECHNOLOGY USA LLC.

16.     Plaintiff is informed and believes that at all relevant times mentioned herein Defendant PATRIK BENGTSSON is and was a Vice President of Software Development for Defendant VOLVO CAR GROUP.

17.     Plaintiff is informed and believes that at all relevant times mentioned herein Defendant DENNIS NOBELIUS is and was the Chief Operating Officer (COO) of Defendant POLESTAR AUTOMOTIVE.

VERIFIED COMPLAINT

18.     Each Defendant is collectively referred to as "Defendants" or "Volvo" or "Volvo Cars" and Plaintiff and Defendants are collectively referred to as "Parties".

19.     Plaintiff is informed and believes and thereon allege that at all times herein mentioned, each of the named or fictitiously designated defendants sued herein as Does 1 through 100, inclusive, was the agent, representative, employee, partner, associate, and joint venturer of every other defendant herein, as well as a co-conspirator, and in doing the things alleged herein, was acting within the scope of such agency, employment and/or conspiracy and took the actions taken with the permission, agreement, authority, ratification and/or consent of the defendants.  Therefore, each of such fictitiously named defendants is responsible in some manner to pay the obligations described herein and that Plaintiff's losses as herein alleged were proximately caused by defendants' acts. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained.

**JURISDICTION AND VENUE**

20.     This matter is within the unlimited jurisdiction of this Court as the amount in controversy, exclusive of interest and costs, exceeds $25,000.00.

21.     Venue is proper in this Court in that the acts that form the basis of this Complaint occurred in Santa Clara County, and many of the parties hereto reside, transact business, and/or have their principal places of business in this county.

**INTRODUCTION**

22.     Volvo Cars is a household name known widely for its family-friendly automobiles, safety record and pristine reputation.  It champions an ethical and principled workplace focused on five values:  Customer Success, Trust, Passion, Change and Performance.  According to Volvo's website, all of the values are geared towards how Volvo interacts "with our customers, and with society as a whole" and drives "decisions at all levels of the organization."

23.     This polished veneer, however, belies the reality of how Volvo actually treats certain employees, and how it engages in its business practices.

24.     This case is about Volvo's surreptitious and underhanded treatment of a small startup company founded by three Volvo employees who relied on Volvo's promises to deliver certain equipment, support and other deliverables in exchange for the startup developing its unique automobile

VERIFIED COMPLAINT

data enablement platform.  Indeed, Volvo's actions are typical of the greedy corporate conglomerate that will stop at nothing to acquire technology it sees as valuable.

25.    The Plaintiff, AIDEN AUTOMOTIVE TECHNOLOGIES, INC. ("AIDEN"), seeks damages for a litany of Defendants' actions, including fraud, unfair business practices and interference with prospective economic advantage, among other wrongful acts.

**FACTUAL ALLEGATIONS**

26.    The Plaintiff, AIDEN AUTOMOTIVE TECHNOLOGIES INC., is a Delaware corporation that was formed by its three founders, Niclas Gyllenram, Jonas Fenn and Syed Mubeen Saifullah ("AIDEN FOUNDERS"), at the behest and encouragement of Volvo Cars' management.

27.    All three AIDEN FOUNDERS were originally full-time employees of the VOLVO CAR TECHNOLOGY USA LLC a subsidiary of Volvo Cars, which is also known as Defendant, VOLVO CAR GROUP, located in Silicon Valley, California; only one of the founders is still employed full-time by Volvo.  Their roles within Volvo were related to developing and finding solutions to allow for Volvo automobiles to expand their digital data utilization and footprint through partnerships with other technology companies in Silicon Valley and elsewhere.

28.    In the course of their work, the AIDEN FOUNDERS, came to realize that a gap existed in the automobile industry in regard to the capturing of automobile data being generated by cars and data being fed back to cars in real time.  Realizing that this gap could be filled, and the solution could potentially spawn a multi-billion dollar industry, the AIDEN FOUNDERS proposed to the Volvo Defendants' corporate management a revolutionary and novel data enablement platform utilizing the Android operating system.

29.    Pertinent VOLVO CAR GROUP management and certain members of the Board of Defendant VOLVO CAR TECHNOLOGY FUND AB, namely Defendants BOBBYKIN MAKWANA, SANELA IBROVIC, ÖDGÄRD ANDERSSON, PATRIK BENGTSSON, JOAKIM ALPSTEN, PÄR ARVIDSSON, MARIA HEMBERG, MÅRTEN LEVENSTAM, and MATS MOBERG, were impressed with this data enablement platform proposed by the AIDEN FOUNDERS. The Volvo management and board, in October of 2020, voted unanimously that this data enablement platform would be better suited as a separate spin-out entity of Volvo and would be better positioned

1   as a startup entity owned in part by Volvo.  Some of the internal steps toward approval of this spin-out

2   entity, which received unanimous board of director approval in November 2020, were memorialized in

3   an email dated March 11, 2021 with the subject line of "The Facts Surrounding Project AIDEN."  **See**

4   **Exhibit 1.**

5   　　　　30.　　Volvo and the three eventual founders of AIDEN negotiated the terms of this new entity

6   in the form of a "Spin-Out Term Sheet" that was signed on or around November 11, 2020, set forth in

7   **Exhibit 2**.  The new spinout was to be called "AIDEN AUTOMOTIVE TECHNOLOGIES, INC.".

8   Among the key terms of the term sheet was that Volvo was to own 18 percent of AIDEN. In addition,

9   Volvo was to assign the intellectual property rights to AIDEN, and AIDEN was to develop the data

10  enablement platform ("Data Enablement Platform") using AIDEN's own resources and raise a

11  minimum of $500,000 in outside investment.

12  　　　　31.　　The Spin-Out Term Sheet also specified that the AIDEN FOUNDERS were to maintain

13  their current employment positions with Volvo, and that if AIDEN was able to raise the minimum

14  $500,000 in outside capital, Volvo would enter into a formal acquisition agreement and provide AIDEN

15  with equipment, office space, R&D project management support - *and most critically* - the testing

16  environment to be able to deploy and test the data enablement platform in Volvo vehicles.

17  　　　　32.　　AIDEN's obligations under the term sheet were to develop a minimally viable product,

18  and a sales pipeline within 18 months after formal acquisition agreements were signed between Volvo

19  and AIDEN. The sales pipeline would only be possible if Volvo provided the testing environment by

20  providing vehicles to AIDEN through which AIDEN could demonstrate the functionality of the Data

21  Enablement Platform to potential clients.

22  　　　　33.　　Upon raising of the $500,000 of outside capital by AIDEN by December 2020,

23  Defendants and AIDEN entered into a formal set of acquisition documents ("Acquisition Agreements")

24  whereby Volvo would formally own the 18 percent of AIDEN's shares and would assign the Data

25  Enablement Platform intellectual property to AIDEN as well as deliver equipment, office space,

26  technology, all research and development needed, project management support and a testing

27  environment for AIDEN in order to ultimately deploy a sales pipeline for AIDEN's technology

28

6

1   products. The Acquisition Agreements were signed on or around March 8, 2021 and effective by their

2   terms on this same date.

3       34.     The relevant Acquisition Agreements signed by Volvo and AIDEN consist of 1) a Seed

4   Preferred Stock Purchase Agreement; 2) a Voting Agreement; and 3) IP Assignment Agreements.

5       35.     From the outset of Volvo executing the Acquisition Agreements, Volvo did not intend

6   to honor its obligations.  Instead, it became clear that Volvo induced the AIDEN FOUNDERS to enter

7   into the Acquisition Agreements to have them raise their own capital to develop a successful minimally

8   viable product.  Once AIDEN developed the Data Enablement Platform, Volvo intentionally began

9   withholding its obligations to provide the necessary equipment, technology, office space, and testing

10  environment with which AIDEN could develop its sales pipeline. Rather, Volvo's intent all along was

11  to misappropriate AIDEN's developed product and intellectual property for its own commercialization

12  and pecuniary benefit.

13      36.     The first signs of Volvo's bad faith and fraudulent intent occurred when AIDEN was

14  informed by an employee of Defendant VOLVO CAR GROUP one day after the Acquisition

15  Agreements were signed on or about March 8, 2021 that VOLVO would not be executing the Services

16  Agreement, despite the Services Agreement being a condition of the Acquisition because Defendant

17  HENRIK GREEN of the Defendant VOLVO CAR GROUP had decided so. Mr. Niclas Gyllenram of

18  AIDEN, then repeatedly tried to contact Defendant HENRIK GREEN through emails and phone calls,

19  and even left a message with Defendant ÖDGÄRD ANDERSSON (GREEN's Domestic

20  Partner/Romantic Interest), in an effort to find out what concerns GREEN harbored and to find a

21  resolution, but Gyllenram received no response.

22      37.     Then, to make matters worse, on April 19, 2021, the AIDEN FOUNDERS were told by

23  Defendants, SANELA IBROVIC of VOLVO CAR GROUP, BOBBYKIN MAKWANA of VOLVO

24  CAR TECHNOLOGY USA LLC and two other Volvo executives on a recorded video conference call

25  that Defendant, VOLVO CAR GROUP's Chief Technology Officer, Defendant HENRIK GREEN, had

26  decided the AIDEN FOUNDERS could not continue employment with Volvo, despite Volvo's

27  previous agreement to allow otherwise, and that Volvo's incubation of AIDEN was no longer possible.

28

VERIFIED COMPLAINT

38.     To date, since the Acquisition Agreements were signed by the Parties, and despite repeated assurances, Volvo has yet to fulfill the Service Agreement and has not delivered the necessary equipment technology, project management and the testing environment necessary for Plaintiff AIDEN to fully develop its products and the sales pipeline due to Volvo's actions.

39.     Volvo's fraudulent behavior does not stop there. In an effort to hamstring Plaintiff AIDEN's ability to create a sales pipeline of potential clients, VOLVO CAR GROUP'S CTO Henrik Green, instructed Volvo's affiliates and subsidiaries to halt all collaboration with AIDEN in providing the testing environment necessary for AIDEN to test its product and develop a sales pipeline as contemplated in the Acquisition Agreements and Services Agreement for which AIDEN was expressly made a third-party beneficiary by paragraph 15 in the Services Agreements.

40.     Specifically, Defendant POLESTAR, a Volvo subsidiary and affiliate, which was on track to utilize and deploy AIDEN's technology on a test basis, suddenly informed AIDEN that they would not be interested in working further with AIDEN.  Inexplicably, demo sessions and discussions of integration of AIDEN's technology were cancelled without explanation and subsequent inquiries were met with radio silence.

41.     AIDEN later learned that VOLVO CAR GROUP'S CTO Henrik Green had given explicit instructions to POLESTAR – and other affiliates within Volvo - to not work with AIDEN in any capacity.

42.     The underlying intent of Volvo's bad faith and fraud was revealed when AIDEN learned that Volvo had started developing its own versions of a similar data enablement and data sharing platforms in direct competition with AIDEN's.  This was done by Volvo despite there being a contractual clause prohibiting Volvo from such development as a condition of the Acquisition Agreements.  Specifically, section 7.2 of the Share Purchase Agreement states:

> 7.2   Non-Competition Agreement. For a period of two years from the date of the Closing, Purchaser and its Affiliates (as defined below) shall not operate a Competitive Business; provided, that nothing in this Section 7.2 shall prohibit Purchaser, or any of its Affiliates or successors and assigns, from (a) acquiring or owning, directly or indirectly, voting securities of any publicly traded Person, (b) conducting any business that Purchaser conducts as of the date hereof so long as it does not utilize the Transferred IP, or (c) utilizing

8

*technology from any Competitive Business for purposes of its vehicle production operations. For purposes of this Section 7.2, (i) "**Competitive Business**" means any other Person engaged, directly or indirectly, in whole or in part, in the commercialization of a data enablement and/or data sharing system that communicates data to and from vehicles using the Android operating system, and (ii) "**Affiliates**" means Volvo Car AB and any Person controlled by Volvo Car AB.*

**See Exhibit 3.**

43.     Thus, it became clear that Volvo engaged in acts to intentionally and fraudulently induce AIDEN to enter into an agreement with Volvo in bad faith in an effort to shutter AIDEN's project while Volvo misappropriated the Data Enablement Platform for its own benefit. This misappropriation was intentional and coordinated to present the Data Enablement Platform as Volvo's own.  This became evident in Volvo's two press releases of June 30, 2021 (**Exhibit 7**) declaring that that their new "cloud-based features" allow developers access to "in-car features such as vehicle sensor data" and "user data" - an almost perfect description of AIDEN's Data Enablement Platform. Mr. HENRIK GREEN, the CTO for Volvo is currently a domestic partner and/or romantically involved with ÖDGÄRD ANDERSSON, who sits on the Board of Directors of VCTF and also the acting CEO of ZENSEACT, thus enabling them to keep close tabs on AIDEN's development and progress. In the words of ÖDGÄRD ANDERSSON herself in one of the June 30 press releases, *"With help from real-life data we can speed up our development processes and go from years to days."*  The Data Enablement Platform has a potential to revolutionize the auto industry and is projected to have a future worth in the billions of dollars – a fact clearly not lost on VOLVO.

44.     Volvo's intentional acts to prevent Volvo affiliates and subsidiaries from working with AIDEN were clearly designed to sabotage and prevent AIDEN from developing its product in the intended and agreed-to testing environment. Volvo's acts were intended to hamstring AIDEN's efforts to develop a sales pipeline for its products within the 18-month window as required by AIDEN under the Acquisition Agreements. Without having a testing environment and access to the appropriate team members at Volvo, AIDEN cannot develop its sales pipeline, a fact of which Volvo is well aware and has used to limit Plaintiff's progress.

45.     Volvo's actions have harmed AIDEN and are particularly egregious because AIDEN was formed at the behest and encouragement of Volvo.  Not only did the founders of AIDEN set up the

1  Delaware corporation at their own expense, but also, pursuant to the Spin-Out Term Sheet executed by

2  Volvo, AIDEN has raised close to $2 million in capital through outside investors, has hired developers,

3  and expended significant resources to develop the intended product, all in reliance on Volvo's false

4  promises.

5       46.    Like the rest of the public, the AIDEN FOUNDERS believed that Volvo was a

6  principled company with values they could trust and believe in.  Unfortunately, trusting Volvo's false

7  image proved to be detrimental to AIDEN.  As further set below, Defendants' conduct has given rise

8  to a myriad of claims and damages to Plaintiff.

9  **FIRST CAUSE OF ACTION**

10  **BREACH OF CONTRACT**

11  **(Against Defendants VOLVO CAR TECHNOLOGY FUND AB, VOLVO CAR**

12  **CORPORATION  and Does 1 through 10, inclusive)**

13       47.    Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby

14  incorporates them by reference as though fully set forth herein.

15       48.    On November 11, 2020, Plaintiff and Defendants executed a "Spin-Out Term Sheet,"

16  (**Exhibit 2**) which was signed by VOLVO CAR TECHNOLOGY FUND AB, and by AIDEN.

17       49.    In the ensuing months, the Parties engaged in contractual negotiations, and on or about

18  March 8, 2021, AIDEN entered into the following additional Agreements with Defendants, which were

19  each signed by Defendant VOLVO CAR TECHNOLOGY FUND AB, and by AIDEN. Each agreement

20  was also signed and witnessed by the AIDEN FOUNDERS.  These agreements include:

21            a.    the Seed Preferred Stock Purchase Agreement (**Exhibit 3**);

22            b.    the Voting Agreement **(Exhibit 4); and**

23            c.    the Intellectual Property Assignment Agreement **(Exhibit 5)**.

24       50.    The agreements set forth as **Exhibits 3 through 5** are collectively referred to as the

25  "Acquisition Agreements."

26       51.    Additionally, the Services Agreement was entered into between Defendants VOLVO

27  CAR TECHNOLOGY FUND AB and VOLVO CAR TECHNOLOGY USA LLC specifically and

28  expressly for the benefit of AIDEN, as referenced in paragraph 15.  (**Exhibit 6**.)

52.     The terms of these Acquisition Agreements,  the Spin-Out Term Sheet, and the Services Agreement are fully incorporated herein by reference.

53.     AIDEN fully performed its obligations under the Acquisition Agreements having raised more than sufficient investor funding and having developed the Data Enablement Platform.

54.     Defendants breached their duties and obligations under the Acquisition Agreements and the Services Agreement (which was expressly contemplated to inure to the benefit of AIDEN), by, *inter alia*:

a.     withholding its obligations to provide the necessary equipment, office space, technology services, research and development support, and a testing environment, which were necessary for Plaintiff to develop its sales pipeline, which were breaches of all of the Acquisition Agreements and the Services Agreement;

b.     intentionally depriving Plaintiff of the ability to deploy and test the data enablement platform in Volvo vehicles, which was a breach of all of the Acquisition Agreements and the Services Agreement;

c.     attempting to terminate the AIDEN FOUNDERS on or about April 19, 2021, which was a breach of all of the Acquisition Agreements and the Services Agreement;

d.     instructing Defendants to halt all contractually agreed upon collaboration efforts with Plaintiff to provide the necessary resources for AIDEN to be able to test its product and develop a sales pipeline as contemplated in the Acquisition Agreements, which were also breaches of all of the Acquisition Agreements and the Services Agreement;

e.     usurping AIDEN's intellectual property and developing its own versions of a similar data enablement and data sharing platform in direct competition with Plaintiff's, which was a breach of the Acquisition Agreements and the Services Agreement; and

f.     maliciously causing Plaintiff to expend time, resources and money to make capital raises, hire labor, and expend significant resources to develop the intended product without compensating Plaintiff, under the false pretenses that Defendants would keep their end of the bargain, which was a breach of all of the Acquisition Agreements and the Services Agreement.

55.     Plaintiff was harmed in an amount to be proven at trial, including but not limited to being unlawfully deprived of the fruits of their money, labor, resources, and the infinitely valuable Intellectual Property they had worked so hard to create and develop, in addition to all the benefits and bargained-for consideration to which they were contractually entitled.

56.     Defendants' conduct was a substantial factor in causing Plaintiff's harm because the contractual breaches and ultimate unilateral termination of the business relationship would not have occurred but for the unlawful inducement described herein.

57.     As a direct, legal and proximate result of the Defendants' breach of the Acquisition Agreements, Plaintiff has suffered, and will continue to suffer substantial general and special damages, including but not limited to, loss of reputation and business relationships and loss of profits in an amount according to proof at the time of trial.

## SECOND CAUSE OF ACTION
### INDUCING BREACH OF CONTRACT
**(Against Defendants VOLVO CAR GROUP, HENRIK GREEN, POLESTAR AUTOMOTIVE USA, INC., BOBBYKIN MAKWANA, SANELA IBROVIC, and Does 1-10, inclusive)**

58.     Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby incorporates them by reference as though fully set forth herein.

59.     Pursuant to the Acquisition Agreements and Services Agreement, Plaintiff AIDEN was to collaborate with Defendant POLESTAR, a Volvo subsidiary and affiliate, and other Volvo subsidiaries and affiliates, to deploy and test AIDEN'S technology and develop its product to aid in ultimately creating a sales pipeline for the Parties' mutual benefit.

60.     However, on or about April 19, 2021 in a recorded conversation among AIDEN FOUNDERS and Defendants, BOBBYKIN MAKWANA and SANELA IBROVIC claimed that after a conversation with Defendant HENRIK GREEN, it was decided that "the incubation [of AIDEN] is no longer possible" and that Volvo would no longer honor the Acquisition Agreements or the Services Agreement.  They also told the AIDEN FOUNDERS that they could no longer work on AIDEN while being employed by Volvo.

61.     Thereafter, on or about June 4, 2021, defendant POLESTAR and other Volvo subsidiaries and affiliates - apropos of nothing - suddenly informed Mr. Gyllenram that they would not be interested in working further with AIDEN.   Inexplicably, demo sessions and discussions of integration of AIDEN'S technology were cancelled without explanation, a subsequent demo session scheduled for September 2, 2021 was also cancelled.   Mr. Hjelm of POLESTAR informed Gyllenram by phone that Dennis Nobelius, the COO of POLESTAR, was instructed by HENRIK GREEN to cease dealing with AIDEN.   Essentially, the contracting Defendants decided to unilaterally terminate the Acquisition Agreements and the Services Agreement, and cease their business relationship with Plaintiff.

62.     Plaintiff AIDEN later learned that Defendant VOLVO CAR GROUP's, Henrik Green, had given explicit instructions to POLESTAR – and ultimately the other Defendants and affiliates of Volvo - to stop working with Plaintiff in any capacity. POLESTAR was entirely complicit with this instruction, and furthered inducement of the contractual breaches by ceasing to do business with Plaintiff.

63.     Defendants were obviously aware of the Acquisition Agreements and AIDEN'S designated role to collaborate with POLESTAR and the other Defendant subsidiaries and affiliates within Volvo, and that such was integral to the development of Plaintiff's product and the ultimate success of the joint venture with Volvo.

64.     In making these explicit instructions, Defendants intended to cause POLESTAR and other Defendant subsidiaries and affiliates within Volvo to cause VOLVO CAR TECHNOLOGY FUND AB and VOLVO CAR CORPORATION to breach the Acquisition Agreements between AIDEN and Defendants, VOLVO CAR TECHNOLOGY FUND AB and VOLVO CAR CORPORATION, by essentially walking away from the entire business relationship.

65.     Plaintiff was harmed in an amount to be proven at trial, including but not limited to being unlawfully deprived of the fruits of their money, labor, resources, and the infinitely valuable Intellectual Property they had worked so hard to create and develop, in addition to all the benefits and bargained-for consideration to which they were contractually entitled.

VERIFIED COMPLAINT

66.     Defendants' conduct was a substantial factor in causing Plaintiff's harm because the contractual breaches and ultimate unilateral termination of the business relationship would not have occurred but for the unlawful inducement described herein.

67.     As a direct, legal and proximate result of the Defendants' breach of its contractual duties and obligations due and owing to Plaintiff, Plaintiff has suffered, and will continue to suffer substantial general and special damages, including but not limited to, loss of reputation and business relationships and loss of profits in an amount according to proof at the time of trial.

<u>**THIRD CAUSE OF ACTION**</u>

**TORTIOUS BREACH OF THE IMPLIED COVENANT OF**

**GOOD FAITH AND FAIR DEALING**

**(Against Defendants VOLVO CAR TECHNOLOGY FUND AB, VOLVO CAR**

**CORPORATION, and Does 1 through 10, inclusive)**

68.     Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby incorporates them by reference as though fully set forth herein.

69.     Implied in every contract, including the Agreement(s) is the covenant of good faith and fair dealing by which the contracting parties are bound. California law recognizes in every contract an implied covenant of good faith and fair dealing. The implied covenant imposes on a contracting party not only a duty to refrain from acting in a manner that frustrates performance of the contract, "but also the duty to do everything that the contract presupposes that he will do to accomplish its purpose." See *Pasadena Live v. City of Pasadena* 114 Cal.App.4th 1089, 1093 (2004).

70.     Defendant VOLVO CAR TECHNOLOGY FUND AB entered into each of the Acquisition Agreements with AIDEN, and Defendant VOLVO CAR CORPORATION entered into the Non-Disclosure Agreement with AIDEN.

71.     Plaintiff has performed all of its obligations required to be performed in accordance with the terms of the Acquisition Agreements.

72.     By failing and refusing to comply with the terms of the Acquisition Agreements, including the Non-Disclosure Agreement, as agreed, Defendants VOLVO CAR TECHNOLOGY FUND AB and VOLVO CAR CORPORATION unfairly interfered with Plaintiff's right to receive the

14

benefits of these agreements.  In particular, VOLVO CAR TECHNOLOGY FUND AB and VOLVO CAR CORPORATION for their own monetary gains, induced AIDEN to develop and create intellectual property at AIDEN's own cost for Defendants' ultimate benefit, including AIDEN's development of the Data Enablement Platform, which Defendants secretly intended to usurp for their own benefit and pecuniary gain.  Furthermore, Defendants promised that they would foster the development of AIDEN's technology by providing office space, Volvo vehicles with which to test and deploy AIDEN's intellectual property and the Data Enablement Platform. Ultimately, however, these inducements by Defendants for AIDEN to enter the Acquisition Agreements never occurred, which Plaintiff later learned was part of a malicious and fraudulent scheme to convert Plaintiff's Intellectual Property and products to these Defendants' own use.  Shortly after AIDEN entered into the Acquisition Agreements, it became clear that Defendants never had any intention of upholding their obligations under the Acquisition Agreements  as  they developed their own business relationships  using the intellectual property misappropriated from AIDEN for Defendants' own monetary gain, at AIDEN's expense.

73.     As a direct, legal and proximate result of Defendants' conduct, Plaintiff has suffered, and will continue to suffer substantial general and special damages, including but not limited to, loss of reputation and business relationships and loss of profits in an amount according to proof at the time of trial.

74.     Plaintiff was harmed in an amount to be proven at trial, including but not limited to being unlawfully deprived of the fruits of their money, labor, resources, and the infinitely valuable Intellectual Property they had worked so hard to create and develop, in addition to all the benefits and bargained-for consideration to which they were contractually entitled.

75.     Defendants' conduct was a substantial factor in causing Plaintiff's harm because the contractual breaches and ultimate unilateral termination of the business relationship would not have occurred but for the unlawful inducement described herein.

76.     AIDEN is informed and believes that the aforementioned conduct of Defendants VOLVO CAR TECHNOLOGY FUND AB and VOLVO CAR CORPORATION, and each of them, was carried out as part of a deliberate and systematic scheme of wrongful misappropriation, conversion

15

and misuse of AIDEN's intellectual property, products, and Data Enablement Platform. Such conduct was oppressive, fraudulent, and malicious, and subjected AIDEN to cruel and unjust hardship in a willful and conscious disregard of their rights, warranting exemplary and punitive damages pursuant to Civil Code Section 3294, for the reasons set forth herein and for at least the following reasons:

a. It was done with the purpose and intent of subjecting AIDEN to the foreseeable risks of losing investment funds, its own monetary investment and resources expended in developing AIDEN and hiring people and being prevented from consummating the business so that AIDEN and its investors could each enjoy the fruits of their personal gains through the establishment of business relationships and sales, which Defendants usurped for their own gains, as set forth above;

b. It was done with the purposeful and intentional design of putting Defendants' own personal interests ahead of the Plaintiff's rights and interests, at the expense of AIDEN's rights to pursue its own business and realize the fruits of its endeavors through the Acquisition Agreements and investor funding, sales and business relationships; and

c. It was done with the purpose and intent of converting, misappropriating and/or misdirecting AIDEN's intellectual property and products, including the Data Enablement Platform, in furtherance of a willful and conscious disregard of AIDEN and the Acquisition Agreements.

## FOURTH CAUSE OF ACTION

### UNFAIR BUSINESS PRACTICES

### (BUSINESS & PROFESSIONS CODE §17200)

### (Against All Defendants and Does 1 – 50, inclusive)

77. Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby incorporates them by reference as though fully set forth herein.

78. California's Unfair Competition Law (the "UCL") defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code § 17200.

79. The UCL imposes strict liability. Plaintiff need not prove that the Defendants intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices – but only that such practices occurred.

VERIFIED COMPLAINT

80.     A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

81.     The Defendants' actions constitute "unfair" business practices because, as alleged herein, Defendants engaged in misleading and deceptive conduct as follows:

        a.      withholding its obligations to provide the necessary equipment, technology services, research and development support, office space and testing environment which were necessary for Plaintiff to develop its sales pipeline;

        b.      intentionally depriving Plaintiff of the ability to deploy and test the data enablement platform in Volvo vehicles;

        c.      attempting to terminate the AIDEN FOUNDERS on or about April 19, 2021;

        d.      instructing Defendants to halt all contractually agreed upon collaboration efforts with Plaintiff to provide the necessary resources for AIDEN to be able to test its product and develop a sales pipeline as contemplated in the Acquisition Agreements;

        e.      usurping AIDEN's intellectual property and Data Enablement Platform in developing Defendants' own versions of a similar data enablement and data sharing platform in direct competition with AIDEN in violation of the Non-Disclosure Agreement; and

        f.      causing Plaintiff to expend time, resources and money to make capital raises, hire labor, and expend significant resources to develop the intended product without Plaintiff being compensated or Defendants keeping their end of the bargain.

82.     AIDEN was harmed in an amount to be proven at trial, including but not limited to being unlawfully deprived of the fruits of their money, labor, resources, and the infinitely valuable Intellectual Property they had worked so hard to create and develop, in addition to all the benefits and bargained-for consideration to which they were contractually entitled.

83.     Defendants' conduct was a substantial factor in causing AIDEN's harm because the contractual breaches and ultimate unilateral termination of the business relationship would not have occurred but for the unlawful inducement described herein.

17

84.     Based upon Defendants' fraudulent business practices, AIDEN is entitled to statutory damages, plus actual damages, court costs and attorneys' fees.

85.     The harm to AIDEN outweighs the utility of the Defendants' practices. There were reasonably available alternatives to further the Defendants' legitimate business interests other than the misleading, deceptive and fraudulent conduct against Plaintiff described herein.

86.     Pursuant to the UCL, AIDEN is entitled to preliminary and permanent injunctive relief and an order that Defendants to cease this unfair competition, as well as disgorgement and restitution to Plaintiff of all Defendants' gains associated with their unfair competition.

87.     As a direct, legal and proximate result of Defendants' conduct, Plaintiff has suffered, and will continue to suffer substantial general and special damages, including but not limited to, loss of reputation and business relationships and loss of profits in an amount according to proof at the time of trial.

### FIFTH CAUSE OF ACTION

### FRAUDULENT MISREPRESENTATION

### (Against All Defendants [Except ZENSEACT and POLESTAR AUTOMOTIVE USA, INC.] and Does 11 – 21, inclusive)

88.     Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby incorporates them by reference as though fully set forth herein.

89.     Defendants made the following material false representations to Plaintiff, which are broadly acknowledged in an email from a concerned employee of the Defendants VOLVO CAR GROUP & VOLVO CAR TECHNOLOGY FUND dated March 11, 2021 to the Defendant MARIA HEMBERG.  These false misrepresentations are as follow:

a.     In October 2020, BOBBYKIN MAKWANA of Defendant VOLVO CAR TECHNOLOGY USA LLC informed Mr. Niclas Gyllenram that AIDEN FOUNDERS would continue to have their "day jobs" with Volvo, while they developed AIDEN, which decision Plaintiff is informed and believes MATS MOBERG of VOLVO CAR GROUP and VOLVO CAR TECHNOLOGY FUND AB had approved. These representations were knowingly false when made, as these Defendants at all times intended to terminate AIDEN's founders once they had taken what they needed from AIDEN.  In

18

1  fact, MAKWANA and IBROVIC informed the AIDEN FOUNDERS on or about April 19, 2021 that

2  they could no longer work for Volvo Cars, while they worked for AIDEN.

3        b.      In November 2020, Pratik Budhdev of Defendant VOLVO CAR

4  TECHNOLOGY FUND AB informed AIDEN FOUNDERS in various meetings that the AIDEN spin-

5  out was formally unanimously approved and that Volvo would unequivocally assign the Data

6  Enablement Platform intellectual property to AIDEN in order to foster development of their product

7  for the Android operating system, which could only be used in Volvo vehicles because Volvo controlled

8  this market supply.

9        c.      In or about December 2020, Budhdev also informed the AIDEN FOUNDERS

10 that Defendants VOLVO CAR GROUP, VOLVO CAR TECHNOLOGY FUND AB, VOLVO CAR

11 CORPORATION, VOLVO CARS TECHNOLOGY USA, would deliver to AIDEN, the equipment,

12 office space, technology and research and development project assistance for AIDEN to develop and

13 deploy Plaintiff's Data Enablement Platform using Volvo vehicles to develop sales, once AIDEN had

14 raised $500,000 in external investor funds.

15       d.      These representations were false because these Defendants surreptitiously

16 intended at all times to convert AIDEN's Intellectual Property for their own pecuniary benefit, which

17 was demonstrated by the following: (1) on or about April 20, 2021 when VOLVO CAR

18 TECHNOLOGY FUND's legal counsel informed AIDEN that the Services Agreement would not be

19 honored; (2) on or about June 30, 2021 Volvo Cars issued a press release that it had developed software

20 for the Android operating system platform for Volvo vehicles uncannily like that of AIDEN's; (3)  in

21 August 2021, AIDEN was informed of multiple commercializing projects using data sharing on the

22 Android platform that AIDEN had essentially developed;  (4) In August 2021, AIDEN was informed

23 by multiple Volvo employees that they were ordered not to work with AIDEN;  (5) In August 2021,

24 IBROVIC and MAKWANA send an email to about 100 employees at Volvo cautioning them not to

25 share information with AIDEN;  (6)  In August 2021, IBROVIC falsely informs her employees that

26 there were no contracts between AIDEN and Volvo and no Non-Disclosure Agreement entered;  and

27 (7)  in or about August 2021, IBROVIC falsely informs AIDEN FOUNDER Gyllenram that she

28

VERIFIED COMPLAINT

"doesn't have one second to spend on AIDEN", despite the Services Agreement expressly stating that R&D support would be provided to AIDEN by Volvo.

These representations were false, as Defendants' intent the whole time was to secretly sabotage AIDEN's efforts in order to usurp AIDEN's intellectual property to secretly develop its own data enablement platform and its own business relationships for Defendants own pecuniary benefits.

90.     And, at the time Defendants made these misrepresentations, they knew they were false, and Defendants concealed this information with the intent that Plaintiff rely on the misrepresentations.

91.     At the time of the Defendants' concealments and misrepresentations, Plaintiff was ignorant of the true facts, including Defendants' secret intention to develop its own data enabling platform using Plaintiff's intellectual property.  Plaintiff could not, in the exercise of reasonable diligence, have discovered these acts of fraud due to the Defendants' concealments and in fact did not realize the fraud until six months after the Acquisition Agreements were signed, when Defendants began to obstruct Plaintiff's attempts to deploy and test its Data Enabling Platform in Volvo vehicles, as had been agreed.  Based on Defendants' representations and Plaintiff's principals' employment with Volvo, which caused them to repose trust in the truth and accuracy of Plaintiff's representations, and that Defendants would deal with Plaintiff in good faith, Plaintiff reasonably relied on these representations.  If Plaintiff had known of the actual intent of the Defendants, Plaintiff would not have executed any of the Acquisition Agreements or expended money and resources to perform its obligations under these agreements, all of which were entered into at Defendants' bequest.

92.     Plaintiff was harmed in an amount to be proven at trial, including but not limited to being unlawfully deprived of the fruits of their money, labor, resources, and the infinitely valuable Intellectual Property they had worked so hard to create and develop, in addition to all the benefits and bargained-for consideration to which they were contractually entitled.

93.     Defendants' conduct was a substantial factor in causing Plaintiff's harm because the contractual breaches and ultimate unilateral termination of the business relationship would not have occurred but for the unlawful inducement described herein.

94.     AIDEN is also informed and believes that the aforementioned conduct of Defendants, and each of them, was carried out as part of a deliberate and systematic scheme of wrongful

VERIFIED COMPLAINT

1   misappropriation, conversion and misuse of AIDEN's intellectual property, products, and Data

2   Enablement Platform.  Such conduct was oppressive, fraudulent, and malicious, and subjected AIDEN

3   to cruel and unjust hardship in a willful and conscious disregard of their rights, warranting exemplary

4   and punitive damages pursuant to Civil Code Section 3294, for the reasons set forth herein and for at

5   least the following reasons:

6           a.      It was done with the purpose and intent of subjecting AIDEN to the foreseeable

7   risks of losing investment funds, its own monetary investment and resources expended in developing

8   AIDEN and hiring people and being prevented from consummating the business so that AIDEN and

9   its investors could each enjoy the fruits of their personal gains through the establishment of business

10  relationships and sales, which Defendants usurped for their own gains, as set forth above;

11          b.      It was done with the purposeful and intentional design of putting Defendants'

12  own personal interests ahead of the Plaintiff's rights and interests, at the expense of AIDEN's rights to

13  pursue its own business and realize the fruits of its endeavors through the Acquisition Agreements and

14  investor funding, sales and business relationships; and

15          c.      It was done with the purpose and intent of converting, misappropriating and/or

16  misdirecting AIDEN's intellectual property and products, including the Data Enablement Platform, in

17  furtherance of a willful and conscious disregard of AIDEN and the Acquisition Agreements.

18                            **SIXTH CAUSE OF ACTION**

19              **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**

20      **(Against VOLVO CAR GROUP; VOLVO CAR TECHNOLOGY USA LLC; ZENSEACT;**

21          **POLESTAR AUTOMOTIVE USA, INC.; HÅKAN SAMUELSSON;  ÖDGÄRD**

22      **ANDERSSON;  HENRIK GREEN;  MARIA HEMBERG;  MATS MOBERG; SANELA**

23      **IBROVIC; PÄR ARVIDSSON; BOBBYKIN MAKWANA, and Does 22 – 32, inclusive)**

24          95.     Plaintiff repeats and realleges each and every allegation above as if set forth in full

25  herein. Wherever the incorporated allegations conflict with the allegations of this cause of action, they

26  are alleged in the alternative.

27          96.     Defendants intentionally interfered with the Acquisition Agreements entered into

28  between AIDEN and Defendants VOLVO CAR TECHNOLOGY FUND AB and VOLVO CAR

21

1    CORPORATION.

2    97.    Defendants VOLVO CAR GROUP; VOLVO CAR TECHNOLOGY USA LLC;

3    ZENSEACT; POLESTAR; HÅKAN SAMUELSSON; ÖDGÄRD ANDERSSON; HENRIK GREEN;

4    MARIA HEMBERG;  MATS MOBERG; SANELA IBROVIC; PÄR ARVIDSSON; BOBBYKIN

5    MAKWANA, knew of the Acquisition Agreements and the Services Agreement.

6    98.    Defendants intentionally obstructed AIDEN from receiving the benefits of the

7    Acquisition Agreements and the Services Agreement for which AIDEN was expressly named as a third

8    party beneficiary, when Defendant, HENRIK GREEN, fraudulently informed other Defendants,

9    including but not limited to POLESTAR, to cease working with AIDEN and cease providing Volvo

10   vehicles for AIDEN to test and deploy its Data Enablement Platform.    These aforementioned

11   Defendants, for their own monetary gains, induced AIDEN to develop and create intellectual property

12   at AIDEN's own cost for Defendants' ultimate benefit, including AIDEN's development of the Data

13   Enablement Platform, which these Defendants collectively and secretly intended to usurp for their own

14   benefit and pecuniary gain.   Furthermore, these Defendants promised that they would foster the

15   development of AIDEN's technology by providing office space, Volvo vehicles with which to test and

16   deploy AIDEN's intellectual property and the Data Enablement Platform these Defendants prevented

17   and obstructed from occurring as follows:

18        a.    On or about April 20, 2021 when VOLVO CARS's legal counsel informed

19   AIDEN that the Services Agreement would not be honored because HENRIK GREEN had decided so;

20        b.    On or about June 30, 2021 Volvo Cars issued a press release that it had

21   developed software for the Android operating system platform for Volvo vehicles uncannily like that

22   of AIDEN's;

23        c.    On or about June 4, 2021, defendant POLESTAR and other Volvo subsidiaries

24   and affiliates - apropos of nothing - suddenly informed AIDEN that they would not be interested in

25   working further with AIDEN.  Inexplicably, demo sessions and discussions of integration of AIDEN'S

26   technology were cancelled without explanation, a subsequent demo session scheduled for September

27   2, 2021 was also cancelled.  Mr. Hjelm of POLESTAR informed Gyllenram by phone that DENNIS

28

_____

1  NOBELIUS, the COO of POLESTAR, was instructed by HENRIK GREEN to cease dealing with

2  AIDEN;

3       d.      In August 2021, AIDEN was informed of multiple commercializing projects

4  using data sharing on the Android platform that AIDEN had essentially developed;

5       e.      In August 2021, AIDEN was informed by multiple Volvo employees that they

6  were ordered not to work with AIDEN;

7       f.      In August 2021, IBROVIC and MAKWANA send an email to about 100

8  employees at Volvo cautioning them not to share information with AIDEN;

9       g.      In August 2021, IBROVIC falsely informs her employees that there were no

10  contracts between AIDEN and Volvo and no Non-Disclosure Agreement entered;  and (7)  in or about

11  August 2021, IBROVIC falsely informs AIDEN FOUNDER Gyllenram that she "doesn't have one

12  second to spend on AIDEN", despite the Services Agreement expressly stating that R&D support would

13  be provided to AIDEN by Volvo.

14       99.    Based on the aforementioned conduct, these Defendants intended to disrupt the

15  performance of the Acquisition Agreements.

16       100.   Plaintiff was harmed in an amount to be proven at trial, including but not limited to

17  being unlawfully deprived of the fruits of their money, labor, resources, and the infinitely valuable

18  Intellectual Property they had worked so hard to create and develop, in addition to all the benefits and

19  bargained-for consideration to which they were contractually entitled.

20       101.   Defendants' conduct was a substantial factor in causing Plaintiff's harm because the

21  contractual breaches and ultimate unilateral termination of the business relationship would not have

22  occurred but for the unlawful inducement described herein.

23       102.   AIDEN is informed and believes that the aforementioned conduct of Defendants and

24  each of them, was carried out as part of a deliberate and systematic scheme of wrongful

25  misappropriation, conversion and misuse of AIDEN's intellectual property, products, and Data

26  Enablement Platform.   Such conduct was oppressive, fraudulent, and malicious, and subjected AIDEN

27  to cruel and unjust hardship in a willful and conscious disregard of their rights, warranting exemplary

28

VERIFIED COMPLAINT

and punitive damages pursuant to Civil Code Section 3294, for the reasons set forth herein and for at least the following reasons:

a.   It was done with the purpose and intent of subjecting AIDEN to the foreseeable risks of losing investment funds, its own monetary investment and resources expended in developing AIDEN and hiring people and being prevented from consummating the business so that AIDEN and its investors could each enjoy the fruits of their personal gains through the establishment of business relationships and sales, which Defendants usurped for their own gains, as set forth above;

b.   It was done with the purposeful and intentional design of putting Defendants' own personal interests ahead of the Plaintiff's rights and interests, at the expense of AIDEN's rights to pursue its own business and realize the fruits of its endeavors through the Acquisition Agreements and investor funding, sales and business relationships; and

c.   It was done with the purpose and intent of converting, misappropriating and/or misdirecting AIDEN's intellectual property and products, including the Data Enablement Platform, in furtherance of a willful and conscious disregard of AIDEN and the Acquisition Agreements.

## SEVENTH CAUSE OF ACTION

### NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

### (Against Defendants VOLVO CAR GROUP; VOLVO CAR TECHNOLOGY USA LLC; ZENSEACT; POLESTAR AUTOMOTIVE USA, INC.; HÅKAN SAMUELSSON; ÖDGÄRD ANDERSSON;  HENRIK GREEN;  MARIA HEMBERG;  MATS MOBERG; SANELA IBROVIC; PÄR ARVIDSSON; BOBBYKIN MAKWANA, and Does 22 – 32, inclusive)

103.   Plaintiff repeats and realleges each and every allegation above as if set forth in full herein. Wherever the incorporated allegations conflict with the allegations of this cause of action, they are alleged in the alternative.

104.   Defendants VOLVO CAR GROUP; VOLVO CAR TECHNOLOGY USA LLC; ZENSEACT; POLESTAR; HÅKAN SAMUELSSON;  ÖDGÄRD ANDERSSON;   HENRIK GREEN;  MARIA HEMBERG;  MATS MOBERG; SANELA IBROVIC; PÄR ARVIDSSON; BOBBYKIN MAKWANA, negligently interfered with AIDEN's economic relationship with Defendants VOLVO CAR TECHNOLOGY FUND AB and VOLVO CAR CORPORATION, as set

VERIFIED COMPLAINT

forth in the Acquisition Agreements above.

105.    Defendants knew or should have known that the economic relationship between Plaintiff, on the one hand, and Defendant VOLVO CAR TECHNOLOGY FUND AB, on the other hand, would be disrupted if Defendants failed to act with reasonable care with respect to the obligations set forth in the Acquisition Agreements by negligently interfering with the Acquisition when Defendant HENRIK GREEN, fraudulently informed other Defendants, including but not limited to POLESTAR, to cease working with AIDEN and cease providing Volvo vehicles for AIDEN to test and deploy its Data Enablement Platform.  These aforementioned Defendants, for their own monetary gains, failed to exercise reasonable care in inducing AIDEN to develop and create intellectual property at AIDEN's own cost for Defendants' ultimate benefit, including AIDEN's development of the Data Enablement Platform, which these Defendants obtained a monetary benefit.  Furthermore, these Defendants owed AIDEN a duty to foster the development of AIDEN's technology by providing office space, Volvo vehicles with which to test and deploy AIDEN's intellectual property and the Data Enablement Platform these Defendants prevented and obstructed from occurring.

106.    The economic relationship between Plaintiff, on the one hand, and Defendants VOLVO CAR TECHNOLOGY FUND AB and VOLVO CAR CORPORATION was disrupted such that AIDEN did not receive any of the contracted benefits of the Acquisition Agreements, and AIDEN was substantially harmed by Defendants' actions in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION

### VIOLATION OF THE CARTWRIGHT ACT

### (Against All Defendants and Does 1 – 50, inclusive)

107.    Plaintiff re-alleges and incorporates by reference each and every paragraph above, as though fully set forth in full.

108.    The Cartwright Act (Business & Professions Code §16700, *et seq*.) is the primary California state antitrust law prohibiting anti-competitive activity.  It provides, in part, that every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

109.    Plaintiff is informed and believes that Defendants VOLVO CAR GROUP AND

25

POLESTAR have the only vehicles in the automotive industry running a full Android operating system. Thus, Defendants control the production and supply of such vehicles in the global automotive market. The agreed-upon purpose behind the creation of AIDEN was for AIDEN to quickly develop, produce and ready for immediate introduction in the marketplace AIDEN's Data Enablement Platform  because AIDEN had an 18-month lead ahead of anyone else in the automotive industry for its Android-based product. Defendants led AIDEN to reasonably believe that Defendants would provide the agreed-upon equipment, technology services, research and development support, office space and testing environment in good faith and in fulfillment of its contractual and ethical duties, particularly given the unanimous Board of Director approval for AIDEN's creation and spin-out in November 2020, and the subsequently negotiated Acquisition Agreements and Services Agreement.

110.    However, because Defendants control the production and supply of all vehicles running on a full Android operating system, Defendants were able to manipulate AIDEN into creating its unique and innovative Data Enablement Platform specifically for Defendants' benefit, thereby creating their own monopoly of this technology and Intellectual Property when they misappropriated it for their own use and usurped Plaintiff's bargained-for opportunities, in restraint of AIDEN's ability to conduct any trade, business or interstate commerce.

111.    Plaintiff is informed and believes and thereon alleges that Defendants, by and through their officers, directors, employees, agents, or other representatives and their co-conspirators have stolen their Intellectual Property and technology, particularly Plaintiff's Data Enabling Platform, and unlawfully obstructed Plaintiff's use of Defendants' equipment, office space and ability to test its products in order to solicit third parties and enter into business relationships with these third parties using Plaintiff's technology and products.  In doing so, Defendants unlawfully obstructed and restrained Plaintiff's ability to engage in fair trade and perform under the Acquisition Agreements and otherwise realize the fruits of their blood, sweat and tears.  Defendants' conduct violates Business & Professions Code §16700, *et seq*.

112.    Because Defendants unfairly and illegally prevented AIDEN from receiving the benefits of the Acquisition Agreements, there has been and will be a substantial effect on AIDEN's ability to conduct interstate commerce in that Defendants will continue to  collectively obstruct AIDEN from

VERIFIED COMPLAINT

being able to develop its Intellectual Property and product technology, through Defendants' continued efforts to prevent AIDEN from testing equipment and developing its products, and otherwise ceasing their business relationship in furtherance of their restraint of AIDEN's pursuit of livelihood.

113.    Plaintiff was harmed, and Defendants threaten to further harm the public interest, including Plaintiff's interest, and Defendants continue to be an unreasonable restraint of trade that is unlawful under the Cartwright Act.

114.    Plaintiff is entitled to recover its costs and reasonable attorneys' fees incurred herein, as the Cartwright Act contains a unilateral fee-shifting provision that allows an award of attorney fees to a prevailing plaintiff but not to a prevailing defendant. (§ 16750(a).) Plaintiff is further entitled to an injunction barring Defendants from further interruption of Plaintiff's business interests and preventing and restraining Defendants from engaging in the violations alleged herein as well as similar conduct in the future.

115.    Plaintiff was harmed in an amount to be proven at trial, including but not limited to being unlawfully deprived of the fruits of their money, labor, resources, and the infinitely valuable Intellectual Property they had worked so hard to create and develop, in addition to all the benefits and bargained-for consideration to which they were contractually entitled.

116.    Defendants' conduct was a substantial factor in causing Plaintiff's harm because the contractual breaches and ultimate unilateral termination of the business relationship would not have occurred but for the unlawful inducement described herein.

117.    AIDEN is informed and believes that the aforementioned conduct of Defendants, and each of them, was carried out as part of a deliberate and systematic scheme of wrongful misappropriation, conversion and misuse of AIDEN's intellectual property, products, and Data Enablement Platform in an unfair and illegal restraint of their ability to conduct business and commerce. Such conduct was oppressive, fraudulent, and malicious, and subjected the AIDEN to cruel and unjust hardship in a willful and conscious disregard of their rights, warranting exemplary and punitive damages pursuant to Civil Code Section 3294, for the reasons set forth herein and for at least the following reasons:

1        a.     It was done with the purpose and intent of subjecting AIDEN to the foreseeable

2 risks of losing investment funds, its own monetary investment and resources expended in developing

3 AIDEN and hiring people and being prevented from consummating the business so that AIDEN and

4 its investors could each enjoy the fruits of their personal gains through the establishment of business

5 relationships and sales, which Defendants usurped for their own gains, as set forth above;

6        b.     It was done with the purposeful and intentional design of putting Defendants'

7 own personal interests ahead of the Plaintiff's rights and interests, at the expense of the AIDEN's rights

8 to pursue its own business, conduct interstate commerce and realize the fruits of its endeavors through

9 the Acquisition Agreements and investor funding, sales and the development of business relationships;

10 and

11        c.     It was done with the purpose and intent of restraining and obstructing AIDEN'S

12 pursuit of its business and interstate commerce by Defendants' converting, misappropriating and/or

13 misdirecting AIDEN's intellectual property and products, including the Data Enablement Platform, in

14 furtherance of a willful and conscious disregard of AIDEN and the Acquisition Agreements in

15 Defendants' pursuit of their own business relationships.

16 **NINTH CAUSE OF ACTION**

17 **CONVERSION**

18 **(Against All Defendants and Does 1-50, inclusive)**

19      118.    Plaintiff realleges and incorporates by reference all of the allegations contained in the

20 preceding paragraphs of the Complaint as though fully set forth herein.

21      119.    Plaintiff is and at all times herein mentioned was, the rightful owner of all

22 misappropriated intellectual property rights and assets as described herein, including the Data Enabling

23 Platform, which Defendants unlawfully misappropriated and secretly converted to create their own data

24 enabling platform after inducing AIDEN to develop its own products and then stealing the intellectual

25 property developed by AIDEN for their unlawful use through their own  platform, which these

26 Defendants used to develop their own business relationships for their own pecuniary benefit.

27      120.    Defendants intentionally, knowingly and substantially interfered with Plaintiff's rights

28 to their own intellectual property and products by engaging in the misappropriation and tortious conduct

28

described herein and in creating Defendants' own business relationships from Plaintiff's intellectual property and Data Enabling Platform.

121.    Plaintiff was harmed in an amount to be proven at trial, including but not limited to being unlawfully deprived of the fruits of their money, labor, resources, and the infinitely valuable Intellectual Property they had worked so hard to create and develop, in addition to all the benefits and bargained-for consideration to which they were contractually entitled.

122.    Defendants' conduct was a substantial factor in causing Plaintiff's harm because the contractual breaches and ultimate unilateral termination of the business relationship would not have occurred but for the unlawful inducement described herein.

123.    AIDEN is informed and believes that the aforementioned conduct of Defendants and each of them, was carried out as part of a deliberate and systematic scheme of wrongful misappropriation, conversion and misuse of AIDEN's intellectual property, products, and Data Enablement Platform.   Such conduct was oppressive, fraudulent, and malicious, and subjected AIDEN to cruel and unjust hardship in a willful and conscious disregard of their rights, warranting exemplary and punitive damages pursuant to Civil Code Section 3294, for the reasons set forth herein and for at least the following reasons:

a.      It was done with the purpose and intent of subjecting AIDEN to the foreseeable risks of losing investment funds, its own monetary investment and resources expended in developing AIDEN and hiring people and being prevented from consummating the business so that AIDEN and its investors could each enjoy the fruits of their personal gains through the establishment of business relationships and sales, which Defendants usurped for their own gains, as set forth above;

b.      It was done with the purposeful and intentional design of putting Defendants' own personal interests ahead of the Plaintiff's rights and interests, at the expense of AIDEN's rights to pursue its own business and realize the fruits of its endeavors through the Acquisition Agreements and investor funding, sales and business relationships; and

c.      It was done with the purpose and intent of converting, misappropriating and/or misdirecting AIDEN's intellectual property and products, including the Data Enablement Platform, in furtherance of a willful and conscious disregard of AIDEN and the Acquisition Agreements.

VERIFIED COMPLAINT

**TENTH CAUSE OF ACTION**

**MISAPPROPRIATION OF INTELLECTUAL PROPERTY**

**(Against All Defendants and Does 1-50, inclusive)**

124.    Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs of the Complaint as though fully set forth herein.

125.    AIDEN, by virtue of having been assigned the Intellectual Property set forth in the Patent Assignment Agreement (**Exhibit 5**), was  the rightful owner of the "Automotive Data Sharing Platform."

126.    By virtue of the conduct set forth above, Defendants have willfully and without authorization converted and usurped AIDEN's Intellectual Property set forth in the Patent Assignment Agreement for commercial purposes and for its own monetary benefit to AIDEN's detriment.

127.    Defendants' unauthorized conversion and usurping of AIDEN's Intellectual Property constitutes commercial misappropriation in violation of Sections 3426 and 3344 of the California Civil Code.

128.    As a direct, legal and proximate result of Defendants' conduct, Plaintiff has suffered, and will continue to suffer substantial general and special damages, including but not limited to, loss of reputation and business relationships and loss of profits in an amount according to proof at the time of trial.

129.    Defendants have further been unjustly enriched by their misappropriation of AIDEN's Intellectual Property. Accordingly, AIDEN is also entitled to restitution of all income, profits, and other benefits resulting from Defendants' conduct, in an amount to be determined according to proof at trial.

130.    AIDEN is informed and believes that the aforementioned conduct of Defendants and each of them, was carried out as part of a deliberate and systematic scheme of wrongful misappropriation, conversion and misuse of AIDEN's intellectual property, products, and Data Enablement Platform. Such conduct was oppressive, fraudulent, and malicious, and subjected AIDEN to cruel and unjust hardship in a willful and conscious disregard of their rights, warranting exemplary and punitive damages pursuant to Civil Code Section 3294, for the reasons set forth herein and for at least the following reasons:

VERIFIED COMPLAINT

a.      It was done with the purpose and intent of subjecting AIDEN to the foreseeable risks of losing investment funds, its own monetary investment and resources expended in developing AIDEN and hiring people and being prevented from consummating the business so that AIDEN and its investors could each enjoy the fruits of their personal gains through the establishment of business relationships and sales, which Defendants usurped for their own gains, as set forth above;

b.      It was done with the purposeful and intentional design of putting Defendants' own personal interests ahead of the Plaintiff's rights and interests, at the expense of AIDEN's rights to pursue its own business and realize the fruits of its endeavors through the Acquisition Agreements and investor funding, sales and business relationships; and

c.      It was done with the purpose and intent of converting, misappropriating and/or misdirecting AIDEN's intellectual property and products, including the Data Enablement Platform, in furtherance of a willful and conscious disregard of AIDEN and the Acquisition Agreements.

## ELEVENTH CAUSE OF ACTION

### PRELIMINARY AND PERMANENT INJUNCTION

#### (Against All Defendants and Does 1-50, inclusive)

131.    Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs of the Complaint as though fully set forth herein.

132.    The wrongful conduct of Defendants in  misappropriating Plaintiff's Intellectual Property, including the Data Enablement Platform, and creating their own platform using that technology for their own commercial purposes, will continue to cause great and irreparable injury to AIDEN, not only because it has damaged AIDEN to the tune of several million dollars – and has deprived AIDEN's current and future investors of their bargained-for opportunities which has cost them several million dollars - but because it destroys AIDEN's very purpose and reason for existence.  As such, irreparable harm will necessarily occur if such conduct on the part of Defendants is permitted to continue.

133.    Accordingly, Plaintiff petitions this Court to issue temporary, preliminary, and permanent injunctive relief against Defendants forever enjoining such conduct.

//

VERIFIED COMPLAINT

1

## **PRAYER FOR RELIEF**

2      **WHEREFORE**, Plaintiff prays for judgment against Defendants, as follows:

3      1.      For the First, Second, Third, Fourth, Fifth, Sixth, Eighth, Ninth and Tenth Causes of

4    Action:   general damages, special damages, compensatory damages, and consequential damages,

5    according to proof at trial;

6      2.      For the Third, Fourth, Fifth, Sixth, Eighth, Ninth and Tenth Causes of Action, and each

7    of them:  punitive damages, according to proof at trial; For the Eighth Cause of Action:

8                    (a)      The Court adjudge and decree that Defendants' conduct constitutes an illegal

9                             restraint of trade and commerce in violation of the Cartwright Act;

10                   (b)      The Court adjudge and decree that Defendants' agreement and conspiracy to

11                            interfere with Plaintiff's business constitutes an illegal restraint of trade and

12                            commerce in violation of the Cartwright Act;

13                   (c)      that Defendants be permanently enjoined and restrained from establishing any

14                            similar agreement unreasonably restricting Plaintiff from establishing business

15                            relationships as contemplated in the Acquisition Agreements; and,

16                   (d)      Plaintiff be awarded statutory damages and attorney's fees.

17      3.      For the Eleventh Cause of Action: For an immediate preliminary and permanent

18    injunction forever enjoining the use of Plaintiff's Intellectual Property, including the Data Enablement

19    Platform, for any purpose.

20

## **AS TO ALL CAUSES OF ACTION**

21      4.      For costs of suit herein;

22      5.      For such other and further relief as the Court deems necessary.

23    Dated:   October 15, 2021                    K&L LAW GROUP, P.C.

24

25                                                _____
                                                   Marc Lazo
26                                                 Attorneys for Plaintiff AIDEN AUTOMOTIVE
                                                   TECHNOLOGIES, INC.
27

28

VERIFIED COMPLAINT

## VERIFICATION

**STATE OF CALIFORNIA**
**COUNTY OF SANTA CLARA**

I, SYED SAIFULLAH, have read the foregoing **VERIFIED COMPLAINT** and know its contents.

☐      I am a party to this action.  The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☒      I am ☒ an Officer ☐ a partner of **AIDEN AUTOMOTIVE TECHNOLOGIES, INC., a Delaware corporation,** a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason.

         ☐      I am informed and believe, and on that ground allege that the matters stated in the foregoing document are true.

         ☐      The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☐      I am one of the attorneys for _____ a party to this action.  Such party is absent from the county of aforesaid where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason.  I am informed and believe, and on that ground allege that the matters stated in the foregoing document are true.

Executed on October  15, 2021, at _____, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.


SYED SAIFULLAH
_____          _____
Type or Print Name                                      Signature

33

VERIFIED COMPLAINT

# EXHIBIT 1

**Subject:**     The Facts Surrounding Project Aiden

**Date:**        Thursday, 11 March 2021 at 01:11:50 Central European Standard Time

**From:**        Millien, Raymond

**To:**          Hemberg, Maria

**BCC:**         Andersson, Emma (PX), Lai, Sharon (A), Budhdev, Pratik, Arvidsson, Pär

**Attachments:** Exh A.pdf, Exh B.pdf

Maria,

I think categorizing the Project Aiden transaction as something "fishy" going on in Silicon Valley mixes apples and oranges.  This has nothing to do with HG's "clean up" of the SV office.  To the contrary, at all times, all the relevant stakeholders in VCTF, Tax, PX, and R&D were fully aware of the transaction and its details, and were fully supportive of it as a "pilot" exercise. The conduct of the VCTF has been fully transparent, ethical, and above board.

To be more clear, the **facts** are as follows:

1.   On or about 18 Aug 2020, the first meeting about Project Aiden is held with **Ödgärd Andersson, Patrik Bengtsson, Sanela Ibrovic, Bobbykin Makwana** and the three Aiden Co-Founders: **Syed Mubeen Saifullah, Niclas Gyllenram, and Jonas Fenn.** It was suggested that Niclas follow up with **Martin Kristensson** to solicit feedback on the idea of a spin-out and if this makes sense.

2.   On 24 Sep. 2020, the VCTF Board decided in a meeting that if R&D approved any spin-outs that VCTF could potentially invest and instructed **Ray** to find a way to make it work under the existing VCTF and VCC legal structures and corporate policies.

3.   On or about Sep 25, 2020, a follow-up meeting took place with **Patrik Bengtsson, Martin Kristensson, Jonas Ronnkvist, Sanela Ibrovic, Bobbykin Makwana, Ödgärd Andersson, Alena Lshkova, and Aiden Co-Founders**. It was concluded that VCTF should investigate a spin-out so other OEMs would adopt the tech and if/how VCTech in Sunnyvale can conduct an internal PoC of the idea.

4.   On 1 Oct. 2020, Ray had a meeting with **Monika Almen** (Global Tax Director) and **Johan Jedeur-Palmgren** (PX Göteborg, Global Comp & Benefits) and got approval to move forward with the Aiden transaction as proposed when R&D approved.

5.   On 2 Oct. 2020, Ray had a meeting with **Allyse Scelfo** (PX, Total Rewards, Volvo Cars USA) and got approval to move forward with the transaction if R&D approved.

6.   On 2 Oct. 2020, Ray followed up his meeting with **Allyse**, summarized their conversation and shared the written opinion from outside California Employment Counsel (Reed Smith LLP) raising no "red flags" about the proposed transaction.

7.   On 5 Oct. 2020, **Allyse** confirmed in an email that she saw no issues with the proposed transaction.

8.   On 7 Oct. 2020, Ray asked the VCTF to formally approve the proposed transaction where the three Aiden founders would keep their "day jobs." This was done via an email to: **Joakim Alpsten Ödgärd Andersson, Pär Arvidsson, Maria Hemberg, Mårten Levenstam, and Mats Moberg.** <u>See Exhibit A.</u>

9.   On 8 Oct. 2020, **Pär Arvidsson** and **Bobbykin** had a discussion where Bobbykin expressed concerns about the timing of a spin-out. From his perspective, it would have made more sense to spend some additional time (e.g., 1-3 months) to create a proof of concept before spinning this out.

10. On or about 21 Oct 2020, **Patrik Bengtsson** (VP, SW) sent an email to **Mats Moberg**

informing him that both his and **Bobbykin Makwana** recommend spinning project Aiden out of Volvo as there were no resources available with the right capabilities and experience to perform a PoC study **Mats Moberg** replied and agreed.

11. On or about 22 Oct. 2020, **Bobbykin** informed **Niclas** of the decision from Mats Moberg to spin out Aiden.

12. On 28 Oct. 2020, **Pär Arvidsson** informed the VCTF Board that after discussions with R&D it was concluded that there were no resources available with the right capabilities and experience to perform a PoC study, and **Mats, Patrik Bengtsson and Bobbykin** agreed the spin-out as Ray proposed was the best way forward.

13. On 29 Oct. 2020, Pär Arvidsson as the chair of the VCTF Board tallied all the (unanimous) votes and gave Ray permission to move forward via email.

14. On Nov. 4, 2020, after the email vote, **Daniel Karlson** (Legal Counsel for VCTF) prepared official board minutes to confirm the email vote to approve the transaction.

15. On 12 Nov 2020, VCTF and Aiden signed the Term Sheet. (**Niclas** then made **Bobbykin** aware of this during his regular 1:1 meeting. And, since then, Niclas has continuously kept Bobbykin updated of Aiden's progress in their  regular 1:1 meetings which are scheduled bi-weekly.

16. From 4 Nov. 2020 to 22 Dec. 2020, each board member (**Joakim Alpsten Ödgärd Andersson, Pär Arvidsson, Maria Hemberg, Mårten Levenstam, and Mats Moberg**) signed the official meeting minutes as shown in Exhibit B approving the transaction.

17. On 8 Jan 2021, **Niclas** and **Bobbykin** have a 1:1. Niclas explained that Aiden has raised the required funds and will initiate work. Niclas updates Bobbykin on the work that three Aiden Co-Founders have been doing. During this meeting Bobbykin expressed concern that he would have to back-fill positions for the founders. Niclas proposed a 5-month lead time before any Aiden Co-Founder would departs Volvo Cars. Bobbykin agreed.

Given the above, VCC at all times concluded the Aiden idea was not something we were **not** willing to fund and pursue.  By agreeing to the spin-out we also waived any conflict-of-interests claims against the founders. Thus, not honoring our agreement with Aiden at this point obviously raises significant legal risks for VCTech, VCTF and VCC.

I personally think the "noise" surrounding this transaction is the result of certain parties never expecting the VCTF to figure out how to do this transaction and never expecting that the three founders would be successful in raising US$750k based on a single patent application filed by the VCC IP Dept.

I am happy to discuss this live with anyone who feels otherwise.

Kind regards / Med vänlig hälsning / 美好的祝福

**Raymond Millien**
Chief IP Officer & MD of Volvo Cars Tech Fund
**VOLVO CAR GROUP**
+46.72.888.8687

---

**From:** Maria Hemberg <maria.hemberg@volvocars.com>
**Date:** Wednesday, 10 March 2021 at 20:35
**To:** Raymond Millien <raymond.millien@volvocars.com>
**Subject:** Fwd: NG

I really need your support to get the fact right here.

EXHIBIT 2

DocuSign Envelope ID: 8FDE0A36-C87D-43BD-8517-EEF3F138A956

**V O L V O**

Raymond Millien
Managing Director
+46.72.888.8687
raymond.millien@volvocars.com

## SPIN-OUT TERM SHEET

*This Term Sheet is intended for discussion purposes only and causes no obligation of any party to enter into any transaction.*

### BACKGROUND

A.  The Founders (defined below), as employees of Volvo Cars Technology USA LLC ("VC Tech"), have invented an automotive data sharing platform known as "Project AIDEN" as described in Exhibit A.

B.  It was agreed by the management of VC Tech and that of its corporate parent Volvo Cars Corp. ("VCC"), that Project AIDEN was not within the current technology roadmap of the company and that there are no existing resources available with the right capabilities and experience to perform a proof of concept study on the relevant technology.

C.  VC Tech and VCC have agreed to allow the employees to spin out Project AIDEN into a new startup company, with Volvo Cars Technology Fund AB – its corporate venture capital arm – holding a minority share of such startup company and entering into agreements in relation thereto, all on the principle terms and conditions as summarized herein.

| | |
|---|---|
| **Entity:** | A newly-formed, USA-based company ("**NewCo**"). |
| **Parties:** | ● Volvo Car Technology Fund AB ("**VCTF**")<br>● Current Volvo Cars US R&D Center employees Syed Mubeen Saifullah, Niclas Gyllenram, and Jonas Fenn (collectively, "**Founders**") |
| **Transaction:** | The outline of this transaction is attached as Exhibit B |
| **NewCo Purpose/Operations:** | Research, develop, test, and commercialize the Automotive Intelligent Data Enablement SaaS ("**Project AIDEN**") intellectual property developed by Founders during their employment. |

---

**VOLVO CAR TECHNOLOGY FUND AB**
SE-405 31 Göteborg
Sweden
volvocars.com

Registered Office Göteborg | Sweden
Registration No. 556887-5760

DocuSign Envelope ID: 8FDE0A36-C87D-43BD-8517-EEE3F138A956

| | |
|---|---|
| **Agreements:** | • Formation and investor documents for NewCo. <br> • *Service Agreement* between VCTF and NewCo for providing incubations services for one year, to include: <br>     ○ Office Space and Desk Area <br>     ○ After-hours big and mini rig access <br>     ○ After-hours car access <br>     ○ IT-related services |
| **Founder's Obligations:[1]** | 1. Raise no less than US$500,000 in capital from additional third-party investors identified and closed by Founders ("**Investors**") (with VCTF approval) within 120 days of execution of this Term Sheet (the "**Initial Capitalization**") <br> 2. Completion and delivery to VCTF of an acceptable business plan <br> 3. Promote and found NewCo <br> 4. Only "after-hours" work at NewCo <br> 5. Grant of Tag-along/drag-along rights to VCTF |
| **VCTF Obligations Post Initial Capitalization:** | 1. Produce first draft of definitive agreements for NewCo's lawyers to review <br> 2. Assign US Prov. Patent entitled "Automotive Data Sharing Platform," Atty. Docket No. P2896US00, filed on 14 Aug. 2020 (the "Provisional Patent Application") to "seed" NewCo <br> 3. Assign AIDEN and SIGNALHUB trademarks, logos and domain names <br> 4. Procure the release from the IP provisions of Founder's employment agreements <br> 5. Procure the continued at-will employment of Founders[2] <br> 6. Performance of *Service Agreement* |
| **NewCo Obligations:** | 1. Granting of Board observer rights to VCTF[3]. If NewCo is unable to meet any of the Founders Obligations or NewCo Obligations (other than Initial Capitalization) then VCTF shall be entitled to a voting Board seat. <br> 2. Grant of covenant-not-to-sue to VCTF and affiliates (does NOT include Geely) to all its patent assets <br> 3. MVP[4] within 12 months of signing the definitive agreements |

---

[1]    Failure to meet any of these obligations (other than the Initial Capitalization) shall allow VCTF to demand, *inter alia*, more frequent reporting requirements and pre-approval of NewCo's extraordinary expenses (e.g., greater than US$10K).

[2]    Note that this Term Sheet shall not be construed as an employment contract (or amendment thereto) and does not give Founders any right to continued employment by Volvo Car Group nor any additional employee benefits. Rather, Founders will be expected to continue the performance of their "day jobs" to the satisfaction of their current, respective managers.

[3]    Subject to input and approval from VCC Tax Dept.

[4]    MVP = NewCo should ship a working prototype of a product that can be deployed in a testing environment to an early-adopter customer to get feedback/early results and constantly iterate the product from thereon.

4. Demonstration of sales and/or partnership pipeline within 18 months of signing the definitive agreements to the satisfaction of VCTF
5. Submission of monthly and quarterly financial reports for the first 24 months of signing the definitive agreements with basic P&L and cash flow items

**Equity:**
- 18% as preferred equity to VCTF paid for in US$110,000 worth of IP and in-kind services via *Service Agreement*
- 82% to Founders/Investors with Initial Capitalization

**Dilution:**
In the event the NewCo enters into any arrangement with Investors – after the Initial Capitalization – where monies or other equity or non-equity consideration are payable to the Investors in consideration of such capital, such payments or other dilution will come equally from the parties; provided, however, in no case shall VCTF's interest equal less than 5% of the NewCo for the first US$10M of outside capital raised by NewCo. VCTF shall have full flexibility to exit complete or part of the investment at any time after the Initial Capitalization.

**Non-compete**
VCTF and its affiliates within the Volvo Car Group (but not including its portfolio companies) shall not compete with NewCo in the field(s) described in the Provisional Patent Application for 2 years from effective date of closing.

**Non-solicitation**
NewCo shall not solicit any employees or contractors of VCTF and its affiliates for a period of two years from the effective date of closing

**Representations/ Warranties:**
Ordinary and customary representations and warranties to be granted by NewCo and the Founders

**Disputes:**
Any and all disputes shall be resolved by expedited binding arbitration in the English language in San Francisco, CA before a single neutral arbitrator chosen by AAA and using California law

**Costs:**
Each party shall bear its own costs in forming the NewCo and related agreements

**Closing:**
Promptly following the execution of a Term Sheet, the parties will undertake to complete their respective due diligence and to prepare, negotiate and execute definitive transaction documents to implement its terms within 90 days of execution.

Until the closing, each party shall continue normal business operations, and obtain applicable board and shareholder/member approval to undertake the transaction contemplated herewith, and amend any corporate documentation necessary to reflect the terms of this Term Sheet.

DocuSign Envelope ID: 8FDE0A36-C87D-43BD-8517-EEF3F138A956

| | |
|---|---|
| **Confidentiality:** | During the period between the date hereof and the closing, neither party shall furnish, or authorize any agent or representative to furnish, any information concerning this Term Sheet to any person or entity without the prior written consent of the other party |
| **Publicity:** | There shall be no publicity with respect to any aspects of this transaction, including contemplation or the closing of such transaction, without written approval of VCTF (which approval shall be deemed granted for potential Investors) |

Except for the paragraph above pertaining to confidentiality, the terms set forth in this Term Sheet are intended only to describe our mutual present intentions as reflected in our conversations regarding the proposed transaction and are not intended to create any binding obligations on the part of each of the parties, or to be construed as an agreement to enter into any binding agreements or consummate the proposed transaction. No such obligations shall arise unless and until each party shall have conducted business and legal diligence to its satisfaction and there shall have been prepared, executed and delivered definitive agreements setting forth such terms and such additional understanding as the parties may develop in the course of their negotiations leading up to such agreements.

*[SIGNATURE PAGE FOLLOWS]*

**VOLVO CAR TECHNOLOGY FUND AB:**

By: _____
Signature

DocuSigned by:
*Pär Arvidsson*
6BE17ABB6F084D7...

**Pär Arvidsson**
Chairman of the Board
november 12, 2020
_____
Date

By: _____
Signature

DocuSigned by:
*Raymond Millien*
D5BE6117C8BC4E5...

**Raymond Millien**
Managing Director
November 12, 2020
_____
Date

**FOUNDERS:**

By: _____
Signature

**Syed Mubeen Saifullah**
11 November 2020
_____
Date

By: _____
Signature

**Niclas Gyllenram**
11 November 2020
_____
Date

By: _____
Signature

**Jonas Fenn**
Nov 11, 2020
_____
Date

# EXHIBIT 3

EXECUTION VERSION

# SEED PREFERRED STOCK PURCHASE AGREEMENT

EXECUTION VERSION

## SEED PREFERRED STOCK PURCHASE AGREEMENT

**THIS SEED PREFERRED STOCK PURCHASE AGREEMENT** (this "**Agreement**") is made as of the 8th day of March, 2021 by and among Aiden Automotive Technologies, Inc., a Delaware corporation (the "**Company**"), Volvo Car Technology Fund AB, reg. no. 556877-5760, a Sweden private limited liability company ("**Purchaser**") and the persons listed as "Founders" on the signature pages to this Agreement (each a "**Founder**" and together the "**Founders**").

The parties hereby agree as follows:

1.      Purchase and Sale of Seed Preferred Stock.

     1.1      Sale and Issuance of Seed Preferred Stock.

          (a)      The Company shall adopt and file with the Secretary of State of the State of Delaware on or before the Closing (as defined below) the Amended and Restated Certificate of Incorporation of the Company in the form of Exhibit B hereto (the "**Restated Certificate**").

          (b)      Subject to the terms and conditions of this Agreement, Purchaser agrees to purchase, and the Company agrees to sell and issue to Purchaser, at the Closing, that number of shares of the Company's Seed Convertible Preferred Stock, par value $0.00001 per share (the "**Preferred Stock**") set forth opposite Purchaser's name on Exhibit A hereto, for a deemed purchase price of $0.11 per share of Preferred Stock which shall be paid-in-kind and shall consist of the Transferred IP and the Services Agreement (the "**Purchase Price**"). The shares of Preferred Stock issued to Purchaser pursuant to this Agreement shall be referred to herein as the "**Shares**."

     1.2      Closing; Delivery. The purchase and sale of the Shares shall take place remotely via the exchange of documents and signatures on the date hereof (which time and place are designated as the "**Closing**"). At the Closing, the Company shall deliver to Purchaser a Carta electronic certificate representing the Shares.

     1.3      Use of Proceeds. In accordance with the directions of the Company's Board of Directors (the "**Board**"), as it shall be constituted in accordance with the Voting Agreement, the Company will use the proceeds from the sale of the Shares to expand the Company's team, accelerate product development, fund the Company's working capital requirements and for other general corporate purposes.

     1.4      Defined Terms Used in this Agreement. In addition to the terms defined above, the following terms used in this Agreement shall be construed to have the meanings set forth or referenced below.

          (a)      "**Affiliate**" means, when used with respect to any specified Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with the Person specified, where "**control**" means the possession, directly or indirectly,

1

by agreement or otherwise, of at least 50% of the voting stock, partnership interest or other ownership interest, or the power (a) to appoint or remove a majority of the board of directors or other governing body of such Person, or (b) to cause the direction of the management of such Person.

(b)  "**Code**" means the Internal Revenue Code of 1986, as amended.

(c)  "**Company Covered Person**" means, with respect to the Company as an "issuer" for purposes of Rule 506 promulgated under the Securities Act, any Person listed in the first paragraph of Rule 506(d)(1).

(d)  "**IP Assignment**" means the intellectual property assignment between Purchaser and the Company, dated as of the date of the Closing, assigning to the Company the Transferred IP, in a form satisfactory to the Company and Purchaser.

(e)  "**Investor Rights Agreement**" means the agreement among the Company, Purchaser and the Founders, dated as of the date of the Closing, in a form satisfactory to the Company and Purchaser.

(f)  "**Key Employee**" means any Founder, as well as any employee or consultant who either alone or in concert with others develops, invents, programs or designs any Company Intellectual Property.

(g)  "**Knowledge**" including the phrase "**to the Company's Knowledge**" shall mean the actual knowledge after reasonable investigation of the Founders.

(h)  "**Material Adverse Effect**" means a material adverse effect on the business, assets (including intangible assets), liabilities, financial condition, property or results of operations of the Company.

(i)  "**Person**" means any individual, corporation, partnership, trust, limited liability company, association or other entity.

(j)  "**Right of First Refusal and Co-Sale Agreement**" means the agreement among the Company, Purchaser and certain other stockholders of the Company, dated as of the date of the Closing, in a form satisfactory to the Company and Purchaser.

(k)  "**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

(l)  "**Services Agreement**" means the services agreement between Volvo Car Technology USA and the Company, in a form satisfactory to the Company and Purchaser.

(m)  "**Transaction Agreements**" means this Agreement, the Investor Rights Agreement, the Right of First Refusal and Co-Sale Agreement, the Voting Agreement, the Restated Certificate, the Services Agreement, the IP Assignment and the other documents and certificates executed in connection therewith.

(n)     "**Transferred IP**" means (i) the United States Provisional Patent Application entitled "Automotive Data Sharing Platform, "Atty. Docket No. P2896US00 and any improvements thereon, and (ii) the AIDEN and SIGNALHUB unregistered trademarks.

(o)     "**Voting Agreement**" means the agreement among the Company, Purchaser and certain other stockholders of the Company, dated as of the date of the Closing, in a form satisfactory to the Company and Purchaser.

2.     <u>Representations and Warranties of the Company</u>. The Company represents and warrants to Purchaser that, except as set forth on the Disclosure Schedule attached as <u>Exhibit C</u> to this Agreement, which exceptions shall be deemed to be part of the representations and warranties made hereunder, the following representations are true and complete as of the date of each Closing, except as otherwise indicated.

2.1     <u>Organization, Good Standing, Corporate Power and Qualification</u>. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as presently conducted and as proposed to be conducted. The Company is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a Material Adverse Effect.

2.2     <u>Capitalization</u>.

(a)     The authorized capital of the Company consists, immediately prior to the Closing, of:

(i)     100,000,000 shares of common stock, par value $0.00001 per share, ("**Common Stock**"), 4,100,000 shares of which are issued and outstanding. All of the outstanding shares of Common Stock have been duly authorized, are fully paid and nonassessable and were issued in compliance with all applicable federal and state securities laws. The Company holds no Common Stock in its treasury.

(ii)     10,000,000 shares of preferred stock, par value $0.00001 per share, none of which are issued and outstanding. The rights, privileges and preferences of the Preferred Stock are as stated in the Restated Certificate and as provided by the Delaware General Corporation Law. The Company holds no Preferred Stock in its treasury.

(b)     <u>Section 2.2(b)</u> of the Disclosure Schedule sets forth the capitalization of the Company immediately following the Closing, including the number of shares of the following: (i) issued and outstanding Common Stock and Preferred Stock and (ii) shares of Common Stock reserved for future award grants.. Except for (A) the conversion privileges of the Shares to be issued under this Agreement, (B) the rights provided in <u>Section 3</u> of the Investor Rights Agreement and (C) the securities and rights described in <u>Section 2.2(c)</u> of the Disclosure Schedule, there are no outstanding options, warrants, rights (including conversion or preemptive rights and rights of first refusal or similar rights) or agreements, orally or in writing, to purchase or acquire from the Company any shares of capital stock of the Company, or any securities convertible into or exchangeable for shares of capital stock of the Company.

DocuSign Envelope ID: EC0BD867-A6B7-4D3D-A74B-8CA7D389E8FD

EXECUTION VERSION

(c)     None of the Company's stock purchase agreements or stock option documents contains a provision for acceleration of vesting (or lapse of a repurchase right) or other changes in the vesting provisions or other terms of such agreement or understanding upon the occurrence of any event or combination of events, including without limitation in the case where the Stock Plan is not assumed in an acquisition. The Company has no obligation (contingent or otherwise) to purchase or redeem any of its capital stock.

(d)     409A. The Company believes in good faith that any "nonqualified deferred compensation plan" (as such term is defined under Section 409A(d)(1) of the Code and the guidance thereunder) under which the Company makes, is obligated to make or promises to make, payments (each, a "**409A Plan**") complies in all material respects, in both form and operation, with the requirements of Section 409A of the Code and the guidance thereunder. To the Company's Knowledge, no payment to be made under any 409A Plan is, or will be, subject to the penalties of Section 409A(a)(1) of the Code.

(e)     The Company has obtained valid waivers of any rights by other parties to purchase any of the Shares covered by this Agreement.

2.3     Subsidiaries. The Company does not currently own or control, directly or indirectly, any interest in any other corporation, partnership, trust, joint venture, limited liability company, association, or other business entity. The Company is not a participant in any joint venture, partnership or similar arrangement.

2.4     Authorization. All corporate action required to be taken by the Board and stockholders in order to authorize the Company to enter into the Transaction Agreements, and to issue the Shares at the Closing and the Common Stock issuable upon conversion of the Shares, has been taken or will be taken prior to the Closing. All action on the part of the officers of the Company necessary for the execution and delivery of the Transaction Agreements, the performance of all obligations of the Company under the Transaction Agreements to be performed as of the Closing, and the issuance and delivery of the Shares has been taken or will be taken prior to the Closing. The Transaction Agreements, when executed and delivered by the Company, shall constitute valid and legally binding obligations of the Company, enforceable against the Company in accordance with their respective terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies, or (iii) to the extent the indemnification provisions contained in the Investor Rights Agreement may be limited by applicable federal or state securities laws.

2.5     Valid Issuance of Shares

(a)     The Shares, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement, will be validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Right of First Refusal and Co-Sale Agreement, applicable state and federal securities laws and liens or encumbrances created by or imposed by Purchaser. Assuming the accuracy of the representations of Purchaser in Section 3 of this Agreement and subject to the filings described

4

in Section 2.6(b)(ii) below, the Shares will be issued in compliance with all applicable federal and state securities laws. The Common Stock issuable upon conversion of the Shares has been duly reserved for issuance, and upon issuance in accordance with the terms of the Restated Certificate, will be validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Transaction Agreements, applicable federal and state securities laws and liens or encumbrances created by or imposed by Purchaser. Based in part upon the representations of Purchaser in Section 3 of this Agreement, and subject to Section 2.5(b) below, the Common Stock issuable upon conversion of the Shares will be issued in compliance with all applicable federal and state securities laws.

(b)     No "bad actor" disqualifying event described in Rule 506(d)(1)(i)-(viii) of the Securities Act (a "**Disqualification Event**") is applicable to the Company or, to the Company's knowledge, any Company Covered Person, except for a Disqualification Event as to which Rule 506(d)(2)(ii–iv) or (d)(3), is applicable.·

2.6     Governmental Consents and Filings. Assuming the accuracy of the representations made by Purchaser in Section 3 of this Agreement, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority is required on the part of the Company in connection with the consummation of the transactions contemplated by this Agreement, except for (i) the filing of the Restated Certificate, which will have been filed as of the Closing, and (ii) filings pursuant to Regulation D of the Securities Act, and applicable state securities laws, which have been made or will be made.

2.7     Litigation. Except as described in Section 2.7 of the Disclosure Schedule, (i) there is no claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending or to the Company's Knowledge, currently threatened in writing (x) against the Company, any Founder, or any officer or director of the Company arising out of their employment or board relationship with the Company or Affiliates of Purchaser; (y) that questions the validity of the Transaction Agreements or the right of the Company to enter into them, or to consummate the transactions contemplated by the Transaction Agreements; or (z) to the Company's Knowledge, that would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, and (ii) neither the Company nor, to the Company's Knowledge, any Founder or officer or director of the Company is a party or is named as subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality (in the case of Founders, officers or directors, such as would affect the Company). There is no action, suit, proceeding or investigation by the Company pending or which the Company intends to initiate. The foregoing includes, without limitation, actions, suits, proceedings or investigations pending or threatened in writing (or any basis therefor known to the Company) involving the prior employment of any of the Company's employees, their services provided in connection with the Company's business, any information or techniques allegedly proprietary to any of their former employers or their obligations under any agreements with prior employers.

2.8     Intellectual Property.

DocuSign Envelope ID: EC0BD867-A6B7-4D3D-A74D-8CA7D389E8FD

EXECUTION VERSION

(a)　　After giving effect to the transactions contemplated by the Transaction Agreements, the Company owns or possess a sufficient legal right to use, free and clear of all liens, encumbrances, charges or claims by any other Person (including prior employers of the Founders, employees, or consultants), all patents, trademarks, domain names, service marks, trade names, copyrights, licenses and rights, and all trade secrets protectable by applicable law, including know-how, inventions, designs, processes, works of authorship, computer programs, hardware, software and technical data and information ("**Intellectual Property**") used and sufficient for use in the conduct of its business as presently conducted (collectively herein "**Company Intellectual Property**"), without, to the Company's knowledge, infringing upon or otherwise acting adversely to the right of any other Person (including prior employers of Founders, employees, or consultants) under or with respect to the foregoing, including without limitation (i) the Founders and the past and present employees and consultants and (ii) employers of the Founders and the past and present employees and consultants of the Company. Neither the Company nor, to the Company's knowledge, any Founder or current or former employee or consultant of the Company, has received, or is aware of, any written communications alleging that the Company, or any Founder or any current or former employee or any consultant of the Company has violated, or by conducting the Company's business as now conducted, is violating the patents, trademarks, service marks, trade names, copyrights or trade secrets or other proprietary rights of other Persons, nor is the Company aware of any similar violation of the Company Intellectual Property by others, nor is the Company is aware of any basis therefore.

(b)　　Section 2.8(b) of the Disclosure Schedule identifies each: (a) patent, registered trademark, registered copyright, or registered domain name that has been issued to the Company with respect to any of the Company Intellectual Property; (b) pending patent, trademark, domain name or copyright application that the Company has made with respect to any of the Company Intellectual Property; (c) each material unregistered trade name or unregistered trademark used by the Company; and (d) material license, agreement, or other permission pursuant to which the Company has received from or granted to any third party with respect to any of the Company Intellectual Property (excluding in each case, contracts for commercially available technology or software or otherwise having an annual value of less than $50,000).

(c)　　Other than with respect to commercially available software products under standard end-user object code license agreements, and other than pursuant to license agreements whereby the Company licenses its software products to customers, there are no outstanding options, licenses, or agreements of any kind relating to the foregoing, nor is the Company bound by or a party to any options, licenses or agreements of any kind with respect to the patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, proprietary rights and processes of any other Person. Neither the Company nor, to the Company's knowledge, any Founder or current or former employee or consultant of the Company is obligated or under any liability whatsoever to make any payments by way of royalties, fees or otherwise to any owner or licensee of, or other claimant to, any patent, trademark, service mark, trade name, copyright or other intangible asset, with respect to the use thereof or in connection with the conduct of its business or as currently proposed to be conducted.

(d)      Any and all rights, title and interest of Intellectual Property of any kind which has been developed or is currently being developed, by any Founder or current or former employee or consultant of the Company in the scope of their duties for the Company is, and shall be, the sole and exclusive property owned by the Company. For avoidance of doubt, none of the Company Intellectual Property owned by the Company including the Transferred IP was conceived during, originated from, or was derived from, any work done by the Founders for the benefit of any Person including prior employers of any Founder or current or former employee or consultant, other than Affiliates of Purchaser. The Company has taken commercially reasonable security measures to protect the secrecy, confidentiality and value of all the Intellectual Property. All of the Company's Founders and any current employees or consultants responsible for the development of, or that have developed, Intellectual Property for the Company have entered into written agreements with the Company assigning to the Company all rights in such Intellectual Property developed for the Company. All of the Company's Founders and current employees and other persons who have substantive knowledge of the trade secrets or other confidential information within the Company Intellectual Property have entered into a written agreement, which includes confidentiality obligations with the Company. To the Company's knowledge it is not necessary to utilize any of the developments, ideas, inventions, trade secrets or proprietary information of any of its Founders, employees or consultants made prior to their employment or engagement by the Company, other than the Transferred IP and that Intellectual Property that has been duly assigned to the Company by such persons. None of the foregoing Persons is or was ever employed by or engaged as a consultant with any academic or other governmental institution, whereby such academic or governmental institution has obtained any rights in any Intellectual Property developed by such Founder or current or former employee or consultant. No facilities of any university, government-owned institution, college, other educational institution or research center was used in the development of any of the Company Intellectual Property.

(e)      None of the Open Source Software that is or has been used by the Company will restrict the Company's ability to charge for distribution of, or to use its products for commercial purposes. With respect to any open source software that is or has been used by the Company, the Company is in material compliance with all applicable licenses with respect thereto. Neither the Company, nor any Founder, employee or consultant or any other Person acting on behalf of the Company, has disclosed or delivered to any third party any non-open source software related source code owned by the Company and included in the Company's products. To the Company's knowledge, no event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time) will, or would reasonably be expected to, result in the disclosure or delivery by the Company, or any Person acting on behalf of the Company, of any such non open source software related source code.

2.9      <u>Compliance with Other Instruments</u>. Except as set forth in <u>Section 2.9</u> of the Disclosure Schedule, the Company is not in violation or default (i) of any provisions of its Restated Certificate or Bylaws, (ii) of any instrument, judgment, order, writ or decree, (iii) under any note, indenture or mortgage, (iv) under any lease, agreement, contract or purchase order to which it is a party or by which it is bound that is required to be listed on the Disclosure Schedule, or (v) of any provision of federal or state statute, rule or regulation applicable to the Company, the violation of which would have a Material Adverse Effect. The execution, delivery and performance of the Transaction Agreements and the consummation of the transactions

contemplated by the Transaction Agreements will not result in any such violation or be in conflict with or constitute, with or without the passage of time and giving of notice, either (i) a default under any such provision, instrument, judgment, order, writ, decree, contract or agreement; or (ii) an event which results in the creation of any lien, charge or encumbrance upon any assets of the Company or the suspension, revocation, forfeiture, or nonrenewal of any material permit or license applicable to the Company.

2.10   <u>Title to Property and Assets</u>. Except as set forth in <u>Section 2.10</u> of the Disclosure Schedule, the Company owns its properties and assets free and clear of all mortgages, deeds of trust, liens, encumbrances and security interests except for statutory liens for the payment of current taxes that are not yet delinquent and liens, encumbrances and security interests which arise in the ordinary course of business and which do not affect material properties and assets of the Company. With respect to the property and assets it leases, the Company is in material compliance with each such lease and holds a valid leasehold interest free of any liens, claims or encumbrances other than those of the lessors of such property or assets. The Company does not own any real property.

2.11   <u>Agreements</u>.

(a)   Except for the Transaction Agreements and as set forth on <u>Section 2.11(a)</u> of the Disclosure Schedule, there are no agreements, understandings, instruments, contracts or proposed transactions to which the Company is a party or by which it is bound that involve (i) obligations (contingent or otherwise) of, or payments to, the Company in excess of $50,000, (ii) the license of any patent, copyright, trademark, trade secret or other proprietary right to or from the Company, (iii) the grant of rights to manufacture, produce, assemble, license, market, or sell its products to any other Person that limit the Company's exclusive right to develop, manufacture, assemble, distribute, market or sell its products, or (iv) indemnification by the Company with respect to infringements of proprietary rights.

(b)   Except as set forth on <u>Section 2.11(b)</u> of the Disclosure Schedule, the Company has not (i) declared or paid any dividends, or authorized or made any distribution upon or with respect to any class or series of its capital stock, (ii) incurred any indebtedness for money borrowed or incurred any other liabilities individually in excess of $10,000 or in excess of $50,000 in the aggregate, (iii) made any loans or advances to any Person, other than ordinary advances for travel expenses, or (iv) sold, exchanged or otherwise disposed of any of its assets or rights, other than the sale of its inventory in the ordinary course of business. For the purposes of (a) and (b) of this <u>Section 2.11</u>, all indebtedness, liabilities, agreements, understandings, instruments, contracts and proposed transactions involving the same Person (including Persons the Company has reason to believe are affiliated with each other) shall be aggregated for the purpose of meeting the individual minimum dollar amounts of such Section.

(c)   The Company is not a guarantor or indemnitor of any indebtedness of any other Person.

(d)   The Company has not engaged in the past three (3) months in any discussion with any representative of any Person regarding (i) a sale or exclusive license of all or

substantially all of the Company's assets, or (ii) any merger, consolidation or other business combination transaction of the Company with or into another Person.

2.12    Certain Transactions.

(a)    Other than (i) standard employee benefits generally made available to all employees, (ii) standard director and officer indemnification agreements approved by the Board, (iii) standard proprietary information and assignment of inventions agreements in favor of the Company, (iii) the purchase of shares of the Company's capital stock and (iv) the Transaction Agreements, in each instance, approved in the written minutes of the Board (previously provided to Purchaser or its counsel), there are no agreements, understandings or proposed transactions between the Company and any of its officers, directors, consultants or Key Employees, or any Affiliate thereof.

(b)    The Company is not indebted, directly or indirectly, to any of the Founders or its directors, officers or employees or to their respective spouses or children or to any Affiliate of any of the foregoing, other than in connection with expenses or advances of expenses incurred in the ordinary course of business expenses and for other customary employee benefits made generally available to all employees. None of the Founders or the Company's directors, officers or employees, or any members of their immediate families, or any Affiliate of the foregoing are, directly or indirectly, indebted to the Company or, have any (i) material commercial, industrial, banking, consulting, legal, accounting, charitable or familial relationship with any of the Company's customers, suppliers, service providers, joint venture partners, licensees and competitors, (ii) direct or indirect ownership interest in any firm or corporation with which the Company is affiliated or with which the Company has a business relationship, or any firm or corporation which competes with the Company, except that the Founders and directors, officers, employees or stockholders of the Company may own stock in (but not exceeding two percent (2%) of the outstanding capital stock of) publicly traded companies that may compete with the Company; or (iii) financial interest in any material contract to which the Company is a party.

2.13    Rights of Registration and Voting Rights. Except as provided in the Investor Rights Agreement, the Company is not under any obligation to register under the Securities Act any of its currently outstanding securities or any securities issuable upon exercise or conversion of its currently outstanding securities. To the Company's knowledge, except as contemplated in the Voting Agreement, no stockholder of the Company has entered into any agreements with respect to the voting of capital stock of the Company.

2.14    Changes. Except as described in Section 2.14 of the Disclosure Schedule, since the date of the incorporation of the Company, there has not been:

(a)    any damage, destruction or loss, whether or not covered by insurance, that would have a Material Adverse Effect;

(b)    any waiver or compromise by the Company of a valuable right or of a material debt owed to it;

(c)     any satisfaction or discharge of any lien, claim, or encumbrance or payment of any obligation by the Company, except in the ordinary course of business and the satisfaction or discharge of which would not have a Material Adverse Effect;

(d)     any material change to a material contract or agreement by which the Company or any of its assets is bound or subject;

(e)     any material change in any compensation arrangement or agreement with any employee, officer, director or stockholder;

(f)     any resignation or termination of employment of any officer of the Company;

(g)     any mortgage, pledge, transfer of a security interest in, or lien, created by the Company, with respect to any of its material properties or assets, except liens for taxes not yet due or payable and liens that arise in the ordinary course of business and do not materially impair the Company's ownership or use of such property or assets;

(h)     any loans or guarantees made by the Company to or for the benefit of its employees, officers or directors, or any members of their immediate families, other than travel advances and other advances made in the ordinary course of its business;

(i)     any declaration, setting aside or payment or other distribution in respect of any of the Company's capital stock, or any direct or indirect redemption, purchase, or other acquisition of any of such stock by the Company;

(j)     any sale, assignment or transfer of any Company Intellectual Property that could reasonably be expected to result in a Material Adverse Effect;

(k)     receipt of notice that there has been a loss of, or material order cancellation by, any major customer of the Company;

(l)     any other event or condition of any character, other than events affecting the economy or the Company's industry generally, that could reasonably be expected to result in a Material Adverse Effect; or

(m)     any arrangement or commitment by the Company to do any of the things described in this Section 2.14.

2.15     Employee Matters.

(a)     As of the date hereof, the Company employs no full-time employees, no part-time employees and engages two consultants or independent contractors. Section 2.15(a) of the Disclosure Schedule sets forth a detailed description of all compensation, paid or payable for each Key Employee, consultant and independent contractor of the Company.

(b)     Except as set forth on Section 2.15(b) of the Disclosure Schedule, to the Company's knowledge, none of its employees is obligated under any contract (including

licenses, covenants or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that would materially interfere with such employee's ability to promote the interest of the Company or that would conflict with the Company's business. Neither the execution or delivery of the Transaction Agreements, nor the carrying on of the Company's business by the employees of the Company, nor the conduct of the Company's business as now conducted and as presently proposed to be conducted, will, to the Company's knowledge, conflict with or result in a breach of the terms, conditions, or provisions of, or constitute a default under, any contract, covenant or instrument under which any such employee is now obligated.

(c)     Except as set forth on <u>Section 2.15(c)</u> of the Disclosure Schedule, the Company is not delinquent in payments to any of its employees, consultants, or independent contractors for any wages, salaries, commissions, bonuses, or other direct compensation for any service performed for it to the date hereof or amounts required to be reimbursed to such employees, consultants or independent contractors. The Company has complied in all material respects with all applicable state and federal equal employment opportunity laws and with other laws related to employment, including those related to wages, hours, worker classification and collective bargaining. The Company has withheld and paid to the appropriate governmental entity or is holding for payment not yet due to such governmental entity all amounts required to be withheld from employees of the Company and is not liable for any arrears of wages, taxes, penalties or other sums for failure to comply with any of the foregoing.

(d)     To the Company's knowledge, no Key Employee intends to terminate its service relationship with the Company or is otherwise likely to become unavailable to continue as a Key Employee. The employment of each employee of the Company, if any, is terminable at the will of the Company. Except as required by law, upon termination of the employment of any such employees, no severance or other payments will become due. The Company has no policy, practice, plan or program of paying severance pay or any form of severance compensation in connection with the termination of employment services.

(e)     The Company has not made any representations regarding equity incentives to any officer, employee, director or consultant that are inconsistent with the share amounts and terms set forth in the minutes of meetings of the Company's board of directors.

(f)     The Company has no employee benefit plans.

(g)     The Company is not bound by or subject to (and none of its assets or properties is bound by or subject to) any written or oral, express or implied, contract, commitment or arrangement with any labor union, and no labor union has requested or, to the knowledge of the Company, has sought to represent any of the employees, representatives or agents of the Company. There is no strike or other labor dispute involving the Company pending, or to the Company's knowledge, threatened, which could have a Material Adverse Effect, nor is the Company aware of any labor organization activity involving its employees.

(h)     To the Company's Knowledge, none of the Founders has been (i) subject to voluntary or involuntary petition under the federal bankruptcy laws or any state insolvency law or the appointment of a receiver, fiscal agent or similar officer by a court for his

or her business or property; (ii) convicted in a criminal proceeding or named as a subject of a pending criminal proceeding (excluding traffic violations and other minor offenses); (iii) subject to any order, judgment or decree (not subsequently reversed, suspended, or vacated) of any court of competent jurisdiction permanently or temporarily enjoining him or her from engaging, or otherwise imposing limits or conditions on his or her engagement in any securities, investment advisory, banking, insurance, or other type of business or acting as an officer or director of a public company; or (iv) found by a court of competent jurisdiction in a civil action or by the Securities and Exchange Commission or the Commodity Futures Trading Commission to have violated any federal or state securities, commodities, or unfair trade practices law, which such judgment or finding has not been subsequently reversed, suspended, or vacated.

2.16     Tax Returns and Payments. There are no federal, state, county, local or foreign taxes due and payable by the Company which have not been timely paid. There are no accrued and unpaid federal, state, country, local or foreign taxes of the Company which are due, whether or not assessed or disputed. There have been no examinations or audits of any tax returns or reports by any applicable federal, state, local or foreign governmental agency. The Company has duly and timely filed all federal, state, county, local and foreign tax returns required to have been filed by it and there are in effect no waivers of applicable statutes of limitations with respect to taxes for any year.

2.17     Insurance. The Company has, or will obtain when appropriate, in full force and effect insurance policies concerning such casualties as would be reasonable and customary for companies like the Company with extended coverage, sufficient in amount (subject to reasonable deductions) to allow it to replace any of its properties that might be damaged or destroyed. ):  A list of the Company's insurance policies is set forth in Section 2.17 of the Disclosure Schedule. There is no claim by the Company pending under any of such policies. All premiums due under such policies have been paid and the Company is otherwise in full compliance with the material terms and conditions of all such policies where the failure to do so could reasonably be expected to result in a Material Adverse Effect.

2.18     Proprietary Information Agreements. Each Founder has executed the Company's Proprietary Information, Assignment of Inventions, Non-Solicitation and Non-Competition Agreement in the form attached hereto as Exhibit D (the "**Proprietary Information Agreements**") and each other Key Employee has executed an agreement containing comparable proprietary information, assignment of inventions and non-solicitation provisions as the Proprietary Information Agreements. The Company is not aware that any of its Key Employees is in violation of any of their agreements with the Company.

2.19     Permits. The Company has or will have, as appropriate, any applicable franchises, permits, licenses and any similar authority necessary for the conduct of its business. The Company is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

2.20     Qualified Small Business Stock. As of and immediately following the Closing:  (i) the Company will be an eligible corporation as defined in Section 1202(e)(4) of the Code, (ii) the Company will not have made purchases of its own stock described in Code Section 1202(c)(3)(B) during the one (1) year period preceding the Closing, except for purchases that are

disregarded for such purposes under Treasury Regulation Section 1.1202-2, and (iii) the Company's aggregate gross assets, as defined by Code Section 1202(d)(2), at no time between its incorporation and through the Closing have exceeded $50 million, taking into account the assets of any corporations required to be aggregated with the Company in accordance with Code Section 1202(d)(3); provided, however, that in no event shall the Company be liable to Purchaser or any other party for any damages arising from any subsequently proven or identified error in the Company's determination with respect to the applicability or interpretation of Code Section 1202, unless such determination shall have been given by the Company in a manner either grossly negligent or fraudulent.

2.21   <u>Foreign Corrupt Practices Act</u>. Neither the Company, nor to the Company's knowledge, any of its directors, officers, employees or agents have, directly or indirectly, made, offered, promised or authorized any payment or gift of any money or anything of value to or for the benefit of any "foreign official" (as such term is defined in the U.S. Foreign Corrupt Practices Act of 1977, as amended (the "**FCPA**")), foreign political party or official thereof or candidate for foreign political office for the purpose of (i) influencing any official act or decision of such official, party or candidate, (ii) inducing such official, party or candidate to use his, her or its influence to affect any act or decision of a foreign governmental authority, or (iii) securing any improper advantage, in the case of (i), (ii) and (iii) above in order to assist the Company or any of its affiliates in obtaining or retaining business for or with, or directing business to, any Person. Neither the Company, nor to the Company's knowledge, any of its directors, officers, employees or agents have made or authorized any bribe, rebate, payoff, influence payment, kickback or other unlawful payment of funds or received or retained any funds in violation of any law, rule or regulation. Neither the Company, nor to the Company's knowledge, any of its officers, directors or employees are the subject of any allegation, voluntary disclosure, investigation, prosecution, or other enforcement action related to the FCPA or any other anti-corruption law. Company further represents that it has not and does not engage in activities prohibited to Persons subject to the jurisdiction of the United States by the United States Trading with the Enemy Act of 1917, as amended, or the United States International Emergency Economic Powers Act of 1977, as amended, or the regulations promulgated under either such Act. The Company further represents that it does not have its principal place of business in either Myanmar or Sudan, or that it does not generates more than 50% of its revenue from either of these countries.

2.22   <u>Disclosure</u>. No representation or warranty of the Company contained in this Agreement, as qualified by the Disclosure Schedule, and no certificate furnished or to be furnished to Purchaser at the Closing contains any untrue statement of a material fact or, to the Company's knowledge, omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances under which they were made. It is understood that this representation is qualified by the fact that the Company has not delivered to Purchaser, and has not been requested to deliver, a private placement or similar memorandum or any written disclosure of the types of information customarily furnished to purchasers of securities.

2.23   <u>Data Privacy</u>. The Company has taken commercially reasonable measures to protect the privacy of any Personal Information collected or processed by the Company and to maintain in confidence such Personal Information and is in compliance in all material respects,

with all applicable laws in all relevant jurisdictions (including applicable regulations promulgated thereunder and guidelines published by the applicable privacy governmental authorities), the Company's privacy policies and the requirements of any contract or codes of conduct to which the Company is a party. No action, or to the knowledge of the Company, no claim, proceeding, compliant, inquiry, audit or investigation, is pending or threatened against the Company or any of its officers, directors, or employees (in their capacity as such) by any private party or any governmental authority, foreign or domestic, with respect to Personal Information. There has been no material loss, unauthorized access to or other misuse by the Company or on its behalf of such Personal Information, and, to the knowledge of the Company, no third party misused any Personal Information (as defined below) collected or processed by the Company. "**Personal Information**" means any personally identifiable information from any individuals, including, without limitation, any customers, prospective customers, employees and/or other third parties (including information that alone or in combination with other information can be used to specifically identify a person or any financial services data collected or used by the Company).

3. <u>Representations and Warranties of Purchaser</u>. Purchaser hereby represents and warrants to the Company that:

3.1 <u>Authorization</u>. Purchaser has full power and authority to enter into the Transaction Agreements. The Transaction Agreements to which Purchaser is a party, when executed and delivered by Purchaser, will constitute valid and legally binding obligations of Purchaser, enforceable in accordance with their terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies, or (b) to the extent the indemnification provisions contained in the Investor Rights Agreement may be limited by applicable federal or state securities laws.

3.2 <u>Purchase Entirely for Own Account</u>. This Agreement is made with Purchaser in reliance upon Purchaser's representation to the Company, which by Purchaser's execution of this Agreement, Purchaser hereby confirms, that the Shares to be acquired by Purchaser will be acquired for investment for Purchaser's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, Purchaser further represents that Purchaser does not presently have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Shares. Purchaser has not been formed for the specific purpose of acquiring the Shares.

3.3 <u>Disclosure of Information</u>. Purchaser has had an opportunity to discuss the Company's business, management, financial affairs and the terms and conditions of the offering of the Shares with the Company's management. The foregoing, however, does not limit or modify the representations and warranties of the Company in <u>Section 2</u> of this Agreement or the right of Purchaser to rely thereon.

3.4     <u>Restricted Securities</u>. Purchaser understands that the Shares have not been, and will not be, registered under the Securities Act, by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of Purchaser's representations as expressed herein. Purchaser understands that the Shares are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, Purchaser must hold the Shares indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available. Purchaser acknowledges that the Company has no obligation to register or qualify the Shares, or the Common Stock into which it may be converted, for resale, except as set forth in the Investor Rights Agreement. Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Shares, and on requirements relating to the Company which are outside of Purchaser's control, and which the Company is under no obligation and may not be able to satisfy.

3.5     <u>No Public Market</u>. Purchaser understands that no public market now exists for the Shares, and that the Company has made no assurances that a public market will ever exist for the Shares.

3.6     <u>Legends</u>. Purchaser understands that the Shares, to the extent certificated, and any securities issued in respect of or exchange for the Shares, may bear one or all of the following legends:

"THE SHARES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933."

(a)     Any legend set forth in, or required by, the other Transaction Agreements.

(b)     Any legend required by the securities laws of any state to the extent such laws are applicable to the Shares represented by the certificate, instrument, or book entry so legended.

3.7     <u>Accredited Investor</u>. Purchaser is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

3.8     <u>Foreign Investors</u>. If Purchaser is not a United States person (as defined by Section 7701(a)(30) of the Code), Purchaser hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Shares or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Shares, (ii) any foreign exchange restrictions applicable to

such purchase, (iii) any foreign governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Shares. Purchaser's subscription and payment for and continued beneficial ownership of the Shares will not violate any applicable securities or other laws of Purchaser's jurisdiction.

3.9    No General Solicitation. Neither Purchaser, nor any of its officers, directors, employees, agents, stockholders or partners has either directly or indirectly, including, through a broker or finder (a) engaged in any general solicitation or (b) published any advertisement in connection with the offer and sale of the Shares.

3.10    Exculpation Among Purchaser. Purchaser acknowledges that it is not relying upon any Person, other than the Founders and the Company in making its investment or decision to invest in the Company.

3.11    Residence. If Purchaser is an individual, then Purchaser resides in the state or province identified in the address of Purchaser set forth on Purchaser's signature page hereto; if Purchaser is a partnership, corporation, limited liability company or other entity, then the office or offices of Purchaser in which its principal place of business is identified in the address or addresses of Purchaser set forth on Purchaser's signature page hereto.

3.12    "Bad Actor". No Disqualification Event is applicable to Purchaser, except for a Disqualification Event as to which Rule 506(d)(2)(ii–iv) or (d)(3), is applicable.

4.    Conditions to Purchaser' Obligations at Closing. The obligations of Purchaser to purchase Shares at the Closing are subject to the fulfillment, on or before the Closing, of each of the following conditions, unless otherwise waived:

4.1    Representations and Warranties. The representations and warranties of the Company and the Founders contained in Section 2 shall be true and correct in all respects as of the Closing.

4.2    Performance. The Company shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by the Company on or before the Closing.

4.3    Compliance Certificate. The Chief Executive Officer of the Company shall deliver to Purchaser at the Closing a certificate certifying that the conditions specified in Sections 4.1 and 4.2 have been fulfilled.

4.4    Qualifications. All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Shares pursuant to this Agreement shall be obtained and effective as of the Closing.

4.5    Opinion of Company Counsel. Purchaser shall have received from Khan Law Group, LLC, Masood Khan, counsel for the Company, an opinion, dated as of the Closing, in substantially the form satisfactory to counsel to Purchaser.

4.6     Board of Directors. As of the Closing, the authorized size of the Board shall be three (3), and the Board shall consist of the Founders.

4.7     Investor Rights Agreement. The Company, Purchaser and the other stockholders of the Company named as parties thereto shall have executed and delivered the Investor Rights Agreement.

4.8     Right of First Refusal and Co-Sale Agreement. The Company, Purchaser and the other stockholders of the Company named as parties thereto shall have executed and delivered the Right of First Refusal and Co-Sale Agreement.

4.9     Voting Agreement. The Company, Purchaser and the other stockholders of the Company named as parties thereto shall have executed and delivered the Voting Agreement.

4.10    Restated Certificate. The Company shall have filed the Restated Certificate with the Secretary of State of Delaware on or prior to the Closing, which shall continue to be in full force and effect as of the Closing.

4.11    Secretary's Certificate. The Secretary of the Company shall have delivered to Purchaser at the Closing a certificate certifying (i) the Restated Certificate, (ii) the Bylaws of the Company, (iii) resolutions of the Board approving the Transaction Agreements and the transactions contemplated under the Transaction Agreements, (iv) resolutions of the stockholders of the Company approving the Restated Certificate and (v) as to the good standing of the Company.

4.12    Proceedings and Documents. All corporate and other proceedings in connection with the transactions contemplated at the Closing and all documents incident thereto shall be reasonably satisfactory in form and substance to Purchaser, and Purchaser (or its counsel) shall have received all such counterpart original and certified or other copies of such documents as reasonably requested.

4.13    Preemptive Rights. The Company shall have fully satisfied (including with respect to rights of timely notification) or obtained enforceable waivers in respect of any preemptive or similar rights directly or indirectly affecting any of its securities.

4.14    Proprietary Information Agreements. Each Founder shall have entered into a Proprietary Information Agreement in the form attached hereto as Exhibit D and Purchaser shall have received a copy of all similar agreements executed by other Key Employees.

5.     Conditions of the Company's Obligations at Closing. The obligations of the Company to sell Shares to Purchaser at the Closing are subject to the fulfillment, on or before the Closing, of each of the following conditions, unless otherwise waived:

5.1     Representations and Warranties. The representations and warranties of Purchaser contained in Section 3 shall be true and correct in all respects as of the Closing.

5.2     _Performance_. Purchaser shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by them on or before the Closing.

5.3     _Qualifications_. All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Shares pursuant to this Agreement shall be obtained and effective as of the Closing.

5.4     _Investor Rights Agreement_. Purchaser and the Founders shall have executed and delivered the Investor Rights Agreement.

5.5     _Right of First Refusal and Co-Sale Agreement_. Purchaser and the other stockholders of the Company named as parties thereto shall have executed and delivered the Right of First Refusal and Co-Sale Agreement.

5.6     _Voting Agreement_. Purchaser and the other stockholders of the Company named as parties thereto shall have executed and delivered the Voting Agreement.

5.7     _Services Agreement_. Volvo Cars Technology (USA) shall have executed and delivered the Services Agreement.

5.8     _IP Assignment_. Purchaser shall have executed and delivered the IP Assignment.

6.     _Survival of Representations and Warranties; Transaction Related Indemnification_.

6.1     _Survival_.

(a)     All representations, warranties, covenants, and agreements of the Company, the Founders and Purchaser made in this Agreement, in the Disclosure Schedule delivered to Purchaser and all agreements, documents and instruments executed and delivered in connection herewith (i) shall be deemed to have been relied upon by the party or parties to whom they are made and (ii) shall bind the parties' successors and assigns (including, without limitation, any successor to the Company by way of acquisition, merger or otherwise), whether so expressed or not, and, except as otherwise provided in this Agreement, all such representations, warranties, covenants and agreements shall inure to the benefit of the parties (subject to _Section 7.2_) and their respective successors and assigns and permitted transferees of the Securities, whether so expressed or not.

(b)     The representations and warranties of the parties contained in this Agreement or in any certificates or other writing delivered pursuant to this Agreement or in connection herewith will survive the Closing until the 12 month anniversary of the Closing; _provided_, that the representations and warranties set out in _Section 2.1_ (_Organization, Good Standing, Corporate Power and Qualification_), _Section 2.2_ (_Capitalization_), _Section 2.3_ (_Subsidiaries_), _Section 2.4_ (_Authorization_), _Section 2.5_ (_Valid Issuance of Shares_) and _Section 2.16_ (_Tax Returns and Payments_) shall survive the Closing until 30 days following the expiration of the maximum statutory limitations period permitted under applicable law. Notwithstanding the

foregoing, any claim for breach of a representation or warranty in respect of which indemnity may be sought under this Agreement shall survive the time at which it would otherwise terminate pursuant to this section if written notice of such claim has been given to the party against whom such indemnification may be sought prior to the end of the applicable survival period described in this <u>Section 6.1</u>. Subject to any applicable statutes of limitations, all covenants and agreements of the parties contained in this Agreement will survive the Closing indefinitely in accordance with their terms.

      7.    <u>Covenants.</u>  In consideration of the transactions contemplated hereby, the parties agree as follows:

      7.1    <u>Non-Solicitation</u>. For a period of two years from the date of the Closing, none of the Company or any Founder shall directly or indirectly through one or more of any of their respective Affiliates, hire or solicit, or encourage any other Person to hire or solicit, any individual who has been employed by, or has an independent contracting arrangement with, Purchaser or any of its Affiliates within two (2) years prior to the date of such hiring or solicitation, or encourage any such individual to leave such employment.

      7.2    <u>Non-Competition Agreement</u>.  For a period of two years from the date of the Closing, Purchaser and its Affiliates (as defined below) shall not operate a Competitive Business; provided, that nothing in this Section 7.2 shall prohibit Purchaser, or any of its Affiliates or successors and assigns, from (a) acquiring or owning, directly or indirectly, voting securities of any publicly traded Person, (b) conducting any business that Purchaser conducts as of the date hereof so long as it does not utilize the Transferred IP, or (c) utilizing technology from any Competitive Business for purposes of its vehicle production operations. For purposes of this <u>Section 7.2</u>, (i) "**Competitive Business**" means any other Person engaged, directly or indirectly, in whole or in part, in the commercialization of a data enablement and/or data sharing system that communicates data to and from vehicles using the Android operating system, and (ii) "**Affiliates**" means Volvo Car AB and any Person controlled by Volvo Car AB.

      7.3    <u>Release Regarding Transferred IP</u>. Purchaser, on behalf of itself and its Affiliates, hereby releases each of the Founders from any breach by them of their agreements with Purchaser or its Affiliates arising from the Founder's activities pertaining to the development of the Transferred IP prior to the date of this Agreement.

      7.4    <u>Dilution Protection</u>.  In the event that the Company shall, at any time and from time to time after the date hereof and continuing until the Company has received aggregate gross proceeds from the sale of equity securities of the Company in excess of $10,000,000, issues or is deemed to have issued in accordance with Subsection 4.4.3 of the Restated Certificate any Additional Shares of Common Stock (as defined in the Restated Certificate), and as a result of such issuance, Purchaser's Pro Rata Portion (as defined below) will fall below 5%, then the Company will issue to Purchaser such number of Additional Shares of Common Stock as necessary to increase Purchaser's Pro Rata Portion to 5%. For the purposes of this <u>Section 7.4</u>, "**Pro Rata Portion**" means a fraction determined by dividing (i) the number of shares of Common Stock and shares of Common Stock issuable on the conversion of the Preferred Stock then held by Purchaser or its successors and assigns, by (ii) the total number of shares of

Common Stock then outstanding, in each case determined on a fully-diluted, as-converted basis as of immediately prior to such issuance.

8. <u>Miscellaneous</u>.

8.1 <u>Publication</u>. For so long as Purchaser holds any shares of capital stock of the Company, none of the Company or its Affiliates or any of their respective officers, directors or employees shall (a) use the corporate name, trade name or logo of Purchaser or any of its Affiliates (including the "Volvo" name or trademark) in a public manner or format (including reference on or links to websites, press releases, etc.) or (b) issue any statement or communication to any third party (other than to their legal, accounting and financial advisors, Company's advisory board members,  and other than to current and potential investors, customers, or acquirers under a duty of confidentiality) regarding the investment in the Company by Purchaser without the prior written approval of Purchaser; provided, that the forgoing will not apply for a disclosure or publication of such information that is required to be made by order or requirement of a court, administrative body or other governmental body (a "**Compelled Disclosure**"); provided, further that in the event of a request for any Compelled Disclosure, the Company will to the extent permitted under applicable law provide Purchaser with prompt written notice of such request and cooperate reasonably with Purchaser in seeking to minimize the extent of disclosure required that uses the corporate name, trade name or logo of Purchaser or any of its Affiliates.

8.2 <u>Successors and Assigns</u>. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

8.3 <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

8.4 <u>Titles and Subtitles</u>. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

8.5 <u>Notices</u>.

(a) All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt, or (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five days after having been

sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective parties at their address as set forth on the signature page, or to such e-mail address, facsimile number or address as subsequently modified by written notice given in accordance with this Section 8.5(a). If notice is given to the Company, a copy shall also be sent to 231 Market Place, Suite 226, San Ramon, CA 94583; Attention: Syed M. Saifullah; mubeen@aidenabled.com, with a copy to Khan Law Group, LC, 9431 Haven Ave., Suite 100, Rancho Cucamonga, CA 91730, Attention Masood Khan; mkhan@khanlegal.com; and if notice is given to Purchaser, a copy shall also be given to such other person as may be set forth on Schedule A and a copy shall be sent to Volvo Car Technology Fund AB, 380 N. Pastoria Ave., Sunnyvale, CA 94087, Attention: Daniel Karlsson, danielkarlsson.3@volvocars.com, with a copy to McKennon, Shelton & Henn LLP, 401 East Pratt Street, Suite 2600, Baltimore, MD 21202, Attention: Sulee Stinson Clay; sulee.clay@mshllp.com.

(b)     Subject to the limitations set forth in Delaware General Corporation Law §232(e), Purchaser consents to the delivery of any notice to stockholders given by the Company under the Delaware General Corporation Law or the Company's certificate of incorporation or bylaws by (i) facsimile telecommunication to the facsimile number set forth on the signature page (or to any other facsimile number for Purchaser or other security holder in the Company's records), (ii) electronic mail to the electronic mail address set forth on the signature page (or to any other electronic mail address for Purchaser or other security holder in the Company's records), (iii) posting on an electronic network together with separate notice to Purchaser or other security holder of such specific posting or (iv) any other form of electronic transmission (as defined in the Delaware General Corporation Law) directed to Purchaser. This consent may be revoked by a Purchaser by written notice to the Company and may be deemed revoked in the circumstances specified in Delaware General Corporation Law §232.

8.6     No Finder's Fees. Each party represents that it neither is nor will be obligated for any finder's fee or commission in connection with this transaction. Purchaser agrees to indemnify and to hold harmless the Company from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which Purchaser or any of its officers, employees or representatives is responsible.

8.7     Expenses. The parties will each pay their own expenses with respect to the transactions contemplated by this Agreement.

8.8     Amendments and Waivers. Any term of this Agreement may be amended, terminated or waived only with the written consent of the Company and the holders of at least a majority of the then outstanding Shares, including Purchaser. Any amendment or waiver effected in accordance with this Section 8.8 shall be binding upon Purchaser and each transferee of the Shares (or the Common Stock issuable upon conversion thereof), each future holder of all such securities, and the Company.

8.9     Severability. If any arbitrator or court finds any provision of this Agreement to be invalid or unenforceable, then: (a) the arbitrator or court shall enforce the

DocuSign Envelope ID: EC0BD867-A6B7-4D3D-A74D-8CA7D389E8FD
Case 5:22-cv-00390   Document 1-2   Filed 01/20/22   Page 246 of 298

EXECUTION VERSION

provision to the maximum lawful extent and (b) the arbitrator's or court's finding of invalidity or unenforceability shall not affect the validity or enforceability of any other provision of this Agreement.

      8.10   <u>Delays or Omissions</u>. No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

      8.11   <u>Entire Agreement</u>. This Agreement (including the exhibits hereto), the Restated Certificate and the other Transaction Agreements constitute the full and entire understanding and agreement between the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties are expressly canceled.

      8.12   <u>Dispute Resolution</u>. Any unresolved controversy or claim arising out of or relating to this Agreement, except as (i) otherwise provided in this Agreement, or (ii) any such controversies or claims arising out of either party's intellectual property rights for which a provisional remedy or equitable relief is sought, shall be submitted to arbitration by one arbitrator mutually agreed upon by the parties, and if no agreement can be reached within thirty (30) days after names of potential arbitrators have been proposed by the American Arbitration Association (the "**AAA**"), then by one arbitrator having reasonable experience in corporate finance transactions of the type provided for in this Agreement and who is chosen by the AAA. The arbitration shall take place in San Francisco, California, in accordance with the AAA rules then in effect, and judgment upon any award rendered in such arbitration will be binding and may be entered in any court having jurisdiction thereof.  There shall be limited discovery prior to the arbitration hearing as follows: (a) exchange of witness lists and copies of documentary evidence and documents relating to or arising out of the issues to be arbitrated, (b) depositions of all party witnesses and (c) such other depositions as may be allowed by the arbitrators upon a showing of good cause.  Depositions shall be conducted in accordance with the California Code of Civil Procedure, the arbitrator shall be required to provide in writing to the parties the basis for the award or order of such arbitrator, and a court reporter shall record all hearings, with such record constituting the official transcript of such proceedings. Each party will bear its own costs in respect of any disputes arising under this Agreement. The prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled.

DocuSign Envelope ID: EC0BD867-A6B7-4D3D-A74D-8CA7D389E8FD

8.13    <u>Governing Law</u>. This Agreement shall be governed by the internal law of the State of Delaware, without regard to conflict of law principles that would result in the application of any law other than the law of the State of Delaware.

8.14    <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

*Signature Page Follows*

EXECUTION VERSION

**IN WITNESS WHEREOF**, the parties have executed this Seed Preferred Stock Purchase Agreement as of the date first written above.

**AIDEN AUTOMOTIVE TECHNOLOGIES, INC.**

By: _____
Name:  Niclas Gyllenram
Title:  President


**FOUNDERS**:

_____
SYED MUBEEN SAIFULLAH

_____
NICLAS GYLLENRAM

_____
JONAS FENN


**PURCHASER**:


**VOLVO CAR TECHNOLOGY FUND AB**

By: _____
Name: Raymond Millien
Title: Managing Director

By: _____
Name: Pär Arvidsson
Title: Chairman of the Board

# EXHIBIT A

## PURCHASER SCHEDULE

| **Name** | **Shares of Seed Preferred Stock** |
|---|---|
| Volvo Car Technology Fund AB | 900,000 |
| **TOTAL** | **900,000** |

## **EXHIBIT B**

### **RESTATED CERTIFICATE**

{See attached.}

# **EXHIBIT C**

## **DISCLOSURE SCHEDULE**

{See Attached.}

Exhibit C

# **EXHIBIT D**

PROPRIETARY INFORMATION, ASSIGNMENT OF INVENTIONS, NON-SOLICITATION
AND NON-COMPETITION AGREEMENT.

{See attached.}

# EXHIBIT 4

## VOTING AGREEMENT

THIS VOTING AGREEMENT (this "**Agreement**"), is made and entered into as of March 8, 2021 (the "**Effective Date**") by and among Aiden Automotive Technologies, Inc., a Delaware corporation (the "**Company**"), Volvo Car Technology Fund AB, reg no. 556877-5760, a Sweden private limited liability company (together with its successors and assigns, "**Volvo**") and each other holder of the Company's Seed Preferred Stock, $0.00001 par value per share ("**Preferred Stock**") listed on Schedule A (collectively with Volvo and any subsequent investors, or transferees, who become parties hereto as "Investors" pursuant to Sections 7.1(a) or 7.2 below, the "**Investors**"), and those certain stockholders of the Company and holders of options and warrants to acquire shares of the capital stock of the Company listed on Schedule B (together with any subsequent stockholders, option holders, warrant holders or any transferees, who become parties hereto as "Key Holders" pursuant to Sections 7.1(b) or 7.2 below, the "**Key Holders**," and together collectively with the Investors, the "**Stockholders**").

## RECITALS

A.    Concurrently with the execution of this Agreement, the Company and Volvo are entering into a Seed Preferred Stock Purchase Agreement (the "**Purchase Agreement**") providing for the sale of shares of the Preferred Stock, and in connection with that agreement the parties desire to provide the Investors with the right, among other rights, to designate the election of certain members of the board of directors of the Company (the "**Board**") in accordance with the terms of this Agreement.

B.    The Amended and Restated Certificate of Incorporation of the Company (the "**Restated Certificate**") provides that (a) the holders of record of a majority of the outstanding shares of the Company's common stock, par value $0.00001 per share ("**Common Stock**"), exclusively and as a separate class, shall be entitled to elect three directors of the Company, and (b) if the Company or the Founders (as defined in the Purchaser Agreement) default or otherwise breach any of their obligations contained in the Transaction Documents (each, a "**Company Default**"), and such default or breach is not cured within any applicable cure period or waived by Volvo, then Volvo shall thereafter be entitled to elect one director of the Company (the "**Preferred Director**").

C.    The parties also desire to enter into this Agreement to set forth their agreements and understandings with respect to how shares of the Company's capital stock held by them will be voted on, or tendered in connection with, an acquisition of the Company an increase in the number of shares of Common Stock required to provide for the conversion of the Preferred Stock.

NOW, THEREFORE, the parties agree as follows:

1.    Voting Provisions Regarding the Board.

    1.1    Size of the Board. Each Stockholder agrees to vote, or cause to be voted, all Shares (as defined below) owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that the size of the Board shall be set and remain at three (3) directors, and not to exceed

nine (9); unless the Preferred Director has been designated to the Board in which event the size of the Board shall be increased by one (1).For purposes of this Agreement, the term "**Shares**" shall mean and include any securities of the Company that the holders of which are entitled to vote for members of the Board, including without limitation, all shares of Common Stock and Preferred Stock, by whatever name called, now owned or subsequently acquired by a Stockholder, however acquired, whether through stock splits, stock dividends, reclassifications, recapitalizations, similar events or otherwise.

      1.2   <u>Board Composition</u>. Each Stockholder agrees to vote, or cause to be voted, all Shares owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that at each annual or special meeting of stockholders at which an election of directors is held or pursuant to any written consent of the stockholders, subject to Section 5, the following persons shall be elected to the Board:

      (a)   At any time after a Company Default (as defined below) and continuing only thereafter, for so long as Volvo and its Affiliates continue to own Shares, one person designated from time to time by Volvo (the "**Preferred Director**"); and

      (b)   The remaining directors permitted by the Restated Certificate shall be designated from time to time by the holders of a majority of the shares of Common Stock outstanding, which individuals shall initially be Niclas Gyllenram, Jonas Fenn and Syed M. Saifullah.

      For purposes of this Agreement, (i) an individual, firm, corporation, partnership, association, limited liability company, trust or any other entity (collectively, a "**Person**") shall be deemed an "**Affiliate**" of another Person who, directly or indirectly, controls, is controlled by, or is under common control with the Person specified, where "**control**" means the possession, directly or indirectly, by agreement or otherwise, of at least 50% of the voting stock, partnership interest or other ownership interest, or the power to appoint or remove a majority of the board of directors or other governing body of such Person, or to cause the direction of the management of such Person and (ii) "**Company Default**" means, collectively, any default or breach by the Company under any of the Transaction Documents of any of the Founder Obligations or the Company Obligations set forth on <u>Schedule C</u> hereto and made a part of this Agreement as if fully set forth herein and, to the extent such default or breach is curable, such default or breach continues for 15 days after written notice thereof to the Company.

      1.3   <u>Board Observer</u>. So long as Volvo holds shares of Preferred Stock or Common Stock, it shall have the right to appoint one representative (a "**Board Observer**") to observe all meetings of the Board in a non-voting capacity, and in this respect, the Company shall give such Board Observer copies of all notices, minutes, consents, and other materials that it provides to the Board at the same time and in the same manner as provided to such directors; <u>provided</u>, <u>however</u> that such representative shall agree to hold in confidence and trust all information so provided.  The Board Observer shall not have a right to vote on any matters presented to the Board.

      1.4   <u>Failure to Designate a Board Member</u>. In the absence of any designation from the Persons or groups with the right to designate a director as specified above, the director

DocuSign Envelope ID: EC0BD867-A6B7-4D3D-A74D-8CA7D389E8FD

previously designated by them and then serving shall be reelected if still eligible and willing to serve as provided herein and otherwise, such Board seat shall remain vacant.

1.5 <u>Removal of Board Members</u>. Each Stockholder also agrees to vote, or cause to be voted, all Shares owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that:

(a) no director elected or appointed pursuant to <u>Section 1.2</u> may be removed from office unless (i) such removal is directed or approved by the affirmative vote of the Person(s), or of the holders of at least a majority of the Shares entitled under <u>Section 1.2</u> to designate that director; or (ii) the Person(s) originally entitled to designate or approve such director pursuant to <u>Section 1.2</u> is no longer so entitled to designate or approve such director;

(b) any vacancies created by the resignation, removal or death of a director elected or appointed pursuant to <u>Sections 1.2</u>, <u>1.4</u> or <u>1.5</u> shall be filled pursuant to the provisions of <u>Section 1.2</u>; and

(c) upon the request of any party entitled to designate a director as provided in <u>Section 1.2(a)</u> or <u>1.2(b)</u> to remove such director, such director shall be removed.

All Stockholders agree to execute any written consents required to perform the obligations of this <u>Section 1.2</u>, and the Company agrees at the request of any Person or group entitled to designate directors to call a special meeting of stockholders for the purpose of electing directors.

1.6 <u>No Liability for Election of Recommended Directors</u>. No Stockholder, nor any Affiliate of any Stockholder, shall have any liability as a result of designating a person for election as a director for any act or omission by such designated person in his or her capacity as a director of the Company, nor shall any Stockholder have any liability as a result of voting for any such designee in accordance with the provisions of this Agreement.

1.7 <u>No "Bad Actor" Designees</u>. Each Person with the right to designate or participate in the designation of a director as specified above hereby represents and warrants to the Company that, to such Person's knowledge, none of the "bad actor" disqualifying events described in Rule 506(d)(1)(i)-(viii) promulgated under the Securities Act of 1933, as amended (the "Securities Act") (each, a "**Disqualification Event**"), is applicable to such Person's initial designee named above except, if applicable, for a Disqualification Event as to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable. Any director designee to whom any Disqualification Event is applicable, except for a Disqualification Event to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable, is hereinafter referred to as a "**Disqualified Designee**". Each Person with the right to designate or participate in the designation of a director as specified above hereby covenants and agrees (A) not to designate or participate in the designation of any director designee who, to such Person's knowledge, is a Disqualified Designee and (B) that in the event such Person becomes aware that any individual previously designated by any such Person is or has become a Disqualified Designee, such Person shall as promptly as practicable take such actions as are necessary to remove such Disqualified Designee from the Board and designate a replacement designee who is not a Disqualified Designee.

2. <u>Matters Requiring Preferred Director Approval</u>. At any time that the Preferred Director is designated to the Board of Directors, the Company hereby covenants and agrees that it shall not, without approval of the Board of Directors, which approval must include the affirmative vote of the Preferred Director:

       2.1    change the principal business of the Company, enter new lines of business, or exit the current line of business;

       2.2    grant or issue any option or other equity incentive grant with non-standard vesting or acceleration provisions;

       2.3    issue any shares of capital stock of the Company, other than Exempted Securities (as defined in the Certificate of Incorporation);

       2.4    increase the number of shares available for issuance under any equity incentive plan;

       2.5    approve the budget and any strategic operating plan for the Company for each fiscal year;

       2.6    file for bankruptcy or consent to the filing of any involuntary petition in bankruptcy;

       2.7    make, or permit any subsidiary to make, any loan or advance to, or own any stock or other securities of, any subsidiary or other corporation, partnership, or other entity unless it is wholly owned by the Company;

       2.8    make, or permit any subsidiary to make, any loan or advance to any Person, including, without limitation, any employee or director of the Company or any subsidiary, except advances and similar expenditures in the ordinary course of business or under the terms of an employee stock or option plan approved by the Board of Directors;

       2.9    enter into any joint venture, partnership, collaboration or other strategic commercial relationship with any strategic partner, vendor or supplier with a value in excess of $500,000, other than in the ordinary course of business;

       2.10    mortgage or pledge, or create a security interest in, or permit any subsidiary to mortgage, pledge or create a security interest in, any assets of the Company other than in connection with equipment leases which are secured only by the leased equipment or pursuant to indebtedness permitted by Subsection 5.4(l);

       2.11    incur or guarantee any aggregate indebtedness in excess of $500,000 that is not already included in a budget approved by the Board of Directors;

       2.12    make any capital expenditures in excess of $500,000 that are not already included in a budget approved by the Board of Directors;

       2.13    otherwise enter into or be a party to any transaction with any director, officer, or employee of the Company or any "associate" (as defined in Rule 12b-2 promulgated

under the Exchange Act) of any such Person, except for transactions made in the ordinary course of business and pursuant to reasonable requirements of the Company's business and upon fair and reasonable terms that are approved by a majority of the Board of Directors;

2.14    hire, terminate, or change the compensation of the executive officers, including approving any option grants or stock awards to executive officers;

2.15    sell, assign, license, pledge, or encumber material technology or intellectual property, other than licenses granted in the ordinary course of business;

2.16    enter into any corporate strategic relationship involving the payment, contribution, or assignment by the Company or to the Company of money or assets greater than $500,000 or

2.17    enter into any agreement regarding any of the foregoing items.

3.    <u>Board Matters</u>. At any time that the Preferred Director has been designated to the Board of Directors, unless otherwise determined by the vote of a majority of the directors then in office, the Board of Directors shall meet at least quarterly in accordance with an agreed-upon schedule. The Company shall reimburse the nonemployee directors for all reasonable out-of-pocket travel expenses incurred (consistent with the Company's travel policy) in connection with attending meetings of the Board of Directors. The Preferred Director, if any, shall be entitled in such person's discretion to be a member of any committee of the Board of Directors.

4.    <u>Vote to Increase Authorized Common Stock</u> . Each Stockholder agrees to vote or cause to be voted all Shares owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to increase the number of authorized shares of Common Stock from time to time to ensure that there will be sufficient shares of Common Stock available for conversion of all of the shares of Preferred Stock outstanding at any given time.

5.    <u>Drag-Along Right</u>.

5.1    <u>Definitions</u>. A "**Sale of the Company**" shall mean either: (a) a transaction or series of related transactions in which a Person, or a group of related Persons, acquires from stockholders of the Company shares representing more than 50% of the outstanding voting power of the Company (a "**Stock Sale**"); or (b) a transaction that qualifies as a "**Deemed Liquidation Event**" as defined in the Restated Certificate.

5.2    <u>Actions to be Taken</u>. In the event that the Board and Volvo approve a Sale of the Company specifying that this Section 5 shall apply to such transaction, then, subject to satisfaction of each of the conditions set forth in <u>Section 5.3</u> below, each Stockholder and the Company hereby agree:

(a)    if such transaction requires stockholder approval, with respect to all Shares that such Stockholder owns or over which such Stockholder otherwise exercises voting power, to vote (in person, by proxy or by action by written consent, as applicable) all Shares in favor of, and adopt, such Sale of the Company (together with any related amendment

or restatement to the Restated Certificate required to implement such Sale of the Company) and to vote in opposition to any and all other proposals that could reasonably be expected to delay or impair the ability of the Company to consummate such Sale of the Company;

(b)     if such transaction is a Stock Sale, to sell the same proportion of shares of capital stock of the Company beneficially held by such Stockholder as is being sold by Volvo to the Person to whom Volvo proposes to sell its Shares, and, except as permitted in Section 5.3 below, on the same terms and conditions as the other stockholders of the Company;

(c)     to execute and deliver all related documentation and take such other action in support of the Sale of the Company as shall reasonably be requested by the Company in order to carry out the terms and provision of this Section 5, including, without limitation, executing and delivering instruments of conveyance and transfer, and any purchase agreement, merger agreement, any associated indemnity agreement, or escrow agreement, any associated voting, support, or joinder agreement, consent, waiver, governmental filing, share certificates duly endorsed for transfer (free and clear of impermissible liens, claims and encumbrances), and any similar or related documents;

(d)     not to deposit, and to cause their Affiliates not to deposit, except as provided in this Agreement, any Shares of the Company owned by such party or Affiliate in a voting trust or subject any Shares to any arrangement or agreement with respect to the voting of such Shares, unless specifically requested to do so by the acquirer in connection with the Sale of the Company;

(e)     to refrain from (i) exercising any dissenters' rights or rights of appraisal under applicable law at any time with respect to such Sale of the Company, or (ii); asserting any claim or commencing any suit (x) challenging the Sale of the Company or this Agreement, or (y) alleging a breach of any fiduciary duty of the Board (including, without limitation, aiding and abetting breach of fiduciary duty) in connection with the evaluation, negotiation or entry into the Sale of the Company, or the consummation of the transactions contemplated thereby;

(f)     if the consideration to be paid in exchange for the Shares pursuant to this Section 5 includes any securities and due receipt thereof by any Stockholder would require under applicable law (x) the registration or qualification of such securities or of any person as a broker or dealer or agent with respect to such securities; or (y) the provision to any Stockholder of any information other than such information as a prudent issuer would generally furnish in an offering made solely to "accredited investors" as defined in Regulation D promulgated under the Securities Act of 1933, as amended (the "**Securities Act**"), the Company may cause to be paid to any such Stockholder in lieu thereof, against surrender of the Shares which would have otherwise been sold by such Stockholder, an amount in cash equal to the fair value (as determined in good faith by the Board) of the securities which such Stockholder would otherwise receive as of the date of the issuance of such securities in exchange for the Shares; and

(g)     in the event that Volvo, in connection with such Sale of the Company, appoints a stockholder representative (the "**Stockholder Representative**") with respect to matters affecting the Stockholders under the applicable definitive transaction agreements following consummation of such Sale of the Company, (x) to consent to (i) the

appointment of such Stockholder Representative, (ii) the establishment of any applicable escrow, expense or similar fund in connection with any indemnification or similar obligations, and (iii) the payment of such Stockholder's pro rata portion (from the applicable escrow or expense fund or otherwise) of any and all reasonable fees and expenses to such Stockholder Representative in connection with such Stockholder Representative's services and duties in connection with such Sale of the Company and its related service as the representative of the Stockholders, and (y) not to assert any claim or commence any suit against the Stockholder Representative or any other Stockholder with respect to any action or inaction taken or failed to be taken by the Stockholder Representative, within the scope of the Stockholder Representative's authority, in connection with its service as the Stockholder Representative, absent fraud, bad faith, or willful misconduct.

5.3     Conditions. Notwithstanding anything to the contrary set forth herein, a Stockholder will not be required to comply with Section 5.2 above in connection with any proposed Sale of the Company (the "**Proposed Sale**"), unless:

(a)     any representations and warranties to be made by such Stockholder in connection with the Proposed Sale are limited to representations and warranties related to authority, ownership and the ability to convey title to such Shares, including, but not limited to, representations and warranties that (i) the Stockholder holds all right, title and interest in and to the Shares such Stockholder purports to hold, free and clear of all liens and encumbrances, (ii) the obligations of the Stockholder in connection with the transaction have been duly authorized, if applicable, (iii)  the documents to be entered into by the Stockholder have been duly executed by the Stockholder and delivered to the acquirer and are enforceable (subject to customary limitations) against the Stockholder in accordance with their respective terms; and (iv) neither the execution and delivery of documents to be entered into by the Stockholder in connection with the transaction, nor the performance of the Stockholder's obligations thereunder, will cause a breach or violation of the terms of any agreement to which the Stockholder is a party, or any law or judgment, order or decree of any court or governmental agency that applies to the Stockholder;

(b)     such Stockholder is not required to agree (unless such Stockholder is a Company officer or employee) to any restrictive covenant in connection with the Proposed Sale (including without limitation any covenant not to compete or covenant not to solicit customers, employees or suppliers of any party to the Proposed Sale);

(c)     such Stockholder and its affiliates are not required to amend, extend or terminate any contractual or other relationship with the Company, the acquirer or their respective affiliates, except that the Stockholder may be required to agree to terminate the investment-related documents between or among such Stockholder, the Company and/or other stockholders of the Company;

(d)     the Stockholder is not liable for the breach of any representation, warranty or covenant made by any other Person in connection with the Proposed Sale, other than the Company (except to the extent that funds may be paid out of an escrow established to cover breach of representations, warranties and covenants of the Company as well as breach by any stockholder of any of identical representations, warranties and covenants provided by all stockholders);

7

(e)      liability shall be limited to such Stockholder's applicable share (determined based on the respective proceeds payable to each Stockholder in connection with such Proposed Sale in accordance with the provisions of the Restated Certificate) of a negotiated aggregate indemnification amount that applies equally to all Stockholders but that in no event exceeds the amount of consideration otherwise payable to such Stockholder in connection with such Proposed Sale, except with respect to claims related to fraud by such Stockholder, the liability for which need not be limited as to such Stockholder;

(f)      upon the consummation of the Proposed Sale (i) each holder of each class or series of the capital stock of the Company will receive the same form of consideration for their shares of such class or series as is received by other holders in respect of their shares of such same class or series of stock, and if any holders of any capital stock of the Company are given a choice as to the form of consideration to be received as a result of the Proposed Sale, all holders of such capital stock will be given the same option, (ii) each holder of a series of Preferred Stock will receive the same amount of consideration per share of such series of Preferred Stock as is received by other holders in respect of their shares of such same series, (iii) each holder of Common Stock will receive the same amount of consideration per share of Common Stock as is received by other holders in respect of their shares of Common Stock, and (iv) unless waived pursuant to the terms of the Restated Certificate and as may be required by law, the aggregate consideration receivable by all holders of the Preferred Stock and Common Stock shall be allocated among the holders of Preferred Stock and Common Stock on the basis of the relative liquidation preferences to which the holders of each respective series of Preferred Stock and the holders of Common Stock are entitled in a Deemed Liquidation Event (assuming for this purpose that the Proposed Sale is a Deemed Liquidation Event) in accordance with the Company's Certificate of Incorporation in effect immediately prior to the Proposed Sale; provided, however, that, notwithstanding the foregoing provisions of this Section 5.3(f), if the consideration to be paid in exchange for the Key Holder Shares or Investor Shares, as applicable, pursuant to this Section 5.3(f) includes any securities and due receipt thereof by any Key Holder or Investor would require under applicable law (x) the registration or qualification of such securities or of any person as a broker or dealer or agent with respect to such securities; or (y) the provision to any Key Holder or Investor of any information other than such information as a prudent issuer would generally furnish in an offering made solely to "accredited investors" as defined in Regulation D promulgated under the Securities Act, the Company may cause to be paid to any such Key Holder or Investor in lieu thereof, against surrender of the Key Holder Shares or Investor Shares, as applicable, which would have otherwise been sold by such Key Holder or Investor, an amount in cash equal to the fair value (as determined in good faith by the Board) of the securities which such Key Holder or Investor would otherwise receive as of the date of the issuance of such securities in exchange for the Key Holder Shares or Investor Shares, as applicable;

(g)      subject to clause (f) above, requiring the same form of consideration to be available to the holders of any single class or series of capital stock, if any holders of any capital stock of the Company are given an option as to the form and amount of consideration to be received as a result of the Proposed Sale, all holders of such capital stock will be given the same option; provided, however, that nothing in this Section 5.3(g) shall entitle any holder to receive any form of consideration that such holder would be ineligible to receive as a

DocuSign Envelope ID: EC0PD867-A6B7-4D3D-A74D-8CA7D389E8FD

result of such holder's failure to satisfy any condition, requirement or limitation that is generally applicable to the Company's stockholders.

(h)    the Electing Holders shall exercise its rights pursuant to this <u>Section 5</u> by delivering a written notice (the "**Drag-along Notice**") to each Stockholder no later than 20 days prior to the closing date of such Proposed Sale. The Drag-along Notice shall make reference to the Electing Holder's rights and obligations hereunder and shall describe in reasonable detail:

(i)    the number of shares of Common Stock to be sold by Volvo, if the Proposed Sale is structured as a Stock Sale;

(ii)    the identity of the third party purchaser;

(iii)    the proposed date, time and location of the closing of the Proposed Sale;

(iv)    the per share purchase price and the other material terms and conditions of the Proposed Sale, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof; and

(v)    a copy of any form of all definitive agreements proposed to be executed in connection therewith.

5.4    <u>Restrictions on Sales of Control of the Company</u>. No Stockholder shall be a party to any Stock Sale unless (a) all holders of Preferred Stock are allowed to participate in such transaction(s) and (b) the consideration received pursuant to such transaction is allocated among the parties thereto in the manner specified in the Company's Certificate of Incorporation in effect immediately prior to the Stock Sale (as if such transaction(s) were a Deemed Liquidation Event), unless the holders of at least the requisite percentage required to waive treatment of the transaction(s) as a Deemed Liquidation Event pursuant to the terms of the Restated Certificate, elect to allocate the consideration differently by written notice given to the Company at least 10 days prior to the effective date of any such transaction or series of related transactions.

6.    <u>Remedies</u>.

6.1    <u>Covenants of the Company</u>. The Company agrees to use its commercially reasonable best efforts, within the requirements of applicable law, to ensure that the rights granted under this Agreement are effective and that the parties enjoy the benefits of this Agreement. Such actions include, without limitation, the use of the Company's commercially reasonable best efforts to cause the nomination and election of the directors as provided in this Agreement.

6.2    <u>Irrevocable Proxy and Power of Attorney</u>. Each party to this Agreement hereby constitutes and appoints as the proxies of the party and hereby grants a power of attorney to the Chief Executive Officer of the Company, and a designee of Volvo, and each of them, with full power of substitution, with respect to the matters set forth herein, including, without

limitation, votes to increase authorized shares pursuant to <u>Section 2</u> hereof and votes regarding any Sale of the Company pursuant to <u>Section 5</u> hereof, and hereby authorizes each of them to represent and vote, if and only if the party (i) fails to vote, or (ii) attempts to vote (whether by proxy, in person or by written consent), in a manner which is inconsistent with the terms of <u>Sections 2</u> and <u>5</u> of this Agreement, all of such party's Shares in favor of the election of persons as members of the Board determined pursuant to and in accordance with the terms and provisions of this Agreement or the increase of authorized shares or approval of any Sale of the Company pursuant to and in accordance with the terms and provisions of <u>Sections 2</u> and <u>5</u>, respectively, of this Agreement or to take any action reasonably necessary to effect <u>Sections 2</u> and <u>5</u>, respectively, of this Agreement. The power of attorney granted hereunder shall authorize the Chief Executive Officer of the Company to execute and deliver the documentation referred to in <u>Section 5.2(c)</u> on behalf of any party failing to do so within five business days of a request by the Company. Each of the proxy and power of attorney granted pursuant to this <u>Section 6.2</u> is given in consideration of the agreements and covenants of the Company and the parties in connection with the transactions contemplated by this Agreement and, as such, each is coupled with an interest and shall be irrevocable unless and until this Agreement terminates or expires pursuant to <u>Section 6</u> hereof. Each party hereto hereby revokes any and all previous proxies or powers of attorney with respect to the Shares and shall not hereafter, unless and until this Agreement terminates or expires pursuant to <u>Section 6</u> hereof, purport to grant any other proxy or power of attorney with respect to any of the Shares, deposit any of the Shares into a voting trust or enter into any agreement (other than this Agreement), arrangement or understanding with any person, directly or indirectly, to vote, grant any proxy or give instructions with respect to the voting of any of the Shares, in each case, with respect to any of the matters set forth herein.

6.3 <u>Specific Enforcement</u>. Each party acknowledges and agrees that each party hereto will be irreparably damaged in the event any of the provisions of this Agreement are not performed by the parties in accordance with their specific terms or are otherwise breached. Accordingly, it is agreed that each of the Company and the Stockholders shall be entitled to an injunction to prevent breaches of this Agreement, and to specific enforcement of this Agreement and its terms and provisions in any action instituted in any court of the United States or any state having subject matter jurisdiction.

6.4 <u>Remedies Cumulative</u>. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

7. "<u>Bad Actor</u>" Matters.

7.1 <u>Definitions</u>. For purposes of this Agreement:

(a) "**Company Covered Person**" means, with respect to the Company as an "issuer" for purposes of Rule 506 promulgated under the Securities Act, any Person listed in the first paragraph of Rule 506(d)(1).

(b) "**Disqualified Designee**" means any director designee to whom any Disqualification Event is applicable, except for a Disqualification Event as to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable.

(c) "**Disqualification Event**" means a "bad actor" disqualifying event

described in Rule 506(d)(1)(i)-(viii) promulgated under the Securities Act.

(d) "**Rule 506(d) Related Party**" means, with respect to any Person, any other Person that is a beneficial owner of such first Person's securities for purposes of Rule 506(d) under the Securities Act.

7.2     Representations.

(a) Each Person with the right to designate or participate in the designation of a director pursuant to this Agreement hereby represents that (i) such Person has exercised reasonable care to determine whether any Disqualification Event is applicable to such Person, any director designee designated by such Person pursuant to this Agreement or any of such Person's Rule 506(d) Related Parties, except, if applicable, for a Disqualification Event as to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable and (ii) no Disqualification Event is applicable to such Person, any Board member designated by such Person pursuant to this Agreement or any of such Person's Rule 506(d) Related Parties, except, if applicable, for a Disqualification Event as to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable. Notwithstanding anything to the contrary in this Agreement, each Investor makes no representation regarding any Person that may be deemed to be a beneficial owner of the Company's voting equity securities held by such Investor solely by virtue of that Person being or becoming a party to (x) this Agreement, as may be subsequently amended, or (y) any other contract or written agreement to which the Company and such Investor are parties regarding (1) the voting power, which includes the power to vote or to direct the voting of, such security; and/or (2) the investment power, which includes the power to dispose, or to direct the disposition of, such security.

(b) The Company hereby represents and warrants to the Investors that no Disqualification Event is applicable to the Company or, to the Company's knowledge, any Company Covered Person, except for a Disqualification Event as to which Rule 506(d)(2)(ii–iv) or (d)(3) is applicable.

7.3     Covenants. Each Person with the right to designate or participate in the designation of a director pursuant to this Agreement covenants and agrees (i) not to designate or participate in the designation of any director designee who, to such Person's knowledge, is a Disqualified Designee, (ii) to exercise reasonable care to determine whether any director designee designated by such person is a Disqualified Designee, (iii) that in the event such Person becomes aware that any individual previously designated by any such Person is or has become a Disqualified Designee, such Person shall as promptly as practicable take such actions as are necessary to remove such Disqualified Designee from the Board and designate a replacement designee who is not a Disqualified Designee, and (iv) to notify the Company promptly in writing in the event a Disqualification Event becomes applicable to such Person or any of its Rule 506(d) Related Parties, or, to such Person's knowledge, to such Person's initial designee named in Section 1, except, if applicable, for a Disqualification Event as to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable.

8.     Term. This Agreement shall be effective as of the date hereof and shall continue in effect until and shall terminate upon the earliest to occur of (a) the consummation of the Company's first underwritten public offering of its Common Stock (other than a registration

DocuSign Envelope ID: EC0PD867-A6B7-4D3D-A74D-8CA7D389E8FD

statement relating either to the sale of securities to employees of the Company pursuant to its stock option, stock purchase or similar plan or an SEC Rule 145 transaction); (b) the consummation of a Sale of the Company and distribution of proceeds to or escrow for the benefit of the Stockholders in accordance with the Restated Certificate, provided that the provisions of Section 3 hereof will continue after the closing of any Sale of the Company to the extent necessary to enforce the provisions of Section 3 with respect to such Sale of the Company; and (c) termination of this Agreement in accordance with Section 9.8 below.

9.    Miscellaneous.

9.1    Additional Parties.

(a)    Notwithstanding anything to the contrary contained herein, if the Company issues additional shares of Preferred Stock after the date hereof, as a condition to the issuance of such shares the Company shall require that any purchaser of such shares become a party to this Agreement by executing and delivering (i) the Adoption Agreement attached to this Agreement as Exhibit A, or (ii) a counterpart signature page hereto agreeing to be bound by and subject to the terms of this Agreement as an Investor and Stockholder hereunder. In either event, each such person shall thereafter be deemed an Investor and Stockholder for all purposes under this Agreement.

(b)    In the event that after the date of this Agreement, the Company enters into an agreement with any Person to issue shares of capital stock to such Person (other than to a purchaser of Preferred Stock described in Section 9.1(a) above), then, the Company shall cause such Person, as a condition precedent to entering into such agreement, to become a party to this Agreement by executing an Adoption Agreement in the form attached hereto as Exhibit A, agreeing to be bound by and subject to the terms of this Agreement as a Stockholder and thereafter such person shall be deemed a Stockholder for all purposes under this Agreement.

9.2    Transfers. Each transferee or assignee of any Shares subject to this Agreement shall continue to be subject to the terms hereof, and, as a condition precedent to the Company's recognition of such transfer, each transferee or assignee shall agree in writing to be subject to each of the terms of this Agreement by executing and delivering an Adoption Agreement substantially in the form attached hereto as Exhibit A. Upon the execution and delivery of an Adoption Agreement by any transferee, such transferee shall be deemed to be a party hereto as if such transferee were the transferor and such transferee's signature appeared on the signature pages of this Agreement and shall be deemed to be an Investor and Stockholder, or Key Holder and Stockholder, as applicable. The Company shall not permit the transfer of the Shares subject to this Agreement on its books or issue a new certificate representing any such Shares unless and until such transferee shall have complied with the terms of this Section 9.2. Each certificate instrument, or book entry representing the Shares subject to this Agreement if issued on or after the date of this Agreement shall be notated by the Company with the legend set forth in Section 9.12.

9.3    Successors and Assigns. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations,

12

or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

9.4     Governing Law. This Agreement shall be governed by the internal law of the State of Delaware, without regard to conflict of law principles that would result in the application of any law other than the law of the State of Delaware.

9.5     Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

9.6     Titles and Subtitles. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

9.7     Notices.

(a) All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after the business day of deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective parties at their address as set forth on Schedule A or Schedule B hereto, or to such email address, facsimile number or address as subsequently modified by written notice given in accordance with this Section 7.7. If notice is given to the Company, a copy shall also be sent to  231 Market Place, Suite 226, San Ramon, CA 94583 Attention: Syed M. Saifullah]; mubeen@aidenabled.com, with a copy to Khan Law Group LC, 9431 Haven Ave., Suite 100, Rancho Cucamonga, CA  91730, mkhan@khanlegal.com; and if notice is given to Stockholders, a copy shall also be given to Volvo Car Technology Fund AB, SE-405 31 Göteborg, Sweden, Attention: Daniel Karlsson, danielkarlsson.3@volvocars.com, with a copy to McKennon Shelton & Henn, LLP, 401 East Pratt Street, Suite 2600, Baltimore, MD 21202, Attention: Sulee S. Clay; sulee.clay@mshllp.com.

(b)     Consent to Electronic Notice. Each Investor and Key Holder consents to the delivery of any stockholder notice pursuant to the Delaware General Corporation Law (the "**DGCL**"), as amended or superseded from time to time, by electronic transmission pursuant to Section 232 of the DGCL (or any successor thereto) at the electronic mail address or the facsimile number set forth below such Investor's or Key Holder's name on the Schedules hereto, as updated from time to time by notice to the Company, or as on the books of the Company.  To the extent that any notice given by means of electronic transmission is returned or undeliverable for any reason, the foregoing consent shall be deemed to have been revoked until a new or corrected electronic mail address has been provided, and such attempted Electronic

13

Notice shall be ineffective and deemed to not have been given. Each Investor and Key Holder agrees to promptly notify the Company of any change in its electronic mail address, and that failure to do so shall not affect the foregoing.

9.8 <u>Consent Required to Amend, Modify, Terminate or Waive</u>. This Agreement may be amended, modified or terminated (other than pursuant to <u>Section 8</u>) and the observance of any term hereof may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a written instrument executed by (a) the Company; (b) the Key Holders holding a majority of the Shares then held by the Key Holders who are then providing services to the Company as officers, employees or consultants; and (c) the holders of a majority of the shares of Common Stock issued or issuable upon conversion of the shares of Preferred Stock held by the Investors (voting together as a single class), including Volvo. Notwithstanding the foregoing:

(a) this Agreement may not be amended, modified or terminated and the observance of any term of this Agreement may not be waived with respect to any Investor or Key Holder without the written consent of such Investor or Key Holder unless such amendment, modification, termination or waiver applies to all Investors or Key Holders, as the case may be, in the same fashion;

(b) the provisions of <u>Sections 1.2(a)</u> and this <u>Section 9.8(b)</u> may not be amended, modified, terminated or waived without the written consent of Volvo;

(c) the consent of the Key Holders shall not be required for any amendment, modification, termination or waiver if such amendment, modification, termination, or waiver either (A) is not directly applicable to the rights of the Key Holders hereunder; or (B) does not adversely affect the rights of the Key Holders in a manner that is different than the effect on the rights of the other parties hereto;

(d) <u>Schedule A</u> hereto may be amended by the Company from time to time in accordance with <u>Section 1.3</u> of the Purchase Agreement to add information regarding additional Purchasers (as defined in the Purchase Agreement) without the consent of the other parties hereto; and

(e) any provision hereof may be waived by the waiving party on such party's own behalf, without the consent of any other party.

The Company shall give prompt written notice of any amendment, modification, termination, or waiver hereunder to any party that did not consent in writing thereto. Any amendment, modification, termination, or waiver effected in accordance with this <u>Section 7.8</u> shall be binding on each party and all of such party's successors and permitted assigns, whether or not any such party, successor or assignee entered into or approved such amendment, modification, termination or waiver. For purposes of this <u>Section 9.8</u>, the requirement of a written instrument may be satisfied in the form of an action by written consent of the Stockholders circulated by the Company and executed by the Stockholder parties specified, whether or not such action by written consent makes explicit reference to the terms of this Agreement.

14

9.9     <u>Delays or Omissions</u>. No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default previously or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

9.10     <u>Severability</u>. The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.

9.11     <u>Entire Agreement</u>. This Agreement (including the Exhibits hereto), the Restated Certificate and the other Transaction Agreements (as defined in the Purchase Agreement) constitute the full and entire understanding and agreement between the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties is expressly canceled.

9.12     <u>Share Certificate Legend</u>. Each certificate, instrument, or book entry representing any Shares issued after the date hereof shall be notated by the Company with a legend reading substantially as follows:

"THE SHARES REPRESENTED HEREBY ARE SUBJECT TO A VOTING AGREEMENT, AS MAY BE AMENDED FROM TIME TO TIME, (A COPY OF WHICH MAY BE OBTAINED UPON WRITTEN REQUEST FROM THE COMPANY), AND BY ACCEPTING ANY INTEREST IN SUCH SHARES THE PERSON ACCEPTING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF THAT VOTING AGREEMENT, INCLUDING CERTAIN RESTRICTIONS ON TRANSFER AND OWNERSHIP SET FORTH THEREIN."

The Company, by its execution of this Agreement, agrees that it will cause the certificates instruments, or book entry evidencing the Shares issued after the date hereof to be notated with the legend required by this <u>Section 7.12</u> of this Agreement, and it shall supply, free of charge, a copy of this Agreement to any holder of such Shares upon written request from such holder to the Company at its principal office. The parties to this Agreement do hereby agree that the failure to cause the certificates, instruments, or book entry evidencing the Shares to be notated with the legend required by this <u>Section 7.12</u> herein and/or the failure of the Company to supply, free of charge, a copy of this Agreement as provided hereunder shall not affect the validity or enforcement of this Agreement.

9.13     <u>Stock Splits, Stock Dividends, etc.</u> In the event of any issuance of Shares or the voting securities of the Company hereafter to any of the Stockholders (including, without limitation, in connection with any stock split, stock dividend, recapitalization, reorganization, or

the like), such Shares shall become subject to this Agreement and shall be notated with the legend set forth in Section 9.12.

9.14   Manner of Voting. The voting of Shares pursuant to this Agreement may be effected in person, by proxy, by written consent or in any other manner permitted by applicable law.  For the avoidance of doubt, voting of the Shares pursuant to the Agreement need not make explicit reference to the terms of this Agreement.

9.15   Further Assurances. At any time or from time to time after the date hereof, the parties agree to cooperate with each other, and at the request of any other party, to execute and deliver any further instruments or documents and to take all such further action as the other party may reasonably request in order to carry out the intent of the parties hereunder.

9.16   Costs of Enforcement. If any party to this Agreement seeks to enforce its rights under this Agreement by legal proceedings, the non-prevailing party shall pay all costs and expenses incurred by the prevailing party, including, without limitation, all reasonable attorneys' fees.

9.17   Aggregation of Stock. All Shares held or acquired by a Stockholder and/or its Affiliates shall be aggregated together for the purpose of determining the availability of any rights under this Agreement, and such Affiliated persons may apportion such rights as among themselves in any manner they deem appropriate.

9.18   Spousal Consent. If any individual Stockholder is married on the date of this Agreement, such Stockholder's spouse shall execute and deliver to the Company a consent of spouse in the form of Exhibit B hereto ("**Consent of Spouse**"), effective on the date hereof. Notwithstanding the execution and delivery thereof, such consent shall not be deemed to confer or convey to the spouse any rights in such Stockholder's Shares that do not otherwise exist by operation of law or the agreement of the parties. If any individual Stockholder should marry or remarry subsequent to the date of this Agreement, such Stockholder shall within 30 days thereafter obtain his/her new spouse's acknowledgement of and consent to the existence and binding effect of all restrictions contained in this Agreement by causing such spouse to execute and deliver a Consent of Spouse acknowledging the restrictions and obligations contained in this Agreement and agreeing and consenting to the same.

9.19   Arbitration. Any unresolved controversy or claim arising out of or relating to this Agreement, except as (i) otherwise provided in this Agreement, or (ii) any such controversies or claims arising out of either party's intellectual property rights for which a provisional remedy or equitable relief is sought, shall be submitted to arbitration by one arbitrator mutually agreed upon by the parties, and if no agreement can be reached within 30 days after names of potential arbitrators have been proposed by the American Arbitration Association (the "**AAA**"), then by one arbitrator having reasonable experience in corporate finance transactions of the type provided for in this Agreement and who is chosen by the AAA. The arbitration shall take place in San Francisco, California, in accordance with the AAA rules then in effect, and judgment upon any award rendered in such arbitration will be binding and may be entered in any court having jurisdiction thereof.  There shall be limited discovery prior to the arbitration hearing as follows: (a) exchange of witness lists and copies of documentary evidence and documents relating to or arising out of the issues to be arbitrated, (b) depositions of

all party witnesses and (c) such other depositions as may be allowed by the arbitrators upon a showing of good cause. Depositions shall be conducted in accordance with the California Code of Civil Procedure, the arbitrator shall be required to provide in writing to the parties the basis for the award or order of such arbitrator, and a court reporter shall record all hearings, with such record constituting the official transcript of such proceedings. Each party will bear its own costs in respect of any disputes arising under this Agreement. The prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled.

       9.20   <u>Governing Law</u>. This Agreement shall be governed by the internal law of the State of Delaware, without regard to conflict of law principles that would result in the application of any law other than the law of the State of Delaware.

       9.21   <u>WAIVER OF JURY TRIAL</u>: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have executed this Voting Agreement as of the date first written above.

**AIDEN AUTOMOTIVE TECHNOLOGIES, INC.**

By: _____
Name:  Niclas Gyllenram
Title:  President

IN WITNESS WHEREOF, the parties have executed this Voting Agreement as of the date first written above.

**INVESTOR:**

**VOLVO CAR TECHNOLOGY FUND AB**

By: _Raymond Millien_
Name: Raymond Millien
Title: Managing Director

By: _Pär Arvidsson_
Name: Pär Arvidsson
Title: Chairman of the Board

IN WITNESS WHEREOF, the parties have executed this Voting Agreement as of the date first written above.

**KEY HOLDERS**:

DocuSigned by:

*Jonas Fenn*

JONAS FENN

DocuSigned by:

SYED MUBEEN SAIFULLAH

DocuSigned by:

*Niclas Gyllenram*

NICLAS GYLLENRAM

DocuSign Envelope ID: EC0PD867-A6B7-4D3D-A74D-9CA7D389E8FD

## SCHEDULE A

### INVESTORS

**Name and Address**                                    **Number of Shares Held**

Volvo Car Technology Fund AB                            900,000 shares of Seed Preferred Stock
SE-405 31 Göteborg
Sweden

## **SCHEDULE B**

## **KEY HOLDERS**

| **Name and Address** | **Number of Shares Held** |
|---|---|
| Syed Mubeen Saifullah<br>23 Pebble Ct.<br>San Ramon, CA 94583 | 1,312,000 Common Stock |
| Niclas Gyllenram<br>129 Lowell Ave<br>Palo Alto, CA  94301 | 1,476,000 Common Stock |
| Jonas Fenn<br>63 A Manchester St.<br>San Francisco, CA 94110 | 1,312,000 Common Stock |

## SCHEDULE C

## INITIAL OBLIGATIONS

**Founder Obligations:**

1. The Company has received, or on or prior to March 11, 2021 shall have received, gross proceeds of at least $500,000 from the sale of SAFE instruments to purchasers other than Volvo in accordance with the Seed Stock Purchase Agreement among the Company and the purchaser of Preferred Stock (the "**Purchase Agreement**").

2. Within 120 days following the Effective Date, the Key Holders (the "**Founders**") shall complete or have completed and delivered to Volvo an acceptable Business Plan (as defined in the Investor Rights Agreement between the Company and Volvo dated as of the Effective Date) to the reasonable satisfaction of Volvo.

3. Founders shall make every reasonable effort to organize, promote and market the Company and its products and services, and shall deliver to Volvo an acceptable marketing plan within 120 days following the Effective Date, to the reasonable satisfaction of Volvo.

4. Founders will continue their employment with Volvo Car Group to the reasonable satisfaction of their current, respective managers, and agree that any of their obligations to the Company shall be subordinate to their obligations to Volvo Car Group. The development of any Company products shall occur outside the Founder's normal work schedule at Volvo Car Group.

5. The Founders' obligations under that certain Right of First Refusal and Co-Sale Agreement dated as of the Effective Date among the Company and the stockholders of the Company party thereto (the "**Co-Sale Agreement**")

**Company Obligations:**

1. Within 12 months following the Effective Date, the Company shall ship a working prototype of a product that can be deployed in a testing environment to an early-adopter customer to get feedback/early results and constantly iterate the product from thereon.

2. Within 18 months following the Effective Date, the Company shall demonstrate a sales and/or partnership pipeline, in each case subject to the reasonable satisfaction of Volvo.

3. The Company shall submit monthly and quarterly financial reports to Volvo for the first 24 months following the Effective Date, with basic P&L and cash flow items.

4. The Company's obligations under the Co-Sale Agreement.

**EXHIBIT A**

**ADOPTION AGREEMENT**

This Adoption Agreement ("**Adoption Agreement**") is executed on _____, 20__, by the undersigned (the "**Holder**") pursuant to the terms of that certain Voting Agreement dated as of March 8, 2021 (the "**Agreement**"), by and among the Company and certain of its Stockholders, as such Agreement may be amended or amended and restated hereafter. Capitalized terms used but not defined in this Adoption Agreement shall have the respective meanings ascribed to such terms in the Agreement. By the execution of this Adoption Agreement, the Holder agrees as follows.

1.1 <u>Acknowledgement</u>. Holder acknowledges that Holder is acquiring certain shares of the capital stock of the Company (the "**Stock**"), for one of the following reasons (Check the correct box):

☐ As a transferee of Shares from a party in such party's capacity as an "Investor" bound by the Agreement, and after such transfer, Holder shall be considered an "Investor" and a "Stockholder" for all purposes of the Agreement.

☐ As a transferee of Shares from a party in such party's capacity as a "Key Holder" bound by the Agreement, and after such transfer, Holder shall be considered a "Key Holder" and a "Stockholder" for all purposes of the Agreement.

☐ As a new Investor in accordance with <u>Section 7.1(a)</u> of the Agreement, in which case Holder will be an "Investor" and a "Stockholder" for all purposes of the Agreement.

☐ In accordance with <u>Section 7.1(b)</u> of the Agreement, as a new party who is not a new Investor, in which case Holder will be a "Stockholder" for all purposes of the Agreement.

1.2 <u>Agreement</u>. Holder hereby (a) agrees that the Stock, and any other shares of capital stock or securities required by the Agreement to be bound thereby, shall be bound by and subject to the terms of the Agreement and (b) adopts the Agreement with the same force and effect as if Holder were originally a party thereto.

1.3 <u>Notice</u>. Any notice required or permitted by the Agreement shall be given to Holder at the address or facsimile number listed below Holder's signature hereto.

**HOLDER:**

_____
Name and Title of Signatory

Address: _____
_____
Email: _____


**ACCEPTED AND AGREED**:
**AIDEN AUTOMOTIVE TECHNOLOGIES, INC.**


**By:** _____
**Name:** _____
**Title:** _____

DocuSign Envelope ID: EC0BD867-A6B7-4D3D-A74D-8CA7D389E8FD

## **EXHIBIT B**

### **CONSENT OF SPOUSE**

I, [_____], spouse of [_____], acknowledge that I have read the Voting Agreement, dated as of March 8, 2021, to which this Consent is attached as Exhibit B (the "**Agreement**"), and that I know the contents of the Agreement. I am aware that the Agreement contains provisions regarding the voting and transfer of shares of capital stock of the Company that my spouse may own, including any interest I might have therein.

I hereby agree that my interest, if any, in any shares of capital stock of the Company subject to the Agreement shall be irrevocably bound by the Agreement and further understand and agree that any community property interest I may have in such shares of capital stock of the Company shall be similarly bound by the Agreement.

I am aware that the legal, financial and related matters contained in the Agreement are complex and that I am free to seek independent professional guidance or counsel with respect to this Consent. I have either sought such guidance or counsel or determined after reviewing the Agreement carefully that I will waive such right.

Dated:_____          _____

                                               [*Name of Key Holder's Spouse*]

# EXHIBIT 5

# PATENT ASSIGNMENT AGREEMENT

This Patent Assignment and License Agreement ("**_Agreement_**"), dated 8 March 2021 (the "**_Effective Date_**"), is made by and between:

**VOLVO CAR TECHNOLOGY FUND AB**, reg. No. 556877-5760, a company organized and existing under the laws of Sweden and having offices Assar Gabrielssons Väg 9, 405 31 Göteborg, Sweden ("**_Tech Fund_**");

**AIDEN AUTOMOTIVE TECHNOLOGIES, INC.**, a Delaware corporation with its principal place of business at 231 Market Place, Suite 226, San Ramon, CA 94583, USA ("**_Aiden_**");

Tech Fund and Aiden are sometimes individually referred to as "**_Party_**" and collectively referred to as "**_Parties_**".

**WHEREAS**, Tech Fund owns U.S. Provisional Patent Application Ser. No. 63/065,559, entitled "Automotive Data Sharing Platform," Atty. Docket No. P2896US00, filed on 14 August 2020 (the "**_Patent_**"); and

**WHEREAS**, Aiden desires to obtain title to the Patent in connection with its business, and Tech Fund desires to assign such Patent, subject to the terms and conditions for such assignment as set out in this Agreement.

**WHEREAS**, Aiden, in consideration for the assignment of the aforementioned Patent, shall allocate an equity interest in Aiden to Tech Fund, subject to specific terms and conditions in a separate writing.

**NOW, THEREFORE**, in consideration of the above premises and mutual covenants contained herein and intending to be legally bound hereby, the Parties hereto agree as follows:

## SECTION 1  ASSIGNMENT AND LICENSE

1.1  **Patent Rights.** As used herein "**_Patent Rights_**" means: **(a)** the Patent; **(b)** any reissues, reexaminations, extensions, continuations, continuing prosecution applications, requests for continuing examinations, divisions, and registrations of any item in any of the foregoing categories (a) and (b); **(c)** all foreign patents, patent applications, and counterparts relating to any item in any of the foregoing categories (a) through (b), including, without limitation, certificates of invention, utility models, industrial design protection, design patent protection, and other governmental grants or issuances; **(d)** all inventions, invention disclosures, and discoveries described in any of the items of categories (a), (b) and (c) (referred to herein as "**_Categories (a)-(c) Items_**") that: (i) are included in any claim in the Categories (a)-(c) Items, (ii) are subject matter capable of being reduced to a patent claim in a reissue or reexamination proceedings brought on the Categories (a)-(c) Items, and/or (iii) could have been included as a claim in the Categories (a)-(c) Items; **(e)** all rights to apply in any or all countries of the world for patents, certificates of invention, utility models, industrial design protections, design patent protections, or other governmental grants or issuances of any type related to any item in any of the foregoing categories (a) through (d), including, without limitation, under the Paris Convention for the Protection of Industrial Property, the International Patent Cooperation Treaty, or any other convention, treaty, agreement, or understanding; and **(f)** all causes of action (whether known or unknown, or whether currently pending, filed or otherwise) and other enforcement rights under, or on account of, the Patent, including, without limitation, all causes of action and other enforcement rights for: (i) damages, (ii) injunctive relief, and (iii) any other remedies of any kind for past, current and future infringement.

1.2  **Assignment of Patent Rights.** Subject to the pre-existing grant-back license to Volvo Car Corporation as disclosed to Aiden, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, Tech Fund hereby sells, conveys, transfers, assigns and delivers to Aiden on the

Effective Date, and Aiden hereby acquires from Tech Fund, all right, title, and interest in and to the Patent Rights, including, without limitation: (a) all right, title and interest in and to the Patent; and (b) all right, title and interest to sue and collect for past infringement of the Patent.

1.3     **Documents.** As used herein, "**Documents**" means: **(a)** the recordable *Assignment of Patent Rights* in the form attached hereto as **Exhibit A**, duly executed by Tech Fund; **(b)** all agreements assigning ownership of the Patent Rights from the inventors and/or prior owners to Tech Fund; **(c)** all files, documents and tangible things constituting, comprising or relating to the investigation, evaluation, preparation, prosecution, maintenance, defense, filing, issuance, registration, assertion or enforcement of the Patent; and **(d)** such additional documents as Aiden may reasonably request in order to ascertain the accuracy of Tech Fund' representations and warranties in this Agreement, or to effect, perfect and evidence the transactions contemplated by this Agreement. Any exchange of information by the Parties (or their respective legal counsel) related to the Patent Rights will be pursuant to a common interest privilege, if applicable.

1.4     **Closing.**  Subject to the terms and conditions of this Agreement, Aiden and Tech Fund will use commercially reasonable efforts to complete the assignment of the Patent Rights contemplated herein within 30 days of the Effective Date (the "*Closing*"); provided, however, that prior to the Closing Tech Fund shall deliver to Aiden the Documents and notify Aiden of any action required with respect to any Patent Rights within 60 days after the Closing Date and will facilitate Aiden's taking such action.

1.5     **Maintenance of Patent Rights**.  Aiden shall have the exclusive right to maintain, enforce, and monetize the Patent Rights, which exclusive right shall include, but not be limited to, filing, applying for, or registering patents in respect of any creations and inventions embodied in the Patent Rights, in its own name, at its expense and in such jurisdictions as it deems appropriate.

1.6     **Right of First Refusal**.  Should Aiden desire to sell any of the Patent Rights separate and apart from a merger or acquisition transaction, it shall offer Tech Fund a right of first refusal to purchase such Patent Rights from Aiden. In the event that Aiden is required to offer Tech Fund a right of first refusal pursuant to this Section 1.6, it shall provide written notice of such offer (the "*Offer Notice*") to Tech Fund not later than 45 days prior to commencing any discussions with one or more third parties with regard to such sale opportunity. Following delivery of an Offer Notice, Aiden will respond to reasonable requests from Tech Fund for information regarding the potential sale opportunity.  Tech Fund shall have the option, for a period of 30 days following its receipt of an Offer Notice (the "*Notice Period*"), to elect whether to commence negotiations with Aiden pertaining to such opportunity and to notify Aiden accordingly.  In the event Tech Fund elects to commence such negotiations with Aiden, Tech Fund shall have 30 days after notifying Aiden thereof (the "*Negotiation Period*") to sign a mutually agreed definitive agreement with Aiden with regard to such sale opportunity. During the Notice Period and the Negotiation Period (if any), Aiden shall negotiate exclusively with Tech Fund and in good faith regarding the terms of a purchase agreement with regard to such opportunity.  Aiden shall not be permitted to negotiate or consummate an agreement pertaining to such opportunity with any person(s) or entity(ies) other than Tech Fund during the Notice Period and Negotiation Period (if any).  In the event that (a) Tech Fund does not elect to commence the Negotiation Period, (b) Tech Fund does not respond to the Offer Notice within the Notice Period, or (c) the Parties do not sign a definitive agreement with regard to such opportunity on mutually agreed terms prior to expiration of the Negotiation Period, then the Aiden shall be permitted to enter into an agreement with any third party with regard to such opportunity; provided, however, that with respect to this subparagraph (c), in no event shall Aiden offer or agree to terms and conditions with any third party that, on the whole, are more favorable to such third party than the most favorable terms and conditions offered to Tech Fund without first providing Tech Fund written notice thereof and a reasonable period of time (but in any event not less than 10 days after receiving written notice thereof) to accept such more favorable terms and sign a definitive agreement with regard to such opportunity with Aiden. The foregoing notwithstanding, Tech Fund shall have no obligation to commence negotiations for, or to sign a definitive agreement with regard to, an such opportunity.

DocuSign Envelope ID: EC0DD867-A6B7-4D2D-A74B-9CA7D389E8ED

**SECTION 2        REPRESENTATIONS AND WARRANTIES**

2.1        **Tech Fund's Representations and Warranties**. Tech Fund hereby represents and warrants to Aiden as follows:

        (a)        **Authority**. Tech Fund has the full power and authority and has obtained all third-party consents, approvals, and/or other authorizations required to enter into this Agreement and to carry out its obligations hereunder, including, without limitation, the assignment of the Patent Rights to Aiden.

        (b)        **Title and Contest**. Tech Fund owns all right, title, and interest to the Patent Rights, including, without limitation, all right, title, and interest to sue and collect for past infringement of the Patents. There are no actions, suits, investigations, claims, or proceedings threatened, pending, or in progress relating in any way to the Patent Rights. There are no existing contracts, agreements, options, commitments, proposals, bids, offers, or rights with, to, or in any person to acquire any of the Patent Rights.

        (c)        **Validity and Enforceability**. The Patent has never been found invalid, unpatentable, or unenforceable for any reason in any administrative, arbitration, judicial or other proceeding, and Tech Fund does not know of and has not received any notice or information of any kind from any source suggesting that the Patent may be invalid or unenforceable.

        (d)        **Documents**. All Documents supplied to Aiden are originals or true and correct copies of the originals.

2.2        **Aiden's Representations and Warranties**. Aiden hereby represents and warrants to Tech Fund that: Aiden is a company duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation; and Aiden has the full power and authority and has obtained all third-party consents, approvals, and/or other authorizations required to enter into this Agreement and to carry out its obligations hereunder, including, without limitation, the acquisition of the Patent Rights from Tech Fund.

2.3        **Negation of Implications**. Nothing in this Agreement shall be construed as: (a) a requirement that Tech Fund shall, in any country, file any patent application, secure any patent or maintain any patent in force; (b) an obligation that Tech Fund bring, prosecute, cooperate or join any actions or suits against third parties for infringement of the Patent Rights; (c) an obligation that Tech Fund furnish to Aiden any hardware, software, manufacturing or technical information, or know-how; (d) conferring to Aiden the right to use in advertising, publicity or otherwise any trademark or trade name of Tech Fund; or (e) granting by implication, estoppel, or otherwise, any licenses or rights under any patents owned by Tech Fund other than the Patent Rights, regardless of whether such other patents are related to, dominant of, or subordinate to, the Patent Rights.

**SECTION 3        GENERAL PROVISIONS**

3.1        **Further Cooperation**. Tech Fund will, at the reasonable request of Aiden and without demanding any consideration therefore, do all things necessary, proper, or advisable, including without limitation, the execution, acknowledgment, and recordation of specific assignments, oaths, declarations, and other documents on a jurisdiction-by-jurisdiction basis, to assist Aiden in obtaining, perfecting, sustaining, and/or enforcing the Patent Rights; provided, however, that any expenses incident to the execution of papers or providing testimony shall be borne by Aiden, its successors and assigns.

3.2        **Limitation of Liability**. EXCEPT IN THE EVENT OF BREACH OF ANY OF THE WARRANTIES IN SECTION 2.1, TECH FUND' TOTAL LIABILITY UNDER THIS AGREEMENT WILL NOT EXCEED US$10,000.00.

3.3        **Limitation on Consequential Damages**. EXCEPT IN THE EVENT OF BREACH OF ANY OF THE WARRANTIES IN SECTION 2.1, NEITHER PARTY WILL HAVE ANY OBLIGATION OR LIABILITY (WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, AND NOTWITHSTANDING ANY

FAULT, NEGLIGENCE (WHETHER ACTIVE, PASSIVE OR IMPUTED), REPRESENTATION, STRICT LIABILITY OR PRODUCT LIABILITY), FOR COVER OR FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL, MULTIPLIED, PUNITIVE, SPECIAL, OR EXEMPLARY DAMAGES OR LOSS OF REVENUE, PROFIT, SAVINGS OR BUSINESS ARISING FROM OR OTHERWISE RELATED TO THIS AGREEMENT, EVEN IF A PARTY OR ITS REPRESENTATIVES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

3.4    **Compliance with Laws**. Notwithstanding anything contained in this Agreement to the contrary, the obligations of the Parties with respect to the consummation of the transactions contemplated by this Agreement shall be subject to all laws, present and future, of any government having jurisdiction over the Parties and this transaction, and to orders, regulations, directions or requests of any such government.

3.5    **Confidentiality of Terms**. The Parties hereto will keep the terms of this Agreement confidential and will not now or hereafter divulge any of this information to any third party except: **(a)** with the prior written consent of the other Party; **(b)** as otherwise may be required by law or legal process; **(c)** during the course of litigation, so long as the disclosure of such terms and conditions is restricted in the same manner as is the confidential information of other litigating parties; **(d)** in confidence to its legal counsel, accountants, banks, and financing sources and their advisors solely in connection with complying with or administering its obligations with respect to this Agreement; **(e)** by Aiden, to potential purchasers or licensees of the Patent Rights; **(f)** in order to perfect Aiden's interest in the Patent Rights with any governmental patent office; or **(g)** to enforce Aiden's right, title, and interest in and to the Patent Rights; provided that, in (b) and (c) above: (i) to the extent permitted by law, the disclosing Party will use all legitimate and legal means available to minimize the disclosure to third parties, including, without limitation, seeking a confidential treatment request or protective order whenever appropriate or available, and (ii) the disclosing Party will provide the other Party with at least ten days' prior written notice of such disclosure. Both Parties acknowledge that the breach of this <u>Section 3.5</u> will immediately give rise to continuing irreparable injury to the non-disclosing Party inadequately compensable in damages at law and without prejudice to any other remedy available to the non-disclosing Party, and may entitle the non-disclosing Party to obtain injunctive relief.

3.6    **Notices**. All notices given hereunder will be given in writing, and will be delivered to the address set forth on the first page to this Agreement by personal delivery or delivery postage prepaid by an internationally-recognized express courier service. Notices are deemed given on the date of receipt if delivered personally or by express courier, or if delivery refused, the date of refusal. Notice given in any other manner will be deemed to have been given only if and when received at the address of the Party to be notified. Either Party may from time to time change its address for notices under this Agreement by giving the other Party written notice of such change in accordance with this <u>Section 3.6</u>.

3.7    **Relationship of Parties.** The Parties hereto are independent contractors. Nothing in this Agreement will be construed to create a partnership, joint venture, franchise, fiduciary, employment or agency relationship between the Parties. Neither Party has any express or implied authority to assume or create any obligations on behalf of the other or to bind the other to any contract, agreement or undertaking with any third party.

3.8    **Waiver**. Failure by either Party to enforce any term of this Agreement will not be deemed a waiver of future enforcement of that or any other term in this Agreement or any other agreement that may be in place between the Parties.

3.9    **Governing Law and Disputes**. This Agreement will be interpreted, construed, and enforced in all respects in accordance with the laws the state of California, without reference to its choice of law principles. Any dispute, controversy or claim arising out of or in connection with this Agreement, or the breach, termination or invalidity thereof, shall be finally settled by arbitration in accordance with the Arbitration Rules of the American Arbitration Association and the laws of the state of California in San Francisco, California. The arbitral tribunal shall be composed of one arbitrator.

3.10    **Assignment.** Either Party may assign or transfer or transfer any rights or delegate any obligations under this Agreement without the other Party's consent. All of the terms, conditions and provisions of this Agreement shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective Parties hereto.

3.11    **Entire Agreement**. The Agreement, including its exhibits, constitutes the entire agreement between the Parties with respect to the subject matter hereof, and merges and supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions. Neither of the Parties will be bound by any conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof other than as expressly provided herein. No oral explanation or oral information by either Party hereto will alter the meaning or interpretation of this Agreement. The terms and conditions of this Agreement will prevail notwithstanding any different, conflicting or additional terms and conditions that may appear on any letter, email or other communication or other writing not expressly incorporated into this Agreement.

3.12    **Amendments**. No amendments or modifications will be effective unless in a writing signed by authorized representatives of both Parties.

3.13    **Agreement is Controlling**. The section headings contained in this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement.

3.14    **Severability.** If any provision of this Agreement is found to be invalid or unenforceable, then the remainder of this Agreement will have full force and effect, and the invalid provision will be modified, or partially enforced, to the maximum extent permitted to effectuate the original objective.

3.15    **No Rights in Third Parties.** The Agreement is not intended to confer any right or benefit on any third party (including, but not limited to, any employee or beneficiary of any Party), and no action may be commenced or prosecuted against a Party by any third party claiming as a third-party beneficiary of this Agreement or any of the transactions contemplated by this Agreement.

3.16    **Counterparts**. This Agreement shall become binding when any one or more counterparts hereof, individually or taken together, shall bear the signatures each of the Parties hereto. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original as against the Party whose signature appears thereon, but all of which taken together shall constitute but one and the same instrument.

**IN WITNESS WHEREOF**, the Parties have entered into this Agreement as of the Effective Date.

**VOLVO CAR TECHNOLOGY FUND AB:**



By: _____
[Signature]

Raymond Millien
_____
[Printed Name]

3/9/2021
_____
[Date]

By: _____
[Signature]

Pär Arvidsson
_____
[Printed Name]

3/9/2021
_____
[Date]

**AIDEN AUTOMOTIVE TECHNOLOGIES, INC:**



By: _____
[Signature]

Niclas Gyllenram
_____
[Printed Name]

3/8/2021
_____
[Date]

## EXHIBIT A
## Recordable Assignment of Patent Rights

For good and valuable consideration, the receipt of which is hereby acknowledged, **Volvo Car Technology Fund AB**, reg. no. 556877-5760, a company organized and existing under the laws of Sweden and having offices Assar Gabrielssons Väg 9, 405 31 Göteborg, Sweden ("*Assignor*"), does hereby sell, assign, transfer, and convey unto **Aiden Automotive Technologies, Inc.**, a Delaware corporation with its principal place of business at 231 Market Place, Suite 226, San Ramon, CA, USA ("*Aiden*"), or its designees, all right, title, and interest that exist today and may exist in the future in and to any and all of the following:

(a)     U.S. Provisional Patent Application Ser. No. 63/065,559, entitled "Automotive Data Sharing Platform," Atty. Docket No. P2896US00, filed on 14 August 2020 (the "*Patent*"):

(b)     all reissues, reexaminations, extensions, continuations, continuing prosecution applications, requests for continuing examinations, divisions, registrations of the Patent;

(c)     all foreign patents, patent applications, and counterparts relating to any item in any of the foregoing including, without limitation, certificates of invention, utility models, industrial design protection, design patent protection, and other governmental grants or issuances;

(d)     all inventions, invention disclosures, and discoveries described in any of the items of categories (a), (b) and (c) (referred to herein as "*Categories (a)-(c) Items*") that: (i) are included in any claim in the Categories (a)-(c) Items, (ii) are subject matter capable of being reduced to a patent claim in any of the Categories (a)-(c) Items, and/or (iii) could have been included as a claim in any of the Categories (a)-(c) Items;

(e)     all rights to apply in any or all countries of the world for patents, certificates of invention, utility models, industrial design protections, design patent protections, or other governmental grants or issuances of any type related to any item in any of the foregoing categories (a) through (d), including, without limitation, under the Paris Convention for the Protection of Industrial Property, the International Patent Cooperation Treaty, or any other convention, treaty, agreement, or understanding; and

(f)     all causes of action (whether known or unknown or whether currently pending, filed, or otherwise) and other enforcement rights under, or on account of, the Patent and/or any item in any of the foregoing categories (c) through (e), including, without limitation, all causes of action and other enforcement rights for (i) damages, (ii) injunctive relief, and (iii) any other remedies of any kind for past, current, and future infringement;

((a)-(f) collectively, the "*Patent Rights*").

Assignor hereby authorizes the respective patent office or governmental agency in each jurisdiction to issue any and all patents, certificates of invention, utility models or other governmental grants or issuances that may be granted upon any of the Patent Rights in the name of Aiden, as the assignee to the entire interest therein. The terms and conditions of this Assignment of Patent Rights will inure to the benefit of Aiden, its successors, assigns, and other legal representatives and will be binding upon Assignor, its successors, assigns, and other legal representatives.

**IN WITNESS WHEREOF**, this Assignment of Patent Rights is executed on 8 March 2021:


ASSIGNOR: **VOLVO CAR TECHNOLOGY FUND AB**

By:  *Raymond Millien*                                   By:  *Pär Arvidsson*
     D5BF6117C8BC4F5...                                       5025F67C493D443...

Name:   Raymond Millien                         Name:   Pär Arvidsson

Title:   Managing Director                        Title:   Chairman of the Board

EXHIBIT 6

DocuSign Envelope ID: BD17778E-4DD7-477F-9697-77FDAEE60096

# SERVICES AGREEMENT

This Services Agreement ("**Agreement**"), is entered into March 8, 2021 (the "**Effective Date**") by and between:

**VOLVO CAR TECHNOLOGY FUND AB**, reg. No. 556877-5760, a company organized and existing under the laws of Sweden and having at offices Assar Gabrielssons Väg 9, 405 31 Göteborg, Sweden ("**Tech Fund**"); and

**VOLVO CAR TECHNOLOGY  USA, LLC,** a Delaware corporation having offices at 231 Market Place, Suite 226, San Ramon, CA 94583. ("*Volvo Cars*").

Tech Fund and Volvo Cars are hereinafter collectively referred to as "**Parties**" and individually referred to as "**Party**"; and Tech Fund is also referred to as "**Purchaser**"; Volvo Cars is also referred to as "**Service Provider**".

1.      **Background.** The Parties have determined that Service Provider shall provide to Purchaser (and/or its respective Affiliates and Portfolio Companies) certain office, equipment, and technology services, and R&D project management services as they may request in writing from time to time (collectively, the "**Services**"). Purchaser now wishes to enter into this Agreement for the purpose of receiving the Services and Service Provider wishes to provide the Services in accordance with the terms set forth in this Agreement.

2.      **Definitions:**

   2.1     **Affiliate** means any other legal entity that, directly or indirectly, is controlled by or is under common control with a Party; and control means the possession, directly or indirectly, by agreement or otherwise, of: (i) at least 50% of the voting stock, partnership interest or other ownership interest; or (ii) the power to: (a) appoint or remove a majority of the board of directors or other governing body of an entity, or (b) cause the direction of the management of an entity; provided, however, the Purchaser shall not be considered Affiliates of each other hereunder.

   2.2     **Background IP** means all IP that were either developed or otherwise acquired by Purchaser before the Effective Date, or are developed or otherwise acquired by Purchaser outside of this Agreement and disclosed to Service Provider hereunder in order to effectuate any of the Services.

   2.3     **Confidential Information** means information, other than the Excluded Information, relating to the Disclosing Party and its business (whether in written, verbal, or digital form), including without limitation ideas, concepts, designs, specifications, drawings, notes, technology, methods, intellectual property, know-how, trade secrets, future (business) plans and programs, operations, services, products, costs, processes, models, procedures, manuals, customer lists, this Agreement, negotiations of and any activities conducted under this Agreement, and information that the Parties shared regarding the Purpose prior to the signing of this Agreement.

   2.4     **Disclosing Party** means the Party disclosing Confidential Information hereunder.

   2.5     **Excluded Information** means information that: (i) is or becomes public through no fault of the Receiving Party; (ii) is lawfully obtained from someone other than the Disclosing Party that is not under an obligation to the Disclosing Party to keep that information confidential; (iii) was already in the possession of the Receiving Party prior to the date of disclosure without an obligation to keep that information confidential; or (iv) the Receiving Party develops independently without use of Confidential Information.

   2.6     **IP** means all proprietary technology, software, methods, processes, know-how, inventions, data or technical information, and all Patents and other intellectual and industrial property rights thereto.

   2.7     **Patents** means utility models, industrial designs and all patents (including, without limitation, patents of importation, patents of confirmation, patents of improvement, design patents,

certificates of addition and utility patents, as well as divisions, reissues, continuations, continuations-in-part, reexamination certificates, provisional applications, renewals and extensions of any of the foregoing, and applications therefor).

**2.8** **Personnel** means employees and non-employee consultants of a Party (or its Affiliates or Portfolio Companies) that participate in the Services or other matters relevant to this Agreement.

**2.9** **Portfolio Company** means any entity in which the Tech Fund has made an equity and/or debt investment, and has identified to Service Provider as a third-party beneficiary to this Agreement pursuant to Section 15.

**2.10** **Receiving Party** means the Party receiving Confidential Information hereunder.

**2.11** **Results** means any outcome of the Services, as described in the relevant specification, plan, statement of work, or other requesting documentation, made by Service Provider hereunder (including, but not limited to, any IP, deliverables, objects, products, documentation, and any modifications or improvements to any Background IP), irrespective of whether the performance of any part of the Services has been completed.

**2.12** **Use** means to use (in object and source code form, if applicable), exploit, make, develop, change, transmit, copy, and distribute (including sell and offer for sale) goods or services; including having a third party at any tier do any of the foregoing on a Party's behalf.

**3.** **Services.** Service Provider shall provide sufficient Personnel to support and carry out its Service commitments under this Agreement. Service Provider hereby warrants that the Services shall be of professional quality and performed consistent with generally accepted industry standards. Service Provider provides the Services "as is". Service Provider does not warrant or represent that any Services provided or delivered to Purchaser hereunder are functional for the business needs of Purchaser, otherwise suitable for any specific purpose, or are not infringing any IP of any third party. Service Provider gives no representations or warranties regarding the merchantability of the Results nor any other representations or warranties of any kind whatsoever concerning the Services. Purchaser acknowledges that the price of the Services is set in consideration of the foregoing.

**4.** **Confidentiality.**

**4.1** The Receiving Party will with respect to Disclosing Party's Confidential Information: (a) hold it in strict confidence; (b) use it only for the performance of the Services and, if applicable, exercising any license rights granted hereunder; (c) protect it from misappropriation, unauthorized use or disclosure using all reasonable precautions that the Receiving Party uses to protect its own confidential information (but not less than a commercially-reasonable degree of care); (d) not modify, reverse engineer, or disassemble it without the Disclosing Party's consent, provided that Receiving Party may perform such activities to exercise license rights granted hereunder; and (e) not share it with anyone except its Affiliates', Personnel and advisors who have a "need to know" and have agreed in writing to keep it confidential.

**4.2** The Receiving Party may disclose Confidential Information to comply with any applicable law or a court order if that Receiving Party notifies the Disclosing Party (if allowed by law) and takes reasonable and lawful actions to limit the extent of the disclosure.

**5.** **Intellectual Property Rights.**

**5.1** As used in this Section 5, "Purchaser" shall include Purchaser and/or any of its relevant Affiliate(s) or Portfolio Companies receiving the relevant Services from Service Provider producing the relevant Results hereunder.

**5.2** All Background IP owned by Purchaser will continue to be owned by such Purchaser. Purchaser hereby grants and agrees to grant Service Provider a royalty-free, fully-paid-up, revocable, non-exclusive, worldwide license to Use its respective Background IP only to the extent necessary for purposes of the Service Provider carrying out the Services.

**5.3** Unless agreed upon by Purchaser in a separate writing, the Parties agree that Purchaser shall be the exclusive owner of all Results and are hereby assigned such Results.

**5.4** If applicable, each Party and its Personnel shall, at no cost to the other Party, provide all support and sign all documents to: (a) assign or otherwise evidence the owning Purchaser's ownership in its Results, and all IP rights thereto; and (b) enable the owning Party to obtain Patents or other IP rights in the Results.

**5.5** Any compensation due to a Party's Personnel in connection with any Patent or the creation of any other IP, whether by agreement, statute, regulation or otherwise, shall be paid entirely by such Party.

6. **Service Charges and Payments.** In consideration of the Service Provider's performance of the Services under this Agreement, the Parties agree that Purchaser shall pay to Service Provider the sums specified in Exhibit A (which may be amended from time to time by mutual agreement of the Parties) monthly in arrears and invoiced by Service Provider on a net-90 basis.

7. **Term.** The term of this Agreement will begin on the Effective Date and will continue for one year thereafter unless terminated as specified herein. Purchaser, together with the written consent of the Third Party Beneficiary (defined in Paragraph 15) may terminate this Agreement at any time, with or without cause, by providing the Service Provider with written notice. Termination is effective immediately unless otherwise specified in the termination notice. Termination of the Agreement shall result in termination of all then outstanding requests for Services. Termination shall not relieve Purchaser of its obligation to pay any fees that have accrued as of the effective date of such termination.

8. **Export Control.** The Parties will comply with all national and foreign export control laws and regulations, and all national and foreign trade restrictions related to any Confidential Information.

9. **Governing Law and Disputes.**

    **9.1** This Agreement shall be governed by and interpreted in accordance with the laws of Sweden, excluding any choice of law rules that direct the application of the law of any other jurisdiction.

    **9.2** Any dispute, controversy or claim arising out of or in connection with this Agreement, or the breach, termination or invalidity thereof, shall be finally settled by arbitration administered by the Arbitration Institute of the Stockholm Chamber of Commerce (the "**SCC**"). The Rules for Expedited Arbitrations shall apply, and the Arbitral Tribunal shall be composed of one arbitrator. The seat of arbitration shall be Gothenburg, Sweden and the language to be used in the arbitral proceedings shall be English. However, the foregoing shall not preclude or restrict any of the Parties to seek specific performance and other injunctive relief in an appropriate court of competent jurisdiction. All information disclosed, and all documents submitted or issued by or on behalf of any of the Parties or the arbitrators in any arbitral proceedings, as well as all decisions and awards made or declared in the course of any such proceedings, shall be kept strictly confidential and may not be used for any purpose other than these proceedings or the enforcement of any such decision or award nor be disclosed to any third party without the prior written consent of the Party to which the information relates.

    **9.3** No right or remedy available to a Party under this Agreement will exclude other rights and remedies available by law.

10. **Relationship.** The Parties are independent contractors. This Agreement does not create any agency, partnership or joint venture between the Parties.

11. **Assignment.** No Party will assign any rights or delegate any obligations under this Agreement without all the other Parties' written consent.

12. **Entire Agreement.** This Agreement is the entire agreement of the Parties relating to the subject matter hereof and supersedes all other oral or written agreements.

13. **Conflicts.** Nothing contained in this Agreement shall supersede, modify, limit, eliminate or otherwise affect any of the representations and warranties, covenants, agreements or indemnities set forth in the JVA.

14. **Amendment and Waiver.** No amendment of this Agreement will be effective unless it is in writing and signed by all the Parties. A waiver of any default is not a waiver of any later default and will not affect the validity of this Agreement.

DocuSign Envelope ID: BD17778E-4DD7-477B-9697-77FDAEE60096

15. **Third-Party Beneficiary.** The Parties agree and acknowledge that Aiden Automotive Technologies, Inc., a Delaware corporation with its principal place of business at 231 Market Place, Suite 226, San Ramon CA 94583, shall be a Portfolio Company hereunder and beneficiary of this Agreement.

16. **Severability.** Unenforceable provisions will be modified to reflect the Parties' intention and only to the extent necessary to make them enforceable, and the remaining provisions of this Agreement will remain in effect.

17. **Notices.** All notices and other communications under this Agreement will be in writing. Each Party will send notices to the other Party at the address stated in the first paragraph, to the attention of such Party's authorized signatory.

18. **Survival.** The terms of this Agreement that expressly are to, or by implication ought to, survive, will survive this Agreement.

19. **Counterparts.** This Agreement may be signed electronically and in counterparts, which together will constitute one instrument. The Parties agree that a scanned or electronic copy of this Agreement signed by all Parties' authorized signatories will constitute a binding agreement.

**VOLVO CAR TECHNOLOGY FUND AB:**

By: _Raymond Milleen_
DS8F6117C8BC4F5...
[Signature]

Raymond Milleen    CEO
[Printed Name]

3/9/2021
[Date]

By: _Pär Arvidsson_
502SF67C493D443...
[Signature]

Pär Arvidsson    Chairman
[Printed Name]

3/10/2021
[Date]

**VOLVO CAR TECHNOLOGY USA, LLC:**

By: _Courtney Murray_
Courtney Murray (May 13, 2021 16:52 EDT)
[Signature]

Courtney Murray
[Printed Name]

5/13/2021
[Date]

By: _Michael (G) Thomas_
Michael (G) Thomas (May 13, 2021 16:53 EDT)
[Signature]

Michael Thomas
[Printed Name]

5/13/2021
[Date]

**EXHBIT A**

| Service | Cost Basis (USD) | Unit | 12-Month Total | |
|---|---|---|---|---|
| Office Space (Area) | $ 80.00 | per sqft/year | $ 16 000.00 | |
| Big Rig | $ 10 000.00 | per unit | $ 20 000.00 | |
| Mini Rig | $ 2 000.00 | per unit | $ 10 000.00 | |
| Desk Space | $ 13 661.00 | per person/year | $ 40 983.00 | |
| Car Access | $ 12 000.00 | per car/year | $ 12 000.00 | |
| | | | | |
| **Estimated Term Total** | | | US$ 98 983.00 | 1 year |

EXHIBIT 7

**V O L V O**

# Press Release

Jun 30, 2021 | ID: 283544

## Volvo Cars To Harness Real-Time Data From Customer Cars To Set New Safety Standards

The next generation of Volvo cars are set to be the company's safest ever, thanks to cutting-edge software and hardware levels, coupled with continuous and more rapid improvements to safety features with the help of real-time data.

Volvo Cars has always taken a data-driven approach to safety, using traffic data from real-life situations to develop new safety technologies and make its cars even safer. For its next generation of cars, Volvo Cars is now looking towards processing data from customer cars in real time, if customers choose to share data and help Volvo Cars make its cars safer.

By allowing customers to choose and be a part of improving safety levels and traffic safety in this way, Volvo Cars can make continuous and much faster improvements to its cars, constantly improving safety levels. This data would include continuous inputs on the car's environment from sensors like the high-resolution LiDAR delivered by technology company Luminar.

Volvo Cars engineers would be able to validate and verify autonomous drive (AD) features quicker, to promote a safe roll-out of AD technology. Thanks to the data generated from millions of kilometres driven by tens of thousands of Volvo drivers around the globe, engineers would be able to validate AD features for specific geographic locations much quicker than with a limited number of cars on a test track.

Verified updates to existing systems and new features can be rolled out rapidly through over-the-air-updates, increasing the safety of Volvo cars step by step. The first car to benefit from this new approach to safety development is the company's first SUV on a completely new electric-only technology base.

"With help from real-life data we can speed up our development processes and go from years to days," said Ödgärd Andersson, CEO at Zenseact, Volvo Cars' autonomous driving software arm. "As real-time collection generates a lot more data, we can create better and higher-quality data sets that allow us to make better and quicker decisions on the next advancements in safety. We're taking a giant leap to increase safety in and around our cars."

To process the real-time traffic data they will collect, Volvo Cars and Zenseact are investing in a data factory that will contain over 200 PebiBytes (225 million gigabytes) of data within the next few years. By using artificial intelligence (AI) capabilities, data can be crunched at record times. Customers will be able to choose whether this data is collected about them, and all collected data will be aggregated with adequate safeguards for customer privacy.

"Safety is part of our heritage and the backbone of our company, but software is a crucial part of our modern-day DNA," said Mats Moberg, head of R&D at Volvo Cars. "So while we continue to build on the 50-year expertise of the industry-leading Volvo Cars Accident Research Team, we can now also leverage AI as a new, virtual accident research team."

The use of real-time data is part of Volvo Cars' longer term vision for a future where collisions simply no longer happen, by equipping its cars with some of the best sensors available and advanced, continuously improving safety and autonomous drive systems.

Volvo Cars' forthcoming fully electric flagship SUV will have industry-leading safety technology as standard, helping the company to save even more lives as it sets a new standard for automotive safety. It will come with state-of-the-art sensors, including a LiDAR developed by Luminar and an autonomous driving computer powered by the NVIDIA DRIVE Orin™ system-on-a-chip, as standard.

By combining this state-of-the-art hardware with software by Volvo Cars, Zenseact and Luminar for the next generation of its well-established collision avoidance technology, Volvo Cars expects its new safety package to reduce fatalities and accidents as a whole.

Over time the car will improve and have the hardware and software capabilities to allow the car to take over on its own, in case the driver does not respond in life-threatening situations after repeated warnings. So while the driver always remains in ultimate control, the car and its safety technology can both support and watch over the driver like an extra pair of eyes and brains.

-------------------------------

*Volvo Car Group in 2020*
*For the 2020 financial year, Volvo Car Group recorded an operating profit of 8.5 BSEK (14.3 BSEK in 2019). Revenue over the period amounted to 262.8 BSEK (274.1 BSEK). For the full year of 2020, global sales reached 661,713 cars (705,452), a decline of 6.2 per cent compared to 2019.*

*About Volvo Car Group*
*Volvo Cars was founded in 1927. Today, it is one of the most well-known and respected car brands in the world with sales of 661,713 cars in 2020 in about 100 countries. Volvo Cars has been under the ownership of the Zhejiang Geely Holding since 2010.*

*As of December 2020, Volvo Cars employed approximately 40,000 (41,500) full-time employees. Volvo Cars head office, product development, marketing and administration functions are mainly located in Gothenburg, Sweden. Volvo Cars head office for APAC is located in Shanghai. The company's main car production plants are located in Gothenburg (Sweden), Ghent (Belgium), South Carolina (US), Chengdu and Daqing (China), while engines are manufactured in Skövde (Sweden) and Zhangjiakou (China) and body components in Olofström (Sweden).*

*Under its new company purpose, Volvo Cars aims to provide customers with the Freedom to Move in a personal, sustainable and safe way. This purpose is reflected into a number of business ambitions: for example, by the middle of this decade it aims for half of its global sales to be fully electric cars and to establish five million direct consumer relationships. Volvo Cars is also committed to an ongoing reduction of its carbon footprint, with the ambition to be a climate-neutral company by 2040.*

Keywords:
Safety, Press Releases, Connectivity

Descriptions and facts in this press material relate to Volvo Cars' international car range. Described features might be optional. Vehicle specifications may vary from one country to another and may be altered without prior notification.

# Media Contacts

## Volvo Cars Media Relations
Phone: +46 31-596525
media@volvocars.com

media.volvocars.com >          volvocars.com >

Copyright © 2020 Volvo Car Corporation (or its affiliates or licensors).

**VOLVO**

# Press Release

Jun 30, 2021 | ID: 283545

## Future Volvo Cars To Run On Volvo Operating System As Company Takes Software Development In-House

Volvo Cars will take software development in-house as a car's appeal increasingly becomes more defined by software-driven functions and features, rather than traditional automotive attributes.

The next generation of pure electric Volvo models, including the company's first SUV on a completely new electric-only technology base, will run on Volvo Cars' own operating system (OS), called VolvoCars.OS, for faster and more flexible development. Coupled with more frequent over-the-air updates to customer cars through their lifetime, the company's aim is to make Volvo cars better every day.

VolvoCars.OS will act as an umbrella system for electric Volvo cars. It incorporates the company's various operating systems across the car and the cloud, creating one coherent software OS environment. The underlying operating systems include Android Automotive OS, QNX, AUTOSAR and Linux.

Through a variety of application programming interfaces (APIs), including the previously announced Extended Vehicle API, the VolvoCars.OS gives developers access to in-car features such as vehicle sensor data, user interfaces and cloud-based features such as fleet data, subject to customer consent. This allows developers to create new services and applications for Volvo cars.

"By developing software in-house we can boost development speeds and improve your Volvo faster than we can today," said Henrik Green, chief technology officer. "Just like on your smartphone or computer, new software and features can be rolled out swiftly through over-the-air updates, making your Volvo better and even more enjoyable over time."

To truly benefit from developing software in-house, Volvo Cars is also centralising computing inside its fully electric cars into a core system, removing a lot of complexity. Rather than relying on multiple electronic control units around the car that control individual features and systems, an increasing amount of in-house developed software will run in a powerful core computing system in the car.

The core computing system, which will first be introduced on a new Volvo model set to be revealed in 2022, is made up of three main computers. These support each other in operating vision processing and artificial intelligence, general computing and infotainment respectively.

The shift to centralised computing also allows Volvo Cars to gradually separate hardware from software. This means the company can introduce more frequent hardware cycles, so that new Volvo models can be equipped with the latest available hardware.

Volvo Cars is making the shift to in-house development and central computing working together with leading technology firms. These include NVIDIA, with whom the company is working with on the core systems, and Google, its co-development partner for its infotainment systems.

"We have a deliberate strategy of partnering with true technology leaders where it makes sense," added Henrik Green. "Google is a true leader in user experience and services, from Google Maps to Google Assistant, while NVIDIA gives us access to some of the fastest and best computing available. This approach of selected strategic partnerships is much more effective than trying to do everything on our own."

Volvo Cars' successful collaboration with technology leaders to give its customers the best possible user experience is also a driving factor behind its decision to open up its VolvoCars.OS to third-party innovation through open APIs.

Today's announcement is made in conjunction with the first Volvo Cars Tech Moment. You can catch the event live and on demand [here.](here.)

-------------------------------

### Volvo Car Group in 2020
*For the 2020 financial year, Volvo Car Group recorded an operating profit of 8.5 BSEK (14.3 BSEK in 2019). Revenue over the period amounted to 262.8 BSEK (274.1 BSEK). For the full year of 2020, global sales reached 661,713 cars (705,452), a decline of 6.2 per cent compared to 2019.*

### About Volvo Car Group
*Volvo Cars was founded in 1927. Today, it is one of the most well-known and respected car brands in the world with sales of 661,713 cars in 2020 in about 100 countries. Volvo Cars has been under the ownership of the Zhejiang Geely Holding since 2010.*

*As of December 2020, Volvo Cars employed approximately 40,000 (41,500) full-time employees. Volvo Cars head office, product development, marketing and administration functions are mainly located in Gothenburg, Sweden. Volvo Cars head office for APAC is located in Shanghai. The company's main car production plants are located in Gothenburg (Sweden), Ghent (Belgium), South Carolina (US), Chengdu and Daqing (China), while engines are manufactured in Skövde (Sweden) and Zhangjiakou (China) and body components in Olofström (Sweden).*

*Under its new company purpose, Volvo Cars aims to provide customers with the Freedom to Move in a personal, sustainable and safe way. This purpose is reflected in a number of business ambitions: for example, by the middle of this decade it aims for half of its global sales to be fully electric cars, to sell half of its global volume online and to establish five million direct consumer relationships. Volvo Cars is also committed to an ongoing reduction of its carbon footprint, with the ambition to be a climate-neutral company by 2040.*

## Keywords:
Safety, Press Releases, Connectivity

Descriptions and facts in this press material relate to Volvo Cars' international car range. Described features might be optional. Vehicle specifications may vary from one country to another and may be altered without prior notification.

# Media Contacts

## Volvo Cars Media Relations
Phone: +46 31-596525
media@volvocars.com

media.volvocars.com >        volvocars.com >

Copyright © 2020 Volvo Car Corporation (or its affiliates or licensors).